**ATTENTION:**

**PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, THIS LETTER AND THE
ENCLOSED COMPLAINT AND WRITTEN DISCLOSURE
ARE SUBMITTED <u>UNDER SEAL</u>**

May 4, 2020

U.S. District Clerk's Office                                        *via: CM/ECF*
ATTN: Divisional Office Manager, Mr. Michael F. Oakes
655 E. Cesar E. Chavez Blvd., Room G65
San Antonio, Texas 78206

RE:     **5:20-CV-00548**

The United States of America, ex rel. David Lyle Reynolds, Individually, and as Co-Independent Executor of the Estate of Thelma Watts Reynolds, and Susan Reynolds Veale, Individually, and in her capacity as Next Friend of the Estate of Thelma Watts Reynolds. v. Jayaseree Rao, M.D, Jayasree Rao, MDPA, and Oncology San Antonio Cancer Center Network

Dear Mr. Oakes:

Pursuant to the service requirments of 31 U.S.C. § 3730(b) and FED.R.CIV.P. 4(i), enclosed please find the following pleadings and papers:

1. A copy of the Federal False Claims Act *qui tam* complaint filed *in camera* and under seal in the above-captioned action; including

2. An Appendix contaning the writen disclosure of substantially all material information and evidence the relators posess in support of the action – all of which have been incoproated by refenecre as exhbits to the above-captioned complaint.

Please file complaint and the exhbits included in the complain'ys Appendix under seal and in camera.

Respectfully submitted,

*Mickey Johnson*

John "Mickey" Johnson

Enclosures: 1) Federal False Claims Act *qui tam* complaint and 2) an Appendix contaning the writen disclosure of substantially all material information and evidence the relators posess in support of the action.

Cc:   Mr. David Lyle Reynolds          via email: tamudave@att.net

     Mrs. Susan Veale Reynolds        via email: srveale123@gmail.com

     Mr. Jon Powell                   via email: jon@jpowell-law.com

     Mr. Brant Mittler                via email: bsm@mittlerlaw.com

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a)  PLAINTIFFS

See attached.

**(b)**  County of Residence of First Listed Plaintiff

*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*

See attached.

## DEFENDANTS

See attached.

County of Residence of First Listed Defendant

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
Plaintiff

☐ 2   U.S. Government
Defendant

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                         *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | of Property 21 USC 881 | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | ☐ 690 Other | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | Exchange |
| | Medical Malpractice | | Leave Act | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | |
| | | ☐ 560 Civil Detainee - | | |
| | | Conditions of | | |
| | | Confinement | | |

Under the FORFEITURE/PENALTY column, the BANKRUPTCY section also includes:
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**SOCIAL SECURITY**

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

## V.  ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
Another District
*(specify)*

☐ 6   Multidistrict
Litigation -
Transfer

☐ 8   Multidistrict
Litigation -
Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S. Code §?3729.False claims

Brief description of cause:
See attached

## VII.  REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes    ☐ No

## VIII.  RELATED CASE(S)
IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #                AMOUNT                APPLYING IFP                JUDGE                MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.**  (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**   **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

## CIVIL COVER SHEET ATTACHMENT

I.      **(a) Plaintiffs:**

THE UNITED STATES OF AMERICA, ex rel. DAVID LYLE REYNOLDS, INDIVIDUALLY, AND AS CO-INDEPENDENT EXECUTOR OF THE ESTATE OF THELMA WATTS REYNOLDS, AND SUSAN REYNOLDS VEALE, INDIVIDUALLY, AND IN HER CAPACITY AS NEXT FRIEND OF THE ESTATE OF THELMA WATTS REYNOLDS.

 **Defendants:**

JAYASREE RAO, M.D, JAYASREE RAO, MDPA, AND ONCOLOGY SAN ANTONIO CANCER CENTER NETWORK

I.      **(c) Attorneys** *(Firm Name, Address and Telephone Number)*

THE POWELL LAW FIRM
Jon Powell
Texas State Bar No. 00797260
John "Mickey" Johnson
Texas State Bar No. 24094002
1148 East Commerce Street
San Antonio, Texas 78205
(210) 225-9300 Telephone
(210) 225-9301 Facsimile
Email: jon@jpowell-law.com
        mickey@jpowell-law.com

LAW OFFICE OF BRANT S. MITTLER
Brant S. Mittler, M.D., J.D.
Texas State Bar No. 24032867
17503 La Cantera Pkwy Ste 104-610
San Antonio, TX  78257
(210) 698-0061 Telephone
(210) 698-0064 Facsimile
Email: bsm@mittlerlaw.com

## VI. CAUSE OF ACTION. Brief Description of Cause:

This is a mis-staging of cancer and subsequently prescribing chemotherapy based upon the mis-staging case – which results in Medicare being billed for improper chemotherapy treatments. From November 11, 2015 until the date of filing this complaint (hereinafter the "relevant period") Defendants failed to provide adequate care for cancer patients of Oncology San Antonio Cancer Center Network ("OSACCN" and Jayasree Rao, MDPA ("Dr. Rao MDPA"), resulting in egregious

harm and even death. In the process, Defendants have defrauded the United States and by seeking, and receiving, substantial reimbursement from the Medicare for care purportedly provided to these cancer patients, despite knowing that such "care" was deficient, inadequate, substandard, and did not promote the maintenance or enhancement of the quality of life for OSACCN and Dr. Rao MDPA patients.

During the relevant period, Defendants knowingly directed and approved of the billings by OSACCN and Dr. Rao MDPA to Medicare, and knowingly accepted and approved of the receipt by OSACCN and Dr. Rao MDPA of Medicare, despite knowing that the services provided to OSACCN and Dr. Rao MDPA patients were deficient, inadequate, substandard, and did not promote the maintenance or enhancement of the quality of life for OSACCN and Dr. Rao MDPA patients. During the relevant period, Defendants perpetrated a fraud on the United States by making material and objectively false representations in the submission of the Medicare claims. Defendants were unjustly enriched by the improper payments from Medicare. Defendants should be required to account for and disgorge their unlawful profits.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **THE UNITED STATES OF AMERICA,** | § | |
| **ex rel. [UNDER SEAL],** | § | |
| | § | |
| **PLAINTIFFS,** | § | |
| | § | |
| **V.** | § | **5:20-CV-00548** |
| | § | |
| **[UNDER SEAL],** | § | **FILED IN CAMERA AND** |
| | § | **UNDER SEAL** |
| | § | **31 U.S.C. §§ 3729-32** |
| **DEFENDANTS.** | § | **JURY TRIAL DEMANDED** |

<u>UNDER SEAL</u>

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **THE UNITED STATES OF AMERICA,** | § | |
| **ex rel. [UNDER SEAL],** | § | |
| | § | |
| **PLAINTIFFS,** | § | |
| | § | |
| **V.** | § | **5:20-CV-00548** |
| | § | |
| **[UNDER SEAL],** | § | **FILED IN CAMERA AND** |
| | § | **UNDER SEAL** |
| | § | **31 U.S.C. §§ 3729-32** |
| **DEFENDANTS.** | § | **JURY TRIAL DEMANDED** |

---

## PLAINTIFFS' FALSE CLAIMS ACT COMPLAINT "QUI TAM"

---

**THE POWELL LAW FIRM**

By:/S/ John "Mickey" Johnson
    John "Mickey" Johnson
    Texas State Bar No. 24094002

Jon Powell
Texas State Bar No. 00797260
1148 East Commerce Street
San Antonio, Texas 78205
(210) 225-9300 Telephone
(210) 225-9301 Facsimile
Email: mickey@jpowell-law.com
    jon@jpowell-law.com

**LAW OFFICE OF BRANT S. MITTLER**
Brant S. Mittler, M.D., J.D.
Texas State Bar No. 24032867
17503 La Cantera Pkwy Ste 104-610
San Antonio, TX  78257
(210) 698-0061 Telephone
(210) 698-0064 Facsimile
Email: bsm@mittlerlaw.com
**Counsel for Relators**

**Table of Contents**

I.     INTRODUCTION ............................................................................................................4

II.    PARTIES ......................................................................................................................5

III.   JURISDICTION AND VENUE ....................................................................................5

IV.    INCORPORATION OF EXHBITS ...............................................................................6

V.     SUMMARY OF COMPLAINT ....................................................................................7

VI.    MEDICARE REIMBURSEMENT ...............................................................................8

VII.   FACTS ..........................................................................................................................8

VIII.  OTHER PATIENTS OF DR. RAO, DR. RAO MDPA AND OSACCN....................21

IX.    OBJECTIVE FALSEHOOD ........................................................................................22

X.     FRAUDULENT SCHEME TO BILL MEDICARE FOR UNREASONABLE AND UNNECESSARY CANCER TREATMENTS ...............................................................24

       A.   BILLING EXCERPTS .........................................................................................24

       B.   MIS-STAGING EXCERPTS ................................................................................25

XI.    COUNT ONE – VIOLATIONS OF THE FALSE CLAIMS ACT ..............................32

XII.   PRAYER FOR RELIEF ...............................................................................................33

XIII.  Appendix ......................................................................................................................35

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **THE UNITED STATES OF AMERICA,** | § | |
| **ex rel. DAVID LYLE REYNOLDS,** | § | |
| **INDIVIDUALLY, AND AS THE** | § | |
| **CO-INDEPENDENT EXECUTOR OF THE** | § | |
| **ESTATE OF THELMA WATTS REYNOLDS,** | § | |
| **AND SUSAN REYNOLDS VEALE,** | § | |
| **INDIVIDUALLY, AND IN HER CAPACITY** | § | |
| **AS NEXT FRIEND OF THE ESTATE OF** | § | |
| **THELMA WATTS REYNOLDS,** | § | |
| | § | |
| **PLAINTIFFS,** | § | |
| | § | |
| **V.** | § | **5:20-CV-00548** |
| | § | |
| **JAYASREE RAO, M.D, JAYASREE RAO,** | § | **FILED IN CAMERA AND** |
| **MDPA, AND ONCOLOGY SAN ANTONIO** | § | **UNDER SEAL** |
| **CANCER CENTER NETWORK,** | § | **31 U.S.C. §§ 3729-32** |
| | § | **JURY TRIAL DEMANDED** |
| **DEFENDANTS.** | § | |

---

**FALSE CLAIMS ACT COMPLAINT "QUI TAM"**

---

## I.     INTRODUCTION

**TO THE HONORABLE JUDGE OF SAID COURT:**

David Lyle Reynolds, Individually, and as the Co-Independent Executor of the Estate of Thelma Watts Reynolds ("Mr. Reynolds"), and Susan Reynolds Veale, Individually, and in her capacity as Next Friend of the Estate of Thelma Watts Reynolds ("Mrs. Veale") (collectively referred to hereinafter as "Relators") file this action under 31 U.S.C. §§ 3729-32 (the "False Claims Act") on behalf of The United States of America ("USA"),  to recover from Jayasree Rao, M.D. ("Dr. Rao"), Jayasree Rao, MDPA ("Dr. Rao MDPA") and Oncology San Antonio Cancer Center Network ("OSACCN") (collectively referred to hereinafter as ("Defendants") for all damages, penalties and other remedies

available under the False Claims Act on behalf of the United States  and themselves and would show unto the Court the following:

## II.      PARTIES

1.  Relator, David Lyle Reynolds, individually, and in his capacity as the Co-Independent Executor of the Estate of Thelma Watts Reynold ("Mr. Reynolds"), is an individual and citizen of the United States of America residing in Bedford, Texas.

2.  Relator Susan Reynolds Veale, individually, and in her capacity as Next Fried of the Estate of Thelma Watts Reynolds ("Mrs. Veale"), is an individual and citizen of the United States of America residing in San Antonio, Texas.

3.  Jayasree Rao, M.D. ("Dr. Rao") is an oncologist who practices at the Oncology San Antonio Cancer Center Network located at 19288 Stone Oak Parkway, Suite B, San Antonio, TX 78258.

4.  Oncology San Antonio Cancer Center Network ("OSACCN") is an oncology practice group with its principle address at 19288 Stone Oak Parkway, Suite B, San Antonio, TX 78258.

5.  Jayasree Rao, MDPA ("Dr. Rao MDPA") is a professional association owned and operated by Jayasree Rao, M.D. with its principle address at 19288 Stone Oak Parkway, Suite B, San Antonio, TX 78258.

## III.      JURISDICTION AND VENUE

6.  This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. §3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

7.  Venue is proper in this Court under 31 U.S.C. § 3732(a) because Defendants provide and offer professional medical services in the Western District of Texas.

8.  Relators are the original source of and have direct and independent knowledge off all publicly

disclosed information that the allegations herein are based upon. Relators have personally gathered all the documentation substantiating the allegations herein. Additionally, Relators have voluntarily provided all such information to the Government prior to the filing of this action.

## IV.    INCORPORATION OF EXHBITS

9.   Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, Relators file this Statement of Intent to Adopt by Reference Exhibits as part of this Complaint for all proposes and in support thereof, and hereby notify all Defendants herein that Relators intend to rely upon each and every factual and substantive statement and assertion contained in the exhibits set forth below and to use portions or all of the following documents in the exhibits set forth below. The exhibits labeled and named below are submitted herewith as Complaint exhibits herein:

| | |
|---|---|
| Exhibit A. | Expert Report of Dr. Stephen Cohen dated November 26, 2018 and Dr. Cohen's CV. |
| Exhibit B. | Thelma Watts Reynold's deposition transcript dated March 15, 2019. |
| Exhibit C. | Lyle Reynold's deposition transcript dated August 19, 2019. |
| Exhibit D. | National Comprehensive Cancer Network Quick Guide article titled "Non-Small Cell Lung Cancer." |
| Exhibit E. | Jayasree Rao, M.D.'s deposition transcript dated December 18, 2019. |
| Exhibit F. | Texas Tribune article titled "Medicare Data Shines Light on Billions Paid to Texas Doctors." |
| Exhibit G. | San Antonio Express-News article titled "Two S.A. doctors are on list of top Medicare payments – Correction Appended." |
| Exhibit H. | San Antonio Express-News article titled "More Troubles at S.A. Oncology Practice." |

Exhibit I.          San Antonio Express-News Article titled "Oncologists allege paperwork was forged."

## V.          SUMMARY OF COMPLAINT

10. This is a mis-staging of cancer and subsequently prescribing chemotherapy based upon the mis-staging case – which results in Medicare being billed for improper chemotherapy treatments. From November 11, 2015 until the date of filing this complaint (hereinafter the "relevant period") Defendants failed to provide adequate care for cancer patients of OSACCN and Dr. Rao MDPA, resulting in egregious harm and even death. In the process, Defendants have defrauded the United States and by seeking, and receiving, substantial reimbursement from the Medicare for care purportedly provided to these cancer patients, despite knowing that such "care" was deficient, inadequate, substandard, and did not promote the maintenance or enhancement of the quality of life for OSACCN and Dr. Rao MDPA patients.

11. During the relevant period, Defendants knowingly directed and approved of the billings by OSACCN and Dr. Rao MDPA to Medicare, and knowingly accepted and approved of the receipt by OSACCN and Dr. Rao MDPA of Medicare, despite knowing that the services provided to OSACCN and Dr. Rao MDPA patients were deficient, inadequate, substandard, and did not promote the maintenance or enhancement of the quality of life for OSACCN and Dr. Rao MDPA patients. During the relevant period, Defendants perpetrated a fraud on the United States by making material and objectively false representations in the submission of the Medicare claims. Defendants were unjustly enriched by the improper payments from Medicare. Defendants should be required to account for and disgorge their unlawful profits.

12. Relators have filed a medical malpractice lawsuit against Defendants in Cause No. 2018CI13942

in the 45h Judicial District Court, Bexar County, Texas. Through this litigation, Relators have discovered a considerable amount of information which leads them to believe Defendants have engaged in a scheme to submit unreasonable and unnecessary cancer treatment and drug bills to Medicare for reimbursement. Relators are attaching and incorporating by reference some of the discovery information they have uncovered to support their allegations.

## VI.    MEDICARE REIMBURSEMENT

13. Through Medicare, the United States pays for certain medical care for cancer patients. During the relevant period, the Center for Medicare and Medicaid Services ("CMS") administered the Medicare program. In administering the Medicare program, CMS retains private insurance companies to act as fiscal intermediaries or agents of CMS and, pursuant to written agreements, make payments on behalf of the program's beneficiaries.

14. Upon information and belief, various fiscal intermediaries processed claims that were submitted by Defendants for medical care purportedly provided by Dr. Rao, Dr. Rao MDPA and OSACCN.

15. Statutes and regulations governing the Medicare program require health care providers to maintain – as a prerequisite to receiving payment under the programs – substantial compliance with all the pertinent rules and regulations governing the programs. Amongst other things, health care providers must assure that all services for which they submit claims for Medicare payment are "of a quality which meets professionally recognized standards of health care." 42 U.S.C. § 1320c-5(A)(2).

## VII.    FACTS

16. The facts outlined below have been verified by Relator's Expert Witness in the underlying medical malpractice lawsuit. A true and correct copy of the Expert Report of Dr. Stephen Cohen dated

November 26, 2018 and Dr. Cohen's CV is attached hereto and incorporated by reference as if set forth in full herein as Exhibit "A".

17. Thelma Watts Reynolds ("Mrs. Reynolds") was a cancer patient of Dr. Rao, Dr. Rao MDPA and OSACCN. Mrs. Reynolds was 81 years old when hospitalized with diverticulitis in 4/2015. The records of Dr. Jayasree Rao state 04/15/15 x-ray showed pneumonia in right upper lobe. The Chest CT was completed on 04/27/2015.   A CXR 7/29/15 did show a right upper infiltrate with consolidation. Subsequent follow up of the lung changes included a negative bronchoscopy, and a PET/CT scan 7/8/15, and 10/02/2015 showed left upper lung lobe opacities. This PET/CT scan comparison 7/8/15 to 10/2/15 showed no significant changes. I did find the 10/02/15 PET/CT showed a 5.7x2.3 cm mass-like posterior upper lobe lesion bordering the fissure. The lesion's SUV was 9,4. In addition the scan showed a more caudal stable left upper lobe lesion of 2.7 x2.8 cm with a SUV 5.6. The hypermetabolic lesions suggest malignancy, along with infectious and inflammatory disease. The right upper lobe showed a 1.7 cm pleuronodular opacity with SUV 1.6 suggesting infectious/infiltrative disease.

18. Mrs. Reynolds had a thoracic PET/CT scan on 04/27/2015 which I noted above. I am concluding the 4/27/15, 7/8/15, 10/02/17 chest PET/CT scans showed no significant changes. They showed extensive bilateral upper lobe lesions and basilar multilobular atelectasis and fibrosis as well.

19. Mrs. Reynolds had a lung biopsy of the left upper lobe of lung on 11/16/2015. Six weeks after her most recent PET/CT chest scan, the biopsy revealed an adenocarcinoma. Mrs. Reynold's doctors at that time was Dr. Hector L. Gomez, and Dr. Christopher Joseph Muniz. The left upper lobe core biopsy revealed an adenocarcinoma, consistent with a lung primary. The biopsy was read by Dr. Nancy B. Banks a pathologist at Baptist Medical Center, San Antonio, Texas. The surgical pathology report revealed Dr. Banks discussed the diagnosis with Dr. Hector Gomez on 11/17//2015.   Dr. Banks also

reported the atypical cell findings to Dr. Christopher Muniz on 10/16/17.

20. The report also noted that testing for critical molecular targeting, the ALK and EGFR markers, was to be done.  An addendum to the pathology report dated 11/23/2015 showed the ALK gene rearrangement was detected in 37% of cells, and the EGFR test was not done due to inadequate tumor tissue. Importantly, the results of the ALK and EGFR testing were not in Dr. Rao's medical records and those two biomarkers were never referred to in any of Dr. Rao's treatment records of Mrs. Reynolds.

21. At the time of the diagnosis of her lung cancer Mrs. Reynolds was in reasonably good health. She was recently retired but was active and ambulatory. She had a history of diverticulitis, with the last episode 4/15/2015, about seven months before receiving the diagnosis of adenocarcinoma of the lung and receiving Avastin therapy. She had hyperlipidemia and was on antilipid meds. She also had controlled BP with antihypertensive drugs. In addition, she was medicated for anxiety and depression.

22. Dr. Rao provided an oncology consultation on 11/20/15. Her consultation on Mrs. Reynolds revealed she was asymptomatic at the time of diagnosis of adenocarcinoma of the lung. Her review of systems was negative as related to her neoplasm. Dr. Rao stated she reviewed the laboratory and diagnostic studies. Except for stating she had adenocarcinoma she cited no lab results and no other pathology. She does not discuss any PET/CT scan findings but concludes she suspected Stage IV disease radiographically. She did not mention any specific evidence, image-wise, that would support that stage of disease.

23. Dr. Rao told Mrs. Reynolds and her family that she had advanced stage disease and that her goal was to palliate and control her disease process. She indicated the goals of treatment were to prolong her life and to provide quality of life.

24. Dr. Rao started Mrs. Reynolds on Avastin and Carboplatin therapy on 11/27/2015.

25. She indicated that Mrs. Reynolds had several treatment options, but only considered chemotherapy/angiogenesis inhibitor treatment. She did not consider Taxol given her age. Dr. Rao did not mention the possibilities of surgery, radiation therapy, targeted therapy or even observation as reasonable alternatives.

26. She did note that Bevacizumab (Avastin) was associated with the risks of hypertension and bowel perforation, and informed Mrs. Reynolds and her family of these complications.

27. Dr. Rao made arrangements for Mrs. Reynolds to get an intravenous catheter placement for the administration of drugs.

28. In less than 1 month after starting Carboplatin and Avastin, Mrs. Reynolds was having gastrointestinal symptoms requiring cessation/delay of her treatment for toxicity.

29. Dr. Rao's 12/23/15 note points out Mrs. Reynolds is not a surgical candidate and was given Avastin/Taxol. Neither of these were true. Mrs. Reynolds was a surgical candidate and the medical records should have reflected that she received Avastin and carboplatin.

30. Dr. Rao's initial note in her office suggested stage IV disease.

31. It was known to Dr. Rao that her N and M clinical staging were 0 based on a number of negative PET/CT thorax and body scans. There are no extra thoracic or nodal metastases identified on her scans. Based upon information and belief, Mrs. Reynolds' initial T Stage was T3. She should have been Staged IIB. Dr. Rao's suggestion that Mrs. Reynolds had stage IV disease was not demonstrated by any imaging testing, and she made no notation of these test results to corroborate her conclusion about disease stage.

32. Classically T, N, & M The classic staging of lung cancer staging is done by the following criteria (T = Tumor, N=Nodes, M=metastasis):

- Stage IA-T1N0M0

- Stage IB-T2N0M0

- Stage IIA-T1N1M0

- Stage IIB-T2N1M0, T3N0M0

- Stage IIIA-T3N1M0, T1-T3N2M0

- Stage IIIB-T4 Any NM Any T N3M0

- Stage IV-Any T Any N M1

- TX-positive cancer cells without primary tumor on imaging or bronchoscopy T0-No evidence of primary tumor T is-carcinoma-in-situ T1-Tumor$\leq$ 3 cm, surrounded by lung or visceral pleura, without bronchoscopic evidence of invasion more proximal than the lobar bronchus.

- T1a:$\leq$2cm

- T1b:>2cm but$\leq$3cm

- T2-Tumor with any of the following features: > 3 cm in greatest dimension, involves mainstem bronchus, $\geq$2 cm distal to the carina, invades the visceral pleura, associated with atelectasis or obstructive pneumonitis that extends to the hilar region but does not involve the entire lung T2a:>3cm but$\leq$5cm

- T2b: >5cmbut$\leq$7cm, Or tumors$\leq$ 7 cm with invasion of visceral pleura, atelectasis of less than entire lung, proximal extent at least 2 cm from carina T3-Tumor of any size that invades any of the following: chest wall (including superior sulcus tumors), diaphragm, mediastinal pleura, parietal pericardium: or tumor in the main bronchus < 2 cm distal to the carina, but without involvement of the carina; or associated atelectasis or obstructive pneumonitis of the entire lung

- T3- tumors> 7 cm or with: Direct invasion of chest wall, diaphragm, phrenic nerve, mediastinal pleura, parietal pericardium, main bronchus< 2 cm from carina (without involvement of carina) and tumor nodules in the same lobe as the primary tumor.

- **T3 -tumors associated with additional tumor nodules (ATNs) in the same lobe as the primary tumor**

- T4 –Tumor of any size that invades any of the following: mediastinum, heart, great vessels, trachea, esophagus, vertebral body, carina: or tumor with a malignant pleural or pericardial effusion, metastatic tumor nodules in different lobe from the primary tumor.

- NX-Regional lymph nodes cannot be assessed N0-No regional lymph node metastases

N1-Metastasis to ipsilateral peribronchial and/or ipsilateral hilar lymph nodes, and involvement of intrapulmonary nodes by direct extension of the primary tumor.

- N2-Metastasis to ipsilateral mediastinal and/ or subcarinal lymph node(s).

- N3-Metastasis to contralateral mediastinal, contralateral hilar, ipsilateral or contralateral scalene, or supraclavicular lymph node(s).

- MX-Presence of distant metastasis cannot be assessed.

- M0-No distant metastasis

- M1-Distant metastasis present including metastatic tumor nodules in the ipsilateral nonprimary tumor lobes of the lung.

- M1a: malignant pleural or pericardial effusion, pleural nodules or nodules in contralateral lung

- M1b: distant metastases

33. One of its aims is to determine which patients are resectable or not. Determines extent of disease and stratifies patients into therapeutic and prognostic groups.

34. Dr. Rao's pretreatment evaluations should have included Mrs. Reynolds' history, physical exam, and pertinent radiographic images, the lung biopsy pathology results and the results of the ALK rearrangement test and the EFGR assay done on the tumor. The fact that she did not get the ALK results is clearly a failure in the standard of care. Furthermore, this information never appeared in any of Dr. Rao's medical records of Mrs. Reynolds, which is also below the standard of care, at every subsequent visit.

35. Shortly after Mrs. Reynold's treatment started, she had gastrointestinal symptoms and a suspicion of bowel perforation. The Avastin was eliminated from subsequent treatment, as it was suspected to be the cause of her bowel perforation. Interestingly, many progress notes say she was started on palliative treatment with carboplatinum and Avastin and tolerated it well.

36. Mrs. Reynolds was started on treatment with Carboplatinum and Avastin on 11/27/15, and the

12/23/15 note says she was quite ill with gastrointestinal complaints. Getting drastically ill within 1 month of initiation of therapy can hardly be reconciled with "it was tolerated well".  This inconsistency of the progress notes and the reality of the clinical situation was a common finding in the medical record, and will be addressed further. Dr. Rao's use of the term "palliative care" does not apply to a patient who is Stage II B who is more likely than not curable.

37. Mrs. Reynolds was switched to a combination of Cisplatinum and Alimta. Mrs. Reynolds' carboplatin therapy was discontinued because of an allergic reaction. Unfortunately, this fact was never presented in the cut and paste present illness notes. Cisplatinum is significantly more toxic than carboplatin, particularly for neuropathy. This omission from the present illness record is significant. In fact, the Cisplatinum was the cause of Mrs. Reynolds debilitating neuropathy.

38. Mrs. Reynolds remained on Cisplatinum/Alimta for quite a while, about 1 year. Because of neutropenia, nausea, fatigue, anemia, mucositis, weakness and weight loss the treatment schedule for Cisplatinum was changed to a weekly regimen.

39. According to Dr. Rao, Mrs. Reynolds lung cancer was Stage IV.

40. This is in error, as there was never evidence of metastatic disease outside of the left upper lobe of the lung.  This misinterpretation of the facts by Dr. Rao fails the standard of care. The record repeatedly states she has metastatic and unresectable disease, not confirmed by the facts. This is a major medical error and is both negligence and gross negligence.

41. On 10/21/16 it is noted for the first time Mrs. Reynolds had uncontrolled hypertension due to Avastin. Yet, Avastin was stopped about 11 months previous.

42. The cut and paste review of systems and physical examinations repeatedly reflect no neurological symptoms or findings, until 12/9/16. At that time, bilateral lower extremity weakness and

an unsteady gait was noted. Dr. Rao indicated the presence of grade 0-1 peripheral neuropathy. On the same date, hypomagnesia, another side effect of Cisplatinum was reported.

43. On 12/30/16, three weeks after noting the presence of a peripheral neuropathy, Dr. Rao states there was no peripheral neuropathy present, but unsteady gait was present.

44. Mrs. Reynolds' unsteady gait was related to Cisplatinum induced motor neuropathy. There was no evidence that that Mrs. Reynolds had paresthesias. It is clear her neuropathy was primarily motor and underrecognized by Dr. Rao and her medical/nursing staff. The delayed recognition of her neuropathy contributed to her prolonged exposure to Cisplatinum. As a result, she developed severe, life altering, permanent peripheral neuropathy of hands and legs.

45. It should also be noted that, on several visits Mrs. Reynolds was seen by Physicians Assistants with oversight by Dr. Rao.

46. On 1/10/17 no coordination abnormalities or motor deficits were noted but unsteady gait persisted. Because of fatigue and weakness, switching therapy to Opdivo was considered.

47. Mrs. Reynolds was switched to Opdivo on 1/20/17 due to declining performance status from Cisplatinum/Alimta, and suspected progression of disease.

48. On 3/17/17 the progress note revealed unsteady gait, use of a walker and peripheral neuropathy of her hands. Gabapentin was initiated at a homeopathic dose. A similar note exists for 5/5/17.

49. Mrs. Reynolds experienced significant toxicities from her chemotherapy/Avastin regimens including: bowel perforation, hypertension, mucositis, anemia, thrombocytopenia, neutropenia, hyponatremia, hypomagmesemia, fatigue, weakness, weight loss and severe peripheral neuropathy.

50. Mrs. Reynolds was diagnosed with a left upper lobe adenocarcinoma on 11/16/15. Interestingly, a chest X-ray ordered by Dr. Hector Gomez on 7/29/15 indicated a right upper lobe infiltrate suggesting

pneumonia.  An aspirational biopsy of the right upper lobe was done on 7/8/15 at Southwest General hospital with negative cytology for cancer and a negative bacterial culture. No mention of a left upper lobe lesion(s) was noted. This suggests the left upper lobe findings were not identifiable by chest X-ray.

51. On 04/27/2015 Mrs. Reynolds had a PET/CT. That study was essential in evaluating and staging her cancer for Mrs. Reynolds appropriate medical management. Extracting from reviewing the available imaging reports: 7/18/17, 10/2/15, 4/29/16, 8/16/16, 12/12/16, 5/26/17 PET/CT scans were done.

52. The results of these scans showed mostly stable disease, with decreased masses and hypermetabolism on 4/29/16. None of the reports from Dr. Rao's notes measure an objective response on these scans. By RECIST measurable criteria (categorizes quantitative tumor size changes into complete response, partial response, stable disease, or progressive disease) no significant PET/CT scan changes were found among the scan reports. More importantly, no imaging study ever showed progression to Stage IV metastatic disease.

53. Mrs. Reynold's records noted Mrs. Reynolds was taking Evista, but never indicated why. Dr. Rao's omission of information about a hormonal drug primarily used for breast cancer fails the standard of care.

54. In summary, Mrs. Reynolds had Stage IIB disease. Dr. Rao mis-staged her disease 11/16/2015 as Stage IV and on all subsequent visits. Mrs. Reynolds cancer was resectable and curable at that time, with surgery-left upper lobectomy. Mrs. Reynolds was asymptomatic from her cancer on 11/15/15. Mrs. Reynolds had stable findings from 4/27/2015 to 10/2/15 on PET/CT scans. The appropriate management choices for an asymptomatic 81-year-old patient with confined low-grade adenocarcinoma, such as Mrs. Reynolds, would be left upper lobectomy, possible radiation, possible ALK kinase inhibitor, or observation.

55. Dr. Rao's incorrect diagnosis of Mrs. Reynolds' cancer stage caused Mrs. Reynolds to lose the chance for cure. This is a significant failure in the standard of care. The toxicities endured by Mrs. Reynolds, have made employing curative therapy impossible.

56. Mrs. Reynolds had an ALK positive lesion. The significance of ALK gene is indicated by the fact the pathologist performed this test as part of the routine study of a lung cancer. If Mrs. Reynolds was staged IV by Dr. Rao, an ALK kinase inhibitor, Crizotinib should have been the treatment of choice. (Solomon BJ et al, NEJM 2014).

57. Dr. Rao should have known that targeted therapy with Crizotinib was the treatment of choice in Stage IV adenocarcinoma of the lung in patients with ALK positive disease. Not having this knowledge and not employing this therapy failed the standard of care.

58. Crizotinib is much less toxic and more efficacious than chemotherapy for ALK positive lung cancers. Failure to use Crizotinib, and using the other inappropriate neurotoxic agents noted above, is the direct and proximate cause of Mrs. Reynolds permanent and disabling neuropathy.

59. Failing to consider an ALK kinase inhibitor is below the standard of care and is negligent and grossly negligent. Remarkably, Dr. Rao failed to get the ALK results. This failed the standard of care. Dr. Rao made no inquiry and/or ignored the ALK results which is below the standard of care, both negligent and grossly negligent and a direct and proximate cause of Dr. Rao's use of inappropriate chemotherapeutic agents which caused permanent disabling neuropathy.

60. This failure and the failure to appropriately stage Mrs. Reynolds cancer led to the inappropriate administration of toxic chemotherapy.

61. The toxic chemotherapy of Cisplatinum/Alimta caused Mrs. Reynolds marked clinical deterioration, with severe peripheral neuropathy, which has been permanent and disabling.

62. Dr. Rao also failed to search out the results of Mrs. Reynold's EGFR result. There are several tyrosine kinase oral inhibitors that would be preferable if this test was positive.

63. Dr. Rao also failed the standard of care by administering Avastin to a patient with recent diverticular disease that required hospitalization. This resulted in a perforated bowel which was directly caused by the Avastin.

64. Bowel disease is a relative contraindication to the use of bevacizumab as it leads to a significant risk of bowel perforation, which Mrs. Reynolds experienced. A prudent approach by an oncologist should have been to avoid the risks of bowel perforation in a patient with symptomatic bowel disease, given its small chance of benefit.  The risk of bowel perforation is so significant in a patient like Mrs. Reynold with a history of diverticulitis disease that is should preclude its usage.

65. Mrs. Reynolds had Stage IIB adenocarcinoma of the lung. The lesion was curable at the time of diagnosis. The upstaging/ wrong staging to Stage IV by Dr. Rao failed the standard of care by confusing probable lepidic spread as metastatic disease. This error caused Dr. Rao to give Mrs. Reynolds toxic palliative chemotherapy instead of employing curative treatment. She incorrectly labeled Mrs. Reynolds' disease non resectable and noncurative.

66. Dr. Rao did not seek the ALK results which were readily available, and should have been the basis for targeted therapy with Crizotinib. Crizotinib would have been the standard therapy in the setting of lung adenocarcinoma in an 81-year-old. She therefore failed the standard of care in not seeking this information, which is a causative reason for her error in administering therapy that caused a bowel perforation, numerous side effects outlined above, and life altering permanent peripheral neuropathy. Failing to consider and use Crizotinib was a failure in the standard of care.

67. Finally, upon information and belief, Mrs. Reynolds had bronchoalveolar adenocarcinoma. This

type of cancer is TTF1 and CK7 positive, as was Mrs. Reynold's tumor. Furthermore, this type of lesion is slow growing, susceptible to lepidic growth and limited aggressivity. This tumor would explain the local tumor involvement, absence of extrathoracic metastases, lack of significant measurable response to chemotherapy, and minimal, if any progression of tumor. Dr. Rao failed the standard of care by not seeking the pathological results of a positive ALK, TTF1 and CK7 marker.

68. Molecular testing is mandatory and is the standard of care in every lung cancer biopsy specimen obtained. Molecular testing is required in all stage IV patients with adenocarcinoma of the lung (Standardofcare.com) to avoid chemotherapy toxicity, and to choose the most efficacious therapy.

69. The Lung Cancer Mutation Consortium in the United States demonstrated that the median survival of patients without driver mutations, with drivers mutations but not treated with targeted therapy, and with driver mutations and treated with targeted therapy was 2.08 years, 2.38 years, and 3.49 years, respectively in patients with Stage IV disease. This suggests that if Mrs. Reynolds was treated appropriately with Crizotinib (even with inappropriately diagnosed Stage IV disease) she would survived many years with minimal toxicity. In fact, Mrs. Reynolds endured terrible non-curable debilitating neuropathy in the months prior to her death which is a direct result of Dr. Rao's mistreating and mis-staging and inappropriately treating her tumor. For illustrative purposes the following deposition testimony from Mrs. Reynold's indicates the severity of her debilitation as a result of her neuropathy:

Reynolds, Thelma, (Pages 18:22 to 20:9)

Q.   Before we talk about that, do you know what your diagnosis is for your hands and your feet, the problems in your hands and feet? A.   Well, it's chemothe- -- It's the chemotherapy that caused it. Q. Right.  And are you aware that you've been diagnosed with peripheral neuropathy in -- A.   Yes. Q.

-- your hands and feet? A.   And I didn't know what that was. Q.   Okay.  Well, what -- Now do you

know what peripheral neuropathy is? A.   Yes. Q.   And te- -- A.   I can't use my hands, and I can't

walk right. Q.   All right.  Well, tell the jury how your hands feel. A.   Well, they're tingly and they're

like paralyzed. Q.   And tell the jury how your feet feel. A.   Well, they have minds of their own. Q.

Okay. A.   I have no control over them at times. Q.   Now, on some of your medical records it

mentions something called "foot drop", that your foot was not staying in a normal position.  Tell the

jury how the neuropathy affected your ability to walk. A.   Well, they say I have a rolling ankle on

my right foot.  And when I try to stand up, my right foot just gives way and I can't stand up. Q.   All

right.  So, are you able to walk now without the help of a walker or a -- A.   No. Q.   No.  Are you

able to walk with the help of a walker? A.   No. Q.   So, are you now wheelchair-bound? A.   Yes.

70. A true and correct copy of Thelma Watts Reynold's deposition transcript dated March 15, 2019.
is attached hereto and incorporated by reference as if set forth in full herein as Exhibit "B".

71. The following deposition testimony from Mrs. Reynold's husband, Lyle Reynolds, is also
illustrative of the severity of the debilitations caused by Mrs. Reynold's neuropathy:

Reynolds, Lyle, (Pages 5:21 to 6:25)

 Q.   Okay.  Can you explain to the jury how your wife was affected by the neuropathy.  What

did it do to her hands? MR. WOOLSEY:  Objection; form. THE WITNESS:  Pardon me? MR.

JOHNSON:   Go ahead. MR. WOOLSEY:   I'm making objections to his questions. THE

WITNESS:  Oh. MR. WOOLSEY:  Unless he tells you not to answer for some reason -- I'm just

objecting for – for a time down the road. THE WITNESS:  Oh, okay. MR. WOOLSEY:  I'm just

complaining about the type of his questions. THE WITNESS:  Okay. A.   She was outwardly --

Her feet were affected in that they bent one way and couldn't be relied on to be walked on, at all.

They stayed that one way.  She had a pair of shoes made, and they were taken at Warm Springs and not returned.  So, that was the way she was.  She couldn't walk. Her hands were affected from the first joint of each finger down to the end of each finger, to where there was no feeling. And she couldn't control that, at all.  So, that restricted her use of her hands completely to where she couldn't sew, she couldn't eat except if she grabbed it like a caveman would (motioning). She just couldn't do anything with her hands.

 Reynolds, Lyle, (Page 7:9 to 7:20)

 Q.   (By Mr. Johnson) Now, how -- How did this make her feel, that she was unable to use her hands? A.   When she -- MR. WOOLSEY:  Objection; form. A.    -- recovered with -- not recovered.  When she realized that she could not control her fingers -- particularly because she had decided that in here, the one thing she could do is sew, so she had her machine in here and was sewing.  When this happened, she 18   realized finally that she would never again be able to do that, and she became very depressed.  And I think subsequently that's probably what killed her.

72. A true and correct copy of Lyle Reynold's deposition transcript dated August 19, 2019 is attached hereto and incorporated by reference as if set forth in full herein as Exhibit "C".

### VIII.        OTHER PATIENTS OF DR. RAO, DR. RAO MDPA AND OSACCN

73. The deficient, inadequate, and substandard care rendered to Mrs. Reynolds is reflective of the systemically poor care given to numerous other OSACCN and Dr. Rao MDPA patients during the relevant period that remain unidentified at this time.

IX.     **OBJECTIVE FALSEHOOD**

74. The facts alleged above and below demonstrate that Defendants' mis-staging of cancer and subsequent unreasonable and unnecessary treatment and prescribing of cancer drugs are inconsistent with proper exercise of a physician's clinical judgment. Objective falsehood of a claim for Medicare reimbursement can be shown when a physician fails to review a patient's medical records or otherwise familiarize themselves with the patient's condition before determining the stage of a patient's cancer. *See United States v. AseraCare Inc., No. 16-13004, slip op. at 38 (11th Cir. Sept. 9, 2019) (published).* Objective falsehood may also be established when expert evidence proves that no reasonable physician could have concluded that a patient had a particular stage of cancer given the relevant medical records. *See United States v. AseraCare Inc., No.* 16-13004, slip op. at 38 (11th Cir. Sept. 9, 2019) (published). In this case, Relators have met both of these objective falsehood standards.

75. While there is no question that clinical judgments must be tethered to a patient's valid medical records, it is equally clear that the law is designed to give physicians meaningful latitude to make informed judgments without fear that those judgments will be second-guessed after the fact by laymen in a liability proceeding. *Id.* at 34. Dr. Rao, despite the National Comprehensive Cancer Network ("NCCN") guidelines, treated Ms. Reynolds without knowing the results of genetic testing – specifically the ALK test. A true and correct copy of the National Comprehensive Cancer Network Quick Guide article titled "Non-Small Cell Lung Cancer" is attached hereto and incorporated by reference as if set forth in full herein as Exhibit "D". This failure to obtain the ALK test readings evidences the fact that Dr. Rao's clinical judgment was not adequately tethered to Mrs. Reynolds' medical records. Moreover, CMS rulemaking commentary signals that well-founded clinical judgments should be granted deference. *Id.* at 33. Here, Dr. Rao's judgment was unfounded given her failure to obtain the ALK test results. Such

an unfounded clinical judgment cannot be relied upon nor granted any deference. Dr. Rao's judgment does not reflect a reasonable interpretation of Mrs. Reynold's medical records because the records were devoid of the critically relevant ALK test results. Dr. Rao's medical records were too thin and lacking in detail to reasonably substantiate her clinical judgment of Mrs. Reynold's stage of cancer. Based on the inadequacy of her records and her deviation from recognized NCCN guidelines, no reasonable doctor would have staged Mrs. Reynold's cancer as Stage IV. Moreover, no reasonable doctor would have continued to treat with chemotherapy without properly doing an acuity rating and continuing toxic chemo without adding up the amount of Cisplatin given in the presence of debilitating neuropathy.

76. Further evidence of the objective falsehood in Dr. Rao's records is revealed by the extended period Mrs. Reynolds lived after she was referred to hospice care. Hospice care is a type of health care that focuses on the palliation of a terminally ill patient's pain and symptoms and attending to their emotional and spiritual needs at the end of life. "Terminally ill" means that the individual "has a medical prognosis that the individual's life expectancy is 6 months or less." 42 U.S.C. § 1395x(dd)(3)(A). Dr. Rao referred Mrs. Reynolds to hospice care on June 2, 2017. However, Mrs. Reynolds did not die until May 6, 2019 – approximately 23 months after she was admitted into hospice care. If Dr. Rao's record were accurate, she would not have referred Mrs. Reynolds to hospice. Fortunately, Mrs. Reynolds sought a second opinion from Dr. Sara M. Conde regarding her cancer and neuropathy treatment. Dr. Conde, unlike Dr. Rao, made sure to get the genetic testing results that revealed Mrs. Reynolds' ALK biomarker. Dr. Conde, pursuant to the NCCN guidelines, began treating Mrs. Reynolds with Crizotinib which extended Mrs. Reynolds' life.

### X.     FRAUDULENT SCHEME TO BILL MEDICARE FOR UNREASONABLE AND UNNECESSARY CANCER TREATMENTS

77. Relators reallege and incorporate by reference paragraphs 1 through 76 as though fully set forth herein.

78. The cancer drugs used and treatment options available to a patient are largely predicated on what stage of cancer the patient has. When a patient's cancer is mis-staged, the cancer drugs used and treatment options available will often be unreasonable and unnecessary. For instance, as is explained in detail above, Mrs. Reynold's cancer was mis-staged and she was prescribed cancer drugs that did not work and caused her to suffer from debilitating neuropathy. Despite failing to adequately treat Mrs. Reynolds and prescribing improper chemotherapy treatments, Dr. Rao, upon information and belief, billed Medicare for the unreasonable and unnecessary drugs and treatment – which is, in fact, a fraud upon Medicare.

79. Relators allege that the mis-staging of cancer and subsequent unreasonable and unnecessary treatment and prescribing of cancer drugs forms the basis of a fraudulent scheme by Defendants to submit false bills to Medicare for reimbursement. To illustrate the mis-staging and fraudulent billing practices alleged herein Relators offer the following deposition testimony of Dr. Rao:

### A.     BILLING EXCERPTS

*Rao, Jayasree, (Pages 145:18 to 146:9)*

Q.   And the patients -- does Medicare -- when you bill Medicare -- we've looked at your billing statements.   When you bill Medicare, is your MDPA billing Medicare, or is Oncology San Antonio billing Medicare? A.   The Oncology San Antonio because it was – it is to get drug discounts. Q.   I'm going to ask you about that in a minute. So, Medicare pays Oncology San Antonio correct? A.   It's a flow -- what do you say -- pass-through entity. Q.   It's a pass-through

entity? A.   (Witness nods head up and down.) Q.   And so then the money comes where, to your PA? A.   Sometimes.

*Rao, Jayasree, (Page 150:8 to 151:12)*

Q.   So, your practice bills Medicare using the name Oncology San Antonio; is that correct? A. Yes. Q.   And that's to get -- because you can get a drug discount? A.   Yes. Q.   And why could Oncolo- -- Why couldn't you get a drug discount just as Dr. Rao MDPA? A.   There's some collective benefit. Q.   What does it mean to get a drug discount? Can you explain that. A.   So, if you by 100 vials of let's say cisplatin, right, we'll get instead of $6.00, maybe $6.50. Q.   And what causes -- What gets you the discount? A.   The volume. Q.   Oh.  So, in other words, you're saying if you -- if you take three or four oncologists and put their needs -- their drug needs together, you can reach the volume level to get a discount; is that right? A.   Yes. Q.   And is that -- Does that also cause Medicare to pay you more money? A.   No. Q.   It doesn't matter? A. (Witness shakes head side to side.) Q.   How do -- A.   Medicare is the bottom of the barrel.  It pays 80 cents on the dollar.

80. A true and correct copy of Jayasree Rao, M.D.'s deposition transcript dated December 18, 2019 is attached hereto and incorporated by reference as if set forth in full herein as Exhibit "E".

## B.   MIS-STAGING EXCERPTS

*Rao, Jayasree, (Pages 59:15 to 60:13)*

 Q.   Now, you also started Mrs. Reynolds on carboplatin; correct? A.   Uh-huh. Q.   And what else?  What other drugs did you start Mrs. Reynolds on in -- on or about November, early December 2015? A.   Avastin and a very low dose of carboplatin. Q.   And she had an allergic reaction to carboplatin; correct? A.   After three or four months, yeah. Q.   And so, you had to

stop that; correct? A.   Yes. Q.   And what did you put her on? A.   Cisplatin. Q.   And what is cisplatin? A.   It's a cousin of carboplatin. Q.   And is that a platinum-containing -- A.   Uh-huh. Q.   -- anticancer drug? A.   Yes. Q.   And one of the complications of platinum-containing anticancer drugs is something called neuropathy; correct? A.   Yes.

*Rao, Jayasree, (Page 86:1 to 86:10)*

Q.   But in your own records you diagnosed peripheral neuropathy; didn't you? A.   And it says it's improving, it's grade zero, and she didn't want any therapy. Q.   Well, you stopped the cisplatin; correct? A.   Because she was getting weaker. Q.   But, in fact, you gave how many more doses of cisplatin after you initially diagnosed the peripheral neuropathy? A.   Three half doses.

*Rao, Jayasree, (Pages 48:21 to 49:10)*

Q.   (By Dr. Mittler) My question is, even though it's relatively rare, the ALK marker in non-small cell cancer, in fact, Mrs. Reynolds had that genetic marker at the time you first saw her and all the time you treated her; correct? A.   It appears to be so. Q.   In other words, just so the jury understands, this is not a marker that developed later sometime in her lung cancer, right, after you saw her?  Is that correct? A.   Yes.  It didn't develop. Q.   Yeah.  She had it at the beginning of her lung cancer, and she had it throughout the course of her lung cancer; correct? A.   Right.

*Rao, Jayasree, (Pages 181:14 to 183:15)*

Q.   And the point is that, at the point of time in which you initiated treatment in Mrs. Reynolds, the ALK genetic factor was known; correct? A.   Not to me. Q.   But it was known; correct? A. Looking back, yes, it was known. Q.   And so, that was a critical factor to take into account in choosing the correct therapy for Mrs. Reynolds in November and December of 2015; correct? A.

I disagree. Q.   (By Dr. Mittler)  And it was the correct factor in January of 2016, in March of 2016, in June of 2016, all the way up until June of 2017, when she was under your care; correct? A.   I -- MR. WOOLSEY: Form. A.   -- disagree. Q.   (By Dr. Mittler)  And during that whole period of time, you could have obtained the results of he ALK genetic factor and you didn't; did you? A.   I disagree. Q.   Well, the term ALK, the three letters in capital, A-L-K, don't appear in your records, in other words, the records you and your nurse practitioner generated, anywhere; do they? A.   No, because we didn't know about it. Q.   Well, you didn't -- You didn't even ask about it later; correct? A.   We asked about it.  We don't ask every two weeks when somebody says there was nothing -- there was no tissue to do that. Q.   But it was a critical factor when you first saw Mrs. Reynolds in terms of decision-making; do you agree with that? A.   No, I do not. Mrs. Reynolds got the best care. Q.   Well, the standard of care would have been for you to write in your record ALK and EGFR are important factors, EGFR is insufficient, and I can't get the ALK.  You didn't even make a note of that; did you? A.   So, Mrs. Reynolds got the best care she possibly -- possibly could have.  She got first-line, second-line.  She got good treatment.  She lived a long time, and we gave her excellent care. Q.   And one of the reasons that Mrs. Reynolds lived a long time is that you didn't have the stage correct; isn't that true? A.   No, that is not true. Q.  In fact, Dr. Cohen said she was Stage IIB. A.   Dr. Cohen is not right.

*Rao, Jayasree, (Pages 47:1 to 48:18)*

You agree that the NCCN guideline on -- that you have before you in an exhibit says that, with an abnormal ALK, the first-line drug is crizotinib?  Do you agree with -- A.   No, I did not agree with that. Q.   So, you don't agree with the NCCN guideline? A.   But it doesn't say that, sir.  So, NCCN guidelines are just guidelines.  You have to – You have to take that and come up with a

treatment plan for your patient that best suits them. Q.   Well, what -- A.   NCCN doesn't say you have to give crizotinib for front-line.   It doesn't say that. Q.   Well, what is your basis for disagreeing with the NCCN guideline of crizotinib being the first treatment for a patient with non-small cell lung cancer, like Mrs. Reynolds, with an abnormal ALK genetic marker? A.   So, non-small cell lung cancers have many types.   There's adenocarcinoma.   There's squamous carcinoma.   Then there's large-cell and neuroendocrine. There are different types of non-small cell lung cancers. So, when you pick anything that's non-squamous -- so you have to go with what drugs are -- the patient is eligible to receive.   And then you have to see what will the patient lose out if you don't do front-line or second-line or third-line.   So, that's how we come up with a treatment plan. Especially when I didn't have enough issue to run tests, we -- we treated appropriately for adenocarcinoma.   She responded.   All the subsequent scans show that.   And I think everything was done appropriately. Q.   Now, you said that the ALK-positive marker is rare in non-small cell lung cancer; correct? A.   Yes. Q.   You gave the number, three percent; correct?   A.   Three to four percent, yeah. Q.   But do you also agree that even though it's a rather small percentage, that Mrs. Reynolds, in fact, had it?   Correct? A.   I didn't know that until later.

Rao, Jayasree, (Pages 55:17 to 56:24)

Q.   Do you know, from looking at Dr. Conde's records, that in fact Mrs. Reynolds did get crizotinib treatment under Dr. Conde's care? A.   Yes, in 2018. Q.   So, Dr. Conde gave her the treatment that the NCCN guidelines called for in 2015; correct? MR. WOOLSEY:  Form.  You can answer. A.   Sir, Dr. Conde after one year -- after her first visit, I know Mrs. Reynolds went back to see her in 2018, and she gave her the crizotinib. Q.   (By Dr. Mittler)  And Mrs. Reynolds lived approximately two years after you last saw her; correct? A.   So, when -- When did Mrs.

Reynolds pass away, sir?  Q.    Okay.  For the record -- A.    What date? Q.    I'm going to represent to you that Mrs. Reynolds died on May 6, 2019. A.    Okay.  Q.    And you last saw Mrs. Reynolds on June 2 -- A.   In June 2017. Q.   -- 2017 -- A.   Yes. Q.   -- correct? A.   Yes. Q.   So, Mrs. Reynolds, in fact, died -- MR. WOOLSEY:   Don't talk over each other. Q.    (By Dr. Mittler) Mrs. Reynolds, in fact, died approximately 23 months after you last saw her; correct? A.    Yes.

81. Dr. Rao has been listed by the Texas Tribune as one of the top 20 doctors paid the most by Medicare in 2012 according to data from the federal Centers for Medicare and Medicaid Services. In 2012, Dr. Rao was paid 3.33 million dollars. A true and correct copy of the Texas Tribune article titled "Medicare Data Shines Light on Billions Paid to Texas Doctors" is attached hereto and incorporated by reference as if set forth in full herein as Exhibit "F". The San Antonio Express-News also reported that Dr. Rao had billed Medicare for $8.4 million in 2012 and that Dr. Rao was among just 23 physicians nationwide to collect at least $3 milling from Medicare in 2012. A true and correct copy of the San Antonio Express-News article titled "Two S.A. doctors are on list of top Medicare payments – Correction Appended" is attached hereto and incorporated by reference as if set forth in full herein as Exhibit "G".

82. In 2016, according to the testimony of Dr. Rao, she was investigated by the Centers for Medicare and Medicaid Services. The following testimony illustrates the nature of that investigation:

*Rao, Jayasree, (Pages 98:10 to 99:18)*

Q.    Have you ever been subject to any government investigation about your cancer therapy practices? A.   Not about my cancer therapy practices. Q.   What have you been contacted about by the government? MR. WOOLSEY:   Form. A.    So, I've -- on my notes there -- there was a

time where I had to, you know, make sure that there were certain things like put the primary diagnosis -- like the format that we have now, that -- on my notes. (By Dr. Mittler)  So, there was an investigation as to the adequacy of your medical records; is that correct? A.   Not the medical records per se.  Just about the formating of it. Q.   What -- Did that investigation have to do with whether there was enough support to justify your billing? A.   No. Q.   So, what was the investi- -- - I'm still not understanding what the investigation was about. A.   So, the investigation was about that it has to have a primary diagnosis and -- What's the other one?  About -- So, the way we have it now, that's how they wanted us to do the notes.  That was because of certain things that happened with my former partner. It had nothing to do with billing practices or nothing like that.  Q.   Who -- Who conducted that investigation? A.   It was an agency for the -- What do you say? I guess the CMS have somebody oversee. Q.   So, "CMS" stands for Center for Medicare & Medicaid Services? A.   Uh-huh.

*Rao, Jayasree, (Pages 101:13 to 102:1)*

DR. MITTLER:  What was it?  Can you read the question back, please. THE REPORTER: "What were they critical of in your progress notes?" A.   That we had to have a primary diagnosis, and they were -- you know, there are certain notes where there are two handwritings. It's because I closely supervise my nurse practitioners.  So, they do a note, and I always -- you know, like Mrs. Reynolds, right, I -- if there is a problem, I don't let my nurse practitioners take care of it.  I will go in and I will add, you know, to the notes.  So, that -- that was another question as to why there was like two signa -- two different handwritings on a note.

83. Prior to working for Oncology San Antonio Cancer Center Network, Dr. Rao Practiced with Radiation Oncology of San Antonio ("ROSA"). ROSA was the subject of two San Antonio Express

New Article regarding disputes between the members of the practice group about the intentional destruction of the practice group and the inability to meet their financial obligations. One of the San Antonio Express-News articles titled "More Troubles at S.A. Oncology Practice" reads, "A new lawsuit alleges Radiation Oncology (ROSA) officials are causing the 'intentional destruction of the medical practice' by, in part, failing to pay for cancer medications, supplies and equipment for ongoing patient treatment in two of its three divisions." A true and correct copy of the San Antonio Express-News article titled "More Troubles at S.A. Oncology Practice" is attached hereto and incorporated by reference as if set forth in full herein as Exhibit "H". The lawsuit seems to indicate that the billing practices of ROSA were improper. The other San Antonio Express-News Article titled "Oncologists allege paperwork was forged" reads, "In September 201, Radiation Oncology and its co-president Dr, Jayasree Rao sued Dr. Rajiv Dahiya alleging he misappropriated hundreds of thousands of dollars, if not millions: from the practice to support his "investment schemes and extravagant lifestyle." A true and correct copy of the San Antonio Express-News Article titled "Oncologists allege paperwork was forged" is attached hereto and incorporated by reference as if set forth in full herein as Exhibit "I". For illustrative purposes, Relators direct the court to the following deposition testimony of Dr. Rao:

> Rao, Jayasree, (Pages 141:7 to 142:6)
>
> Q.   And then it says that -- There's a quote by Mr. Davis, and then it says Davis represents ROSA and its co-president, Dr. Jayasree Rao, in a lawsuit against Dahiya's husband, Dr. Rajiv Dahiya, who was removed as the practice's president and is part owner in September -- and a part owner in September.  Did I read that correctly?  A.   Yes. Q.   So, were you co-president of Radiation Oncology of San Antonio? A.   After all that happened. Q.   So -- well, at the time of the -- Were you involved in this lawsuit, at all? A.   So, I was just nobody.  And we found out --

THE WITNESS:  Am I supposed to answer this? MR. WOOLSEY:  You can answer. THE WITNESS:  Okay. A.   So, in 2014, earlier in the year, we found out that our chemotherapy drugs were not being paid. So, I was supposed to be a partner, but they weren't showing me any records, any bank statements, nothing. So, I had to find somebody who will help me get to the bottom of it.  So, we found out that Dr. Dahiya had swindled the company of over $20 million.

Rao, Jayasree, (Pages 158:19 to 159:3)

Q.   (By Dr. Mittler)  I'm going to -- before we deal with this next exhibit, the Express-News article said the Dahiyas were "suing Scott Rickenbach, ROSA's former CFO and their financial manager."  Is that an accurate description of Mr. Rickenbach? A.   They were all thieves and lowlifes. Q.   Is Mr. Rickenbach still working in San Antonio? A.   I do not have any contact with him.  I hope they all are having a party somewhere in hell together.

84. As shown in great detail above, there is a significant amount of documentary and testimonial evidence showing that Defendants have mis-staged cancer and provided oncology treatments to Mrs. Reynolds that fell below the requisite standard of care. Dr. Rao and her practice have been surrounded by investigations and lawsuits stemming from their suspect medical billing practices. Relators urge the United States of America to further investigate the allegations set forth herein and intervene in this matter to fully uncover the fraudulent scheme of Defendants to submit improper chemotherapy bills to Medicare.

## XI.        COUNT ONE – VIOLATIONS OF THE FALSE CLAIMS ACT

85. Relators reallege and incorporate by reference paragraphs 1 through 84 as though fully set forth herein.

86. This is a claim by Relators, on behalf of The United States of Amercia, for treble damages and penalties under the False Claims Act, 31 U.S.C. 3729-3733 against Defendants for knowingly causing to be presented false claims to Government Healthcare Programs.

87. From on or about 2015, in the Western District of Texas, Defendants have knowingly and willfully violated the False Claims Act by submitting and causing false claims to be submitted.

88. Defendants have knowingly submitted Medicare claim forms for payment, knowing that such false claims would be submitted to Government Healthcare Programs for reimbursement, and knowing that such Government Healthcare Programs were unaware that they were reimbursing cancer related prescriptions for non-covered uses and/or otherwise non-covered treatments because they were not reasonable and necessary and were being submitted as part of a scheme to mis-stage cancer; and therefore false claims. By virtue of the acts described in this Complaint, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States of America for payment or approval.

89. Defendants caused false claims to be submitted, resulting in Government Program reimbursement to healthcare providers in the millions of dollars, in violation of the False Claims Act, 31 U.S.C. § 3729 et seq.

90. The United States of America is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim presented or caused to be presented.

## XII.        PRAYER FOR RELIEF

91. WHEREFORE, Relators respectfully request this Court enter judgment against Defendants, as follows:

a. That the United States of America be awarded damages in the amount of three times the damages sustained by the USA because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. provides;

b. That civil penalties of $11,000 be imposed for each and every false claim that Defendants caused to be presented to the Government Healthcare Programs under the Federal False Claims Act;

c. That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the USA and Relators necessarily incurred in bringing and pressing this case;

d. That the USA and Relators be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

e. That the Court award such other and further relief as it deems proper.

Respectfully submitted,

**THE POWELL LAW FIRM**

By:/S/ John "Mickey" Johnson
     John "Mickey" Johnson
     Texas State Bar No. 24094002

Jon Powell
Texas State Bar No. 00797260
1148 East Commerce Street
San Antonio, Texas 78205
(210) 225-9300 Telephone
(210) 225-9301 Facsimile
Email: mickey@jpowell-law.com
     jon@jpowell-law.com

**LAW OFFICE OF BRANT S. MITTLER**
Brant S. Mittler, M.D., J.D.
Texas State Bar No. 24032867
17503 La Cantera Pkwy Ste 104-610
San Antonio, TX  78257
(210) 698-0061 Telephone
(210) 698-0064 Facsimile
Email: bsm@mittlerlaw.com
**Counsel for Relators**

## XIII.     Appendix

Exhibit A.          Expert Report of Dr. Stephen Cohen dated November 26, 2018 and Dr. Cohen's CV.

Exhibit B.          Thelma Watts Reynold's deposition transcript dated March 15, 2019.

Exhibit C.          Lyle Reynold's deposition transcript dated August 19, 2019.

Exhibit D.          National Comprehensive Cancer Network Quick Guide article titled "Non-Small Cell Lung Cancer."

Exhibit E.          Jayasree Rao, M.D.'s deposition transcript dated December 18, 2019.

Exhibit F.          Texas Tribune article titled "Medicare Data Shines Light on Billions Paid to Texas Doctors."

Exhibit G.          San Antonio Express-News article titled "Two S.A. doctors are on list of top Medicare payments – Correction Appended."

Exhibit H.          San Antonio Express-News article titled "More Troubles at S.A. Oncology Practice."

Exhibit I.          San Antonio Express-News Article titled "Oncologists allege paperwork was forged."

# Exhibit A.

# Expert Report of Dr. Stephen Cohen dated November 26, 2018 and Dr. Cohen's CV.

**Medical Therapy & Research, PLLC**
**Stephen Carl Cohen, M.D.**
2130 NE Interstate 410 Loop Ste. 250
San Antonio, TX 78217
Phone: (210) 590-8206

November 26, 2018

Brant S. Mittler M.D. J.D.
Law Office of Brant S. Mittler
17503 La Cantera Pkwy. Ste. 104-610
San Antonio, TX  78257

Jon Powell J.D.
The Powell Law Firm
1148 E. Commerce
San Antonio, TX  78205

                    Re: Thelma Louise Reynolds, D.O.B. 07/11/1934

Dear Dr. Mittler and Mr. Powell:

At your request I have reviewed the medical records of your client Mrs. Thelma Louise
Reynolds.

I am a board certified medical oncologist who has practiced for more than 42 years, in San
Antonio, Texas. I am very familiar with non-small cell lung carcinoma. I am also familiar with
the possible complications due to the management of the disease, and with available
multimodality therapies to treat it.

I have been certified for over 40 years with the Texas Medical Board, National Board of Medical
Examiners, American Board of Internal Medicine, Subspecialty Board in Medical Oncology,
Subspecialty Board in Hematology. My medical license in the State of Texas is in good standing.

My curriculum vitae is attached as **Exhibit "A"** to this report and is incorporated into this report
to further support my qualifications to offer opinions on the standard of care and causation
regarding  the diseases, treatments, complications and injuries/damages that Thelma Louise
Reynolds experienced under the care of Dr. Jayasree Rao and the Oncology San Antonio Cancer
Center Network.

By virtue of my education, training, knowledge and clinical experience, and review of the
medical records noted below, I am qualified to give expert opinions on the applicable standards
of care, the breeches of the standards of care, and causal relationships between breeches of the
standards of care and the harms and injuries sustained by Thelma Reynolds, specifically with the
diagnosis, staging, prognosis, treatments, management, and complications of non-small cell lung
carcinoma and the other medical conditions experienced by Mrs. Reynolds which are noted in
my report below and int the medical records I reviewed.

I am familiar with the relevant disease processes and medical evaluations and treatments pertinent to this case by virtue of my education, knowledge, training, experience and actual hands on treatment of patients with conditions like or similar to those experienced by Mrs. Reynolds.

All of the opinions contained in this report are being provided on a "more likely than not" standard or put another way, a "within reasonable medical probability" standard.


**LEGAL DEFINITIONS**

I have been provided with the following legal definitions which I will follow in this report.

"NEGLIGENCE," when used with respect to the conduct of the physicians, health care providers listed below means failure to use ordinary care, that is, failing to do that which a physician, health care provider of ordinary prudence would have done under the same or similar circumstances or doing that which a physician, health care provider of ordinary prudence would not have done under the same or similar circumstances.

"ORDINARY CARE," when used with respect to the conduct of the physicians, health care providers listed below means that degree of care that a physician, health care provider of ordinary prudence would use under the same or similar circumstances.

"PROXIMATE CAUSE," when used with respect to the conduct of the physicians, health care providers listed below means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a physician, health care provider using ordinary care would have foreseen that the event, or some similar event, might reasonably result there from. There may be more than one proximate cause of an event.

"GROSS NEGLIGENCE" means: (a) An act or omission by the physicians, health care providers listed below: (I) which, when viewed objectively from the standpoint of physicians, or health care providers at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (ii) of which physicians, health care providers have actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others. The Standard of Care requires that a physician, hospital, and all health care providers use ordinary care.

I have reviewed the following records related to Thelma Reynolds:

1. Medical records of Baptist Health Systems;
2. Medical records Baptist M & S Imaging;
3. Medical & billing records of Oncology San Antonio Cancer Center Network;
4. Medical records of Jayasree Rao M.D.;
5. Medical Records Southwest General Hospital;
6. Literature. Gridelli, Cesare et al. "Cisplatin-Based First-Line Treatment of Elderly Patients With Advanced Non-Small-Cell Lung Cancer: Joint Analysis of MILES-

7. 3 and MILES-4 Phase III Trials." J Clin Oncol, 09/2018, **Volume** 36, **Issue** 25, pp. 2585–2592;

8. Literature. Bunn, P.A., et al. "Systemic Therapy for Elderly Patients With Advanced Non-Small Cell Lung Cancers." J Clin Oncol, 09/2018, **Volume** 36, **Issue** 25, pp. 2571–2574:

9. Literature. Solomon BJ et al. "First-Line Crizotinib versus Chemotherapy in ALK-Positive Lung Cancer." NEJM 12/04/2014, Vol 371, Iss 23, pp. 2167-2177; and

10. Literature. Lung Cancer Research Foundation and the Lung Cancer Mutation Consortium. http://www.lungcancerresearchfoundation.org/research/lung-cancer-mutation-consortium.

Firstly, I will briefly summarize the information available to me.

Mrs. Reynolds was 81 years old when hospitalized with diverticulitis in 4/2015. The records of Dr. Jayasree Rao state 04/15/15 x-ray showed pneumonia in right upper lobe. The Chest CT was completed on 04/27/2015. A CXR 7/29/15 did show a right upper infiltrate with consolidation.

I have concluded that subsequent follow up of the lung changes included a negative bronchoscopy, and a PET/CT scan 7/8/15, and 10/02/2015 showed left upper lung lobe opacities. This PET/CT scan comparison 7/8/15 to 10/2/15 showed no significant changes. I did find the 10/02/15 PET/CT showed a 5.7x2.3 cm mass-like posterior upper lobe lesion bordering the fissure. The lesion's SUV was 9,4. In addition the scan showed a more caudal stable left upper lobe lesion of 2.7 x2.8 cm with a SUV 5.6. The hypermetabolic lesions suggest malignancy, along with infectious and inflammatory disease. The right upper lobe showed a 1.7 cm pleuronodular opacity with SUV 1.6 suggesting infectious/infiltrative disease.

Mrs. Reynolds had a thoracic PET/CT scan on 04/27/2015 which I noted above. I am concluding the 4/27/15, 7/8/15, 10/02/17 chest PET/CT scans showed no significant changes. They showed extensive bilateral upper lobe lesions and basilar multilobular atelectasis and fibrosis as well.

In any case, Mrs. Reynolds had a lung biopsy of the left upper lobe of lung on 11/16/2015. Six weeks after the most recent PET/CT chest scan, the biopsy revealed an adenocarcinoma. Mrs. Reynold's doctors at that time was Dr. Hector L. Gomez, and Dr. Christopher Joseph Muniz. I have not seen their records. The left upper lobe core biopsy revealed an adenocarcinoma, consistent with a lung primary. The biopsy was read by Dr. Nancy B. Banks a pathologist at Baptist Medical Center, San Antonio, Texas. The surgical pathology report revealed Dr. Banks discussed the diagnosis with Dr. Hector Gomez on 11/17//2015. Dr. Banks also reported the atypical cell findings to Dr. Christopher Muniz on 10/16/17. The report also noted that testing for critical molecular targeting, the ALK and EGFR markers, was to be done. An addendum to the pathology report dated 11/23/2015 showed the ALK gene rearrangement was detected in 37% of cells, and the EGFR test was not done due to inadequate tumor tissue. Importantly, the results of the ALK and EGFR testing were not in doctor Rao's medical records and those two biomarkers were never referred to in any of Dr. Rao's treatment records of Mrs. Reynolds.

At the time of the diagnosis of her lung cancer Mrs. Reynolds was in reasonably good health. She was recently retired but was active and ambulatory. She had a history of diverticulitis, with the last episode 4/15/2015, about 7 months before receiving the diagnosis of adenocarcinoma of the lung and receiving Avastin therapy. She had hyperlipidemia and was on antilipid meds. She also had controlled BP with antihypertensive drugs. In addition, she was medicated for anxiety and depression.

She did have a remote history of smoking for 8 years.

Dr. Jayasree Rao provided an oncology consultation on 11/20/15. Her consultation on Mrs. Reynolds revealed she was asymptomatic at the time of diagnosis of adenocarcinoma of the lung. Her review of systems was negative as related to her neoplasm. Dr. Rao stated she reviewed the laboratory and diagnostic studies. Except for stating she had adenocarcinoma she cited no lab results and no other pathology. She does not discuss any PET/CT scan findings but concludes she suspected Stage IV disease radiographically. She did not mention any specific evidence image-wise that would support that stage of disease.

Dr. Rao told Mrs. Reynolds and her family that she had advanced stage disease and that her goal was to palliate and control her disease process. She indicated the goals of treatment were to prolong her life and to provide quality of life.

Dr Rao started Mrs. Reynolds on Avastin and Carboplatin therapy on 11/27/2015. She indicated that Mrs. Reynolds had a number of treatment options, but only considered chemotherapy/angiogenesis inhibitor treatment. She did not consider Taxol given her age.  Dr. Rao did not mention the possibilities of surgery, radiation therapy, targeted therapy or even observation as reasonable alternatives.

She did note that Bevacizumab (Avastin) was associated with the risks of hypertension and bowel perforation, and informed Mrs. Reynolds and her family of these complications.

Dr. Rao made arrangements for Mrs. Reynolds to get an intravenous catheter placement for the administration of drugs.

In less than 1 month after starting Carboplatin and Avastin, Mrs. Reynolds was having gastrointestinal symptoms requiring cessation/delay of her treatment for toxicity.

Dr. Rao's 12/23/15 note points out Mrs. Reynolds is not a surgical candidate and was given Avastin/Taxol. Neither of these were true. According to my analysis Mrs. Reynolds was a surgical candidate and the medical records should have reflected that she received Avastin and carboplatin.

Dr. Rao's initial note in her office suggested stage IV disease.

It was known that her N and M clinical staging were 0 based on a number of negative PET/CT thorax and body scans. There are no extra thoracic or nodal metastases identified on her scans.  I believe her initial T Stage was T3. She should have been Staged IIB. Dr. Rao's suggestion that Mrs. Reynolds had stage IV disease was not demonstrated by any imaging testing, and she made no notation of these test results to corroborate her conclusion about disease stage.

Classically T, N, & M The classic staging of lung cancer staging is done by the following criteria (T = Tumor, N=Nodes, M=metastasis):

Stage IA-T1N0M0
Stage IB-T2N0M0
Stage IIA-T1N1M0
**Stage IIB-T2N1M0, T3N0M0**
Stage IIIA-T3N1M0, T1-T3N2M0
Stage IIIB-T4 Any NM Any T N3M0
Stage IV-Any T Any N M1

TX-positive cancer cells without primary tumor on imaging or bronchoscopy T0-No evidence of primary tumor T is-carcinoma-in-situ T1-Tumor≤ 3 cm, surrounded by lung or visceral pleura, without bronchoscopic evidence of invasion more proximal than the lobar bronchus.

T1a:≤2cm

T1b:>2cm but≤3cm

T2-Tumor with any of the following features: > 3 cm in greatest dimension, involves mainstem bronchus, ≥2 cm distal to the carina, invades the visceral pleura, associated with atelectasis or obstructive pneumonitis that extends to the hilar region but does not involve the entire lung

T2a:>3cm but≤5cm

T2b: >5cmbut≤7cm, Or tumors≤ 7 cm with invasion of visceral pleura, atelectasis of less than entire lung, proximal extent at least 2 cm from carina T3-Tumor of any size that invades any of the following: chest wall (including superior sulcus tumors), diaphragm, mediastinal pleura, parietal pericardium: or tumor in the main bronchus < 2 cm distal to the carina, but without involvement of the carina; or associated atelectasis or obstructive pneumonitis of the entire lung T3- tumors> 7 cm or with: Direct invasion of chest wall, diaphragm, phrenic nerve, mediastinal pleura, parietal pericardium, main bronchus< 2 cm from carina (without involvement of carina) and tumor nodules in the same lobe as the primary tumor.

**T3 -tumors associated with additional tumor nodules (ATNs) in the same lobe as the primary tumor**

T4 –Tumor of any size that invades any of the following: mediastinum, heart, great vessels, trachea, esophagus, vertebral body, carina: or tumor with a malignant pleural or pericardial effusion, metastatic tumor nodules in different lobe from the primary tumor.

NX-Regional lymph nodes cannot be assessed N0-No regional lymph node metastases N1-Metastasis to ipsilateral peribronchial and/or ipsilateral hilar lymph nodes, and involvement of intrapulmonary nodes by direct extension of the primary tumor.

N2-Metastasis to ipsilateral mediastinal and/ or subcarinal lymph node(s).

N3-Metastasis to contralateral mediastinal, contralateral hilar, ipsilateral or contralateral scalene, or supraclavicular lymph node(s).

MX-Presence of distant metastasis cannot be assessed.

M0-No distant metastasis

M1-Distant metastasis present including metastatic tumor nodules in the ipsilateral nonprimary tumor lobes of the lung.

M1a: malignant pleural or pericardial effusion, pleural nodules or nodules in contralateral lung

M1b: distant metastases

One of its aims is to determine which patients are resectable or not.

Determines extent of disease and stratifies patients into therapeutic and prognostic groups.

Dr. Rao's pretreatment evaluations should have included Mrs. Reynolds' history, physical exam, and pertinent radiographic images, the lung biopsy pathology results and the results of the ALK rearrangement test and the EFGR assay done on the tumor. The fact that she did not get the ALK results is clearly a failure in the standard of care. Furthermore, this information never appeared in any of Dr. Rao's medical records of Mrs. Reynolds which is also below the standard of care, at every subsequent visit.

Shortly after Mrs. Reynold's treatment started, she had gastrointestinal symptoms and a suspicion of bowel perforation. The Avastin was eliminated from subsequent treatment, as it was suspected to be the cause of her bowel perforation. Interestingly, many progress notes say she was started on palliative treatment with carboplatinum and Avastin and tolerated it well.

Actually, Mrs. Reynolds was started on treatment with Carboplatinum and Avastin on 11/27/15, and the 12/23/15 note says she was quite ill with gastrointestinal complaints. Getting drastically ill within 1 month of initiation of therapy can hardly be reconciled with "it was tolerated well". This inconsistency of the progress notes and the reality of the clinical situation, was a common finding in the medical record, and will be addressed further. Dr. Rao's use of the term "palliative care" does not apply to a patient who is Stage II B who is more likely than not curable.

Mrs. Reynolds was switched to a combination of Cisplatinum and Alimta.
Mrs. Reynolds' carboplatin therapy was discontinued because of an allergic reaction. Unfortunately, this fact was never presented in the cut and paste present illness notes. Cisplatinum is significantly more toxic than carboplatin, particularly for neuropathy. This omission from the present illness record is significant. In fact, the Cisplatinum was the cause of Mrs. Reynolds debilitating neuropathy which I will discuss further.

Mrs. Reynolds remained on Cisplatinum/Alimta for quite a while, about 1 year. Because of neutropenia, nausea, fatigue, anemia, mucositis, weakness and weight loss the treatment schedule for Cisplatinum was changed to a weekly regimen.

According to Dr. Rao, Mrs. Reynolds lung cancer was Stage IV.
This is in error, as there was never evidence of metastatic disease outside of the left upper lobe of the lung.  This misinterpretation of the facts by Dr. Rao fails the standard of care. The record repeatedly states she has metastatic and unresectable disease, not confirmed by the facts. This is a major medical error and is both negligence and gross negligence.

On 10/21/16 it is noted for the first time Mrs. Reynolds had uncontrolled hypertension due to Avastin. Yet, Avastin was stopped about 11 months previous.

The cut and paste review of systems and physical examinations repeatedly reflect no neurological symptoms or findings, until 12/9/16. At that time, bilateral lower extremity weakness and an unsteady gait was noted. Dr. Rao indicated the presence of grade 0-1 peripheral neuropathy. On the same date, hypomagnesia, another side effect of Cisplatinum was reported.

On 12/30/16, three weeks after noting the presence of a peripheral neuropathy, Dr. Rao states there was no peripheral neuropathy present, but unsteady gait was present. Mrs. Reynolds

unsteady gait was related to Cisplatinum induced motor neuropathy. There was no evidence that that Mrs. Reynolds had paresthesias. It is clear her neuropathy was primarily motor and underrecognized by Dr. Rao and her medical/nursing staff. The delayed recognition of her neuropathy contributed to her prolonged exposure to Cisplatinum. As a result, she developed severe, life altering, permanent peripheral neuropathy of hands and legs.

I should point out that on a number of visits Mrs. Reynolds was seen by Physicians Assistants with oversight by Dr. Rao.

On 1/10/17 no coordination abnormalities or motor deficits were noted but unsteady gait persisted. Because of fatigue and weakness, switching therapy to Opdivo was considered.

Mrs. Reynolds was switched to Opdivo on 1/20/17 due to declining performance status from Cisplatinum/Alimta, and suspected progression of disease.

On 3/17/17 the progress note revealed unsteady gait, use of a walker and peripheral neuropathy of her hands. Gabapentin was initiated at a homeopathic dose. A similar note exists for 5/5/17.

As I review the records, Mrs. Reynolds experienced significant toxicities from her chemotherapy/Avastin regimen including: bowel perforation, hypertension, mucositis, anemia, thrombocytopenia, neutropenia, hyponatremia, hypomagmesemia, fatigue, weakness, weight loss and severe peripheral neuropathy.

Mrs. Reynolds was diagnosed with a left upper lobe adenocarcinoma on 11/16/15. Interestingly, a chest X-ray ordered by Dr. Hector Gomez on 7/29/15 indicated a right upper lobe infiltrate suggesting pneumonia. An aspirational biopsy of the right upper lobe was done on 7/8/15 at Southwest General hospital with negative cytology for cancer and a negative bacterial culture. No mention of a left upper lobe lesion(s) was noted. This suggests the left upper lobe findings were not identifiable by chest X-ray.

On 04/27/2015 Mrs. Reynolds had a PET/CT. That study was essential in evaluating and staging her cancer for Mrs. Reynolds appropriate medical management. I do not have the images of her subsequent PET/CT scans for review. Extracting from reviewing the available imaging reports: 7/18/17, 10/2/15, 4/29/16, 8/16/16, 12/12/16, 5/26/17 PET/CT scans were done.

The results of these scans showed mostly stable disease, with decreased masses and hypermetabolism on 4/29/16. None of the reports from Dr. Rao's notes measure an objective response on these scans. By RECIST measurable criteria (categorizes quantitative tumor size changes into complete response, partial response, stable disease, or progressive disease) I could not find any significant PET/CT scan changes among the scan reports. More importantly, no imaging study ever showed progression to Stage IV metastatic disease.

The Mrs. Reynold's record noted Mrs. Reynolds was taking Evista, but never indicated why. This omission of information is significant.  Did she have a history of breast cancer? Did she have breast adenocarcinoma metastatic to lung? Dr. Rao's omission of information about a hormonal drug primarily used for breast cancer fails the standard of care.

I have reached the following opinions about Mrs. Reynold care provider Dr. Jayasree Rao & Oncology San Antonio Cancer Center Network:

Mrs. Reynolds had Stage IIB disease. Dr. Rao mis-staged her disease 11/16/2015 as Stage IV and on all subsequent visits. This is a failure in the standard of care.
Mrs. Reynolds cancer was resectable and curable at that time, with surgery-left upper lobectomy.
Mrs. Reynolds was asymptomatic from her cancer on 11/15/15.
Mrs. Reynolds had stable findings from 4/27/2015 to 10/2/15 on PET/CT scans.
The appropriate management choices for an asymptomatic 81-year-old patient with confined low-grade adenocarcinoma, such as Mrs. Reynolds, would be left upper lobectomy, possible radiation, possible ALK kinase inhibitor, or observation.

By Dr. Rao's incorrectly diagnosing Mrs. Reynolds' cancer stage Mrs. Reynolds lost the chance for cure. This is a significant failure in the standard of care. The toxicities  endured by Mrs. Reynolds, have made employing curative therapy impossible.

Mrs. Reynolds had an ALK positive lesion.
The significance of ALK gene is indicated by the fact the pathologist performed this test as part of the routine study of a lung cancer.

If Mrs. Reynolds was staged IV by Dr. Rao, an ALK kinase inhibitor, Crizotinib should have been the treatment of choice. (Solomon BJ et al, NEJM 2014).

Dr. Rao should have known that targeted therapy with Crizotinib was the treatment of choice in Stage IV adenocarcinoma of the lung in patients with ALK positive disease. Not having this knowledge and not employing this therapy failed the standard of care.

Crizotinib is much less toxic and more efficacious than chemotherapy for ALK positive lung cancers. Failure to use Crizotinib, and using the other inappropriate neurotoxic agents I have noted above, is the direct and proximate cause of Mrs. Reynolds permanent and disabling neuropathy.

Failing to consider an ALK kinase inhibitor is below the standard of care and is negligent and grossly negligent.  Remarkably, Dr. Rao failed to get the ALK results. This failed the standard of care. Dr Rao made no inquiry and/or ignored the ALK results which is below the standard of care, both negligent and grossly negligent and a direct and proximate cause of Dr. Rao's use of inappropriate chemotherapeutic agents which caused permanent, disabling neuropathy.

This failure and the failure to appropriately stage Mrs. Reynolds cancer led to the inappropriate administration of toxic chemotherapy.

The toxic chemotherapy of Cisplatinum/Alimta caused Mrs. Reynolds marked clinical deterioration, with severe peripheral neuropathy, which has been permanent and disabling.

Dr. Rao also failed to search out the results of Mrs. Reynold's EGFR result. There are a number of tyrosine kinase oral inhibitors that would be preferable if this test was positive.

Dr. Rao also failed the standard of care by administering Avastin to a patient with recent diverticular disease that required hospitalization. This resulted in a perforated bowel which was directly caused by the Avastin.

Bowel disease is a relative contraindication to the use of bevacizumab as it leads to a significant risk of bowel perforation, which Mrs. Reynolds experienced. A prudent approach by an oncologist should have been to avoid the risks of bowel perforation in a patient with symptomatic bowel disease, given its small chance of benefit.  The risk of bowel perforation is so significant in a patient like Mrs. Reynold with a history of diverticulitis disease that is should preclude its usage.

My assessment is Mrs. Reynolds had Stage IIB adenocarcinoma of the lung. The lesion was curable at the time of diagnosis. The upstaging/ wrong staging to Stage IV by Dr. Rao failed the standard of care by confusing probable lepidic spread as metastatic disease. This error caused Dr. Rao to give Mrs. Reynolds toxic palliative chemotherapy instead of employing curative treatment. She incorrectly labeled Mrs. Reynolds' disease non resectable and noncurative. Dr. Rao did not seek the ALK results which were readily available, and should have been the basis for targeted therapy with Crizitonib

Crizinotib would have been the standard therapy in the setting of lung adenocarcinoma in an 81-year-old. She therefore failed the standard of care in not seeking this information, which is a causative reason for her error in administering therapy that caused a bowel perforation, numerous side effects outlined above, and life altering permanent peripheral neuropathy.
Failing to consider and use Crizotinib was a failure in the standard of care.

Finally, I believe Mrs. Reynolds had bronchoalveolar adenocarcinoma. This type of cancer is TTF1 and CK7 positive, as was Mrs. Reynold's tumor. Furthermore, this type of lesion is slow growing, susceptible to lepidic growth and limited aggressivity. This tumor would explain the local tumor involvement, absence of extrathoracic metastases, lack of significant measurable response to chemotherapy, and minimal, if any progression of tumor.
Dr. Rao failed the standard of care by not seeking the pathological results of a positive ALK, TTF1 and CK7 marker.

Molecular testing is mandatory and is the standard of care in every lung cancer biopsy specimen obtained. Molecular testing is required in all stage IV patients with adenocarcinoma of the lung (Standardofcare.com) to avoid chemotherapy toxicity, and to choose the most efficacious therapy.

The Lung Cancer Mutation Consortium in the United States demonstrated that the median survival of patients without driver mutations, with drivers mutations but not treated with targeted therapy, and with driver mutations and treated with targeted therapy was 2.08 years, 2.38 years, and 3.49 years, respectively in patients with Stage IV disease. This suggests that if Mrs. Reynolds was treated appropriately with Crizitonib (even with inappropriately diagnosed Stage IV disease) she would survived many years with minimal toxicity. In fact, Mrs. Reynolds has survived but with terrible non- curable debilitating neuropathy which is a direct result of Dr. Rao's mistreating and mis staging and inappropriately treating her tumor.

To summarize my analysis of the care provided to Mrs. Rey by Dr. Rao and Oncology San Antonio Cancer Center Network:

### Breech of Standard of Care of Jayasree Rao M.D.

Dr. Rao failed to meet the minimum standard of care in caring for Mrs. Reynolds. The following deviations from the standard of care are noted and apply to Dr. Rao.

1. Failed to properly stage Mrs. Reynolds cancer. This occurred at every visit to Dr. Rao's office.
2. Failed to recognize at every medical visit that that Mrs. Reynold was mis staged and more likely than not curable and should have led to curative left upper lobectomy.
3. Administered chemotherapy/Cisplatinum when a less toxic regimen was available based on ALK molecular target.
4. Failed to recognize that there was an alternative available to chemotherapy based on patients ALK results Crizotinib.
5. Failed to obtain ALK and EGFR results and incorporating that into Mrs. Reynolds treatment strategy throughout treatment.
6. Failed to take in to account the TTFI and CK7 histological markers which more likely than not indicates a bronchoalveolar adenocarcinoma which is less aggressive, more localized and a more likely curable tumor throughout treatment.
7. Failed to keep adequate medical records:
   a. Dr. Rao's use of the term palliative care does not apply to a patient who is Stage II B;
   b. Inconsistency of medical records; failed to timely note motor neuropathy complication of therapy;
   c. 12/23/15 note says she was quite ill with gastrointestinal complaints. Getting drastically ill within 1 month of initiation of therapy can hardly be reconciled with "it was tolerated well.
8. Administered Avistan in a patient with known diverticular disease.
9. Failed to timely recognize Cisplatinum induced peripheral neuropathy.
10. The delayed recognition of her neuropathy contributed to her prolonged exposure to Cisplatinum. As a result, she developed severe, life altering, uncurable, peripheral neuropathy of hands and legs.
11. Erroneously diagnosed the need for hospice as end of life due to cancer when it was reaction to the extreme toxicity from Cisplatinum.

### The Standard of Care for Jayasree Rao M.D.

The minimum standard of care for Dr. Jayasree Rao in caring for Mrs. Reynolds was as follows:

1. Properly stage Mrs. Reynolds cancer at every visit to Dr. Rao's office.
2. Recognize at every medical visit that that Mrs. Reynold was mis staged and more likely than not curable with appropriate therapy.
3. Do Not administer chemotherapy/Cisplatinum when a less toxic regimen was available based on ALK molecular target.

4. Recognize that there was an alternative better/ more appropriate treatment to chemotherapy based on patients ALK results, namely, Crizotinib.

5. Obtain ALK and EGFR results and incorporate those results into Mrs. Reynolds treatment strategy throughout treatment.

6. Take into account the TTFI and CK7 histological markers which more likely than not indicated a bronchoalveolar adenocarcinoma which is less aggressive, more localized and a more likely curable tumor throughout treatment.

7. Keep adequate medical records:

> a. Do not use the term "palliative care" for a patient who is Stage II B;
>
> b. Timely motor neuropathy complication of therapy;
>
> c. do not use the term, : "it was tolerated well" when Avastin therapy 12/23/15 note says she was quite ill with gastrointestinal complaints. Getting    drastically ill within 1 month of initiation of therapy can hardly be reconciled with "it was tolerated well".

8. Do Not administer Avastin in a patient with known diverticular disease

9. Timely recognize Cisplatinum induced peripheral neuropathy and take appropriate action

10. Timely recognize her neuropathy contributed to her prolonged exposure to Cisplatinum. As a result, she developed severe, life altering, uncurable, peripheral neuropathy of hands and legs.

11. Do Not diagnose the need for hospice as end of life care due to cancer when it was reaction to the extreme toxicity from Cisplatinum.

### *Analysis of Causation and Damages Pertaining to Dr. Jayasree* **Rao**

Dr. Jayasree Rao's failure to meet the minimum standard of care in caring for Mrs. Thelma Reynolds was a direct and proximate cause of damages to Mrs. Reynolds in the following ways:

1. Failure to properly stage Mrs. Reynolds cancer. This occurred at every visit to Dr. Rao's office. This was a direct and proximate cause of mistreatment with toxic chemotherapeutic agents as noted above which caused permanent disabling neuropathy and Mrs. Reynolds being independent and able to care for herself to her being placed in assisted living. It also caused severe depression and pain, suffering, and emotional distress and increased expenses associated with treatments and assisted living.

2. Failed to recognize at every medical visit that that Mrs. Reynold was mis staged and more likely than not curable with appropriate therapy. This was a direct and proximate cause of mistreatment with toxic chemotherapeutic agents as noted above which caused permanent disabling neuropathy and Mrs. Reynolds being independent and able to care for herself to her being placed in assisted living. It also caused severe depression and pain, suffering, and emotional distress and increased expenses associated with treatments and assisted living.

3. Administered chemotherapy/Cisplatinum when a less toxic regimen was available based on ALK molecular target. This was a direct and proximate cause of mistreatment with toxic chemotherapeutic agents as noted above which caused permanent disabling neuropathy and Mrs. Reynolds being independent and able to care for herself to her being placed in assisted living. It also caused severe depression and pain, suffering, and emotional distress and increased expenses associated with treatments and assisted living

4. Failed to recognize that there was an alternative available to chemotherapy based on patients ALK results Crizotinib. This was a direct and proximate cause of mistreatment with toxic

chemotherapeutic agents as noted above which caused permanent disabling neuropathy and Mrs. Reynolds being independent and able to care for herself to her being placed in assisted living. It also caused severe depression and pain, suffering, and emotional distress and increased expenses associated with treatments and assisted living

5. Failed to obtain ALK and  EGFR results and incorporating that into Mrs. Reynolds treatment strategy throughout treatment. This was a direct and proximate cause of mistreatment with toxic chemotherapeutic agents as noted above which caused permanent disabling neuropathy and Mrs. Reynolds being independent and able to care for herself to her being placed in assisted living. It also caused severe depression and pain, suffering, and emotional distress and increased expenses associated with treatments and assisted living
6. Failed to take in to account the TTFI and CK7 histological markers which more likely than not indicates a bronchoalveolar adenocarcinoma which is less aggressive, more localized and a more likely curable tumor throughout treatment. This was a direct and proximate cause of mistreatment with toxic chemotherapeutic agents as noted above which caused permanent disabling neuropathy and Mrs. Reynolds being independent and able to care for herself to her being placed in assisted living. It also caused severe depression and pain, suffering, and emotional distress and increased expenses associated with treatments and assisted living
7. Failed to keep adequate medical records
      a. Dr. Rao's use of the term palliative care does not apply to a patient who is Stage II B;
      b. Inconsistency of medical records; failed to timely note motor neuropathy complication of therapy
      c. 12/23/15 progress note says she was quite ill with gastrointestinal complaints. Getting drastically ill within 1 month of initiation of therapy can hardly be reconciled with "it was tolerated well
These record keeping failures delayed the recognition of life altering permanent neuropathy and was a direct and proximate cause of mistreatment with toxic chemotherapeutic agents as noted above which caused permanent disabling neuropathy and Mrs. Reynolds being independent and able to care for herself to her being placed in assisted living. It also caused severe depression and pain, suffering, and emotional distress and increased expenses associated with treatments and assisted living.
The delayed recognition of Mrs. Reynold's neuropathy contributed to her prolonged exposure to Cisplatinum. As a result, she developed severe, life altering, uncurable, peripheral neuropathy of hands and legs. This was a direct and proximate cause of mistreatment with toxic chemotherapeutic agents as noted above which caused permanent disabling neuropathy and Mrs. Reynolds being independent and able to care for herself to her being placed in assisted living. It also caused severe depression and pain, suffering, and emotional distress and increased expenses associated with treatments and assisted living.
9. Administered Avastin in a patient with known diverticular disease. This was a direct and proximate cause of bowel perforation and the pain and suffering and expenses associated with this along with the weakening of an elderly patient such as Mrs. Reynolds who was subjected to a serious illness that should not have occurred but for the negligence of Dr. Rao.  This was a direct and proximate cause of mistreatment with toxic chemotherapeutic agents as noted above which caused permanent disabling neuropathy and Mrs. Reynolds being independent and able to care for herself to her being placed in assisted living. It also caused severe depression and pain, suffering, and emotional distress and increased expenses associated with treatments and assisted

living.

10. Failed to timely recognize Cisplatinum induced peripheral neuropathy. This was a direct and proximate cause of mistreatment with toxic chemotherapeutic agents as noted above which caused permanent disabling neuropathy and Mrs. Reynolds being independent and able to care for herself to her being placed in assisted living. It also caused severe depression and pain, suffering, and emotional distress and increased expenses associated with treatments and assisted living.

11. Erroneously diagnosed the need for hospice as end of life due to cancer when it was reaction to the extreme toxicity from Cisplatinum. This was as direct and proximate cause of depression and emotional distress in a patient who was negligently told she had 6 months or less to live when in fact she had much more time to live but suffered with the spectre of impending death due to Dr. Rao's negligent disease staging and treatments which caused permanent life threatening neuropathy. I have been told that Mrs. Reynolds effectively lost the will to live which was not due to her disease but rather due to the toxic, wrong chemotherapies administered to her by Dr. Rao and her staff at Oncology

**Gross Negligence:**

Dr. Jayasree Rao was grossly negligent by inappropriately staging Mrs. Reynolds, failing to give Mrs. Reynolds the opportunity to be cured of her cancer, by not obtaining and incorporating into the treatment evaluation protocol the results of molecular markers, specifically, the ALK marker, which was available at all times to Dr. Rao and her staff, and as a result Dr. Rao was consciously indifferent to the health and safety of Mrs. Reynolds, and treated her with toxic neuropathic chemotherapy, inappropriate at all times for the tumor Mrs. Reynolds actually had, causing Mrs. Reynolds severe, debilitating, incurable, peripheral neuropathy ( permanent damage to nerves) which has required Mrs. Reynolds to go from independent living to assisted living, with associated costs and life stresses associated with having to give up her independence. In addition, Mrs. Reynolds became so debilitated from the neuropathy that due to her weakness and exhaustion and false assessment by Dr. Rao and her staff that she was dying, she agreed to enter hospice, a program designed by law to be only for those with 6 or fewer months to live. This was a false and negligent referral by Dr. Rao based on a negligent diagnosis and assessment and negligent and grossly negligent treatment that caused debilitation and permanent neuropathy.

I will assume that Dr. Rao is an employee of Oncology San Antonio Cancer Center Network as are the employees who cared for Mrs. Reynolds at Dr. Rao's direction. And as such, Oncology San Antonio Cancer Center Network is vicariously liable for the negligence and gross negligence of Dr. Rao and its employees as I have specified in detail above. All of my criticism and causation analysis and damages analysis for Dr. Rao apply equally to Oncology San Antonio Cancer Center Network and its employees.

**Conclusion***:*
Based upon my review of the medical records, and based upon my knowledge, training and experience, it is my opinion that based upon reasonable medical probability, Mrs. Thelma Reynolds suffered pain, suffering, extra medical costs, and emotional distress in addition to the probability of future pain and suffering due to negligence and gross negligence of Dr. Rao and Oncology San Antonio Cancer Center Network, as explained in detail above. Dr. Rao failed to stage Mrs. Reynold's cancer correctly, failed to incorporate the ALK markers into a treatment plan at all times, and treated Mrs. Reynolds with the wrong chemotherapeutic drugs which

caused severe debilitating permanent neuropathy.

As more materials become available in this case, I reserve the right to supplement or amend this report.

Sincerely,

Stephen C. Cohen M.D.


Encls.  Exhibit A CV
        Exhibit B Any research?

CURRICULUM VITAE

**NAME:**                       STEPHEN CARL COHEN, M.D.

**BORN:**                       Brooklyn, New York
                                April 20, 1944

**MARRIED:**                    Elaine Bergman
                                December 25, 1965

**CHILDREN:**                   Andrew Seth, born July 27, 1969
                                Harris Lee, born August 15, 1971

**SCHOOLS:**                    1961  Thomas Jefferson High School
                                1965  Univ. of Miami, Coral Gables,
                                          Florida (B.S.)
                                1969  Univ. of Oklahoma School of
                                          Medicine, (M.D.) Medicine Internist

**TRAINING:**                   1971  Univ. of Washington, Internal
                                          Medicine Residency
                                1974  Walter Reed, Washington, D.C.,
                                          Fellowship Hematology/Oncology

**BOARD CERTIFICATION:**        National Board of Medical Examiners, 1970
                                American Board of Internal Medicine, 1974
                                Subspecialty Board in Medical Oncology, 1975
                                Subspecialty Board in Hematology, 1976
                                Post Surgeon, Ft. Leslie J. McNair, Washington,
                                D.C.

**EMPLOYMENT:**                 1974-1975 Asst. Chief, Hematology - Oncology
                                Service, U.S. Army, Fitzsimmons Army Hospital,
                                Denver, Colorado

                                1975-1978 Practice of Medical Oncology with
                                Southwest Oncology Associates, P.A., San Antonio,
                                Texas
                                1978 – 10/2009 - Private Practice of Medical
                                          Oncology, San Antonio Tumor & Blood Clinic,
                                          P.A.
                                1992 - 1999 - Healthcare Analysis & Review, Inc.,
                                          San Antonio, Texas
                                1998 – Present – President, The Standard of Care
                                1999 – Present – President, Sign of the Times
                                2009 – Present – Private Medical Practice;
                                          Medical Therapy & Research, PLLC
                                2014 California Medical Weight Management

**SOCIETIES:**  Alpha Omega Alpha
                Bexar County Medical Society
                        (Vice President, 1986; President, 1987)
                South Texas Regional Blood Bank
                        (President, 1985-1986)
                Texas Medical Association
                American Medical Association
                Physicians Who Care

(President, 1985-1996)
(National Vice President, 1989-1997)

**CURRICULUM VITAE**
STEPHEN C. COHEN, M.D.
PAGE 2

                National President, 1997-1998)
                Baptist Medical System
                (Chief of Staff, Northeast, 1988)
                (President Medical Executive Board, 1990)
                Healthcare Analysis & Review, Inc.  1994-
                American Society of Hematology
                American Society of Oncology
                American College of Physicians

**LICENSURE:**  Texas, 1975

**TEACHING POSITION:**  1985      Clinical Professor Medicine,
                                  The University of Texas Health Science Center
                                  at San Antonio, Texas.

                        BIBLIOGRAPHY

1.  Cohen, S.C. and Gabelnick, H.L.:  Effects of Cyclophosphamide and
    Adriamycin on the Healing of Surgical Wounds in Mice. Cancer 36:4,
    1277-1281, 1975.

2.  Cohen, S.C., Gabelnick, H.L., Johnson, R.K., and Goldin, A.: Effects of
    Antineoplastic Agents on Wound Healing in Mice. Surgery 78:2, 238-244,
    1995.

3.  Cohen, S.C., et al: Adriamycin Recall Injury. Annals of Internal Medicine,
    83:232, 1975.

4.  Cohen, S.C., Gabelnick, H.L., Johnson, R.K. and Goldin, A.: Effect of
    Antineoplastic Agents on Wound Healing in Mice.  Year Book of Cancer
    1977, 468, 1977.

5.  Bergevin, P.R., and Cohen, S.C.:  Bone and Soft Tissue. Guide to
    Therapeutic Oncology, 519-531, 1971.

6.  Gregory, Ernest, J., Cohen, S.C., Oines, Donald W., Mims, Charles H.:
    Megestrol Acetate Therapy for Advanced Breast Cancer.  Journal of
    Clinical Oncology, Vol 3, No. 2, 155-160, 1985.

7.  Gordon, D.H., Cohen, S.C., Lopez, J.A.: 5-FU and Mitomycin-C Therapy of
    Gallbladder and Extrahepatic Biliary Duct Carcinomas.  Proceedings of
    ASCO, Vol 4, 84, 1985.

8.  Lopez, J.A., Gordon, D.H., Cohen, S.C.: 5-FU and Mitomycin-C (FAM)
    Chemotherapy of Hepatocellular Carcinoma. Proceedings of ASCO, Vol 4,
    84, 1985.

9.  Storm, F.K., Scanlon, E.F., Baker, H.W., Cohen, S.C. Khandekar, J.D.,
    Galen, W.P., Benz, M., Drury, R., Roe, D., Morton, D.L.: Response to
    Clinical Thermochemotherapy with Single and Combination Drugs.
    Proceedings of ASCO, Vol 4, 129, 1985.

CURRICULUM VITAE
STEPHEN C. COHEN, M.D.
PAGE 3

10. Storm, F.K., Baker, H.W., Scanlon, E.F., Plenk, H.P., Meadows, P.W., Cohen, S.C., Olson, C.E., Thomson, J.W., Khandekar, J.D.: Hyperthermia. Cancer, Vol 55, No. 11, June 1, 1985.

11. Cohen, S.C., Gordon, D.H., McNiff, J., Packard, A., Lopez, J.A.: Hyperthermia (HT) in Combination with Radiotherapy (RT) or Chemotherapy in the Treatment of Central Nervous System (CNS) Malignancies. Proc Amer Soc Clin Oncol, 4:140, (C-545), 1985.

12. Cohen, S.C.: Reforming the Health Care System. New England Journal of Medicine, Vol 324, No 13, 920, March 26, 1991.

13. Bronow, Ronald S., Beltran, Robert A., Cohen, S.C., Elliott, Paul T., Goldman, Gordon M., Spotnitz, Seth G.: The Physicians Who Care Plan. JAMA, Vol 265, No 19, 2511, May 15, 1991.

14. Cohen, Stephen C.: Patients' Freedom of Choice is Crucial to Health Care Reform. Oncology Times, No. 13, June, 1993.

15. Cohen, Stephen C.: Keep Choice in Any New Health Plan. San Antonio Express News, September 9, 1993.

16. Cohen, Stephen C.: Government's Heavy Hand. Policy Review, No 66, 87, Fall 1993.

17. Cohen, Stephen C.: Physicians' insensitivity to blame for managed care woes. Texas Medicine, Vol 89, No 11, 7, November 1993.

18. Cohen, Stephen C.: Health Care Reform. North San Antonio Times and Recorder Times. May 24, 1994.

19. Cohen, Stephen C.: Medical Resources Could be Rationed. North San Antonio Times and Recorder Times. April 7, 1994.

20. Cohen, Stephen C.: Rights Missing. The Daily Oklahoman. April 28, 1994.

21. Cohen, Stephen C.: Oncologists and Health Care Reform. Oncology Times, Viewpoints, Vol XVI, No. 8, August 1994.

22. Cohen, Stephen C.: Letter, Business Week, March 10, 1995.

23. Cohen, Stephen C.: Head to Head: One Issue, Two Viewpoints. CANCER Management Today, Vol. 1 No. 3, October 1996, p 6.

24. Cohen, Stephen C.: The Standard of Care - A Guide to the Prudent Practice of Medicine for the Legal Profession, Editor and Publisher, January 1998 –

25. Cohen, Stephen C., Minn, M.C.: Complete Recovery from Refractory Immune Thrombocytopenic Purpura in Three Patients Treated with Etanercept. American Journal of Hematology, 73:135-140, 2003.

Revised: 01/22/2015

4

**CURRICULUM VITAE**
STEPHEN C. COHEN, M.D.
PAGE 4

<u>**SPEECHES AND PRESENTATIONS**</u>:

<u>House Ways and Means Subcommittee</u>, October 26, 1993. U.S. Health Care Reform: Implications for Patients, Practice and Progress, "How Quality Care Will Be Affected"; Beacon Hill Institute at Suffolk University and The Medical Action Committee for Education; Cambridge, Ma., November 13, 1993.

Winter Meeting of the National Governors' Association Health Networks Plenary Session, National Governors' Association, Washington, DC, January 31, 1994.

University of Texas School of Law Health Seminar, Austin, Texas, "Breast Cancer: Diagnostic Delay and Its Significance" January 1996.

American Association of Legal Nurse Consultants Greater Houston Chapter Annual Seminar, Houston, Texas, "Managed Care and Its Influence on Clinical Medicine," October 1996.

CNN Interview, Financial Report, August 5, 1997.

American Society of Dermatology, October 5, 1997.

Panelist, Cooper Institute for Advanced Studies in Medicine and the Humanities, Naples, FL. "Patient Relationship - A Dialogue: Understanding Managed Care".   February 1998.

Host - "PWC Presents" on weekly cable TV. October 1998-

Nurse Oncology Educational Program, Laredo, Texas, January 15, 1999.

---

Independent Professional Medical Review Fee: $350.00 Per Hour

Dr. Cohen can be reached at Medical Office: Phone 210/590-8206
                                         FAX:  210/590-8251

**CLINICAL RESEARCH EXPERIENCE:**

A Phase III, Double Blind, Placebo-controlled multicenter study to determine the effectiveness and tolerability of the combination of XXXXX and XXXXX Versus XXXXX in H.I.V.-1 Infected patients receiving XXXXX XXXXX (NRTI) Therapy.
**Sponsor:   Dupont Merck Pharmaceuticals Co.**
**Stephen Carl Cohen, MD: Sub-Investigator 1997-1999**

A Randomized Double Blind Placebo Controlled Comparison of the Analgesic Activity of XXXXX BID as Add-On-Therapy to Opioid Medication in Patients with Chronic Cancer Pain
**Sponsor: Searle**
**Stephen Carl Cohen, MD: Principal Investigator 1998-2000**

A Randomized, Double-Blind, Active-Comparator-Controlled, Parallel-Group Study to Evaluate the Safety of XXXXX in Patients with Osteoarthritis or Rheumatoid Arthritis
**Sponsor: Merck**
**Stephen Carl Cohen, MD: Principal Investigator 2003-2006**

A 6-Month Double-blind, Double-dummy, Randomized, Parallel group, Multicenter Efficacy and Safety Study of XXXXX Compared to XXXXX, XXXXX and Placebo in Patients with COPD
**Sponsor: AstraZeneca**
**Stephen Carl Cohen, MD: Principal Investigator 2003-2006**

A Study To Evaluate The Clinical And Microbial Efficacy And Safety Of XXXXX Compared To Vehicle In The Treatment Of Bacterial Conjunctivitis

**Sponsor: Insite Vision Inc.**
**Stephen Carl Cohen, MD: Sub-Investigator 2004-2005**

A Phase I Open-Label Escalation Study of XXXXX Injection Administered Intratumorally and Locally to Patients with Solid Tumors In accordance with Sponsors protocol no. XXXXX
**Sponsor-CRO:  PPD Development**
**Stephen C. Cohen, M.D. Medical Monitor**

A Randomized, 24-week, Double-blind, Placebo-controlled, Parallel-group Study to Evaluate the            Efficacy, Safety and Tolerability of XXXXX in Patients with Chronic Obstructive Pulmonary Disease (COPD)
**Sponsor: GlaxoSmithKline**
**Stephen Carl Cohen, MD: Principal Investigator 2004-2006**

A Randomized, Investigator-Blind, Active-Controlled, Parallel-Group Study To Compare The Efficacy And Safety Of 6-Week Treatment With XXXXX Pediatric Suspension In Children With Tinea Capitis
**Sponsor: Novartis**
**Stephen Carl Cohen, MD: Principal Investigator 2004-2006**

A Multicenter, Double-Blind, Placebo-Controlled Efficacy and Safety Study of XXXXX in Female Patients with Irritable Bowel Syndrome
**Sponsor: Pain Therapeutics, Inc.**
**Stephen Carl Cohen, MD: Sub-Investigator 2005-2006**

A Multicenter, Double-Blind, Placebo-Controlled Efficacy and Safety Study of Low-Dose XXXXX in Male Patients with Irritable Bowel Syndrome
**Sponsor: Pain Therapeutics, Inc.**
**Stephen Carl Cohen, MD: Sub-Investigator 2005-2006**

An International, Randomized, Double-Blind, Placebo-Controlled, Multicenter, 6-Month Study Of The Efficacy And Safety Of XXXXX Vs. Placebo For The Suppression Of XXXXX Genital Herpes In Newly Infected Immunocompetent Subjects.
**Sponsor: GlaxoSmithKline**
**Stephen Carl Cohen, MD: Principal Investigator 2005-2006**

An open-label, randomized, multicenter, clinical study to compare the effects XXXXX XXXXX, and XXXXX XXXXX on the penicillin or macrolide resistance of Streptococcus pneumoniae in patients with acute exacerbation of chronic bronchitis
**Sponsor: Aventis**
**Stephen Carl Cohen, MD: Principal Investigator 2005**

A Randomized, Double-Blind, Placebo-Controlled, Multicenter Phase 3 Study to Evaluate the Efficacy and Safety of XXXXX 1.5 mg Once Daily and 0.5mg Twice Daily for 12 Weeks for the Treatment of Opioid-Induced Bowel Dysfunction in Adults taking Opioid Therapy for Persistent Non-Cancer Pain
**Sponsor: GlaxoSmithKline**
**Stephen Carl Cohen, MD: Principal Investigator 2005-2006**

A Multicenter, Randomized, Double-Blind, Triple-Dummy, Placebo-Controlled, Parallel Group, Four-Week Study Assessing the Efficacy XXXXX Nasal Spray 200 mcg QD versus XXXXX 10 mg QD in Adolescent and Adult Subjects with Asthma and Seasonal Allergic Rhinitis Who are Receiving XXXXX XXXXX 100/50 mcg BID or Placebo BID, Subject Activity
**Sponsor: GlaxoSmithKline**
**Stephen Carl Cohen, MD: Principal Investigator 2005-2006**

Randomized, Double-Blind Trial of XXXXX 350-mg and 250 mg Tablet Compared to Placebo in Patients with Acute, Painful Musculoskeletal Spasm of the Lower Back
**Sponsor: MedPointe Pharmaceuticals**
**Stephen Carl Cohen, MD: Principal Investigator 2005-2006**

A phase III pivotal, multi-center, double-blind, randomized, placebo-controlled mono-therapy study of XXXXX for treatment of fibromyalgia
**Sponsor: Forest Labs**

**Stephen Carl Cohen, MD: Principal Investigator 2005-2006**

An extension  phase III pivotal, multi-center, double-blind, randomized,
placebo-controlled mono-therapy study of XXXXX for treatment of
fibromyalgia
**Sponsor: Forest Labs**
**Stephen Carl Cohen, MD: Principal Investigator 2005-2006**

Randomized, double-blind trial of XXXXX 250-mg tablets compared to
placebo in patient with acute, painful musculoskeletal spasm of the lower
back
**Sponsor: MedPointe Pharmaceuticals**
**Stephen Carl Cohen, MD: Principal Investigator 2006**

A multicenter, randomized, double-blind, prospective study comparing the
safety and efficacy XXXXX and XXXXX combination therapy to XXXXX and
XXXXX in subjects with mixed dyslipidemia
**Sponsor: Abbott Labs**
**Stephen Carl Cohen, MD: Principal Investigator 2006**

A phase IIIb Multicenter, randomized, double-blind, placebo-controlled study of XXXXX in subjects with
moderate to severe persistent asthma who are inadequately controlled with high-dose XXXXX and long-
acting XXXXX
**Sponsor: Genentech**
**Stephen Carl Cohen, MD: Principal Investigator 2006**

A 12- week, randomized, double-blind, dose-ranging, placebo-controlled study of XXXXX in subjects with
irritable bowel syndrome
**Sponsor: RTI**
**Stephen Carl Cohen, MD: Principal Investigator 2006**

A clinical study to evaluate the safety and efficacy of XXXXX 12-HR 5 mg XXXXX  tabled BID vs.
placebo tablet in the treatment of Allergic Rhinitis
**Sponsor: Schering Plough**
**Stephen Carl Cohen, MD: Principal Investigator 2006**

A multicenter, randomized, double-blind, placebo-controlled, parallel group, adaptive-design, efficacy,
safety and tolerability study of 4 fixed oral doses of XXXXX in adult outpatients with fibromyalgia
syndrome
**Sponsor: Wyeth**
**Stephen Carl Cohen, MD: Principal Investigator 2006**

An observational study to characterize the burden of illness associated with laxative use in subjects using
opioids for the management of persistent pain
**Sponsor: GlaxoSmithKline**
**Stephen Carl Cohen, MD: Principal Investigator 2006**

A Long-Term Safety and Efficacy Study of XXXXX in Elderly Subjects with Primary Chronic Insomnia
**Sponsor: Sepracor**
**Stephen Carl Cohen, MD: Principal Investigator 2006**

A Multicenter, Randomized, Double-Blind, Placebo-Controlled, Parallel-Group Study of Oral XXXXX  for
the Treatment of Opioid-induced Bowel Dysfunction in Subjects With Chronic Non-Malignant Pain
**Sponsor: Wyeth**
**Stephen Carl Cohen, MD: Principal Investigator 2006**

A Comparison of XXXXX Nasal Spray versus Oral XXXXX in the Treatment of Seasonal Allergic
Rhinitis
**Sponsor: GlaxoSmithKline**
**Stephen Carl Cohen, MD: Principal Investigator 2006**

A Multi-Center, No Drug Treatment, Cross-Sectional Survey Study to Develop and Validate the Rhinitis
Control Assessment Questionnaire (RCAQ) in Adult and Adolescent Subjects 12 Years of Age and Older
with Non-Infectious Allergic Rhinitis
**Sponsor: GlaxoSmithKline**
**Stephen Carl Cohen, MD: Principal Investigator 2006**

Evaluation of nasal congestion clinical efficacy for XXXXX 25 mg and XXXXX 50 mg in seasonal
allergic rhinitis:  A randomized, double-blind, placebo and XXXXX controlled study
**Sponsor: Pfizer**
**Stephen Carl Cohen, MD: Principal Investigator 2006**

A 12-week, randomized, double-masked, parallel group comparison of XXXXX given in the evening,
XXXXX given in the evening, and XXXXX given in the morning in subjects with open  angle glaucoma
or ocular hypertension in the United States
**Sponsor: Pfizer**
**Stephen Carl Cohen, MD: Sub-Investigator 2006**

A double-blind, placebo controlled evaluation of the efficacy, safety and tolerability of XXXXX  in the
treatment of breakthrough pain in cancer patients
**Sponsor: BSI**
**Stephen Carl Cohen, MD: Principal Investigator 2006**

An open label, long-term treatment evaluation of safety of XXXXX use for breakthrough pain in cancer
subjects on chronic opioid therapy
**Sponsor: BSI**
**Stephen Carl Cohen, MD: Principal Investigator 2006**

A study to evaluate the clinical and microbial efficacy of XXXXX
compared to vehicle in the treatment of bacterial conjunctivitis,
Pediatric ages 6 months to 18years old
**Sponsor: Bausch & Lomb**
**Stephen Carl Cohen, MD: Sub-Investigator 2006**

A 6-Month Open-Label Extension Study of the Long-Term Safety of XXXX in
Outpatient with Fibromyalgia Syndrome
**Sponsor: Wyeth**
**Stephen Carl Cohen, MD: Principal Investigator 2006**

A 52-week Randomized, Double-Blind, Parallel Group, Placebo Controlled,
Multicenter Clinical Trail, To Assess The Efficacy and Safety of 200mg of
the XXXXX Compared to Placebo, Both Administered Once Daily By
Inhalation, in the maintenance treatment of patients with moderate to
severe, stable chronic obstructive pulmonary disease
**Sponsor: Almirall Prodesfarma**
**Stephen Carl Cohen, MD: Principal Investigator 2006**

Randomized, Double-Blind Trial of the Combination of XXXXX 250-mg
Tablets and XXXXX 50-mg Tablets Compared to Placebo and Either Product
Alone in Patients with Acute, Painful Musculoskeletal Spasm of the
Lower Back
**Sponsor: Medpointe**
**Stephen Carl Cohen, MD: Principal Investigator 2007**

A Randomized, Double-Blind, Placebo Controlled, Safety and Efficacy
Study of XXXXX  in Subjects with Fibromyalgia
**Sponsor: Jazz Pharmaceuticals, Inc.**
**Stephen Carl Cohen, MD: Principal Investigator 2007**

A Long-Term, Open Label Safety and Efficacy Study of XXXXX in Subjects
with Fibromyalgia
**Sponsor: Jazz Pharmaceuticals, Inc.**
**Stephen Carl Cohen, MD: Principal Investigator 2007**

A randomized, open-label, blinded-endpoint, parallel-group trial of GI
safety of XXXXX compared with non-selective XXXXX  in osteoarthritis
patients
**Sponsor: Pfizer**
**Stephen Carl Cohen, MD: Principal Investigator 2007**

A 16-week, Parallel-Group, Double-Blind, Randomized, Placebo-
Controlled, Multicenter, Dose-Ranging Study to Evaluate the Efficacy,
Safety and Tolerability of Multiple Doses and Multiple treatment
Regimens of XXXXX, with XXXXX as an Open-Label Active Reference, in
Subjects with Type 2 Diabetes Mellitus
**Sponsor: GlaxoSmithKline**
**Stephen Carl Cohen, MD: Principal Investigator 2007**

A 12-Week, Multicenter, Randomized, Double-Blind, Parallel-Group Study
of the Combination of XXXXX and XXXXX Compared to XXXXX and XXXXX in
Subjects with Type IIa and IIb Dyslipidemia
**Sponsor: Abbott Laboratories**
**Stephen Carl Cohen, MD: Principal Investigator 2007**

A Randomized, Open-Label, Two-Way Crossover Trial of XXXXX  Inhalation
Solution (20mcg) and XXXXX  in the Treatment of Patients with Chronic
Obstructive Pulmonary Disease
**Sponsor: Dey**
**Stephen Carl Cohen, MD: Principal Investigator 2007**

A Double-Blind, Randomized, Placebo-Controlled Phase 2b Study of XXXXX,
XXXXX, and XXXXX mg BID XXXXX in Female Outpatients with Irritable
Bowel Syndrome
**Sponsor: Pharmos**

**Stephen Carl Cohen, MD: Principal Investigator 2007**

Safety and Efficacy of Olopatadine HCI Nasal Spray in 6-11 Year Old
Patients
**Sponsor: Alcon**
**Stephen Carl Cohen, MD: Sub-Investigator 2007**

A Randomized, Double-Blind, Placebo-Controlled, Parallel-Group, Multi-
Center Study to Evaluate the Effects of a One-Year Course of  XXXXX XXXXX
Nasal Spray XXXXX QD on Growth in Pre-Pubescent, Pediatric Subjects with
Perennial Allergic Rhinitis.
**Sponsor: GlaxoSmithKline**
**Stephen Carl Cohen, MD: Principal Investigator 2007**

A Multi-center, Randomized, Controlled Study to Investigate the Safety and Tolerability of XXXXX XXXXX (XXXXX) vs. Standard Medical Care in Treating Iron Deficiency Anemia in Heavy Uterine Bleeding and Postpartum Patients
**Sponsor: Luitpold Pharmaceuticals**
**Stephen Carl Cohen, MD: Principal Investigator 2007**

A Randomized, Double-Blind, Placebo-Controlled, Multicenter, Parallel Group Study to Assess the Efficacy (Reduction of Cardiovascular Disease Events) and Safety of 100 mg XXXXX XXXXX XXXXX in Patients at Moderate Risk of Cardiovascular Disease
**Sponsor: Bayer Healthcare**
**Stephen Carl Cohen, MD: Principal Investigator 2007**

A Randomized, Double-Blind, Placebo and Active Comparator-Controlled, Parallel-Group Study of the Efficacy and Safety of XXXXX as Monotherapy Treatment of Type 2 Diabetes Mellitus
**Sponsor: Daiichi Sankyo Development**
**Stephen Carl Cohen, MD: Principal Investigator 2007**

A randomized, multicenter, double-blind study to compare the efficacy of single-day treatment (1000 mg b.i.d.) with XXXXX compared to that of Placebo in patient-initiated episodic treatment of recurrent genital herpes in immunocompetent black patients
**Sponsor: Novartis**
**Stephen Carl Cohen, MD: Principal Investigator 2007**

A Phase 3 Multicenter, Randomized, Double-Blind, Placebo-Controlled Study to Evaluate the Efficacy and Safety of XXXXX XXXXX in Subjects with Uncomplicated Acute Influenza
**Sponsor: Biocryst**
**Stephen Carl Cohen, MD: Principal Investigator 2007**

A Multi-center, Randomized, Double-blind, Placebo-controlled Study with an Open-label Run-in to Assess the Efficacy, Tolerability, and Safety of XXXXX 10 or XXXXX 20 Compared to Placebo in Opioid-naïve Subjects with Moderate to Severe, Chronic Low Back Pain
**Sponsor: Purdue Pharma, L.P.**
**Stephen Carl Cohen, MD: Principal Investigator 2007**

A Multi-center, Randomized, Double-blind, Placebo-controlled Study with an Open-label Run-in to Assess the Efficacy, Tolerability, and Safety of XXXXX 10 or XXXXXX 20 Compared to Placebo in Opioid-naïve Subjects with Moderate to Severe, Chronic Pain due to Osteoarthritis of the Knee.
**Sponsor: Purdue Pharma, L.P.**
**Stephen Carl Cohen, MD: Principal Investigator 2007**

A Phase II randomized, observer blind, multicenter study of  XXXXX XXXXX combined XXXXX XXXXX XXXXX XXXXX (XXXX) versus XXXXX, according to a one dose schedule, both administered subcutaneously at 12-14 months of age, concomitantly with XXXXX XXXXX XXXXX  (XXXXX) and XXXXX XXXXX XXXXX (XXX) but at separate sites.
**Sponsor: GlaxoSmithKline**
**Stephen Carl Cohen, MD: Sub-Investigator 2007**

The Efficacy and Safety of XXXXX in the Treatment of Osteoarthritis of the Knee
**Sponsor: Wyeth**
**Stephen Carl Cohen, MD: Principal Investigator 2007**

Efficacy and Safety of 200 mcg BID XXXXX Nasal Spray (XXXX) vs Placebo as Adjunctive Treatment to Antibiotics in Relief of Symptoms of Acute Bacterial Sinusitis
**Sponsor: Schering-Plough**
**Stephen Carl Cohen, MD: Principal Investigator 2007**
A multi-center, randomized, double-blind, placebo-controlled, parallel-group study evaluating the efficacy and impact on health-related quality of life of XXXXX 5 mg once daily given for 2 weeks in subjects 18 yr of age and older with seasonal allergic rhinitis
**Sponsor: UCB Inc.**
**Stephen Carl Cohen, MD: Principal Investigator 2008**

A Multiple-Dose, Non-Randomized, Open-Label, Multicenter Study to Evaluate the Long-Term Safety and Effectiveness of XXXXX in the Treatment of Breakthrough Pain in Cancer Patients
**Sponsor: Endo Pharmaceuticals**
**Stephen Carl Cohen, MD: Principal Investigator 2008**

Evaluation of XXXXX XXXXX (XXXXX) on Carotid Intima-Media Thickness (cIMT) in Subjects with Type IIb Dyslipidemia with Residual Risk in Addition to XXXXX XXXXX (XXXXX) Trial
**Sponsor: Abbott Laboratories**
**Stephen Carl Cohen, MD: Principal Investigator 2008**

A Randomized, Double-blind, Placebo-controlled Study of XXXXX (XXXXX) in the Treatment of Irritable Bowel Syndrome with Diarrhea (IBS-D)
**Sponsor: AGI Therapeutics**
**Stephen Carl Cohen, MD: Principal Investigator 2008**

An Open-label, Roll-over Safety Study of XXXXX (XXXXX) in the Treatment of Irritable Bowel Syndrome with Diarrhea (IBS-D)
**Sponsor: AGI Therapeutics**
**Stephen Carl Cohen, MD: Principal Investigator 2008**

Randomized, Double-Blind, Double-Dummy Trial of Two Sustained Release Formulations of XXXXX Compared to Placebo in Patients with Acute, Painful Musculoskeletal Spasm of the Lower Back
**Sponsor: Meda Pharmaceuticals**
**Stephen Carl Cohen, MD: Principal Investigator 2008**

A 12-week, randomized, double-blind, double dummy, multi-center, phase IV study comparing the efficacy and safety of XXXX XXXXX XXXX x 2 actuations twice daily versus XXXXX XXXXX XXXXX XXXXX XXXXX x 2 inhalations twice daily, in adult and adolescent (≥12 years) African American subjects with asthma
**Sponsor: AstraZeneca**
**Stephen Carl Cohen, MD: Principal Investigator 2008**

A Randomized, Double-Blind, Placebo-Controlled, Safety and Efficacy Study of XXXXX (XXXXX XXXXX) in Subjects with Fibromyalgia
**Sponsor: Jazz Pharmaceuticals**
**Stephen Carl Cohen, MD: Principal Investigator 2008**

A Multicenter, Randomized, Double-Blind, Placebo Controlled, XXXXX-Referenced, Parallel-Group, Adaptive Design Study of XXXXX XXXXX in Adult Female Outpatients With Fibromyalgia Syndrome
**Sponsor: Wyeth Consumer Healthcare**
**Stephen Carl Cohen, MD: Principal Investigator 2008**

A Multicenter, Randomized, Double-Blind Study to Evaluate the Efficacy and Safety of XXXXX Compared to XXXXX in Elderly Subjects with Type 2 Diabetes
**Sponsor: Takeda Global Research & Development**
**Stephen Carl Cohen, MD: Principal Investigator 2008**

A Multi-center, Randomized, Controlled Study to Investigate the Safety and Tolerability of A Single Dose of XXXXX XXXXX XXXXX (XXXXX) vs. Standard Medical Care in Treating Iron Deficiency Anemia in Subjects Who are Not Dialysis Dependent

**Sponsor: Luitpold Pharmaceuticals, Inc.**

**Stephen Carl Cohen, MD: Principal Investigator 2008**

A Randomized, Double-Blind, Multicenter Trial Comparing the Efficacy of the
XXXXX XXXXX XXXXX XXXXX XXXXX XXXXX (XXXXX) to a Control for the Treatment of Chronic Lower Back Pain
**Sponsor: Empi, a ReAble Company**
**Stephen Carl Cohen, MD: Principal Investigator 2008**

A Randomized, Multiple-Dose, Double-Blind, Crossover Trial to Assess the Systemic Exposure of XXXXX XXXXX (XXXXX)/XXXXX XXXXX (XXXXX) Fixed-Dose Combination Compared to XXXXX and XXXXX Monocomponents, and a 7-Day Open-Label Extension in Subjects with Chronic Obstructive Pulmonary Disease (COPD)
**Sponsor: Dey, LP**
**Stephen Carl Cohen, MD: Principal Investigator 2008**

A multicenter, randomized, placebo-controlled, "factorial" design, 12-month study to evaluate the efficacy and safety of XXXXX 25 mg/day and 50 mg/day co-administered with all registered XXXXX strengths ranging from 10 mg to 80 mg in patients with primary hypercholesterolemia
**Sponsor: Sanofi Aventis**
**Stephen Carl Cohen, MD: Principal Investigator 2008**

A Randomized, Double-blind, Placebo-controlled Study to Evaluate the Safety and Tolerability of XXXXX in Subjects with Acute Back Spasms
**Sponsor: Xenoport**
**Stephen Carl Cohen, MD: Principal Investigator 2008**

Safety and Tolerability Study Comparing XXXXX XXXXX Given as an Oral solution to a Single-blinded Combination of Oral Tablets plus Oral Solution in Subjects with Fibromyalgia
**Sponsor: Jazz Pharmaceuticals**
**Stephen Carl Cohen, MD: Principal Investigator 2008**

Randomized, Double-Blind, Double-Dummy Trial of Two Sustained Release Formulations of XXXXX Compared to Placebo in Patients with Acute, Painful Musculoskeletal Spasm of the Lower Back

**Sponsor: Meda Pharmaceuticals**
**Stephen Carl Cohen, MD: Principal Investigator 2008**

A Double Blind Placebo Study to Determine the Effectiveness of XXXXX on the Management of Chronic Back Pain

**Sponsor: Targeted Medical Pharma, Inc.**
**Stephen Carl Cohen, MD: Principal Investigator 2009**

An 8-Week, Multicenter, Randomized, Double-blind, Four-arm, Parallel-group Study Comparing the Safety and Efficacy of XXXXX to XXXXX in Subjects with Hypercholesterolemia
**Sponsor: Abbott Laboratories**
**Stephen Carl Cohen, MD: Principal Investigator 2009**

A Randomized, Double-Blind, Placebo- and Active-Controlled, Parallel-Group, Multicenter Study to Determine the Efficacy and Safety of XXXXX When used in Combination With XXXXX Compared with XXXXX Plus XXXXX, XXXXX Plus XXXXX, and XXXXX Plus Placebo in Subjects With Type 2 Diabetes Mellitus
**Sponsor: GlaxoSmithKline**
**Stephen Carl Cohen, MD: Principal Investigator 2009**

A Randomized, Open-Label, Parallel-Group, Multicenter Study to Determine the Efficacy and Long Term Safety of XXXXX Compared With XXXXX in Subjects With Type 2 Diabetes Mellitus
**Sponsor: GlaxoSmithKline**
**Stephen Carl Cohen, MD: Principal Investigator 2009**

A Randomized, Double-Blind, Placebo- and Active-Controlled, Parallel-Group, Multicenter Study to Determine the Efficacy and Safety of XXXXX Administered in Combination With XXXXX and XXXXX Compared With XXXXX Plus XXXXX and Placebo and With XXXXX Plus XXXXX and XXXXX in Subjects With Type 2 Diabetes Mellitus
**Sponsor: GlaxoSmithKline**
**Stephen Carl Cohen, MD: Principal Investigator 2009**

A Randomized, Double-Blind, Placebo-Controlled, Parallel-Group, Multicenter Study to Determine the Efficacy and Safety of XXXXX When Used in Combination With XXXXX With or Without XXXXX in Subjects with Type 2 Diabetes Mellitus
**Sponsor: GlaxoSmithKline**
**Stephen Carl Cohen, MD: Principal Investigator 2009**A Randomized, Double-Blind, Placebo-Controlled, Parallel-Group, Multicenter Study to Determine the Efficacy and Safety of Two Dose Levels of XXXXX Compared With Placebo in Subjects With Type 2 Diabetes Mellitus
**Sponsor: GlaxoSmithKline**
**Stephen Carl Cohen, MD: Principal Investigator 2009**

A Randomized Double-Blind Parallel Study of XXXXX Extended-Release 50 mg Versus XXXXX 40 mg for Healing and Symptomatic Relief of Moderate to Severe Erosive Gastroesophageal Reflux Disease (GERD)
**Sponsor: Eisai**
**Stephen Carl Cohen, MD: Principal Investigator 2009**

A Phase 3, Double-Blind, Randomized, Factorial, Efficacy and Safety Study of XXXXX Plus XXXXX Fixed-Dose Combination in Subjects with Moderate to Severe Hypertension
**Sponsor: Takeda Global Research and Development Inc.**

**Stephen Carl Cohen, MD: Principal Investigator 2009**

A Randomized, Double Blind, Active Controlled Crossover Study to
Evaluate the Efficacy and Safety of XXXXX XXXXX Tablets Compared With
Immediate Release XXXXX for the Management of Breakthrough Pain in
Opioid Tolerant Patients With Chronic Pain, Followed by a 12 Week Open
Label Extension to Evaluate the Impact of XXXXX XXXXX Tablets on
Patient Outcomes
**Sponsor: Cephalon**
**Stephen Carl Cohen, MD: Principal Investigator 2009**

An Open-Label Study to Evaluate the Long-term Safety of Subcutaneous
XXXXX for Treatment of Opioid-Induced Constipation in Subjects With
Nonmalignant Pain
**Sponsor: Wyeth Research**
**Stephen Carl Cohen, MD: Principal Investigator 2009**

A Prospective, Randomized, Double Blind Study of the Efficacy of XXXXX
in Atopic Asthmatics With Good Lung Capacity Who Remain Difficult To
Treat (EXACT)
**Sponsor: Genentech**
**Stephen Carl Cohen, MD: Principal Investigator 2009**

A Phase II, Randomized, Double-Blind, Placebo-Controlled Study to
Evaluate the Safety, Tolerability and Efficacy of XXXXX (XXXXX) in
Adult Patients with Asthma Who Are Inadequately Controlled on Inhaled
Corticosteroids (MILLY)

**Sponsor: Genentech, Inc.**

**Stephen Carl Cohen, MD: Principal Investigator 2009**

A Multi-Center Phase III Study to Evaluate XXXXX, a Novel XXXXX Gel
0.5% Formulation, for the Control of Head Lice in Pediatric Subjects
and Adult Subjects with Pediculosis Capitis
**Sponsor: TARO Pharmaceuticals USA, Inc.**
**Stephen Carl Cohen, MD: Principal Investigator 2009**

A Phase 3 Randomized, Double-Blind, Placebo-Controlled Multicenter
Study of XXXXX on Peripheral Nerve Function in Patients with
Osteoarthritis
**Sponsor: Pfizer, Inc.**
**Stephen Carl Cohen, MD: Principal Investigator 2009**

A 26-week, multinational, multi-centre, open-labelled, two-arm,
parallel, randomised, treat-to-target trial comparing efficacy and
safety of XXXXX (XXXXX) once daily plus meal-time insulin aspart for
the remaining meals vs. basal-bolus treatment with insulin detemir plus
meal-time insulin aspart in subjects with type 1 diabetes.
**Sponsor: Novo Nordisk**
**Stephen Carl Cohen, MD: Principal Investigator 2009**

A 52-week randomised, controlled, open label, multicentre,
multinational treat-to-target trial comparing the efficacy and safety
of XXXXX and insulin glargine, both injected once daily in combination
with oral anti-diabetic drugs (OAD), in subjects with type 2 diabetes
mellitus currently treated with OAD(s) and qualifying for more
intensified treatment

**Sponsor: Novo Nordisk**
**Stephen Carl Cohen, MD: Principal Investigator 2009**

A Dose-Response Efficacy and Safety Study of XXXXX XXXXX (XXXXX) as Adjunctive Therapy in Subjects with Gastroesophageal Reflux Disease (GERD) who are Incomplete Responders to a Proton Pump Inhibitor (PPI)
**Sponsor: Xenoport**
**Stephen Carl Cohen, MD: Principal Investigator 2009**


A Multicenter, Randomized, Double-Blind, Placebo-Controlled Study to Evaluate Cardiovascular Outcomes Following Treatment with XXXXX in Addition to Standard of Care in Subjects with Type 2 Diabetes and Acute Coronary Syndrome
**Sponsor: Takeda**
**Stephen Carl Cohen, MD: Principal Investigator 2009**

A Multicenter, Randomized, Double - Blind, Placebo-Controlled Study to Determine the Efficacy and Safety of Alogliptin Plus Metformin, Alogliptin Alone, or Metformin Alone in Subjects with Type 2 Diabetes.
**Sponsor: Takeda**
**Principle Investigator: Stephen C. Cohen, M.D. 2010**

A study comparing powered Bone Marrow Biopsy Procedures tp Manual Bone Marrow Biposy procedures using healthy volunteers
**Sponsor: Vidacare Corporation**
**Primary Investigator: Larry Miller, M.D.**
**Back Up Investigator: Stephen C. Cohen M.D. 2010**


A Phase 2, Randomized, Double-Blind, Placebo Controlled, Multicenter Study Evaluating the Efficacy and Safety of Two Doses of favipiravir in Adult Patients with Uncomplicated Influenza.
**Sponsor: Toyama Chemical Co Ltd**
**Principle Investigator: Stephen C. Cohen. M.D. 2011**

A randomized, double-blind, placebo-controlled multi center study of BYM338 for treatment of
of cachexia in patients with Stage-IV non-small cell lung carcinoma or Stage III/IV adeno carcinoma of the pancreas.
**Sponsor: Novartis**
**Principle Investigator: Stephen C. Cohen, M.D. 2011**

A Phase II, Randomized, Double Blind, Placebo controlled, multicenter Study to Investigate the Impact of NPR in Subjects with Insurable Pain due to Malignancy.
**Sponsor: Diamyd**
**Principle Investigator: Stephen C. Cohen, M.D. 2011**

A Randomized open labeled, multicenter phase III Study of Efficacy and Safety in Polycythemia vera subjects who are resistant to or intolerant of hydroxyurea; JAK inhibitor INC424 tablets vesus best available care (The Response Trial)
**Sponsor: Novartis**
**Principle Investigator: Stephen C. Cohen, M.D. 2011**

A Phase 2, Randomized, Double-Blind, Placebo Controlled, Multicenter
Study Evaluating the Efficacy and Safety of Two Doses of favipiravir in
Adult Patients with Uncomplicated Influenza.
**Sponsor: Toyama Chemical Co Ltd**
**Principle Investigator: Stephen C. Cohen. M.D. 2012**

Study title: A Study Comparing Powered Ported Bone Marrow Aspiration Procedures to Manual Standard
Bone Marrow Aspiration Procedures Using Healthy Volunteers (2014-12)

Participated as a co-principal investigator for the above-referenced study in which healthy volunteers
underwent bilateral bone marrow aspiration of the posterior iliac crest for comparative pathological
analysis of bone marrow specimens collected with the standard manual bone marrow aspiration device and
with the OnControl Bone Marrow Ported Aspiration System.

Dates involved: October 2014- December 2014

Sponsor: Vidacare LLC, a division of Teleflex Incorporated

# Exhibit B.

# Thelma Watts Reynold's deposition transcript dated March 15, 2019.

1

### CAUSE NO. 2018-CI-13942

| | | |
|---|---|---|
| THELMA LOUISE REYNOLDS, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | BEXAR COUNTY, TEXAS |
| | § | |
| JAYASREE RAO, M.D. and | § | |
| ONCOLOGY SAN ANTONIO | § | |
| CANCER CENTER NETWORK, | § | |
| | § | |
| Defendants. | § | 45TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION
OF
THELMA LOUISE REYNOLDS

MARCH 15, 2019

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL and VIDEOTAPED DEPOSITION OF
THELMA LOUISE REYNOLDS, produced as a witness at the
instance of Plaintiff's counsel, and duly sworn, was
taken in the above-styled and numbered cause on
March 15, 2019, from 9:52 a.m. to 10:39 a.m., before
Deborah A. Koole certified Shorthand Reporter in and
for the State of Texas, reported by computerized
stenotype machine at Heritage Creek Assisted Living,
6538 Eckhert Road, San Antonio, Bexar County, Texas,
pursuant to the Texas Rules of Civil Procedure and the
provisions stated on the record or attached hereto.

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Thelma Louise Reynolds
March 15, 2019

---

**2**

APPEARANCES

FOR THE PLAINTIFF:

    Mr. Jon Powell
    THE POWELL LAW FIRM
    1148 East Commerce Street
    San Antonio, TX  78205
    (210) 225-9300
    (210) 225-9301  Fax
    jon@jpowell-law.com

FOR THE PLAINTIFF:

    Dr. Brant Mittler
    BRANT S. MITTLER, P.C.
    17503 La Cantera Parkway, Suite 104-610
    San Antonio, TX  78257
    (210) 698-0061
    (210) 698-0064

FOR THE DEFENDANTS:

    Mr. William C. Woolsey
    WOOLSEY & WOOLSEY
    555 North Carancahua, Suite 1160
    Corpus Christi, TX  78401
    (361) 561-1961
    (361) 561-1967  Fax
    bwoolsey@rcwoolseylaw.com

ALSO PRESENT:

    Mr. Garland Lyle Reynolds

    Ms. Deborah A. Koole, CSR

    Mr. Pete Resendez, Videographer

---

**3**

INDEX
Page

APPEARANCES...................................   2

EXAMINATION BY:

    Mr. Powell.................................    4

    Mr. Woolsey..............................   30

FURTHER EXAMINATION BY:
    Mr. Powell.................................   38
    Mr. Woolsey..............................   41

REPORTER'S CERTIFICATE..........................   43

\* \* \* \* \*

NO EXHIBITS MARKED.

---

**4**

    THE VIDEOGRAPHER:  This marks the start
of the Thelma Louise Reynolds deposition.  Today is
Friday, March 15, 2019.  The time on record is 9:52.
    THELMA LOUISE REYNOLDS,
having been first duly sworn through the interpreter,
testified as follows:
    \* \* \* \* \*
EXAMINATION BY MR. POWELL:
    Q.  Would you please tell us your full name.
    **A.  Thelma Louise Watts Reynolds.**
    Q.  All right, Mrs. Reynolds.  And do you
understand that your testimony is being videotaped
today to show to the jury?
    **A.  Yes.**
    Q.  And you understand that it's being typed out
by the court reporter who's here to your left?
    **A.  Yes.**
    Q.  And we're taking this deposition in your room
at the assisted living center?
    **A.  Yes.**
    Q.  Okay.  Tell the jury where you were born.
    **A.  I was born in San Antonio, Texas.**
    Q.  All right.  What hospital?
    **A.  Santa Rosa Hospital.**
    Q.  And how old are you now?

---

**5**

    **A.  Eighty-four.**
    Q.  All right.  And where did you grow up?
    **A.  San Antonio.**
    Q.  And where did you graduate from high school?
    **A.  I graduated from Brackenridge High School in
1952.**
    Q.  Now, we have your husband Lyle sitting at the
back of the room.  How long have you and Lyle been
married for?
    **A.  Sixty-four years in March it was.**
    Q.  All right, wonderful.  You want to tell the
jury the secret of a long marriage.
    **A.  Well, we -- when we married, there were --
there were three of us -- Lyle, me, and the Lord, our
Lord.**
    Q.  And that's helped you throughout your 64
years of March?
    **A.  Through the whole, yes, many times.**
    Q.  All right.  Now, you and Lyle have children.
What are their names?
    **A.  David -- David Lyle Reynolds and Susan Louise
Reynolds.**
    Q.  All right.  And you've got seven
grandchildren.  So, can you name them for the jury?
    **A.  Can I name them?**

---

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Thelma Louise Reynolds
March 15, 2019

**6**

1     Q.  Yep.
2     A.  Let's see.  Matthew, Michael, Eric.
3         Now let me go to Susan's.  Robert, Chase
4   and Elizabeth and Alexandria.
5     Q.  Very good.  And so, that's one husband, two
6   children, seven grandchildren.
7         And do you have great-grandchildren?
8     A.  We have two great-grandsons.
9     Q.  And what are their names?
10    A.  We have one on the way.  What I mean is he
11  will be adopted.  Michael is not his father.  Michael,
12  my grandson, will be his father because he married JT's
13  mother.
14    Q.  Okay.
15    A.  And so, he will eventually adopt JT and give
16  him his name.
17    Q.  All right.  That's one great-grandchild.  How
18  about your second one?
19    A.  Chase Hunter has a grandson with bright red
20  hair, and his name is Ashton King.
21    Q.  Okay.  All right.  Now, tell us about after
22  high school.  Where did you work?
23    A.  I worked -- went to work at Security Service,
24  which is a branch of the Air Force.  And I also worked
25  part-time at Joske's department store.

**7**

1     Q.  And what did you do at Security Service?
2     A.  I was a typist.
3     Q.  All right.  Now, your husband Lyle, was he
4   ever in the Air Force?
5     A.  Yes, for four years.
6     Q.  And then what did he do after that?
7     A.  He began -- He worked for Security Service as
8   a civilian.
9     Q.  All right.  And then did you stop working at
10  Security Service at some point?
11    A.  Well, when he retired.
12    Q.  No, you.  Okay.
13        He stopped -- He retired from Security
14  Service?
15    A.  Yeah.
16    Q.  And then how about you; did you stop working
17  at Security Service?
18    A.  Yeah.  I worked there three years.
19    Q.  Okay.
20    A.  And when I became pregnant, I quit working.
21    Q.  Okay.  And have you ever gone back to work
22  after that?
23    A.  Yes.  At our day- -- At our church.  I was
24  the day-care director for 40 years.
25    Q.  All right.  And what church is that?

**8**

1     A.  That was -- It started at Southside Christian
2   Church, and then I worked for Marbach Christian Church.
3     Q.  All right.  And then did you retire after
4   that?
5     A.  Yes.
6     Q.  Okay.
7     A.  I was in my 70s, so I decided it was --
8     Q.  -- time to retire?
9     A.  -- time to retire.
10    Q.  All right.  Now, you understand that your
11  testimony today is being taken in a lawsuit where you
12  have sued a Dr. Rao?  Do you understand that?
13    A.  Yes, yes.
14    Q.  Now, what did you go see Dr. Rao for?
15    A.  Lung cancer.
16    Q.  And did any of your children go to your
17  visits with Dr. Rao?
18    A.  My daughter went most of the time.
19    Q.  And this is Susan?
20    A.  Yes.
21    Q.  And did she stay out in the waiting room, or
22  did she actually go in to the visits?
23    A.  No, she went into the room with the doctor
24  and me.
25    Q.  Okay.

**9**

1     A.  And my son went a couple of times.  But he
2   lives in Fort Worth, so it was easier for Susan.  She
3   lived in Austin, so she would drive down here and take
4   me.
5     Q.  Now, if the lawyer for Dr. Rao wanted to know
6   details about your visits with Dr. Rao, could he ask
7   your daughter Susan about that?
8     A.  She would probably know more than me.
9     Q.  Okay.  And did she also go with you to your
10  visits to Dr. Conde?
11    A.  Yes.
12    Q.  Did she go with you to basically all of your
13  doctors visits?
14    A.  Basically, yes.
15    Q.  And she went in to see the doctor with you;
16  she just didn't stay out in the waiting room?
17    A.  No.  She went into the room with me and while
18  I took -- had my blood tests taken and everything.
19    Q.  Does she have any type of medical background
20  or knowledge?
21    A.  No.  The only thing she did have, she rode
22  with the -- the fire department.
23        MR. REYNOLDS:  EMT.
24    A.  And she learned a lot from them.
25    Q.  (By Mr. Powell)  Like as an EMT?

3 (Pages 6 to 9)

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Thelma Louise Reynolds
March 15, 2019

---

**10**

1    A.  Yes.
2    Q.  Okay.
3    A.  She learned to give shots.
4    Q.  Now, when you went to see Dr. Rao, did she
5  diagnose you with lung cancer?
6    A.  No.
7    Q.  Who diagnosed you with that?
8    A.  Dr. Srinivasan.
9    Q.  Okay.  And then when you went to visit
10  Dr. Rao, was she the one that was going to treat your
11  lung cancer?
12    A.  Uh-huh.
13    Q.  Yes?
14    A.  Yes.
15    Q.  Okay.  And how did she explain to you that
16  she was going to treat your lung cancer?
17    A.  Well, she told me she's going to give me
18  chemotherapy, which I figured that she would then.  And
19  I asked her if she was going to -- if I was going to
20  have x-ray, you know, whatever you call that.  And --
21    Q.  Radiation?
22    A.  Radiation.  And she said, "Oh, no."
23    Q.  Okay.
24    A.  No.
25    Q.  Now --

---

**11**

1    A.  And no surgery.
2    Q.  No surgery.  So, it was just going to be
3  chemotherapy?
4    A.  Yes.
5    Q.  Did she explain to you about different types
6  of chemotherapy that might be available?
7    A.  I don't remember hearing any different types
8  of chemotherapy.  I thought there was just one.
9    Q.  Okay.  Did Dr. Rao discuss with you something
10  called an ALK marker?
11    A.  Uh-huh.
12    Q.  Yes or no?
13    A.  No.
14    Q.  Okay.  What did Dr. Rao tell you about your
15  lung cancer?  Was she expecting it to be
16  fast-developing, slow-developing?  What was your
17  prognosis according to Dr. Rao?
18    A.  She said it was a slow-growing cancer.
19    Q.  Okay.  Did she tell you that it was
20  life-threatening then or that it was not
21  life-threatening, or did she not say either way?
22    A.  She didn't say either way.
23    Q.  Okay.  Now, did Dr. Rao then give you
24  chemotherapy?
25    A.  Yes.

---

**12**

1    Q.  And did Dr. Rao tell you any of the risks
2  associated with chemotherapy?
3    A.  Not that I remember.
4    Q.  Were you given any paperwork about the risks?
5    A.  Yes.
6    Q.  Did you read over that paperwork?
7    A.  I read over it, but I didn't understand it.
8    Q.  Okay.  Did Dr. Rao, or anybody at her office,
9  go over that paperwork with you?
10    A.  No.
11    Q.  Did Dr. Rao, or anyone at the office -- at
12  her office, explain to you the risks associated with
13  the chemotherapy treatment?
14    A.  No.
15    Q.  Now, before you started the course of
16  chemotherapy treatment, tell the jury about your
17  health.
18    A.  Well, my health was good.  I was very
19  thankful.  I worked as many -- I worked sometimes ten
20  hours a day at the church, with the children.  And at
21  wintertime or getting close to Christmas, I would bake
22  dozens and dozens of cookies and fruitcake and a date
23  loaf and pies because the kids always came to my house
24  and -- for Christmas dinner and Thanksgiving dinner.
25  And it was a glorious time.  They would come over.

---

**13**

1    Q.  Now, before the chemotherapy treatment, were
2  you able to sew?
3    A.  Oh, yes.  I sewed -- sewed forever.  I love
4  to sew.  Right there by my sewing machine is a -- it's
5  a quilt, about a yard long, that I made for -- they
6  have a place here in town where you make quilts and
7  donate them to -- they find children that need these
8  quilts.  I don't know the name of it, but I could get
9  ahold of it on -- on my iPad, which I worked my iPad
10  quite a bit, and my computer.  I played the piano.  And
11  like I said, the sewing was the love of my life.
12    Q.  Now, you also had a hobby of crocheting?
13    A.  Crocheting, yes.
14    Q.  And how does crochet differ from sewing?
15    A.  You use yarn and you use needles, different
16  needles.
17    Q.  Okay.
18    A.  And you work with your hands, and I can't do
19  that anymore.
20    Q.  Now, on -- What is the type of sewing machine
21  that you have at your home?
22    A.  At home I have a Singer sewing machine.
23    Q.  Now, to use that machine, did that have one
24  of those step pedals for your feet?
25    A.  Yes.  This one has the pedal, too.

---

4 (Pages 10 to 13)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Thelma Louise Reynolds**
**March 15, 2019**

---

**14**

1    Q.   Okay.
2    A.   And it -- I bought this one at Sears.  It's a
3    portable.
4    Q.   So, for you to sew, you needed to use your
5    hands and your feet?
6    A.   (Witness nods head up and down.)
7    Q.   Right?
8    A.   Right.
9    Q.   Now, before the chemotherapy, did you need to
10   use a walker to get around?
11   A.   No.
12   Q.   Did you need to use a wheelchair?
13   A.   No.
14   Q.   How easy was it for you to walk around and do
15   things prior to the chemotherapy?
16   A.   I was normal.
17   Q.   Okay.
18        (Cell phone ringing.)
19        MR. POWELL:  One second.
20   Q.   (By Mr. Powell)  So, prior to the
21   chemotherapy, were you able to drive a car?
22   A.   Yes.  Oh, yes.  I was able to drive my
23   Lincoln that my husband bought for me.
24   Q.   All right.  What kind of car again?  A
25   Lincoln?

---

**15**

1    A.   A Lincoln.
2    Q.   All right.  And where did you drive to?
3    A.   Well, I'd drive to the store.  I'd drive to
4    work, to the church a lot of the times.
5    Q.   Were you able to do your own shopping?
6    A.   Yes.
7    Q.   Did you drive you and your husband around?
8    A.   I did when he'd let me drive.
9    Q.   Okay.  He liked to drive when you two were
10   together if he could?
11   A.   Yes.
12   Q.   How long could you drive?  Like could you
13   drive for 30 minutes? an hour? two hours?  How long
14   were you able to drive for?
15   A.   Well, we have -- We have a condo down in
16   Rockport, and we'd go down there every so often to
17   fish.  And that's a three-hour drive.
18   Q.   And were you able to drive that yourself?
19   A.   I was able to drive that and help him after
20   he fell and broke his hip.
21   Q.   Did you fish, also?
22   A.   Did he fish?
23   Q.   Did you fish?
24   A.   Oh, yes.
25   Q.   Were you a good fisherwoman?

---

**16**

1    A.   Yes, I was.
2    Q.   Okay.  Where did you fish?  In the bay or
3    deep sea or --
4    A.   In the bay.
5    Q.   And so, you cast your own reel and all that?
6    A.   Yes, I did.
7    Q.   Okay.
8    A.   I could put the hook on there and everything.
9    Q.   Right.  And were you able to work around the
10   house before the chemotherapy, cleaning up and cooking
11   and that sort of thing?
12   A.   Oh, yes.
13   Q.   So --
14   A.   I loved to do that.  On rainy days -- rainy,
15   cold days I would cook.  I'd make a big pot of soup and
16   maybe bake a pie or two.  And -- I'd do that or either
17   go into my sewing room -- I had my own sewing room --
18   and sew.
19   Q.   So, before the chemotherapy you were able to
20   live at your own home?
21   A.   Oh, yes.
22   Q.   And what's the address of your home?
23   A.   446 Creath, C-r-e-a-t-h.
24   Q.   Okay.
25   A.   It's on the south side.

---

**17**

1    Q.   Of San Antonio?
2    A.   Yes.
3    Q.   Now, today we're in an assisted living
4    center.
5    A.   Yes.
6    Q.   And so, you're no longer able to live at your
7    home address any further?
8    A.   (Witness shakes head side to side.)
9    Q.   Right?
10   A.   Right.
11   Q.   And why did you originally move to this
12   assisted living center?
13   A.   Because of the fact that I could no longer
14   take care of my husband and he couldn't take care of
15   me, and the chemotherapy just took away my life.
16   Q.   Well, tell us about that.  What did the
17   chemotherapy do to you?
18   A.   Well, my hands are no longer useful as far as
19   crocheting or even sewing or even holding my
20   great-grandbaby.  I was afraid to hold him because my
21   hands.  And he -- I was afraid that I would drop him.
22   Q.   Now, are --
23   A.   My legs.  My legs gave out.  And she saw --
24   I'm sure she saw all this.  And that is when -- because
25   when I started -- when I started not walking right and

---

**5 (Pages 14 to 17)**

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Thelma Louise Reynolds
March 15, 2019

**18**

1  not using my hands and I was complaining of that,
2  that's when she let me go.
3      Q.  Dr. Rao?
4      A.  Yes.  I haven't told you that before.
5      Q.  Okay.  Now --
6      A.  But that's what happened.  She -- Just one
7  day I walked in, and she called me to her office and
8  told me there was no more that she could do for me.
9      Q.  All right.
10         MR. WOOLSEY:  Objection; nonresponsive.
11     Q.  (By Mr. Powell)  Now, is that when you went
12  to go see Dr. Conde?
13     A.  No.  We didn't go right away.  My daughter
14  and son were quite bothered by what happened, and it
15  took them a while to get ahold of things.  And,
16  eventually, they decided that they wanted me to go to
17  another doctor.
18     Q.  Another cancer doctor or oncologist?
19     A.  Yes.
20     Q.  And that was Dr. Conde?
21     A.  Yes.
22     Q.  Before we talk about that, do you know what
23  your diagnosis is for your hands and your feet, the
24  problems in your hands and feet?
25     A.  Well, it's chemothe- -- It's the chemotherapy

**19**

1  that caused it.
2      Q.  Right.  And are you aware that you've been
3  diagnosed with peripheral neuropathy in --
4      A.  Yes.
5      Q.  -- your hands and feet?
6      A.  And I didn't know what that was.
7      Q.  Okay.  Well, what -- Now do you know what
8  peripheral neuropathy is?
9      A.  Yes.
10     Q.  And te- --
11     A.  I can't use my hands, and I can't walk right.
12     Q.  All right.  Well, tell the jury how your
13  hands feel.
14     A.  Well, they're tingly and they're like
15  paralyzed.
16     Q.  And tell the jury how your feet feel.
17     A.  Well, they have minds of their own.
18     Q.  Okay.
19     A.  I have no control over them at times.
20     Q.  Now, on some of your medical records it
21  mentions something called "foot drop", that your foot
22  was not staying in a normal position.  Tell the jury
23  how the neuropathy affected your ability to walk.
24     A.  Well, they say I have a rolling ankle on my
25  right foot.  And when I try to stand up, my right

**20**

1  just gives way and I can't stand up.
2      Q.  All right.  So, are you able to walk now
3  without the help of a walker or a --
4      A.  No.
5      Q.  No.  Are you able to walk with the help of a
6  walker?
7      A.  No.
8      Q.  So, are you now wheelchair-bound?
9      A.  Yes.
10     Q.  And is the reason you're wheelchair-bound the
11  peripheral neuropathy in your feet?
12         MR. WOOLSEY:  Objection; leading.
13     A.  Yes.
14     Q.  (By Mr. Powell)  Why are you
15  wheelchair-bound?
16     A.  Because of the neuropathy.  I can't walk.
17     Q.  Did Dr. Rao ever recommend you for hospice
18  care?
19     A.  That's what she did at the end --
20     Q.  Did she --
21     A.  -- when she told me there's nothing more she
22  could do.  And I think she told my daughter about the
23  hospice.
24     Q.  Do you know how long ago that was?
25     A.  (Witness shakes head side to side.)

**21**

1      Q.  Did Dr. Rao ever tell you that you had less
2  than six months to live?
3      A.  No.
4      Q.  Did she ever give you any prognosis as to how
5  long you had to live?
6      A.  No.  I never asked her.
7      Q.  Now, you said you went to go visit Dr. Conde?
8      A.  (Witness nods head up and down.)
9      Q.  Yes?
10     A.  Right.
11     Q.  And Dr. Conde did some testing.  And did
12  Dr. Conde ever tell you about this ALK marker?  Do you
13  remember ever any discussion about that?
14     A.  No.
15     Q.  Did Dr. Conde change the type of chemotherapy
16  treatment that you had been given?
17     A.  I'm not on chemotherapy.
18     Q.  All right.  Well, what did Dr. Conde do for
19  you in terms of treatment?
20     A.  She's giving me a pill.
21     Q.  Do you know what that pill is?
22     A.  No.
23     Q.  Okay.  Have you ever heard the medication
24  Lyrica?
25     A.  Yes.

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Thelma Louise Reynolds**
**March 15, 2019**

---

22

1  Q.  Have you been on Lyrica?
2  **A.  Yes.**
3  Q.  And what is that for?  What does that treat?
4  **A.  Neuropathy.**
5  Q.  Does it help you, at all?
6  **A.  No.**
7  Q.  What are the side effects of it?  Does it
8  make you sleepy or anything like that?
9  **A.  Yes.**
10  Q.  Nauseous or anything?
11  **A.  No.  It did at times make me nauseous, but**
12  **they gave me a pill for nauseous.**
13  Q.  Okay.  Has that pill helped with your nausea,
14  at all?
15  **A.  Yes, it did help.**
16  Q.  Now, after the peripheral neuropathy set into
17  your hands and your feet, were you able to sew?
18  **A.  Uh-uh.**
19  Q.  Why not?
20  **A.  Well, because of my hands.  I sewed for a**
21  **while, and then I had my stroke.  But my hands -- My**
22  **right hand caught up with my left hand as far as the**
23  **neuropathy.**
24          **And they've tried to get me different**
25  **cups to hold down in the lunchroom.  And that's become**

---

23

1  a problem -- eating and drinking.  I can't hardly do
2  that anymore.  And I guess I'll have to let them feed
3  me.  Well, my husband has fed me a couple of times.
4  Q.  So, are --
5          MR. WOOLSEY:  Objection; nonresponsive.
6  Q.  (By Mr. Powell) -- you able to use the sewing
7  machine with your hands and the foot pedal with your
8  foot now, or no?
9  **A.  No.**
10  Q.  Are you able to crochet?
11  **A.  (Witness shakes head side to side.)**
12  Q.  No or yes?
13  **A.  No.**
14  Q.  And why not?
15  **A.  Because my hands won't -- won't go -- won't**
16  **go with the needles.**
17  Q.  Are you -- Are you able to clean up your room
18  here by yourself?
19  **A.  Uh-uh.**
20  Q.  No?
21  **A.  (Witness shakes head side to side.)**
22  **And I used to love to clean my house.**
23  **We had our own home.  We still have our own home.  And**
24  **I loved to clean.  I'd go room by room, and I used to**
25  **love to clean up my room.**

---

24

1  Q.  And why can't you clean now?
2  **A.  Because of the neuropathy.**
3  Q.  How does it prevent you from cleaning?
4  **A.  Well, the family doesn't want me overdoing.**
5  **And it's hard to use a sweeper or you -- or it's hard**
6  **to mop or wax if you want to -- we had hardwood floors,**
7  **and I would wax them maybe once a week.  And then I**
8  **wouldn't want Lyle to walk on them, but he'd walk on**
9  **them anyway.**
10  Q.  Now, are you able to bake or cook today?
11  **A.  Well, not really because I'm not in my home.**
12  **This is the place.  And that's what it is, a place for**
13  **me to be comfortable, but it's not my home.**
14  Q.  If you had your best wish, would you rather
15  live at your home or at an assisted living center?
16  **A.  I would rather live at home, both of us**
17  **would.**
18  Q.  But for the peripheral neuropathy in your
19  hands and feet, do you think you would be able to live
20  at home?
21  **A.  No.**
22          MR. WOOLSEY:  Objection; form.
23  Q.  (By Mr. Powell)  Why would you not be able to
24  live at home?
25  **A.  Because I couldn't take care of myself.**

---

25

1  Q.  And is that from the peripheral neuropathy or
2  something else?
3  **A.  Well, it's from neuropathy.**
4  Q.  Any other reason why you wouldn't be able to
5  live at home other than the neuropathy?
6  **A.  No.**
7  Q.  So, you think you would be able to live at
8  home if you did not have neuropathy?
9  **A.  (Witness nods head up and down.)**
10          MR. WOOLSEY:  Objection; leading.
11  Q.  (By Mr. Powell)  Yes?
12  **A.  Yes.**
13  Q.  Now, one question back to Dr. Conde.  Did she
14  give you a pill for your cancer that was not
15  chemotherapy?  Do you remember her giving you a pill?
16  **A.  Oh, yes.**
17  Q.  Okay.
18  **A.  I'd take two of them a day.**
19  Q.  All right.  Has Dr. Conde given you a
20  prognosis in terms of how long --
21  **A.  No.  I haven't -- There, I haven't asked her.**
22  Q.  Okay.
23  **A.  She has told me that what she's doing will**
24  **not make -- will not make the cancer go away.**
25  Q.  Okay.

---

7 (Pages 22 to 25)

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Thelma Louise Reynolds
March 15, 2019

---

26

1   A.  But she said it would prolong.  She wants to
2   prolong my life.
3   Q.  And has she told you how long she thinks she
4   can do that?
5   A.  No.
6   Q.  And you've not asked her?
7   A.  No.
8   Q.  But is it your understanding that the cancer
9   is still slow-developing?
10  A.  Yes.  She's going to take a PET scan in a
11  couple of weeks.  A PET scan is better than any kind of
12  scan or x-ray because the PET scan shows the cancer
13  more or better than just regular x-rays.  The PET --
14  It's a PET scan.
15  Q.  Now, are you able to feel the cancer in your
16  lungs?
17  A.  No.
18  Q.  Okay.  And does the cancer in your lungs
19  cause you any pain that you're aware of?
20          MR. WOOLSEY:  Objection; form.
21  A.  No.
22  Q.  (By Mr. Powell)  Now, have you seen any other
23  doctors or are you seeing any other doctors besides
24  Dr. Conde?
25  A.  No.

---

27

1   Q.  Are you in hospice care now?
2   A.  No.
3   Q.  When did they take you off of hospice care,
4   do you know?
5   A.  Lyle is thinking.
6   Q.  It's been a while, though.
7   A.  Yes.  And the reason why they took me off of
8   hospice care was because when you're in hospice care,
9   you're not supposed to see any more -- any doctors, any
10  other doctors, and David and Susan wanted me to see
11  another oncologist.
12  Q.  Right.
13          MR. WOOLSEY:  Objection; nonresponsive.
14  Q.  (By Mr. Powell)  So, you are getting care
15  today from an oncologist to try to extend your life --
16  life expectancy, right, Dr. Conde?
17  A.  Yes.
18  Q.  And -- but you're -- And you're also getting
19  physical therapy here at the assisted living center?
20  A.  Yes.
21  Q.  Who is your physical therapist?
22  A.  Well, you met him.  He was right there.
23  Clint.
24  Q.  Clint.  And does he do exercises with you on
25  your hands?

---

28

1   A.  Yes.
2   Q.  What are those?
3   A.  Well, he wants me to keep my -- This hand is
4   swollen.  This hand is swollen, and for some reason
5   it's -- I guess it's poor circulation.  I don't know,
6   but it's swollen.  And I haven't done anything to it.
7   But he works my fingers and tells me to do exercises
8   that will help or he hopes will help the chemotherapy.
9   Q.  Okay.  And how about your feet, do you do any
10  exercises on your feet?
11  A.  Yes, on my legs.  I've got -- Right now, if
12  you want to roll up my pants leg, I've got a new -- a
13  new brace on my leg that they put on just the other
14  day.
15  Q.  All right.  And has your physical therapist
16  given you any prognosis?  Like, does he expect you to
17  be able to walk again, or did he say?
18  A.  Well, they're hoping because -- they're just
19  hoping, but so far I haven't been able to stand.  And I
20  mean you have to stand to be able to walk.
21  Q.  Right.  Now, you had a minor stroke a little
22  while back.  Could you tell the jury about that.
23  A.  Well, I don't know when I had it or how I had
24  it.  I can't tell you.  But one morning I was over at
25  the other place, and they called my daughter and told

---

29

1   her that I wasn't acting normal.  I wasn't acting
2   right.
3          So, she came over and she could see,
4   too.  And I told her no, I felt fine.  I didn't want to
5   go to the hospital.  So, she took me to the hospital,
6   and they prognosed me as having a stroke.  So, that's
7   when they sent me to the hospital.
8   Q.  Okay.  And you're doing very well today.  You
9   have a good recall of events, and you appear to be
10  doing well, but what has been the consequences of the
11  stroke?  What -- How has that affected you?
12  A.  Well, it affected mainly my left side is what
13  it did.  And my right side doesn't seem normal, but
14  they told me that a stroke only affects one side.
15  Q.  One side.  Here, let me get that for you.
16  A.  It doesn't affect two sides.  It affects just
17  one side.
18  Q.  I'll give you that.
19  A.  So --
20          MR. POWELL:  Okay.  Let me do this
21  because I know we have limited time with you here
22  today.  And I want to give the other lawyer a chance to
23  question you.  So, if you don't mind, I'll pass it to
24  you.  I probably will have some further questions, but
25  I do want to give you some time.

---

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Thelma Louise Reynolds**
**March 15, 2019**

---

30

1         MR. WOOLSEY: Very good. I appreciate
2 that.
3         MR. POWELL: So, now the lawyer for
4 Dr. Rao is going to ask you some questions. Okay?
5         THE WITNESS: Okay.
6         * * * * *
7 EXAMINATION BY MR. WOOLSEY:
8   Q. Mrs. Reynolds, we met briefly before your
9 deposition started. You understand -- I'm Bill
10 Woolsey, and you understand that I represent Dr. Rao;
11 correct?
12   **A. Yes.**
13   Q. And I hate that we have to meet under these
14 circumstances, and I do only have a few questions to
15 ask you thus far. And, particularly, I want to get a
16 little bit of information about your health history
17 prior to April of 2015. Okay?
18       And my understanding is that, in April
19 of 2015, you went to the hospital due to
20 diverticulitis. Does -- Do you recall that?
21   **A. Yes.**
22   Q. Okay. So, I want to use that date as kind of
23 a marker in time and ask you what sort of health
24 history you had prior to that. Any health conditions
25 that you were dealing with before that date?

---

31

1   **A. No, except for the -- what you just said.**
2   Q. Okay. Did you ever have treatment for
3 osteoporosis?
4   **A. No.**
5   Q. Or low bone density?
6   **A. No.**
7   Q. Okay. If there are medical records that
8 reflect that, would those be simply erroneous or is it
9 that maybe you're not recalling that treatment?
10   **A. No. My sister now had what you've just said.**
11   Q. Osteoporosis?
12   **A. Yes.**
13   Q. Okay. And did you have any treatment for
14 that yourself?
15   **A. No.**
16   Q. Or testing conducted to determine whether you
17 also had that condition?
18   **A. Well, my mother might have had me tested --**
19 **I can't remember that far back -- because my sister had**
20 **a bump -- a lump on her back. And so, my parents had**
21 **her tested for that, and that's when they found out she**
22 **had what you just said.**
23   Q. Okay.
24   **A. Now, she -- My mother might have had me**
25 **tested, and by brother both, to see if we were clear of**

---

32

1 that.
2   Q. All right.
3   **A. Because it was really upsetting for her -- to**
4 **her for my sister to have it because they -- of course,**
5 **she was told about how her back would de-- be**
6 **deformed. And, eventually, Maxine was told, if she**
7 **didn't have surgery on her back, she could have**
8 **paralysis and end up in a wheelchair.**
9   Q. Okay. Thank you, ma'am. I appreciate that.
10 Let me -- Let me ask you just a couple of general
11 questions.
12      Your daughter's name is Susan?
13   **A. Yes.**
14   Q. Where does Susan live?
15   **A. She lives here now.**
16   Q. Here being San Antonio?
17   **A. Yes.**
18   Q. And Susan's full name is what, please?
19   **A. Susan what?**
20   Q. What's her full name, last name?
21   **A. Susan Louise Downey, but it will be -- she's**
22 **using Reynolds again because she divorced her husband.**
23   Q. Okay. And although they have divorced, can
24 you tell me what her ex-husband or soon-to-be
25 ex-husband's name is if you know it?

---

33

1   **A. Bob, Robert.**
2   Q. Downey?
3   **A. Robert Downey.**
4   Q. Thank you, ma'am.
5      And your son, what's his full name? I
6 assume he goes by Reynolds.
7   **A. David Lyle.**
8   Q. David Lyle Reynolds?
9   **A. (Witness nods head up and down.)**
10   Q. And does -- Does David Lyle Reynolds live in
11 San Antonio?
12   **A. No. He lives in Bedford. He works --**
13   Q. Up near Dallas?
14   **A. Yes. He works for Bell Helicopter and has**
15 **for 40 -- over 40 years.**
16   Q. Excellent. And -- And let me ask you about
17 your grandchildren. I took all their names down
18 earlier, but rather than go through them one by one,
19 can you tell me, of your grandchildren -- and we can go
20 through them one at a time, but do any of those
21 grandchildren live here in San Antonio or the Bexar
22 County area?
23   **A. The two grandsons do.**
24   Q. Okay. What are their names?
25   **A. Michael James and Eric Lyle.**

---

**Koole Court Reporters of Texas**

(210) 558-3129 Fax      myreportingfirm@gmail.com      210-558-9484

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Thelma Louise Reynolds**
**March 15, 2019**

---

34

1  Q.  And can you tell me are those grandsons both
2  Reynolds, last names?
3      A.  Yes.
4      Q.  Okay.  And are those -- Let's start with
5  Michael James Reynolds.  Is he married?
6      A.  Yes.
7      Q.  And what is his spouse's name?
8      A.  Stacy.
9      Q.  Did Stacy take his last name?
10     A.  Stacy Reynolds.
11     Q.  And what sort of work does Michael James
12  Reynolds do?
13     A.  Right now he's in between jobs, but he was
14  working for one of those big oil companies --
15     Q.  All right.
16     A.  -- close to the coast.
17     Q.  Thank you, ma'am.
18         And let's talk about Eric Lyle Reynolds.
19     A.  He's going to Texas A&M.
20     Q.  It's A fine institution of learning.
21     A.  San Antonio A&M.
22     Q.  Oh, at the A&M San Antonio.  Excellent.
23         And how old is -- Let me just ask it
24  this way.  He's over 18, I assume?
25     A.  He's what?

---

35

1      Q.  Over 18?
2      A.  Yes.
3      Q.  All right.  And is he married?
4      A.  No.
5      Q.  Does he have any children?
6      A.  No.
7      Q.  All right.  Are there any other of your
8  grandchildren that live in Bexar County?
9      A.  No.
10     Q.  How about other family members, siblings
11  or --
12     A.  My sister.
13     Q.  -- cousins?
14     A.  My sister lives in Bexar County.
15     Q.  And what is her name?
16     A.  Maxine Pauline Jones.  She's the one that
17  has -- had the --
18     Q.  Osteoporosis that we --
19     A.  Yes.
20     Q.  -- talked about earlier.  All right.
21         And is Maxine married?
22     A.  She was.  She's a widow.
23     Q.  All right.  Other than your sister and the
24  two grandsons that we've talked about here in Bexar
25  County, any other family?

---

36

1      A.  No.
2      Q.  Okay.  When -- When you first went under the
3  care of my client, Dr. Rao, did she explain to you what
4  the purpose and treatment goals were that she had for
5  you?
6      A.  I don't recall.
7      Q.  All right.  Do you remember any discussions
8  about the -- the desire being controlling the disease,
9  improving quality of life, and prolonging life?
10     A.  No.
11     Q.  And if those conversations happened or
12  discussions took place, you're -- you're just telling
13  me you don't recall it; is that right?
14     A.  Right.
15     Q.  And so -- you told us earlier that your
16  daughter Susan is a good source of information --
17     A.  Yes.
18     Q.  -- about your health care; is that right?
19     A.  Yes.
20     Q.  All right.  And you understand that while
21  Dr. Rao was providing you health care, that as that was
22  happening she was creating a record of what was going
23  on; right?
24     A.  What did you say?
25     Q.  And if I've asked you a bad question, please

---

37

1  do let me know.  I meant to say that earlier.  If I ask
2  you something that's unclear, I want you to let me know
3  so I can get you a good question.
4      A.  Okay.
5      Q.  But my question is this.  You -- You
6  understand that while Dr. Rao was treating you, she was
7  at the same time, each time you would visit her,
8  documenting and making a medical record of those
9  visits; correct?
10     A.  Well, I would hope so.
11     Q.  All right.  You don't -- You don't know that
12  to not be true, I supposed --
13     A.  No.
14     Q.  -- is the best answer?  All right.
15         MR. WOOLSEY:  Ma'am, that's I think all
16  I have for you at this moment.  I'll let your attorney
17  ask you a few more questions if he -- if he has any.
18  And then if I think of any more, I may ask you a couple
19  more.  Okay?
20         THE WITNESS:  Okay.
21         MR. WOOLSEY:  Thank you.
22         MR. POWELL:  And I just have a few
23  questions for you, and then we'll -- we'll conclude for
24  the day.
25              * * * * *

---

10 (Pages 34 to 37)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Thelma Louise Reynolds**
**March 15, 2019**

---

38

1    FURTHER EXAMINATION BY MR. POWELL:
2        Q.   Are you -- Do you remember being on a
3    medicine for cancer called Avastin, A-v-a-s-t-i-n, from
4    Dr. Rao?
5        **A.   (Witness shakes head side to side.)**
6        Q.   Avastin?
7        **A.   (Witness shakes head side to side.)**
8        Q.   Okay.  Do you recall Dr. Rao telling you
9    anything about a risk of bowel perforation from
10   Avastin?
11       **A.   (Witness shakes head side to side.)**
12       Q.   Nor or -- No?
13       **A.   No.**
14       Q.   Did you ever have any problem with a bowel
15   perforation that you're aware of?
16           THE WITNESS:  I guess I did, Lyle, huh?
17   No?
18           MR. REYNOLDS:  No.  Occasional
19   constipation maybe, but --
20           MR. POWELL:  Okay.
21           MR. REYNOLDS:  -- nothing --
22           MR. POWELL:  Okay.
23           MR. WOOLSEY:  I'll have to object to the
24   sidebar.
25           MR. POWELL:  Yeah.  Her husband is

---

39

1    helping her.
2            MR. WOOLSEY:  Something is not right.
3    Let's --
4            MR. POWELL:  Yeah.
5            MR. WOOLSEY:  -- put that in the record.
6            MR. POWELL:  All right.  Thank you very
7    much, again, for your testimony today, and we
8    appreciate you working with us on that.  I'll pass the
9    witness.
10           MR. WOOLSEY:  Give me just a moment and
11   make sure I'm --
12           THE WITNESS:  It bothered me that I
13   didn't get to see Dr. Rao very much.  And I kept asking
14   the people that would come in and ask me questions
15   about how I was feeling or how my health was or this or
16   that, and I'd ask them, "Are you telling Dr. Rao this?"
17           And they'd always say, "Yes, of course."
18           And when they wanted to change
19   something, I'd say, "Well, do you ask Dr. Rao?"
20           So, I understood that they went to
21   Dr. Rao, but it made me -- it didn't make me feel real
22   good not seeing her.  I'd see her in the hall.  But as
23   far as seeing her and talking with her, the two times
24   were when we first went in, and the second time was
25   when my son -- our son was there and Lyle was there.

---

40

1    We were all there, and she came in and talked with us.
2            And then at the cl- -- when she let me
3    go, which surprised me.  I mean, to let me go and say,
4    "Put her on hospice," to me didn't sound good.  Hospice
5    meant death, which I knew, you know, that -- my
6    prognosis or whatever you want to call it.  But I
7    believe in a lot of prayer, and I do believe He answers
8    prayer.  And that's one reason -- one thing that I
9    couldn't -- I wouldn't give up on.
10           MR. POWELL:  Mrs. Reynolds, I should
11   have asked you if there's anything --
12           MR. WOOLSEY:  Let me object --
13           MR. POWELL:  -- else that you wanted --
14           MR. WOOLSEY:  -- as nonresponsive.
15       Q.   (By Mr. Powell)  Yeah.  I should have ask you
16   if there's anything else you wanted to say.  And you've
17   just I think said it, but were you able to visit with
18   Dr. Rao in person at most of your visits?
19           MR. WOOLSEY:  I'm going to --
20       **A.   No.**
21           MR. WOOLSEY:  -- object to the form.
22       Q.   (By Mr. Powell)  And you weren't happy about
23   the hospice recommendation?
24       **A.   No.**
25           MR. WOOLSEY:  Objection; leading.

---

41

1        Q.   (By Mr. Powell)  And why not?
2        **A.   Well, it meant death was close.**
3        Q.   Right.  Okay.  I'm going to let him ask --
4            How many times did you see Dr. Rao
5    personally, do you remember?
6        **A.   No, but it wasn't too many times.**
7        Q.   And, again, your daughter can tell us about
8    that?
9        **A.   Yeah.**
10       Q.   Okay.  All right.
11       **A.   I'd see her in the hall, or I'd hear her in**
12   **the hall because she's got a sounding voice.**
13       Q.   Okay.
14       **A.   And I'd see her and hear her in the hall.**
15           MR. POWELL:  All right.  I'm going to
16   pass and let Mr. Woolsey ask you any final questions.
17           MR. WOOLSEY:  I apologize.  I'm just --
18   Give me one moment.  It's a slow-moving train here.
19                    * * * * *
20   FURTHER EXAMINATION BY MR. WOOLSEY:
21       Q.   Ma'am, I want to ask you whether you've had
22   discussions with any health care providers that were
23   critical of Dr. Rao?
24       **A.   No.**
25       Q.   You're shaking your head no?  Okay.

---

**11 (Pages 38 to 41)**

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Thelma Louise Reynolds
March 15, 2019

---

**42**

```
 1            MR. WOOLSEY:  That's all I have.
 2            MR. POWELL:  Thank you very much for
 3   your time today.
 4            THE WITNESS:  Thank you.
 5            THE VIDEOGRAPHER:  The deposition --
 6            MR. POWELL:  We're done.
 7            THE VIDEOGRAPHER:  -- has ended.  We're
 8   going off the record at 10:39.
 9
10            (The deposition was concluded at
11            10:39 a.m.)
12
13            ***  SIGNATURE WAIVED  ***
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**44**

```
 1       That pursuant to information given to the
     deposition officer at the time said testimony was
 2   taken, the following includes all parties of record and
     the amount of time used by each party at the time of
 3   the deposition:
 4       Jon Powell, Counsel for Plaintiff        (0:38)
 5       Brant Mittler, Counsel for Plaintiff      (0:00)
 6       William C. Woolsey, Counsel for Defendants (0:09)
 7
 8       I further certify that I am neither counsel for,
     related to, nor employed by any of the parties in the
     action in which this proceeding was taken, and further
     that I am not financially or otherwise interested in
 9   the outcome of this action.
10
11       The deposition was delivered in accordance with
     Rule 203.3, and a copy of this certificate, served on
12   all parties shown herein, was filed with the Clerk.
13
        Certified to by me on this 18th day of March,
14   2019.
15
16                      [signature]
        Deborah A. Koole, CSR
17      Texas CSR #6699
        Expiration: 1/31/2021
18
        Koole Court Reporters of Texas
19      Firm Registration No. 413
        8000 I-10 West, Suite 600
20      San Antonio, TX  78230
        (210) 558-9484
21      (210) 558-9484 Fax
        myreportingfirm@gmail.com
22
23
24
25
```

---

**43**

```
 1            CAUSE NO. 2018-CI-13942
 2
     THELMA LOUISE REYNOLDS,  §  IN THE DISTRICT COURT
 3                            §
        Plaintiff,            §
 4                            §
     vs.                      §
 5                            §  BEXAR COUNTY, TEXAS
     JAYASREE RAO, M.D. and   §
 6   ONCOLOGY SAN ANTONIO     §
     CANCER CENTER NETWORK,   §
 7                            §
 8      Defendants.    §  45TH JUDICIAL DISTRICT
 9   ***************************************************
10
11           REPORTER'S CERTIFICATE
12        ORAL AND VIDEOTAPED DEPOSITION
                     OF
13           THELMA LOUISE REYNOLDS
14            MARCH 15, 2019
15   ***************************************************
16      I, Deborah A. Koole, Certified Shorthand Reporter
     in and for the State of Texas, hereby certify to the
17   following:
18
19      That the witness, THELMA LOUISE REYNOLDS, was duly
     sworn and that the transcript of the deposition is a
     true record of the testimony given by the witness;
20
21      That examination and signature of the witness to
     the deposition transcript was waived by the witness and
22   agreement of the parties at the time of the deposition;
23
        $ _____ is the deposition officer's
24   charges to Plaintiff for preparing the original
     deposition and any copies of exhibits;
25
```

---

**Koole Court Reporters of Texas**

(210) 558-3129  Fax          myreportingfirm@gmail.com          210-558-9484

# Exhibit C.

# Lyle Reynold's deposition transcript dated August 19, 2019.

1

CAUSE NO. 2018-CI-13942

THELMA LOUISE REYNOLDS,      §      IN THE DISTRICT COURT
                             §
          Plaintiff,         §
                             §
vs.                          §
                             §      BEXAR COUNTY, TEXAS
                             §
JAYASREE RAO, M.D. and       §
ONCOLOGY SAN ANTONIO         §
CANCER CENTER NETWORK,       §
                             §
          Defendants.        §      45TH JUDICIAL DISTRICT


**************************************************

ORAL AND VIDEOTAPED DEPOSITION
OF
LYLE REYNOLDS

AUGUST 19, 2019
**************************************************


ORAL and VIDEOTAPED DEPOSITION OF
LYLE REYNOLDS, produced as a witness at the instance of
Plaintiff's counsel, and duly sworn, was taken in the
above-styled and numbered cause on August 19, 2019,
from 10:02 a.m. to 10:25 a.m., before Deborah A. Koole
certified Shorthand Reporter in and for the State of
Texas, reported by computerized stenotype machine at
Heritage Creek Assisted Living, 6538 Eckhert Road, San
Antonio, Bexar County, Texas, pursuant to the Texas
Rules of Civil Procedure and the provisions stated on
the record or attached hereto.

**Thelma Louis Reynolds vs.**
**Jayasree Roa, M.D., et al.**

**Lyle Reynolds**
**August 19, 2019**

---

**2**

1          APPEARANCES
2
FOR THE PLAINTIFF:
3
    Mr. John "Mickey" Johnson
4    THE POWELL LAW FIRM
    1148 East Commerce Street
5    San Antonio, TX 78205
    (210) 225-9300
6    (210) 225-9301 Fax
    mickey@jpowell-law.com
7
8
9 FOR THE DEFENDANTS:
10    Mr. William C. Woolsey
    WOOLSEY & WOOLSEY
11    555 North Carancahua, Suite 1160
    Corpus Christi, TX 78401
12    (361) 561-1961
    (361) 561-1967 Fax
13    bwoolsey@rcwoolseylaw.com
14
15
16 ALSO PRESENT:
17
    Ms. Deborah A. Koole, CSR
18
    Mr. Pete Resendez, Videographer
19
20
21
22
23
24
25

---

**3**

1          INDEX
                 Page
2
3 APPEARANCES...................................... 2
4
EXAMINATION BY:
5
    Mr. Johnson................................. 4
6
    Mr. Woolsey................................. 13
7
8 FURTHER EXAMINATION BY:
9    Mr. Johnson................................. 20
10
REPORTER'S CERTIFICATE........................... 22
11
12
13
14

         * * * * *

15
16
17
18

    NO EXHIBITS MARKED.
19
20
21
22
23
24
25

---

**4**

1      THE VIDEOGRAPHER:  This marks the start
2 of the Lyle Reynolds deposition.  Today is Monday,
3 August 19, 2019.  The time on record is 10:02.
4      LYLE REYNOLDS,
5 having been first duly sworn through the interpreter,
6 testified as follows:
7      * * * * *
8      EXAMINATION
9 BY MR. JOHNSON:
10    Q.  Mr. Reynolds, you and I have talked a little
11 bit before, but I'm --
12    **A.  Yes.**
13    Q.  -- Mickey Johnson, and I'm representing your
14 wife in this case.  You do understand that we are here
15 in a deposition related to a case, a medical
16 malpractice case?  Do you understand that?
17    **A.  Yes.**
18    Q.  Okay.  And could you state your full name for
19 the record.
20    **A.  Garland Lyle Reynolds.**
21    Q.  Okay, thank you.  And what is your date of
22 birth, sir?
23    **A.  5 October 1928.**
24    Q.  So, you are 90 years old today as you sit
25 there?

---

**5**

1    **A.  Yes.**
2    Q.  Okay, very good.  And you were married to
3 Thelma Louise Reynolds; is that correct?
4    **A.  Yes.**
5    Q.  And how long were y'all married for?
6    **A.  64 years plus.**
7    Q.  64-plus years?
8    **A.  Yes.**
9    Q.  Wow, that's very impressive.
10      MR. WOOLSEY:  Object to form.
11    Q.  (By Mr. Johnson)  I wanted to talk to you
12 today a little bit about how she was affected by the
13 chemotherapy treatment that she got --
14    **A.  Yes.**
15    Q.  -- from Dr. Rao.  You do understand that your
16 wife did get diagnosed with cancer, correct?
17    **A.  Yes.**
18    Q.  And she also was diagnosed with peripheral
19 neuropathy, correct?
20    **A.  Yes.**
21    Q.  Okay.  Can you explain to the jury how your
22 wife was affected by the neuropathy.  What did it do to
23 her hands?
24      MR. WOOLSEY:  Objection; form.
25      THE WITNESS:  Pardon me?

---

**Thelma Louis Reynolds vs.**
**Jayasree Roa, M.D., et al.**

**Lyle Reynolds**
**August 19, 2019**

---

**6**

1      MR. JOHNSON:  Go ahead.
2      MR. WOOLSEY:  I'm making objections to
3  his questions.
4      THE WITNESS:  Oh.
5      MR. WOOLSEY:  Unless he tells you not to
6  answer for some reason -- I'm just objecting for -- for
7  a time down the road.
8      THE WITNESS:  Oh, okay.
9      MR. WOOLSEY:  I'm just complaining about
10  the type of his questions.
11      THE WITNESS:  Okay.
12      A.  She was outwardly -- Her feet were affected
13  in that they bent one way and couldn't be relied on to
14  be walked on, at all.  They stayed that one way.  She
15  had a pair of shoes made, and they were taken at
16  Warm Springs and not returned.  So, that was the way
17  she was.  She couldn't walk.
18      Her hands were affected from the first
19  joint of each finger down to the end of each finger, to
20  where there was no feeling.  And she couldn't control
21  that, at all.  So, that restricted her use of her hands
22  completely to where she couldn't sew, she couldn't eat
23  except if she grabbed it like a caveman would
24  (motioning).  She just couldn't do anything with her
25  hands.

---

**7**

1      Q.  (By Mr. Johnson)  Was she able to hold a fork
2  and feed herself?
3      A.  No.
4      Q.  Was she able to hold a cup without spilling
5  water or --
6      A.  No.
7      Q.  -- juice?  No, okay.
8      MR. WOOLSEY:  Form.
9      Q.  (By Mr. Johnson)  Now, how -- How did this
10  make her feel, that she was unable to use her hands?
11      A.  When she --
12      MR. WOOLSEY:  Objection; form.
13      A.  -- recovered with -- not recovered.  When she
14  realized that she could not control her fingers --
15  particularly because she had decided that in here, the
16  one thing she could do is sew, so she had her machine
17  in here and was sewing.  When this happened, she
18  realized finally that she would never again be able to
19  do that, and she became very depressed.  And I think
20  subsequently that's probably what killed her.
21      Q.  Now --
22      MR. WOOLSEY:  Objection; nonresponsive.
23      Q.  (By Mr. Johnson)  Before your wife passed
24  away, was she helpful or did she help you with taking
25  care of yourself, as well?

---

**8**

1      A.  She couldn't, no.
2      Q.  She couldn't?
3      A.  No.  I went to -- I went to her room down the
4  hallway every day, eight or ten times, talking with
5  her, checking with her, just being with her, but it
6  affected -- affected her.  I'm sorry.
7      Q.  That's okay.
8      A.  But it was hard to see.  And then -- She
9  could talk, and we did talk.  But she had always had
10  the hope, up until the last, maybe the last few
11  weeks --
12      Q.  Uh-huh.
13      A.  -- that she could -- would be able to do
14  stuff.  She couldn't write.  She couldn't -- She could
15  talk, and that was about it.  She was -- had trouble
16  hearing, but that was probably unre- -- unrelated to
17  this.  But she couldn't do anything but lay there and
18  couldn't move.  She couldn't take care of herself in
19  any way.
20      She could press the button, the call
21  button, by grasping it and pushing it with her hand.
22  That was the extent of her use for her hands.  It was
23  very hard to see.  And she had been so active.  I'm
24  sorry.
25      Q.  You're fine.  So, I wanted to ask you --

---

**9**

1      MR. WOOLSEY:  Objection; nonresponsive.
2      Q.  (By Mr. Johnson)  Before she was diagnosed
3  with the cancer and neuropathy, it sounds like you
4  indicated that she was living an active lifestyle.
5      A.  She was.
6      Q.  What types of things was she doing before she
7  had neuropathy, or would y'all do things together?
8      A.  Yes.
9      Q.  What sorts of things would y'all do?
10      A.  Well, we would go out to eat once in a while.
11  She worked around the house and kept the house clean,
12  did the cleaning and so on and so forth, everything
13  associated with the housework.  She worked outside
14  quite a bit, as much as she could.  She liked plants,
15  so she was working somewhat with them.  She did a lot
16  of sewing.  She had sewed from the beginning of our
17  marriage practically --
18      Q.  Yeah.
19      A.  -- until -- up until this time.
20      Q.  Uh-huh.
21      A.  And she spent hours in there making quilts
22  primarily, or lap covers, for elderly people.  Then she
23  would give them to somebody who would distribute them
24  around to nursing homes or wherever they could be used
25  for babies.  I mean this was what she wanted --

---

3 (Pages 6 to 9)

**Thelma Louis Reynolds vs.**
**Jayasree Roa, M.D., et al.**

**Lyle Reynolds**
**August 19, 2019**

---

10

1    Q.  Right.
2    A.  -- to do, and that's what she settled to do.
3  She was also active in the church.  And she wrote notes
4  concerning her childhood up to her parents' deaths,
5  concerning their raising and stories they would tell
6  her.  And she loved reading them over and making sure
7  that they were right.
8         And she did have beautiful handwriting
9  which deteriorated, of course, to where you couldn't
10 hardly decipher it even because there was no holding of
11 a pencil except if you held it like that (motioning) or
12 tried to write something that way.
13   Q.  Uh-huh.
14   A.  So, she didn't -- We went to church nearly
15 every Sunday, and she tried leading a women's group
16 there, she tried teaching children there, and she tried
17 being an educational director.  And one of her -- She
18 was an elder in our church for quite a long time.  But
19 when we changed churches -- this was in 2010 -- then
20 she became active in this new church.  So, that's where
21 what she did I'm talking about now rather than the 40
22 years before that.
23   Q.  Okay.
24   A.  So --
25   Q.  And do -- You and Thelma, y'all had children;

---

11

1  is that right?
2    A.  We had two children, David Lyle Reynolds and
3  Thelma -- Susan Reynolds.
4    Q.  And did you have any grandchildren?
5    A.  Seven grandchildren.
6    Q.  And did Thelma spend a lot of time with her
7  children and your grandchildren?
8    A.  She spent all the time that she could.  The
9  daughter was in the military with her husband and then,
10 of course, went overseas.  And we went over to -- She
11 went over to England twice, to Italy once, with the
12 children.  I was working for the government, so I went
13 with her when I could.  And I also went -- was gone TDY
14 a number of times, east and west --
15   Q.  Right.
16   A.  -- and around the country, too.  So, she kept
17 up and managed the household and took care of the kids
18 as much as was required and more.
19   Q.  And once she was diagnosed with cancer and
20 neuropathy, she was no longer able to do that; is that
21 true?
22         MR. WOOLSEY:  Form, leading.
23   A.  She couldn't.  There was no way she could
24 walk.  She couldn't even properly manipulate a
25 wheelchair.  She could sit in a wheelchair if her feet

---

12

1  were -- were moved so they rested on the footrests from
2  the wheelchair, but that was the only way she could get
3  around.  And, of course, not being able to use her
4  hands properly, she couldn't do much with the
5  wheelchair --
6    Q.  (By Mr. Johnson)  Yeah.
7    A.  -- besides have somebody move her.
8    Q.  Right.
9    A.  And that just defeated her over time because
10 she constantly was looking for ways to try to do
11 something mainly for others.
12   Q.  Right.
13   A.  She thought of -- She loved children.  She
14 tried to think of ways she could help them and people
15 in general.  And when she finally realized that she
16 wouldn't be able to ever again do what she wanted to,
17 she started going downhill --
18   Q.  Uh-huh.
19   A.  -- and never recovered.
20   Q.  Okay.
21         MR. WOOLSEY:  Objection; nonresponsive.
22         MR. JOHNSON:  I may ask you one or two
23 more questions, but I'm going to hand it over to
24 opposing counsel if he has any questions for you.
25              *  *  *  *  *

---

13

1  EXAMINATION BY MR. WOOLSEY:
2    Q.  Mr. Reynolds, I'm sorry we have to meet under
3  these circumstances, and I'm very sorry for the loss of
4  your wife.  Do you accept my --
5    A.  Okay.
6    Q.  -- condolences to you, sir?
7    A.  What?
8    Q.  Do you accept my condolences to you, sir?
9  I'm very sorry --
10   A.  Oh, yes.
11   Q.  -- that we're --
12   A.  Oh, yes.
13   Q.  -- here under these circumstances.
14   A.  Oh, yes.  You didn't cause it.
15   Q.  Let me -- Let me ask you, sir, just a couple
16 of quick questions.  All right?
17        What -- What's the name of the church
18 that y'all were attending most recently?
19   A.  Most recently was South Memorial Christian
20 Church.  That was the last since 2010.
21   Q.  What was the name of the church that y'all
22 attended prior to that?
23   A.  Marbach Christian Church.
24   Q.  You said Marbach Christian Church?
25   A.  Yes.

---

**4 (Pages 10 to 13)**

**Thelma Louis Reynolds vs.**                                    **Lyle Reynolds**
**Jayasree Roa, M.D., et al.**                                   **August 19, 2019**

---

**14**

1    Q.  How long were y'all members there?  I assume
2  you were members at Marbach Christian Church.
3    **A.  Yes.**
4    Q.  How long were y'all members there?
5    **A.  We went there in 19- -- I'm backing it up.**
6  **'55, '56, '57 -- 1963 I think, two or three.**
7    Q.  You can get close -- Close enough.  1962 or
8  three?
9    **A.  Whenever the church founded.  Yeah, we were**
10  **founding members at that time.**
11    Q.  And you stayed there until 2010?
12    **A.  Yes.**
13    Q.  All right, sir.  What type of work did you do
14  before retiring?
15    **A.  I was an air intelligence analyst at**
16  **Security Service.**
17    Q.  Did you say air intelligence --
18    **A.  -- analyst.**
19    Q.  Air intelligence analyst.
20        And you said that was with the
21  government?
22    **A.  The Air Force, yes.**
23    Q.  Thank you for your service.
24    **A.  Okay.**
25    Q.  And --

---

**15**

1    **A.  Well, that was civilian primarily.**
2    Q.  Okay.
3    **A.  Four years of civilian and -- I mean four**
4  **years military and the rest civilian.**
5    Q.  All right.  So, four years active in the
6  Air Force and then as a civilian?
7    **A.  Yes.**
8    Q.  All right, sir.  And you mentioned your --
9  your children.  Neither of them live here in
10  San Antonio or Bexar County; is that right?
11    **A.  At that time, no.  Susan does now.**
12    Q.  She now lives in San Antonio?
13    **A.  Yes.**
14    Q.  When did Susan -- and her -- Is her last name
15  Reynolds?
16    **A.  She goes by Reynolds right now, yes.**
17    Q.  All right.  When did Susan move back in to
18  San Antonio?
19    **A.  Permanently, when she was divorced.  I'm**
20  **trying to remember, 19 -- 20 -- I'm sorry.  Four or**
21  **five years ago.**
22    Q.  Sometime 2012, '13?
23    **A.  Somewhere in there, yes.**
24    Q.  Okay.  And are any of your grandchildren over
25  the age of 18, sir?

---

**16**

1    **A.  They all are.**
2    Q.  All of your grandchildren are?
3    **A.  Yes.**
4    Q.  Do -- Does Susan have children that live here
5  in San Antonio?
6    **A.  She has one in San Antonio.**
7    Q.  What's that -- What's that kid's name?
8    **A.  Chase Hunter Downey.**
9    Q.  Chase Hunter --
10    **A.  -- Downey.**
11    Q.  -- Downey?
12        How old, if you know, is Chase?
13    **A.  Oh, boy.  19- -- she was born in -- She was**
14  **married in 1986.  Bobby was born in 1988.  Chase was**
15  **born in 1989, I think.**
16    Q.  Making him 29 or 30 years old?
17    **A.  Yes.**
18    Q.  All right.  Do you know what kind of work
19  Chase -- Does Chase have a job here in town?
20    **A.  Yes.**
21    Q.  Do you know what he does?
22    **A.  I'm trying to remember because he's had so**
23  **many jobs.**
24    Q.  It's common.
25    **A.  I think he's working in a -- Oh, man.  I**

---

**17**

1  **should know this, and I just -- It escapes me at the**
2  **moment.**
3    Q.  That's all right.  Do you -- Do you know what
4  kind of industry it is?  Is he in the construction
5  industry, oil and gas?  Does he sell widgets?
6    **A.  He was in construction, working with masonry.**
7    Q.  Okay.
8    **A.  But I think he changed jobs.**
9    Q.  Okay.
10    **A.  And what he's doing right now I can't**
11  **remember.  My memory is shot.**
12    Q.  Fair -- Fair enough.  More interesting things
13  to talk about than his job, I imagine.
14        Any other grandchildren that live here
15  in San Antonio other than Chase?
16    **A.  Eric is -- he has two boys of David's.**
17  **Michael is working with the oil industry in some**
18  **capacity.**
19    Q.  And is Michael's last --
20    **A.  And --**
21    Q.  -- name Reynolds?
22    **A.  What?**
23    Q.  Michael Reynolds?
24    **A.  Yes.**
25        **And Eric Reynolds is working as going to**

---

**Koole Court Reporters of Texas**
**myreportingfirm@gmail.com**

(210) 558-3129  Fax                                              210-558-9484

**Thelma Louis Reynolds vs.**
**Jayasree Roa, M.D., et al.**

**Lyle Reynolds**
**August 19, 2019**

---

**18**

1  college at Texas A&M San Antonio.
2      Q.  Very well.  And does David, your son, does he
3  live -- he doesn't live here in town, does he?
4      A.  No, not yet.  He's moving here and having a
5  house built.  Retires up there next month in Bedford
6  and having a house built here, which he plans to move
7  into late in the year.  He's hoping to I should say.
8      Q.  Mr. Reynolds, did you go with -- with your
9  wife to any of the doctor's visits to Dr. Rao's office
10  when she was under her care?
11      A.  Yes.
12      Q.  Do you recall any specific conversations with
13  Dr. Rao from that time frame?
14      A.  I remember the last one.
15      Q.  Can you tell me what --
16      A.  -- specifically.
17      Q.  -- what you recall about that last
18  conversation.
19      A.  Dr. Rao came -- called us all in -- my wife,
20  myself, my son David, and Susan, and said, in essence,
21  that she had treated Louise all that she could and she
22  couldn't treat her anymore.  This was after 18 months
23  of treatment with chemo.  And she left the room.  That
24  was it.  She just left us all crying and wondering what
25  happened because it was so unexpected.

---

**19**

1          And it just -- We had nowhere to go, so
2  we started looking for another cancer doctor, which --
3  Louise and my son.  My daughter subsequently found, but
4  that's another story.
5          Dr. Rao, that was essentially what the
6  last meeting we had with her in so many words.  She
7  just cut us off completely.  I had my doubts about her,
8  but that's a personal opinion from the time it started
9  and particularly the last six months because I had
10  heard about Opdivo on TV.
11          And their claim of extending your life
12  was theoretically correct, but their -- their
13  advertisement said we can extend your life.  Well, they
14  subsequently found out that it was six weeks, the
15  extension, which was to me nothing.  But it took her
16  six months of treatment with that before she called
17  halt to the whole thing of 18 months.
18          I went with my wife to weekly
19  appointments a number of times, not always.  Somebody
20  accompanied her always and was with her.  My daughter,
21  my son, or -- I think that was them or me.  I don't
22  believe anybody else accompanied her there.
23          She saw Dr. Rao once in a while, but
24  mainly Dr. Rao communicated by telephone with the aide
25  who talked with Louise and treated her.  So, that's

---

**20**

1  really all I know.  She was hooked up every week for an
2  hour, two hours, or three hours, to my knowledge, for
3  whatever was in the bag.  I don't know what.
4      Q.  You're -- You're not a physician, right?
5      A.  That's right.
6      Q.  Okay.  I'm not going to quiz you on the
7  medication.
8      A.  Please don't.
9      Q.  How's that?
10      A.  Please don't.  My daughter could rattle them
11  off to you, but I can't.
12      MR. WOOLSEY:  Fair enough.
13  Mr. Reynolds, I think that's all I have to ask you at
14  this time.  And so, I appreciate you answering my
15  questions.
16      THE WITNESS:  Okay, thank you.
17          * * * * *
18  FURTHER EXAMINATION BY MR. JOHNSON:
19      Q.  Mr. Reynolds, you said that the last meeting
20  that you had with Dr. Rao, she left the room and the
21  family was crying; is that correct?
22      A.  We all were.
23      Q.  And --
24      A.  She just walked out.  You know?  She told us
25  she couldn't do any more and walked out.

---

**21**

1      Q.  Do you think she could have handled that last
2  meeting better?
3      A.  In so --
4      MR. WOOLSEY:  Objection; form.
5      A.  -- many words, I mean that was it.  So, I
6  felt -- we all felt like we were abandoned at that
7  child -- at that time, like a child that just been
8  left standing in the middle of the street.  But it was
9  a shock.
10      MR. JOHNSON:  Okay.  Well, I don't have
11  any more questions for you.  I appreciate your time,
12  and I think that's the end of the deposition.
13      MR. WOOLSEY:  Yeah, that's it.  I don't
14  have anything else for you, sir.
15      THE WITNESS:  Okay.
16      THE VIDEOGRAPHER:  This concludes the
17  deposition.
18      THE WITNESS:  Thank you.
19      THE VIDEOGRAPHER:  Going off record at
20  10:25.
21
22      (The deposition was concluded at
23      10:25 a.m.)
24
25      *** SIGNATURE WAIVED ***

---

6 (Pages 18 to 21)

**Thelma Louis Reynolds vs.**
**Jayasree Roa, M.D., et al.**

**Lyle Reynolds**
**August 19, 2019**

---

**22**

```
 1              CAUSE NO. 2018-CI-13942
 2
 3   THELMA LOUISE REYNOLDS,   §   IN THE DISTRICT COURT
        Plaintiff,    §
 4                    §
     vs.              §
 5                    §   BEXAR COUNTY, TEXAS
                      §
 6   JAYASREE RAO, M.D. and   §
     ONCOLOGY SAN ANTONIO    §
 7   CANCER CENTER NETWORK,   §
                      §
 8      Defendants.   §   45TH JUDICIAL DISTRICT
 9
     ********************************************
10
11           REPORTER'S CERTIFICATE
            ORAL AND VIDEOTAPED DEPOSITION
12                     OF
                  LYLE REYNOLDS
13
               AUGUST 19, 2019
14
     ********************************************
15
16       I, Deborah A. Koole, Certified Shorthand Reporter
     in and for the State of Texas, hereby certify to the
17   following:
18
         That the witness, LYLE REYNOLDS, was duly sworn
19   and that the transcript of the deposition is a true
     record of the testimony given by the witness;
20
21       That examination and signature of the witness to
     the deposition transcript was waived by the witness and
22   agreement of the parties at the time of the deposition;
23
         $ _____ is the deposition officer's
24   charges to Plaintiff for preparing the original
     deposition and any copies of exhibits;
25
```

---

**23**

```
 1       That pursuant to information given to the
     deposition officer at the time said testimony was
 2   taken, the following includes all parties of record and
     the amount of time used by each party at the time of
 3   the deposition:
 4       Mickey Johnson, Counsel for Plaintiff    (0:13)
 5       William C. Woolsey, Counsel for Defendants  (0:10)
 6
 7       I further certify that I am neither counsel for,
     related to, nor employed by any of the parties in the
 8   action in which this proceeding was taken, and further
     that I am not financially or otherwise interested in
 9   the outcome of this action.
10
         The deposition was delivered in accordance with
11   Rule 203.3, and a copy of this certificate, served on
     all parties shown herein, was filed with the Clerk.
12
         Certified to by me on this 26th day of August,
13   2019.
14
15
         _____
16       Deborah A. Koole, CSR
         Texas CSR #6699
         Expiration:  1/31/2021
17
18       Koole Court Reporters of Texas
         Firm Registration No. 413
19       8000 I-10 West, Suite 600
         San Antonio, TX  78230
20       (210) 558-9484
         (210) 558-9484  Fax
21       myreportingfirm@gmail.com
22
23
24
25
```

**7 (Pages 22 to 23)**

# Exhibit D.

# National Comprehensive Cancer Network Quick Guide article titled "Non-Small Cell Lung Cancer."



National
Comprehensive
Cancer
Network®

# NCCN QUICK GUIDE™
# Non-Small Cell Lung Cancer

## Treatment Options



**Version 1.2015**

This **NCCN QUICK GUIDE™** sheet summarizes key points from the complete *NCCN Guidelines for Patients®: Non-Small Cell Lung Cancer.* These guidelines explain which tests and treatments are recommended by experts in cancer. To view and download the guidelines, visit NCCN.org/patients or, to order printed copies, visit Amazon.com.

*NCCN Guidelines
for Patients®
Page Number*

## How do doctors choose treatment options?

| | |
|---|---|
| Treatment options for lung cancer greatly depend on the cancer stage. Options for one or more related tumors are listed next. Besides treatment, ask for supportive care. You can get help for symptoms, managing your care, deciding your treatment, and more. | **57** |

## What are the options for stage I?

| | |
|---|---|
| ▪ Surgery to remove the cancer and lymph nodes. Then, more surgery or radiation therapy if it's likely that not all the cancer was removed. If stage IB, chemotherapy may be added to either option.<br>▪ Radiation therapy, and if stage IB, maybe chemotherapy, too. | **58** |

## What are the options for stage II?

| | | |
|---|---|---|
| **No growth of tumor into other tissues (No invasion)** | ▪ Surgery to remove the cancer and lymph nodes. Then, chemotherapy if chances are low that cancer remains. If high, surgery with or without chemotherapy or chemoradiation alone.<br>▪ Radiation therapy and maybe chemotherapy, too.<br>▪ Chemoradiation alone | **62** |
| **Superior sulcus tumor** | ▪ Chemoradiation then surgery then chemotherapy.<br>▪ Chemoradiation alone | **64** |
| **Growth of tumor into other tissues (Invasion)** | ▪ Surgery to remove the cancer and lymph nodes. Then, chemotherapy if chances are low that cancer remains. If high, surgery with chemotherapy or chemoradiation alone.<br>▪ Chemoradiation or chemotherapy followed by surgery. You may have a second surgery if not all of the cancer was removed.<br>▪ Chemoradiation alone | **64** |

EXHIBIT
Rao - 5
12·18·19   DK
PENGAD 800-631-6989

## What are the options for Stage III?

| | | |
|---|---|---|
| **No growth of tumor into other tissues (No invasion)** | ▪ Surgery to remove the cancer and lymph nodes. Then, chemotherapy if chances are low that cancer remains. If high, you may have chemoradiation.<br>▪ Chemotherapy then surgery. Radiation therapy may be received before or after surgery. More chemotherapy may follow surgery.<br>▪ Chemoradiation alone | **68** |
| **Superior sulcus tumor** | ▪ Chemoradiation then surgery then chemotherapy.<br>▪ Chemoradiation then more chemotherapy.<br>▪ Chemoradiation alone | **72** |
| **Growth of tumor into other tissues (Invasion)** | ▪ Surgery to remove the cancer and lymph nodes. Then, chemotherapy if chances are low that cancer remains. If high, surgery with chemotherapy or chemoradiation alone.<br>▪ Chemoradiation or chemotherapy then surgery. You may have a second surgery if not all of the cancer was removed.<br>▪ Chemoradiation alone | **74** |

## What are the options for widespread Stage IV?

| | | |
|---|---|---|
| **Abnormal EGFR** | ▪ Erlotinib or afatinib. | **78** |
| **Abnormal ALK** | ▪ First, crizotinib and if it fails, then ceritinib. | **80** |
| **Normal or unknown EGFR or ALK status** | ▪ Chemotherapy and if the cancer grows, try another chemotherapy. Drugs that stop cancer from getting food may be added. An immune-boosting drug is sometimes an option.<br>▪ Supportive care if chemotherapy will be harmful. | **82** |

## Are multiple unrelated tumors treated the same?

| | |
|---|---|
| Surgery is preferred to try to cure. Otherwise, treatment is the same as for stage IV. | **90** |

## How do I decide between options?

| | |
|---|---|
| Ask your doctors many questions. Also, you could get a second opinion, attend support groups, and compare pros and cons. | **97** |

The NCCN QUICK GUIDE™ series and NCCN Guidelines for Patients® are supported by charitable donations made to the NCCN Foundation®. For more details and the full library of patient and caregiver resources, visit NCCN.org/patients.



pay it forward

**NCCN** NATIONAL COMPREHENSIVE CANCER NETWORK
**FOUNDATION**®
*Guiding Treatment, Changing Lives.*

**DONATE NOW**
nccnfoundation.org



**NCCN.org** - For Clinicians | **NCCN.org/patients** - For Patients

# Exhibit E.

# Jayasree Rao, M.D.'s deposition transcript dated December 18, 2019.

1

CAUSE NO. 2018-CI-13942

| | | |
|---|---|---|
| THELMA LOUISE REYNOLDS, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | BEXAR COUNTY, TEXAS |
| | § | |
| JAYASREE RAO, M.D. and | § | |
| ONCOLOGY SAN ANTONIO | § | |
| CANCER CENTER NETWORK, | § | |
| | § | |
| Defendants. | § | 45TH JUDICIAL DISTRICT |

*****************************************************

ORAL AND VIDEOTAPED DEPOSITION
OF
JAYASREE RAO, M.D.

DECEMBER 18, 2019
*****************************************************

ORAL and VIDEOTAPED DEPOSITION OF
JAYASREE RAO, M.D., produced as a witness at the
instance of Plaintiff's counsel, and duly sworn, was
taken in the above-styled and numbered cause on
December 18, 2019, from 9:59 a.m. to 3:46 p.m., before
Deborah A. Koole certified Shorthand Reporter in and
for the State of Texas, reported by computerized
stenotype machine at the offices of Woolsey & Woolsey,
310 South St. Mary's Street, Suite 1030, San Antonio,
Bexar County, Texas, pursuant to the Texas Rules of
Civil Procedure and the provisions stated on the record
or attached hereto.

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Jayasree Rao, M.D.
December 18, 2019

---

**2**

APPEARANCES

FOR THE PLAINTIFF:
    Dr. Brant Mittler
    BRANT S. MITTLER, P.C.
    17503 La Cantera Parkway, Suite 104-610
    San Antonio, TX  78257
    (210) 698-0061
    bsm@mittlerlaw.com

FOR THE PLAINTIFF:
    Mr. Jon Powell
    THE POWELL LAW FIRM
    1148 East Commerce Street
    San Antonio, TX  78205
    (210) 225-9300
    (210) 225-9301 Fax
    jon@jpowell-law.com

FOR THE DEFENDANTS:
    Mr. William C. Woolsey
    WOOLSEY & WOOLSEY
    555 North Carancahua, Suite 1160
    Corpus Christi, TX  78401
    (361) 561-1961
    (361) 561-1967 Fax
    bwoolsey@rcwoolseylaw.com

ALSO PRESENT:
    Ms. Deborah A. Koole, Certified Shorthand Reporter
    Mr. Gary Gutierrez, Videographer

---

**3**

INDEX
                                                    Page

APPEARANCES.....................................    2

EXAMINATION BY:

    Dr. Mittler................................    6

CHANGES AND SIGNATURE...........................  199

NOTARY PAGE.....................................  200

REPORTER'S CERTIFICATE..........................  201

                * * * * *

EXHIBITS

No.     Description             Page Marked

Exhibit 1   Dr. Rao's medical file on
            Thelma Reynolds.....................    6

Exhibit 2   Texas Medical Board
            Public Verification/Physician Profile
            for Dr. Rao, as of 12/17/2019.......   13

Exhibit 3   Three lab reports from Mrs. Reynolds'
            initial evaluation in November 2015..   25

Exhibit 4   Two lab reports from Mrs. Reynolds'
            initial evaluation in November 2015,
            with handwritten notes...............   30

---

**4**

EXHIBITS CONTINUED
No.     Description             Page Marked

Exhibit 5   NCCN Quick Guide article titled
            "Non-Small Cell Lung Cancer".........   35

Exhibit 6   7/06/2017 History and Physical by
            Dr. Sara Conde......................   43

Exhibit 7   List of cisplatin injections
            recorded in nurses notes from
            4/8/2016 to 12/30/2016..............   64

Exhibit 8   Journal of Clinical Oncology article
            titled "Systemic Therapy for Stage IV
            Non-Small-Cell Lung Cancer:
            American Society of Clinical Oncology
            Clinical Practice Guideline Update"..   76

Exhibit 9   Frontiers in Molecular Neuroscience
            article titled "Pathophysiology of
            Chemotherapy-Induced Peripheral
            Neuropathy".........................  108

Exhibit 10  Handwritten calculations by Dr. Rao
            on the total milligrams of cisplatin
            per meter squared on Mrs. Reynolds...  136

Exhibit 11  San Antonio Express-News article
            titled "More troubles at
            S.A. oncology practice".............  139

Exhibit 12  Printout from Oncology San Antonio's
            website, listing the Providers.......  146

Exhibit 13  Printout from Oncology San Antonio's
            website, with information regarding
            lung cancer.........................  158

---

**5**

EXHIBITS CONTINUED
No.     Description             Page Marked

Exhibit 14  Printout from Oncology San Antonio's
            website, with bio on Jayasree Rao, MD  161

Exhibit 15  Printout from Oncology San Antonio's
            website, with information on
            "What to Expect"....................  163

Exhibit 16  The Texas Tribune article
            dated 4/14/2014 and titled
            "Medicare Data Shines Light on
            Billions Paid to Texas Doctors"......  166

Exhibit 17  San Antonio Express-News article,
            dated 4/10/2014, with the headline
            "Two S.A. doctors are on list of top
            Medicare payments --
            Correction Appended"................  167

Exhibit 18  San Antonio Express-News article,
            dated 11/17/2015, with the headline
            "Oncologists allege loan paperwork
            was forged".........................  173

Exhibit 19  The New England Journal of Medicine
            article titled "First-Line Crizotinib
            versus Chemotherapy in ALK-Positive
            Lung Cancer".........................  178

Exhibit 20  Dr. Stephen Cohen's 11/26/2018 report  183

Exhibit 21  11/16/2015 Surgical Pathology Report
            addendum signed on 11/25/15..........  189

Exhibit 22  Prescribing information for doctors
            from the package insert on Opdivo....  194

---

2 (Pages 2 to 5)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

**6**

1    (Exhibit 1 was marked.)
2         * * * * *
3         THE VIDEOGRAPHER:  This marks the start
4  of Jayasree Rao, M.D. deposition.  Today is Wednesday,
5  December 18, 2019.  We're going on the record at 9:59.
6         JAYASREE RAO, M.D.,
7  having been first duly sworn, testified as follows:
8         EXAMINATION BY
9  BY DR. MITTLER:
10    Q.  Could you please state your full name.
11    **A.  My first name is Jayasree.  Last name is Rao,**
12  **R-a-o.**
13    Q.  Okay.  Do you have any middle name?
14    **A.  It's "N" as in Nancy, Nagaraja.**
15    Q.  How do you spell that?
16    **A.  N-a-g-a-r-a-j-a.**
17    Q.  And, Dr. Rao, my name is Brant Mittler.  And
18  you understand that I represent the Plaintiff in this
19  lawsuit against you?  Do you understand that?
20    **A.  Yes.**
21    Q.  Okay.  Could you please state your business
22  address.
23    **A.  I have two offices.  One of them is at**
24  **Stone Oak, and the other downtown.**
25    Q.  And in pur- -- For the purposes of contacting

---

**7**

1  you at a business address, which address should be
2  used?
3    **A.  I --**
4         MR. WOOLSEY:  You can contact her
5  through me.
6         MR. POWELL:  Well, I'd like to know what
7  her business address is.
8         MR. WOOLSEY:  You can have her business
9  address.  I just want to make sure you contact her
10  through me.
11         DR. MITTLER:  Well, I understand that.
12  Okay?
13         MR. WOOLSEY:  Okay.  I just --
14         DR. MITTLER:  I think it's a standard
15  part of depositions --
16         MR. WOOLSEY:  I've had --
17         DR. MITTLER:  -- to ask the doctor's
18  business address.  And when she has -- I'm going to ask
19  her for all of her business addresses.
20         MR. WOOLSEY:  I agree --
21         DR. MITTLER:  Okay?
22         MR. WOOLSEY:  -- you're entitled to it.
23  I've had in the last -- in the last week three
24  plaintiffs lawyers contact my clients direct.  And so,
25  it's --

---

**8**

1         DR. MITTLER:  Well, I've never done
2  that, and please don't accuse -- please don't imply
3  that I would do it.
4         MR. WOOLSEY:  I'm --
5         DR. MITTLER:  Okay?
6         MR. WOOLSEY:  -- just being belts and
7  suspenders, Brant.
8         DR. MITTLER:  All right.
9    Q.  (By Dr. Mittler)  Could you please tell us --
10  Do you have a principal business address?
11    **A.  202 Baltimore Avenue.**
12    Q.  In San --
13    **A.  78215.**
14    Q.  Is that in San Antonio, Texas?
15    **A.  Uh-huh.**
16    Q.  And is that where you have your pri- -- your
17  main office, where you, say, do your work every day,
18  in your capacity that we'll discuss, with your oncology
19  practice?
20    **A.  Yes.**
21    Q.  And are the other offices -- Are the other
22  office or offices satellite offices?
23    **A.  Yes.**
24    Q.  How many total offices do you have in your
25  practice where you practice oncology?

---

**9**

1    **A.  Only two.**
2    Q.  Only two, okay.  And have you been in a
3  deposition before?
4    **A.  I don't think so.**
5    Q.  You've never been deposed under oath in a
6  deposition?
7    **A.  (Witness shakes head side to side.)**
8    Q.  Do you understand that you're under oath
9  today?
10    **A.  (Witness nods head up and down.)**
11    Q.  And that you -- Do you understand that the
12  laws of perjury apply to your testimony today?
13    **A.  Yes.**
14    Q.  Okay.  You understand that you're being
15  videotaped; correct?
16    **A.  Yes.**
17    Q.  And do you understand that the videotape and
18  your deposition testimony can be played to a jury just
19  like you were live in a courtroom?
20    **A.  If you say so.**
21    Q.  Well, do you understand that?
22    **A.  Okay.**
23    Q.  And do you -- Could we have some agreements?
24  Do you agree that if you do not understand my question
25  that you'll ask me to repeat it or clarify my question?

---

3 (Pages 6 to 9)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

**10**

1    A. Yes.
2    Q. And do we have an agreement that if an answer
3  calls for a "yes" or a "no," that you will answer as
4  "yes" or "no" as opposed to "uh-huh" or "uh-uh"?
5    A. Okay.
6    Q. Do you understand that?
7    A. Yes.
8    Q. And rea- -- And you understand the reason is
9  that we have a court reporter taking down your response
10  and we want the court reporter to be able to understand
11  your response? Do you understand that?
12    A. Yes.
13    Q. Are you -- Do you have any medical conditions
14  today or any reason that you can't give your best
15  testimony today?
16    A. No.
17    Q. Is -- Now, how long have you been licensed to
18  practice in the state of Texas?
19    A. Seventeen years.
20    Q. And what is your -- Do you have a medical
21  specialty?
22    A. I'm a hematologist/oncologist.
23    Q. And is your basic training in internal
24  medicine?
25    A. And geriatrics.

---

**11**

1    Q. And geria- -- And where did you do your
2  internal medicine training?
3    A. In Easton Hospital. Easton, Pennsylvania.
4    Q. And where did you do your hematology
5  training?
6    A. Hematology/oncology, I did it here at UT
7  San Antonio.
8    Q. And so, it was at the university medical
9  center in San Antonio?
10    A. Yes.
11    Q. And what years were you in training for
12  hematology/oncology?
13    A. It was 2002 to 2005.
14    Q. So, it was a three-year fellowship?
15    A. Yes.
16    Q. And did you graduate from that fellowship in
17  good standing?
18    A. Yes.
19    Q. Did you -- have you ever taken boards that --
20    A. Yes.
21    Q. Okay. Let's have another agreement. Can you
22  agree that you'll let me finish my question before you
23  attempt to answer?
24    A. Yes.
25    Q. Okay. Because sometimes my -- I'm a little

---

**12**

1  bit slow in asking the question, and you're -- you know
2  the answer and you'll anticipate it. But, again, for
3  purposes of the court reporter, we have to have a
4  question completed and then you're allowed to answer.
5  Do you understand that?
6    A. Yes.
7    Q. Okay. So, did you ever take the boards in
8  internal medicine?
9    A. Yes.
10    Q. And when was that?
11    A. It was 2002.
12    Q. And did you pass the boards?
13    A. Yes.
14    Q. Okay. Did you have to take boards in
15  hematology/oncology?
16    A. Yes.
17    Q. And when did you take those?
18    A. 2005.
19    Q. And did you pass those?
20    A. Yes.
21    Q. Was it necessary to be recertified in those
22  boards?
23    A. I'm not sure if it's necessary.
24    Q. Were you ever recertified?
25    A. No.

---

**13**

1    Q. Has there -- Has there ever been an issue at
2  the Texas Medical Board about your board certification?
3    A. No.
4    Q. Let me hand you what's been marked as
5  Exhibit --
6    DR. MITTLER: Did we mark that as an
7  exhibit yet?
8    MR. WOOLSEY: Yes.
9    DR. MITTLER: Did we mark it already as
10  1?
11    MR. WOOLSEY: Yes.
12    DR. MITTLER: Okay.
13    Q. (By Dr. Mittler) Let me just do a little
14  bookkeeping here. We have marked as Exhibit 1 the -- a
15  set of medical records on paper from your office,
16  regarding the Plaintiff in this case, Thelma Louise
17  Reynolds; is that correct, Dr. Rao?
18    A. These are her records, yes.
19    Q. And these are all the records in your
20  possession, at your office, regarding Thelma Reynolds;
21  is that correct?
22    A. To the best of my knowledge, yes.
23    Q. Does this also include billing records?
24    A. Yes.
25    (Exhibit 2 was marked.)

---

4 (Pages 10 to 13)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

**14**

1    Q.   (By Dr. Mittler)  Let's -- I'm going to hand
2   you what's been marked Exhibit 2.
3       A.   Okay.
4       Q.   Exhibit --
5            DR. MITTLER:  I'm sorry.
6            MR. WOOLSEY:  Thank you.
7       Q.   (By Dr. Mittler)  Exhibit 2 is a copy of a --
8   of a printout from the Texas Medical Board website,
9   regarding you, that I believe was printed out
10  yesterday.  Can you take a look at that.  Does that --
11  First of all, does that pertain to you?
12      A.   Yes.
13      Q.   Is that you?
14      A.   Yes.
15      Q.   Do you see that there is some information
16  there about a -- I guess a matter that came before the
17  board regarding your advertising that you were board
18  certified?
19      A.   Yes.
20      Q.   And they're having you agree to an agreement
21  that you not advertise anymore that you were board
22  certified; is that accurate?
23      A.   Yes.
24      Q.   And you signed that agreement in October of
25  2016; is that correct?

---

**15**

1       A.   What agreement, sir?  That I will not
2   advertise?
3       Q.   A remedial plan, yes.
4       A.   Oh, yes.
5       Q.   Is that -- Is that correct?
6       A.   Uh-huh.
7       Q.   All right.  And so, how did that come about
8   if you were board certified?
9       A.   So, we previously had our business office in
10  Floyd Curl Drive.  So, apparently, they were sending
11  communications to that address for two years, and it
12  kept going back to them.
13           At that time that they said, you know,
14  when it was first started, I was well within board
15  certification.  And so, they were looking at cached
16  filings on -- so, by the time I -- it came to me,
17  finally, it was two and a half years later.
18           And I did have somebody represent me,
19  and they said it was easier to do this than to go to
20  Austin to fight it.
21      Q.   Were you a -- Was there a period of time when
22  you were not board certified?
23      A.   My board certification lapsed after ten
24  years.
25      Q.   Okay.  So, that would have been in when?

---

**16**

1       A.   2015.
2       Q.   It lapsed, all right.
3            And then -- So, there was a period of
4   time that you were advertising you were board certified
5   when you were not board certified; is that correct?
6       A.   I was not advertising anything, sir.  It was
7   in our previous in whatever they were looking at, at
8   some website.
9       Q.   Well, you were -- you were -- you said you
10  were -- Were you board certified initially in 2005?
11      A.   Yes.
12      Q.   And that board certification was good for ten
13  years; correct?
14      A.   Yes.
15      Q.   All right.  And so, when the board
16  certification lapsed in 2015, when were you
17  recertified?
18      A.   I did not recertify.
19      Q.   So, are you board certified now?
20      A.   I am not board certified now.
21      Q.   And just -- let's just -- because the
22  remedial plan you signed, the findings were that you
23  improperly advertised that you were board certified on
24  your website and your Texas Medical Board profile when
25  she is not board certified; is that correct?

---

**17**

1       A.   That was this issue about, yes.
2       Q.   Is that correct?
3       A.   What is correct, sir?
4       Q.   That --
5       A.   I don't understand your question.
6       Q.   That those were the findings of the Texas
7   Medical Board, that you had advertised you were board
8   certified on your -- on your website and your Texas
9   Medical Board profile, when you were not board
10  certified.
11      A.   So, we had a different company with a
12  different address, and the Texas Medical Board was
13  communicating with an address that was no longer, you
14  know, available, so they kept -- they kept returning
15  it.  And they were looking at cached files.
16           So in, the you know, whatever I was
17  practicing, all the information was updated.  And I
18  wanted to go to Austin to fight it, and my attorney
19  said it was easier to just go through this.
20      Q.   All right.  Were you board certified in 2016?
21      A.   Till December 2015 I was.
22      Q.   You were board certified?
23      A.   Yes.
24      Q.   In 2016, were you board certified?
25      A.   No.

---

**Koole Court Reporters of Texas**
(210) 558-3129  Fax          myreportingfirm@gmail.com          210-558-9484

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

18

1    Q.   In 2017, were you board certified?
2    **A.   No.**
3    Q.   In 2018, were you board certified?
4    **A.   No.**
5    Q.   In 2019, are you board certified?
6    **A.   No.**
7    Q.   Your Texas Medical Board profile -- could I
8    see, I'm sorry, Exhibit 1 [sic].  The -- if you turn
9    over to the -- If you turn to the page that has
10   specialty certifications up at the top, do you see that
11   up at the top about specialty certifications?
12   **A.   Uh-huh.**
13   Q.   And you see this is your current Texas
14   Medical Board profile?  Do you see that?  You can look
15   on the first page and see when it was printed out.
16   **A.   Okay.**
17   Q.   All right.  Now, that -- That indicates that
18   you're board certified; is that correct?
19   **A.   It says it was board certified at that date,**
20   **at that year.**
21   Q.   Well, aren't you representing to the public
22   right now that you are board certified?
23   **A.   No, sir.**
24   Q.   Well, it says board certification 2015.
25   **A.   This is the first time I'm looking at it.**

---

19

1    **I'll have to talk to my people who keep up with all**
2    **the -- the credentialing people.**
3    Q.   So, would you agree that that is inaccurate?
4    **A.   I don't understand what this whole thing**
5    **looks like.  I will definitely talk to my credentialing**
6    **people.**
7    Q.   Well, do you have someone else send in
8    your --
9    **A.   Yes.**
10   Q.   -- information on re-credentialing to the
11   Texas Medical Board?
12   **A.   Yes, sir.**
13   Q.   Do you check it before you send it in?
14   **A.   No, sir.**
15   Q.   Do you -- Don't you think it would be wise to
16   check what you send in to the Texas Medical Board
17   regarding your board certification?
18          THE WITNESS:  Mr. Woolsey, does this
19   look like -- I don't understand this.
20   **A.   I would like to think that it expired in**
21   **2015.**
22          DR. MITTLER:  I'm going to object as
23   nonresponsive.
24   Q.   (By Dr. Mittler)  So, my question is, don't
25   you think it's a good idea to check the information

---

20

1    being sent in to the Texas Medical Board about the
2    status of your board certification?
3    **A.   Yes, sir.**
4    Q.   Does the word "expired" appear anywhere on
5    that Texas Medical Board website, pertaining to your
6    board certification?
7    **A.   I don't see that.**
8    Q.   So, the answer is no; correct?
9    **A.   I'll definitely talk to my credentialing**
10   **people about it.**
11   Q.   So, the answer is no, the word "expired" does
12   not appear anywhere relating to your board
13   certification; correct?
14   **A.   Yes.**
15   Q.   Is there any -- You've had a chance now to
16   review that printout from the Texas Medical Board on
17   their website, pertaining to you.  Have you found
18   anything else that's incorrect on that printout?
19   **A.   I have two other nurse practitioners, and**
20   **their names are not in here.**
21   Q.   And who are they?
22   **A.   There's a lady called Shaneeka Hamlett,**
23   **H-a-m-l-e-t [sic].  They were just recruited recently.**
24   Q.   Shaneeka?
25   **A.   Yeah.**

---

21

1    Q.   And who else?
2    **A.   Selina, S-e-l-i-n-a.  Her last name is**
3    **K-a-d-i-w-a-l.**
4    Q.   And these are nurse practitioners who you
5    supervise?
6    **A.   Yes, sir.**
7    Q.   And you have a legal duty to report the nurse
8    practitioners you supervise to the Texas Medical Board;
9    correct?
10   **A.   I think so.**
11   Q.   And who -- Who reports that for you?
12   **A.   My credentialing people.**
13   Q.   Okay.  Do you know how long you have to
14   report that to the Texas Medical Board after they're
15   hired?
16   **A.   I don't know, sir.**
17   Q.   Can you tell the jury why you didn't seek
18   board recertification in 2015?
19   **A.   Because I was not well.**
20   Q.   So, it was because of illness?
21   **A.   (Witness nods head up and down.)**
22   Q.   And is that the reason that you haven't
23   sought board certification since December of 2015?
24   **A.   Yes.**
25   Q.   But you're -- you're not -- because of

---

6 (Pages 18 to 21)

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Jayasree Rao, M.D.
December 18, 2019

**22**

1  illness you can't recertify; is that correct?
2  **A.  I haven't had the time to do it.**
3  Q.  Are you practicing full-time?
4  **A.  Yes.**
5  Q.  How many hours a week do you practice?
6  **A.  60 to 65 hours.**
7  Q.  So, whatever illness you have is not
8  preventing you from practicing over 60 hours a week;
9  is that correct?
10  **A.  Yes.**
11  Q.  And the illness you have is not -- again, not
12  preventing you from giving your best testimony today;
13  is that correct?
14  **A.  Yes.**
15  Q.  And you're not on any medications today that
16  would prevent you from giving your best testimony?
17  **A.  No.**
18  Q.  Now, we talked about your -- your office
19  record, Exhibit 1.  Did you go over this record in
20  detail prior to today's deposition?
21  **A.  Not all of it.**
22  Q.  Do you have a specific recall of
23  Mrs. Reynolds?
24  **A.  About anything in specific?**
25  Q.  Well, do you have a specific recall of what

**23**

1  Mrs. Reynolds looked like --
2  **A.  Yes.**
3  Q.  -- when you saw her?
4  **A.  Yes.**
5  Q.  And what did she look like?
6  **A.  She was very pleasant and anxious.**
7  Q.  And do you remember how tall she was or how
8  much she weighed?
9  **A.  I don't remember that now.**
10  Q.  Do you remember talking to any family members
11  who were with her?
12  **A.  Yes.  I've met her husband and her son and**
13  **daughter.**
14  Q.  And do you -- What recall do you have about
15  her son and daughter?
16  **A.  Her son came maybe three times during the**
17  **time I took care of her.  Her daughter most every time**
18  **she brought her.  Mrs. Reynolds was very appreciative,**
19  **always complimentary, sweet.  And they, the daughter**
20  **and Mrs. Reynolds, seemed to have conflict.  And so,**
21  **the daughter felt like she -- Mrs. Reynolds wasn't,**
22  **like, forthcoming with some information.  So, they were**
23  **frequently having discord, the daughter and**
24  **Mrs. Reynolds.**
25  Q.  What was her daughter's name?

**24**

1  **A.  I don't remember.**
2  Q.  And what was the discord that Mrs. Reynolds
3  and her daughter had that you saw?  What was it about?
4  **A.  There wasn't just one time.  You know, there**
5  **were many times.**
6  Q.  Well, what -- What did the daughter want that
7  Mrs. Reynolds didn't want let's say?
8  **A.  Maybe that the daughter felt Mrs. Reynolds**
9  **wasn't completely telling all her, you know, symptoms.**
10  Q.  Did the daughter think that Mrs. Reynolds was
11  having -- was sicker than she was letting you and your
12  office staff know about?
13  **A.  I think that's what she was trying to convey.**
14  Q.  Did the daughter want Mrs. Reynolds to have
15  different treatments than what you were prescribing?
16  **A.  Her daughter from the beginning always seemed**
17  **to think Mrs. Reynolds should think about, you know,**
18  **not getting treated.**
19  Q.  So, is it your testimony that Mrs. Reynolds'
20  daughter did not want Mrs. Reynolds treated?
21  **A.  She, I think, felt that Mrs. Reynolds wasn't**
22  **forthcoming with all her symptoms and she wasn't -- you**
23  **know, when we asked "How are you doing?" and she would**
24  **say I'm fine, and her daughter would say, "Tell her the**
25  **truth."**

**25**

1  Q.  Well, what treatments did her daughter not
2  want Mrs. Reynolds to have as you heard them in
3  interacting with them?
4  **A.  This was over a long period of time, sir.  I**
5  **don't recall exactly all the details.**
6  Q.  So, you don't remember any specific treatment
7  that Mrs. Reynolds' daughter did not want her to have?
8  **A.  Nothing in particular.**
9  DR. MITTLER:  Let me see here.  Let me
10  hand you what's been marked -- Let's see here.  I'm
11  going to mark this as Exhibit 3.
12  MR. WOOLSEY:  Thank you.
13  (Exhibit 3 was marked.)
14  Q.  (By Dr. Mittler)  I'm going to hand you
15  what's been marked Exhibit 3, which are some laboratory
16  reports from Mrs. Reynolds' records.  And, again, these
17  do not have Bates stamps on them.  They're three
18  different laboratory reports on Mrs. Reynolds, from her
19  initial evaluation in November of 2015.  Do you see
20  those?
21  **A.  Yes.**
22  Q.  Now, take a moment to look through them.
23  Have you seen these before?
24  **A.  I've seen the first page before.**
25  Q.  You haven't seen the other pages?

**7 (Pages 22 to 25)**

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

26

1    A.  I don't -- I have not seen this page.
2    Q.  Do you want to take a moment -- Would these
3  records be in a specific part of your paper records?
4    A.  Sure.
5    Q.  Is there -- Is there a laboratory section?
6    A.  Yeah.
7    Q.  Do you want to take a moment to look through
8  those pages and confirm that these are there.
9    A.  I have -- Oh, sorry.  I only have this.
10    Q.  Okay.  So, let's see.  You have this.  And
11  let me look at this page.  Okay.
12        So, these are the pages that you have;
13  is that correct?
14    A.  Yes, sir.
15    Q.  You only have the first two pages; is --
16    A.  Yeah.
17    Q.  -- that correct?
18    A.  Yeah.
19    Q.  All right.  And that -- And I'm going to ask
20  you.
21        And the pages you have have writing on
22  them; correct?
23    A.  Uh-huh.
24    Q.  All right.  Now, I'm going to represent to
25  you that this is -- that the page -- Exhibit 3, the

27

1  first two pages are pages that were produced in the
2  time period of around the first part of July of 2018,
3  and they have no writing on them.
4        MR. WOOLSEY:  Produced by who?
5        DR. MITTLER:  Mrs. Reynolds' daughter.
6  Okay.
7    Q.  (By Dr. Mittler)  And they have no writing on
8  them.  Was there ever a time when that piece of
9  paper -- well, do you recall when you put the
10  handwriting on Exhibit -- Exhibit 3 has no handwriting.
11        The same page -- first page of Exhibit 3
12  in your records has handwriting on it; correct?
13    A.  Yeah.
14    Q.  All right.
15    A.  And this is my assistant's handwriting.
16    Q.  That's your assistant's handwriting.  And
17  some of the handwriting is -- Is all of the handwriting
18  by your assistant?
19    A.  No.  This is mine.
20    Q.  So, can you -- can you hold that up to --
21  the piece of paper from your record, can you show that.
22  Which is your handwriting?
23    A.  This (pointing) is mine.
24    Q.  Okay.  And what about the ink, are those
25  initials on the other side of the page?

28

1    A.  No.  She wrote "not ready".
2    Q.  Okay.  But what about the initials -- I'm
3  sorry -- at the bottom of the other side?  Do you see
4  that?  They're sort of -- Are those initials?
5        MR. WOOLSEY:  Right here (pointing)?
6        DR. MITTLER:  No.  On the other side.
7    A.  It says "11/18 sent -- not ready".
8    Q.  (By Dr. Mittler)  Below that there's another
9  ink mark.  Do you see that?
10    A.  That's just a --
11    Q.  What is --
12    A.  -- signature.
13    Q.  Okay.  Whose signature?
14    A.  Mine.
15    Q.  Can you show that.
16    A.  (Witness complies.)
17    Q.  So, that's your signature; is that correct?
18    A.  Yeah.
19    Q.  All right.  When did you write in the black
20  ink on that piece of paper?
21    A.  I don't recall.
22    Q.  Was it done at the time you first saw
23  Mrs. Reynolds?
24    A.  Not when I first saw her.
25    Q.  Was it done after this lawsuit was filed?

29

1    A.  No.
2    Q.  You can put this down.
3    A.  (Witness complies.)
4    Q.  All right.  What does that -- what do those,
5  your -- can you tell us -- well, let me just -- let's
6  make it a little bit -- We have Exhibit 1.
7        DR. MITTLER:  Bill, would it be okay if
8  I just made Exhibit 4 this piece of paper?
9        MR. WOOLSEY:  Yes.
10        DR. MITTLER:  Do you see what I mean?
11        MR. WOOLSEY:  Yeah.
12        DR. MITTLER:  And then we can refer to
13  Exhibit 4.
14        MR. WOOLSEY:  Yeah.  I just want to make
15  sure we can -- yeah, because I don't want to get --
16        DR. MITTLER:  Yeah.
17        MR. WOOLSEY:  -- what we've marked as
18  Exhibit 1 --
19        DR. MITTLER:  Yeah.
20        MR. WOOLSEY:  -- mixed up.
21        DR. MITTLER:  Well, let's just mark this
22  as Exhibit 4.  Okay?  I'm going to mark this as
23  Exhibit 4.
24        MR. WOOLSEY:  Somebody is going to have
25  to help Debbie get everything back to her car.

8 (Pages 26 to 29)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

30

1           (Exhibit 4 was marked.)
2       Q.  (By Dr. Mittler)  Okay.  So, we've marked
3   Exhibit 4, and that's -- do you agree that that's a
4   copy of the page from your record?  Is that right?
5   Could you hold up Exhibit 4 and also the page from your
6   record and just show that they're basically the same;
7   is that correct?
8       **A.  (Witness complies.)**
9       Q.  They're the same.  All right.
10          Now, if you'll now look at Exhibit 4.
11  There's a -- In your handwriting it says 12/15, verbal
12  negative.  Do you see that?
13      **A.  Uh-huh.**
14          MR. WOOLSEY:  You've got to say "yes" or
15  "no".
16      Q.  (By Dr. Mittler)  And that's by your
17  assistant, not you, or is that by you?
18      **A.  This (pointing) is my handwriting.**
19      Q.  Okay.  So, you -- So, what's written, 12/15
20  verbal negative, what does that mean?
21      **A.  I don't exactly recall what that means right**
22  **now, sir.**
23      Q.  And you don't know when you made that
24  annotation to the record; is that correct?
25      **A.  So, what happens is my assistant usually**

---

31

1   **calls and tries to get all the information that's**
2   **lacking.  So, it looks like she had written there that**
3   **it was not ready, and then I've written here that there**
4   **was insufficient tissue and to get a copy.**
5       Q.  All right.  And you wrote there was
6   "insufficient tissue for EGFR".  Is that correct?
7       **A.  That's what it looks like, yes.**
8       Q.  All right.  And had you gotten -- did the --
9   Did you ever attempt to get an EGFR determination on
10  Mrs. Reynolds' lung tissue?
11      **A.  So, you know, these tumor markers are all,**
12  **like, evolving, so every so often we have something new**
13  **that would come up.  Like, for example, there's PD-L1.**
14  **Then there is ROS.  There is BRAF.  So --**
15      Q.  So, what -- What was the second one?  The
16  se-- One was PD-L1.  And what --
17      **A.  PD-L1.**
18      Q.  -- was the second one?  I'm sorry.
19      **A.  Then there is ROS.**
20      Q.  That's capital R-O-S?
21      **A.  Uh-huh.**
22      Q.  And?
23      **A.  BRAF.**
24      Q.  B-R-A-F?
25      **A.  Uh-huh.**

---

32

1       Q.  Okay.
2       **A.  And then there is something called MSI-H.**
3   **Then there is EGFR.  Then there is ALK.**
4       Q.  That's A-L-K?
5       **A.  Uh-huh.**
6       Q.  Those are all capitals; right?
7       **A.  (Witness nods head up and down.)**
8       Q.  Okay.
9       **A.  So, there, you know -- So, for example, for**
10  **breast cancer there is, you know, a set of things we**
11  **look for -- ER, PR, HER2, lymph node, things like that.**
12          **For lung cancer, it seems like something**
13  **new comes up every six months.  So, it's hard to**
14  **remember, you know, what was step -- you know, what was**
15  **done at that time.  We called to ask if prognostic**
16  **markers were done.**
17      Q.  Why are prognostic markers important?
18      **A.  It would give the patient eligibility for**
19  **more options.**
20      Q.  And those options have to do with targeted
21  treatment; correct?
22      **A.  Not always.  Sometimes it could be just a**
23  **hormone blocker.**
24      Q.  Now, in lung cancer, two markers are
25  particularly important; aren't they?

---

33

1       **A.  There's numerous markers that are important.**
2       Q.  Well, would you agree that the two genetic
3   markers that are noted in both Exhibit 3 and Exhibit 4,
4   namely the ALK and EGFR markers, are important in
5   selecting the correct treatment for patients with lung
6   cancer like Mrs. Reynolds?
7       **A.  So, there is a PD-L1, that that one is also**
8   **important.  Actually, that one has so much more**
9   **implication because these are very rare.  ALK and EGFR**
10  **are rare.**
11          THE REPORTER:  I'm sorry.  These are
12  very rare...
13          THE WITNESS:  Rare aberrations.
14          DR. MITTLER:  I'm going to object as
15  nonresponsive.
16      Q.  (By Dr. Mittler)  My question is, are the
17  ALK and EGFR genetic markers that are noted in the
18  pathology report on Mrs. Reynolds that was collected on
19  November, it looks like 16th, 2015, are those markers
20  important for selecting appropriate therapy for the
21  lung cancer that Mrs. Reynolds had?
22      **A.  So, there are numerous things that we try to**
23  **obtain on the tumor marker which will give more options**
24  **for the patient.**
25      Q.  Is the answer to my question yes?

---

9  (Pages 30 to 33)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

34

1    A.  I don't completely agree with your question.
2    Q.  Would a oncologist -- hematologist/oncologist
3  seeing Mrs. Reynolds in November of 2015, would a --
4  would that oncologist, exercising ordinary prudence,
5  take into account the status of the ALK and EGFR
6  markers in designing and selecting appropriate therapy
7  for lung cancer in a patient like Mrs. Reynolds?
8    A.  So, these -- these targeted, you know -- So,
9  the PD-L1 is much more important than these two because
10  that's the most common one that we have therapies
11  against.
12    Q.  Are you aware of any guidelines that indicate
13  that a patient, who was staged as you staged
14  Mrs. Reynolds in November of 2015, should have had
15  treatment that was tailored to her -- either her EGFR
16  or ALK marker status as a -- in deciding first-line
17  therapy?  Are you aware any -- aware of any guidelines
18  that say that?
19    A.  We follow NCCN guidelines and --
20    Q.  And what is the NCCN?
21    A.  National Comprehensive Cancer Network.
22    Q.  And what's the importance of NCCN?
23    A.  They're just a broad range of guidelines, and
24  we take that and try to customize somebody's treatment.
25  They are just guidelines.

---

35

1    Q.  They're not the -- Do they have some meaning
2  for the standard of care in treating patients like
3  Mrs. Reynolds?
4    A.  Sure, yes, standard of care.
5       (Exhibit 5 was marked.)
6    Q.  (By Dr. Mittler) I'm going to hand you
7  what's been marked Exhibit 5.  Dr. Rao, this -- I've
8  marked as Exhibit 5 two pages of a quick guide for
9  "Non-Small Cell Lung Cancer" published by the National
10  Comprehensive Cancer Network.  It says Version 1.2015.
11  Do you see that at the top?
12    A.  Yes.
13    Q.  Have you seen this guideline before?
14    A.  Not this 1.215 [sic], but we follow NCCN
15  guidelines.
16    Q.  And do you agree that Mrs. Reynolds had
17  non-small cell lung cancer when you first saw her?
18    A.  Yes.
19    Q.  All right.  And do you agree that you staged
20  her as Stage IV?
21    A.  Yes.
22    Q.  Okay.  And if you would turn to the second
23  page, do you see where that section says, "What are the
24  options for widespread Stage IV?"  Do you see that?
25    A.  Uh-huh.

---

36

1    Q.  And do you see that the NCCN has a table for
2  guiding therapy?  The first option is abnormal EGFR.
3  Do you see that?
4    A.  Yes.
5    Q.  And the second one is abnormal ALK?
6    A.  Yes.
7    Q.  And the third is known or unknown EGFR or ALK
8  status, correct?
9    A.  Normal or unknown, yes.
10    Q.  Do you see that?
11    A.  Uh-huh.
12    Q.  So, my first question is this.  Is this
13  guideline -- Does this indicate that the NCCN believes
14  that knowing the EGFR or ALK status is important for
15  selecting therapy for Stage IV lung cancer like
16  Mrs. Reynolds had?
17    A.  So, like I was trying to talk to you, sir,
18  there are other -- other tumor markers as well, which
19  is not here.  So, I don't know how they can be missing
20  from this page, like PD-L1 or ROS or BRAF.
21       So, they have -- usually we have to
22  have -- you know, if somebody is able to get that kind
23  of information, that would be good, too, so we can,
24  you know, have more options for patients' treatment.
25    Q.  Well, the NCCN didn't list, on this two-page

---

37

1  quick guide in 2015, PD-L1 for making the initial
2  treatment decision; did they?
3    A.  Well, I don't know where you got it from, but
4  PD-L1 was already well -- you know, the -- aware at
5  that time.
6    Q.  So, is it your testimony that the EGFR and
7  the ALK status were not the critical tumor biomarkers
8  that were necessary to make an initial treatment
9  decision on Mrs. Reynolds in November of 2015?
10    A.  I would say that there are many things that
11  one has to look at.  And if they're available, that
12  gives them another choice.
13    Q.  The ALK status was known on Mrs. Reynolds in
14  November of 2015; wasn't it?
15    A.  I didn't know.
16    Q.  But it -- My question is, the ALK status was
17  known on Mrs. Reynolds in November of 2015; wasn't it?
18    A.  I can't answer that question because I didn't
19  know.
20    Q.  Well, haven't you learned subsequently that
21  the ALK status was determined in November of 2015?
22    A.  Yes.  I -- I learned that subsequently.
23    Q.  And when did you learn that?
24    A.  When I got paperwork from Mr. Powell's
25  office.

---

10 (Pages 34 to 37)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

38

1  Q.  So, the first time you learned that the ALK
2  status was positive is when you received notice of this
3  lawsuit; correct?
4  **A.  Yes.**
5  Q.  But at the time you made a notation on
6  Exhibit 4 in your records, you also knew that the EGFR
7  status was not known; correct?
8  **A.  Sir, this happened so long ago, all I can**
9  **tell you is my assistant had called and she's written**
10 **here "not ready".  I've written here there was**
11 **"insufficient tissue".  So, that's all I can tell you,**
12 **sir.  I don't remember.  It was five years ago.**
13 Q.  Well, have you read Dr. Stephen Cohen's
14 expert report in this lawsuit?
15 **A.  Stephen -- stephen Cohen's expert report?**
16 Q.  Yes, in this lawsuit.
17 **A.  I have read his paperwork, yes.**
18 Q.  Do you know who Dr. Cohen is?
19 **A.  I've heard of him.**
20 Q.  Have you ever worked with him?
21 **A.  No.**
22 Q.  Okay.  Have you -- Have you heard that he's
23 an oncologist in the community, of good reputation?
24 **A.  I know he's an oncologist.**
25 Q.  You've seen his multiple criticisms of your

---

39

1  treatment of Mrs. Reynolds; is that correct?
2  **A.  I have read through them, yes.**
3  Q.  Okay.  And in fairness, we're going to go
4  over these in detail, but do you recall that one
5  criticism is that you initiated therapy, on
6  Mrs. Reynolds with her lung cancer, without knowing the
7  ALK or EGFR status of her tumor?  Do you recall that
8  that's one of his criticisms?
9  **A.  Well, any oncologist who wants to help a**
10 **patient will initiate treatment.  That is standard of**
11 **care.  You don't wait for mutations and all that.  You**
12 **know?  You just start treatment when somebody is sick.**
13 Q.  But you -- But it's important to start
14 treatment with the right drugs; correct?
15 **A.  What treatment she got was the right drug for**
16 **her.**
17 Q.  So, it's your testimony that you were right
18 to start the -- the chemotherapeutic agents you did
19 without knowing the ALK or EGFR status of her tumor; is
20 that correct?
21 **A.  Yes.**
22 Q.  Do you also agree that the ALK and EGFR
23 status of her tumors were knowable at the time you
24 initiated treatment?
25 **A.  I did not know that.**

---

40

1  Q.  Well, going back to Exhibit 4 from your
2  record, do you see -- Can you look at Exhibit 4,
3  please, Dr. Rao.  Do you see it says "ALK AND EGFR
4  TESTING:  IN PROGRESS; ADDENDUM TO FOLLOW"?
5  **A.  And it says "discussed with Dr. Gomez".**
6  Q.  Yes, but -- but did you initiate any call on
7  your own, at any time you took care of Mrs. Reynolds,
8  to find out what her ALK status was?
9  **A.  I called and -- It looks like I called and**
10 **spoke to the pathologist and this is what we were told.**
11 Q.  And who -- Which pathologist did you talk to?
12 **A.  It was a woman.  I don't -- They have had a**
13 **lot of people come and go at Baptist.  I don't remember**
14 **exactly.**
15 Q.  And the pathologist told you what?
16 **A.  I have written here that "insufficient**
17 **tissue".**
18 Q.  Did you -- Did you order a new test for the
19 EGFR?
20 **A.  Sir, when they say there's insufficient**
21 **tissue, how can I order new tests?**
22 Q.  Well, you could have ordered a test to get
23 more tissue to do the EGFR test; correct?
24 **A.  So, I don't know -- Mrs. Reynolds, I know you**
25 **know her history.  She has had three or four biopsies**

---

41

1  by the time she came to see me in December of 2015, and
2  she has had numerous nondiagnostic tests.  And by the
3  time she came to see me, she was very anxious,
4  desperate, wanting to start treatment.  So, getting
5  another tissue biopsy was out of the question.  We
6  already knew it's an adenocarcinoma, so I -- I knew
7  what I needed to start her therapy.
8  Q.  Well, the standard of care from the NCCN that
9  we have says that you needed to know the -- either
10 the -- you needed to know both the EGFR status and the
11 ALK status, both genetic tumor markers, to select the
12 correct therapy; isn't that true?
13          MR. WOOLSEY:  Objection; form.  You can
14 still answer.  I'm just objecting for the record.  You
15 can...
16 **A.  So, the standard of care is also to the know**
17 **the ROS status, PD-L1 status, BRAF, all of them.**
18 Q.  (By Dr. Mittler)  All right.  Did you obtain
19 any of those on Mrs. Reynolds?
20 **A.  When they say there is not enough tissue,**
21 **there is no way to obtain anything.**
22 Q.  So, you've mentioned PD-L1.  Did you ever
23 obtain the PD-L1 status on her?
24 **A.  When they say there is not enough tissue,**
25 **there is no way to get any other further testing.**

---

**Koole Court Reporters of Texas**
**(210) 558-3129  Fax**     **myreportingfirm@gmail.com**     **210-558-9484**

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

42

1  Q.  So, the answer to that is no --
2  A.  There was not --
3  Q.  -- correct?
4  A.  -- enough tissue I was told.
5  Q.  So, if treating a patient with a -- well,
6  first of all, you do advertise on your website that you
7  offer targeted therapy; correct?
8  A.  Yes.
9  Q.  What does "targeted therapy" mean?
10  A.  Targeted therapy -- so, for example, breast
11  cancer, if somebody had HER2+, we would give a drug
12  called Herceptin.
13  Q.  Well, what about in lung cancer, what does
14  targeted therapy mean?
15  A.  So, lung cancer treatments have been
16  evolving.  So, when I was first in my fellowship, there
17  was carbo, Taxol, Gemzar, etoposide.  That's it.  So,
18  every six months there seems to be something new coming
19  out, so we have to also look at it in that time frame.
20  Q.  Well, in 2015, it was well-known that a lung
21  cancer patient like Mrs. Reynolds, who had a positive
22  ALK genetic rearrangement, would do best with a drug
23  called crizotinib; isn't that correct?
24  A.  It doesn't say that.  All it says is, if you
25  have a target -- if you have a mutation, you have,

---

43

1  you know, the ability to help the patient with
2  another -- with another drug.
3  Q.  Are you -- have you seen Dr. Conde's --
4  Well, first of all, do you know who Dr. Conde is?
5  A.  I know of her.
6  Q.  Have you looked at her records pertaining to
7  Mrs. Reynolds?
8  A.  Yes.
9  Q.  And did you look at the first visit of
10  Mrs. Reynolds to Dr. Conde?
11  A.  I read -- I have looked at it, yes.
12  Q.  And that occurred sometime in early July of
13  2017; is that correct?
14  A.  Yeah.
15  Q.  All right.  And do you recall that one of the
16  first things Dr. Conde did was to determine
17  Mrs. Reynolds' ALK status?
18  A.  I don't know what she did first and what she
19  did second.  I don't know, sir.
20  DR. MITTLER:  I'm going to just hand
21  you -- I'm going to make this -- I just didn't bring
22  extra copies, but I'm going to hand you the --
23  (Exhibit 6 was marked.)
24  DR. MITTLER:  -- July 6th initial visit
25  of Mrs. Reynolds to see Dr. Conde.

---

44

1  Q.  (By Dr. Mittler)  Have you looked at that
2  visit before?
3  MR. WOOLSEY:  Does that have a page
4  number on it?
5  A.  I read through it.
6  Q.  (By Dr. Mittler)  Yeah.  Do you agree that
7  Dr. Conde emphasizes the ALK status of Mrs. Reynolds'
8  tumor?
9  A.  So, Dr. Conde writes here that she had called
10  and she got the pathology report, and she wrote here
11  that "EGFR and ALK gene rearrangement was ordered, but
12  it was subsequently reported as an addendum."  That's
13  what she writes.
14  Q.  Right.  And she also reports that it was --
15  the ALK biomarker was positive; correct?
16  A.  Yeah, she had that information.
17  Q.  And it's also true that all the time you
18  treated Mrs. Reynolds from November through June of
19  2017, that you never called and got the actual result
20  of the ALK marker determination; isn't that true?
21  A.  I did call, and I was told there was not
22  enough tissue.
23  Q.  Well, you were told that -- The report says
24  there was not enough tissue for the EGFR, but the ALK
25  status was determined; correct?

---

45

1  A.  I didn't know that.
2  Q.  But it was knowable; correct?
3  A.  I can't answer that question, sir.
4  Q.  Well, Dr. Conde was able to -- to get --
5  A.  Because --
6  Q.  -- that information; correct?
7  A.  -- by the time she called --
8  Q.  Correct?
9  A.  What correct, sir?  What -- What is correct,
10  sir?
11  Q.  The ALK marker -- the EGFR st- -- The
12  insufficient tissue referred to the EGFR marker, not to
13  the ALK marker?
14  A.  I can only go by what I've written here.
15  That was five years ago.  And I was the first doctor to
16  see the patient.  When I called the pathologist, this
17  is what was told, and I initiated appropriate treatment
18  for Mrs. Reynolds.  She responded well to the
19  treatment, and she, you know, did well on various
20  therapies till 6/2017.
21  Q.  You did not get the ALK status because you
22  did not call subsequent to your initial conversation,
23  to see if the ALK had been completed; correct?
24  A.  I had called and talked to the pathologist,
25  and I was told that there was insufficient tissue.  And

---

12  (Pages 42 to 45)

**Koole Court Reporters of Texas**
**myreportingfirm@gmail.com**

(210) 558-3129  Fax                                    210-558-9484

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Jayasree Rao, M.D.
December 18, 2019

---

**46**

1    I also wrote here something like verbal negative.  I
2    don't know what that means.
3            But I initiated treatment, and my
4    patient did well.  So, I didn't know that there was an
5    ALK mutation out there.
6        Q.   Would it have been important to know --
7        A.   Not really.
8        Q.   -- the ALK mutation?
9        A.   Not really.
10       Q.   Well, that was my next question.
11           So, it's your testimony that you really
12   didn't need to know the ALK mutation status to treat
13   Mrs. Reynolds; is that correct?
14       A.   It's a very -- It's a very rare mutation, and
15   it's only in 3 percent of lung cancers.  So, Avastin is
16   only approved for front-line.  So, when somebody has
17   Stage IV cancer, they only have so many drugs that you
18   can use, so you have to go with what is front-line
19   which you can use.  If you don't use, you lose.
20           So, if you have six or seven drugs
21   approved for a particular cancer and you don't use
22   which is first-line therapy, you cannot go back and use
23   it after two years.  So, my job is to help my patient
24   get maximum control of disease and live the longest, so
25   I chose Avastin which is only approved front-line.

---

**47**

1        Q.   You agree that the NCCN guideline on -- that
2    you have before you in an exhibit says that, with an
3    abnormal ALK, the first-line drug is crizotinib?  Do
4    you agree with --
5        A.   No, I did not agree with that.
6        Q.   So, you don't agree with the NCCN guideline?
7        A.   But it doesn't say that, sir.  So, NCCN
8    guidelines are just guidelines.  You have to -- You
9    have to take that and come up with a treatment plan for
10   your patient that best suits them.
11       Q.   Well, what --
12       A.   NCCN doesn't say you have to give crizotinib
13   for front-line.  It doesn't say that.
14       Q.   Well, what is your basis for disagreeing with
15   the NCCN guideline of crizotinib being the first
16   treatment for a patient with non-small cell lung
17   cancer, like Mrs. Reynolds, with an abnormal ALK
18   genetic marker?
19       A.   So, non-small cell lung cancers have many
20   types.  There's adenocarcinoma.  There's squamous
21   carcinoma.  Then there's large-cell and neuroendocrine.
22   There are different types of non-small cell lung
23   cancers.
24           So, when you pick anything that's
25   non-squamous -- so you have to go with what drugs

---

**48**

1    are -- the patient is eligible to receive.  And then
2    you have to see what will the patient lose out if you
3    don't do front-line or second-line or third-line.  So,
4    that's how we come up with a treatment plan.
5            Especially when I didn't have enough
6    tissue to run tests, we -- we treated appropriately for
7    adenocarcinoma.  She responded.  All the subsequent
8    scans show that.  And I think everything was done
9    appropriately.
10       Q.   Now, you said that the ALK-positive marker is
11   rare in non-small cell lung cancer; correct?
12       A.   Yes.
13       Q.   You gave the number, three percent; correct?
14       A.   Three to four percent, yeah.
15       Q.   But do you also agree that even though it's a
16   rather small percentage, that Mrs. Reynolds, in fact,
17   had it?  Correct?
18       A.   I didn't know that until later.
19           DR. MITTLER:  I'm going to object as
20   nonresponsive.
21       Q.   (By Dr. Mittler)  My question is, even though
22   it's relatively rare, the ALK marker in non-small cell
23   cancer, in fact, Mrs. Reynolds had that genetic marker
24   at the time you first saw her and all the time you
25   treated her; correct?

---

**49**

1        A.   It appears to be so.
2        Q.   In other words, just so the jury understands,
3    this is not a marker that developed later sometime in
4    her lung cancer, right, after you saw her?  Is that
5    correct?
6        A.   Yes.  It didn't develop.
7        Q.   Yeah.  She had it at the beginning of her
8    lung cancer, and she had it throughout the course of
9    her lung cancer; correct?
10       A.   Right.
11           MR. WOOLSEY:  When you get to a shift
12   point, I'd like to take a break.  We've been going
13   about an hour.
14           DR. MITTLER:  Okay.  We can --
15           THE VIDEOGRAPHER:  Going off the
16   record --
17           DR. MITTLER:  -- do that.
18           THE VIDEOGRAPHER:  -- at 11:03.
19           (Recess.)
20           THE VIDEOGRAPHER:  We are back on the
21   record at 11:15.
22       Q.   (By Dr. Mittler)  Okay, Dr. Rao.  We're back
23   on the record, and you're still under oath.  Do you
24   understand that?
25       A.   Yes.

---

**13 (Pages 46 to 49)**

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

50

1    Q.   All right.  So, we've marked as Exhibit 6
2    four pages from Dr. Conde's medical records that are
3    the record of the first visit of Mrs. Reynolds to see
4    Dr. Conde on July 6, 2017.  Do you -- Do you see that?
5        A.   (Witness nods head up and down.)
6        Q.   And those are the records you just looked at;
7    correct?
8        A.   Yes.
9        Q.   And if you would turn to page four of those
10   records, I think there is actually a "4" on the bottom
11   right of that page.  Do you see that?
12       A.   Yes.
13       Q.   And do you see under Impression/Plan that
14   Dr. Conde wrote "Patient with ALK positive
15   adenocarcinoma of the lung with evidence of progression
16   of the disease after two lines of therapy that included
17   carboplatin, Alimta and followed by Opdivo"?
18       A.   Yes.
19       Q.   Do you see that?
20       A.   Uh-huh.
21       Q.   So -- And then do you see the three lines
22   from the bottom where she said, "I recommend treatment
23   with crizotinib"?
24       A.   Uh-huh.
25       Q.   Do you see that?

---

52

1        Q.   So, you don't think Mrs. Reynolds' lung
2    cancer disease progressed under your treatment?
3        A.   Not -- Over a period of time.
4        Q.   Yes or no?
5        A.   Over a period of time.
6        Q.   Is the answer yes?
7        A.   She progressed when she had a PET scan done
8    in May 2017, yes.
9        Q.   Okay.  I'm sorry.  I'm still not clear.
10           Is the answer yes, it did progress over
11   a period of time or no, it didn't progress over a
12   period of time?
13       A.   Yes, it progressed over a period of time.
14       Q.   And you last saw Mrs. Reynolds on or about
15   June 2, 2017; is that correct?
16       A.   I can check.  Yes, June 2, 2017.
17       Q.   And Mrs. Reynolds went into a hospice shortly
18   after that; correct?
19       A.   Per her family's wishes.
20       Q.   And did you -- Well, wasn't it your
21   assessment that she wasn't doing well and hospice was
22   appropriate for her?
23       A.   It was my assessment that she wasn't doing
24   well.
25       Q.   Did you certify her for hospice?

---

51

1        A.   (Witness nods head up and down.)
2            MR. WOOLSEY:  You've got to go "yes" or
3    "no" for the sake of the record.
4        A.   Yes, I see that.
5            MR. WOOLSEY:  All right.
6            THE WITNESS:  Sorry about that.
7            MR. WOOLSEY:  It's the "uh-huh" that --
8            THE WITNESS:  I'm sorry.
9            MR. WOOLSEY:  That's --
10           THE WITNESS:  I know the --
11           MR. WOOLSEY:  It's natural speech.
12           THE WITNESS:  Sorry.
13           MR. WOOLSEY:  I'm not picking on you.
14           THE WITNESS:  Just nudge me.
15           DR. MITTLER:  Thank you, Bill.
16       Q.   (By Dr. Mittler)  Okay.  So -- Now, do you
17   also see that Dr. Conde had noted that Mrs. Reynolds
18   had been on hospice?  Correct?
19       A.   Yes.
20       Q.   Well, first of all, do you agree that the --
21   that the treatments that you had Mrs. Reynolds on
22   had -- in spite of her being on them, had been
23   associated with progression of disease?  Do you agree
24   with that?
25       A.   No, I don't.

---

53

1        A.   I'm not sure who certified her, but her
2    family wanted her to consider comfort measures.
3        Q.   Was the -- Was putting her in hospice in June
4    of 2017 appropriate?
5        A.   It was appropriate at that time, yes.
6        Q.   And going into hospice means that a patient
7    has six months or less to live, right?
8        A.   Not always.
9        Q.   Let me say it again.  Going into a hospice,
10   for a Medicare patient, means that a doctor has to
11   certify that a patient has six months or less to live;
12   correct?
13       A.   That's what I've heard of, yes.
14       Q.   And, in fact, Mrs. -- Do you know when
15   Mrs. Reynolds died?
16       A.   Not the appropriate -- I mean not the exact
17   date, but I think she passed away last year.
18       Q.   Okay.
19       A.   Or earlier in 2019.
20       Q.   All right.  I'm going to represent to you
21   that Mrs. Reynolds died in 2019.
22           So, in fact, Mrs. Reynolds lived almost
23   two years after she was certified as being a terminal
24   patient; correct?
25       A.   I didn't certify her to be -- I didn't

---

14  (Pages 50 to 53)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

54

1   certify the hospice.
2       Q.  Well, your assessment of Mrs. Reynolds'
3   prognosis was not correct as of June 2, 2017; correct?
4       A.  My assessment of?
5       Q.  Of Mrs. Reynolds' prognosis was not correct
6   as of June 2, 2017; correct?
7       A.  Can you elaborate on that.  I don't
8   understand.
9       Q.  Was your assessment of Mrs. Reynolds'
10  prognosis accurate as of the last time you saw her?
11      A.  So, when I saw her the last time, we had a
12  family meeting.  So, her son was there, her daughter,
13  and her husband.  So, I talked to them about the PET
14  scan, and I said that, you know, there are new lesions.
15  And she was also not feeling very well, and her son
16  wanted her to go on hospice.
17          So, I told them that, you know, she's
18  not going to be -- you know, she's not going to do well
19  on chemotherapy, and we had tried immunotherapy, which
20  is Opdivo.  So, I -- When her son said that, I said I
21  will definitely help get a hospice company to talk to
22  you.
23      Q.  So, did you have a different assessment of
24  Mrs. Reynolds' prognosis on June 2, 2017 that is
25  indicated in your medical records?

55

1       A.  So, her PET scan showed that she had
2   progressed and she was also not feeling very good.
3   Every week, you know, she was getting more anxious and
4   tired, and lots of conflict in the family.
5           So, the same thing happened on that day
6   when I asked Mrs. Reynolds, "How are you feeling?"
7           She said, "I feel good," or "I feel
8   fine."
9           And her son yelled at her, and he said,
10  "You're not feeling good.  You don't say that to the
11  doctor."
12      Q.  So, it's your testimony that her son yelled
13  at her; is that correct?
14      A.  Yes.
15      Q.  And what did he want her to do?
16      A.  He wanted her to stop treatments.
17      Q.  Do you know, from looking at Dr. Conde's
18  records, that in fact Mrs. Reynolds did get crizotinib
19  treatment under Dr. Conde's care?
20      A.  Yes, in 2018.
21      Q.  So, Dr. Conde gave her the treatment that the
22  NCCN guidelines called for in 2015; correct?
23          MR. WOOLSEY:  Form.  You can answer.
24      A.  Sir, Dr. Conde after one year -- after her
25  first visit, I know Mrs. Reynolds went back to see her

56

1   in 2018, and she gave her the crizotinib.
2       Q.  (By Dr. Mittler)  And Mrs. Reynolds lived
3   approximately two years after you last saw her;
4   correct?
5       A.  So, when -- When did Mrs. Reynolds pass away,
6   sir?
7       Q.  Okay.  For the record --
8       A.  What date?
9       Q.  I'm going to represent to you that
10  Mrs. Reynolds died on May 6, 2019.
11      A.  Okay.
12      Q.  And you last saw Mrs. Reynolds on June 2 --
13      A.  In June 2017.
14      Q.  -- 2017 --
15      A.  Yes.
16      Q.  -- correct?
17      A.  Yes.
18      Q.  So, Mrs. Reynolds, in fact, died --
19          MR. WOOLSEY:  Don't talk over each
20  other.
21      Q.  (By Dr. Mittler)  Mrs. Reynolds, in fact,
22  died approximately 23 months after you last saw her;
23  correct?
24      A.  Yes.
25      Q.  And the only treatment she had during that

57

1   time was crizotinib; correct?
2       A.  Can you please tell me -- To answer that
3   question, I would like to know how many months she took
4   the crizotinib.
5       Q.  Well, we'll talk about that.  I get to ask
6   the questions, okay, at this -- at this point.
7       A.  No, but you're asking me to tell you that --
8   you are telling me she lived for two years.
9           MR. WOOLSEY:  He didn't ask you a
10  question.  He didn't ask you a question.
11          DR. MITTLER:  There's no question on the
12  table for you, Dr. Rao.  That's just the way the
13  deposition works.
14      Q.  (By Dr. Mittler)  The -- Let's go back to
15  the -- your decision about Avastin.  One of the first
16  anticancer drugs you prescribed was Avastin; correct?
17      A.  Yes.
18      Q.  And Mrs. Reynolds got one dose of Avastin;
19  correct?
20      A.  Yes.
21      Q.  And then she got a complication; correct?
22      A.  Uh-huh, yes.
23      Q.  And what was -- What was the complication?
24      A.  She had diverticular abscess.
25      Q.  And, in fact, she had a bowel perforation;

15  (Pages 54 to 57)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

58

1  correct?
2    **A.   Which was limited.**
3    Q.   Is that the answer yes?
4    **A.   Yes.**
5    Q.   And you know that Avastin has a black box
6  warning about intestinal perforation; correct?
7    **A.   Yes.**
8    Q.   And, in fact, you've seen in Dr. Cohen's
9  report that he's criticized you for prescribing Avastin
10  in someone like Mrs. Reynolds who had had recent
11  diverticulitis and diverticular disease; correct?
12    **A.   When I saw Mrs. Reynolds, she did not have**
13  **diverticulitis.**
14    Q.   But you knew she had a history of recent
15  diverticular disease; correct?
16    **A.   She has a history of it.**
17    Q.   You noted that in your records; correct?
18    **A.   I don't know.  I have to look at my notes.**
19    Q.   Okay.  I'm going to have to -- in the
20  interest of time, I will -- we'll provide that record
21  to you, but I'm going to represent to you that you did
22  note that she had a history of diverticular disease.
23  And we'll find that record.
24         But let's -- assuming that you noted
25  diverticular disease, are you aware that there are --

---

59

1  that there are articles in the medical literature that
2  say that diverticulitis is a relative contraindication
3  to prescribing Avastin?
4         MR. WOOLSEY:  Form.
5    Q.   (By Dr. Mittler)  Are you aware of that?
6    **A.   If they -- someone has active diverticulitis,**
7  **you don't prescribe Avastin.**
8    Q.   But, in fact, Mrs. Reynolds had got in fact
9  an intestinal problem within 30 days of your giving her
10  Avastin; correct?
11    **A.   She did get -- She had a problem, yes.**
12    Q.   And that caused you to stop the Avastin;
13  correct?
14    **A.   Yes.**
15    Q.   Now, you also started Mrs. Reynolds on
16  carboplatin; correct?
17    **A.   Uh-huh.**
18    Q.   And what else?  What other drugs did you
19  start Mrs. Reynolds on in -- on or about November,
20  early December 2015?
21    **A.   Avastin and a very low dose of carboplatin.**
22    Q.   And she had an allergic reaction to
23  carboplatin; correct?
24    **A.   After three or four months, yeah.**
25    Q.   And so, you had to stop that; correct?

---

60

1    **A.   Yes.**
2    Q.   And what did you put her on?
3    **A.   Cisplatin.**
4    Q.   And what is cisplatin?
5    **A.   It's a cousin of carboplatin.**
6    Q.   And is that a platinum-containing --
7    **A.   Uh-huh.**
8    Q.   -- anticancer drug?
9    **A.   Yes.**
10    Q.   And one of the complications of
11  platinum-containing anticancer drugs is something
12  called neuropathy; correct?
13    **A.   Yes.**
14    Q.   And what is neuropathy?
15    **A.   Neuropathy is tingling, numbness of hands and**
16  **feet.**
17    Q.   Well, you're describing what's called
18  sensory -- the sensory part of the nervous system;
19  correct?
20    **A.   Yes, the sensory neuropathy.**
21    Q.   But you also can get -- patients can get
22  motor neuropathy, too, from platinum; correct?
23    **A.   They can, yes.**
24    Q.   And Mrs. Reynolds in fact got that; correct?
25    **A.   I don't think so.**

---

61

1    Q.   So, you -- do you -- Did you document
2  neuropathy in Mrs. Reynolds' medical records while she
3  was under your care?
4    **A.   She had very mild peripheral neuropathy.**
5    Q.   She also had an abnormal gait and inability
6  to walk, ultimately requiring her to be in a
7  wheelchair; isn't that correct?
8    **A.   Not when she was under my care.**
9    Q.   And so -- And, in fact, the neuropathy caused
10  by platinum can be permanent; correct?
11    **A.   Some people it can be permanent.**
12    Q.   And Dr. Cohen in his report says, in fact,
13  the platinum -- the cisplatin that you gave in fact
14  caused her peripheral neuropathy, particularly the
15  motor component.  Did you read that part of his report?
16    **A.   You know, he wrote a lot of things, sir.**
17  **Yes.**
18    Q.   Do you -- Do you agree with it?
19    **A.   No, I don't.**
20    Q.   Why do you disagree with it?
21    **A.   Because, number one, Dr. Cohen doesn't know**
22  **how ma- -- what is the milligrams of any of these drugs**
23  **the patient received.  So...**
24    Q.   Okay.  And why are the milligrams important?
25    **A.   Because she got a very low dose.**

---

**16 (Pages 58 to 61)**

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

**62**

1    Q.  Of cisplatin.
2    A.  And carboplatin.
3    Q.  Okay.  And is there a certain dose of
4  cisplatin that somebody gets that can be associated
5  with neuropathy?
6    A.  Well, neuropathy doesn't just come from
7  chemotherapy drug alone.  If somebody has had the
8  comorbid conditions, like diabetes, or they're frail
9  and they're old, like over 80 years of age, you know,
10  there are so many other things that can cause -- or if
11  they're on medications, other medications.  So, they
12  can all contribute to a cumulative toxicity.
13    Q.  Do you know how many milligrams of cisplatin
14  that Mrs. Reynolds received?
15    A.  She got less than 15 milligrams per meter
16  square.
17    Q.  Do you know what her cumulative dose was?
18    A.  I don't have the number right now, but we can
19  figure it out.
20    Q.  Okay.  I'm going to help you in a minute.
21        Do you know what -- Do you know any
22  articles in the literature that associate peripheral
23  neuropathy or nerve damage with a certain amount of
24  cisplatin milligrams per meter squared?
25    A.  I don't have -- you know, I can't cite an

---

**63**

1  article right now, but neuropathy can be associated
2  with certain drugs, yes.
3    Q.  Are you aware that articles have been written
4  in the oncology medical literature that look into the
5  association between the amount of milligrams given per
6  meter square and neuropathy in patients like
7  Mrs. Reynolds?
8    A.  If you show me the article, I can tell you
9  whether I've seen it.
10    Q.  Okay.  I will in a moment.
11        The -- how many meters square -- What
12  does the term "meters square" refer to?
13    A.  It's called BSA.  So, it's based on height
14  and weight of a patient.
15    Q.  So, is it your testimony that body surface
16  area is meters squared?
17    A.  Body surface area is what we use to calculate
18  doses of chemotherapy drugs.
19    Q.  Do you know how many meters squared
20  Mrs. Reynolds was?
21    A.  She was different meters squared at different
22  times.
23    Q.  Okay.  When you first saw her, what was her
24  height and weight?
25    A.  I'll have to go back and look in the chart.

---

**64**

1    Q.  Okay.  Well, I'm going to represent to you
2  that she was 138 pounds and listed at 65 inches.  Do
3  you recall that?
4    A.  I can look and tell you.
5    Q.  Okay.  See if I'm correct.  Could you do
6  that?
7    A.  So, it says 65 inches, 138.7 pounds, BSA
8  1.69.
9    Q.  Okay.
10        (Exhibit 7 was marked.)
11    Q.  (By Dr. Mittler) I'm going to hand you --
12  I'm going to hand you what's been marked Exhibit 7, and
13  this is my own calculation taken from your records.
14  And, you know, I'm sure Mr. Woolsey will object and
15  you-all can do your own calculation, but this is a
16  running total of your cisplatin dosages taken from your
17  billing records.
18        MR. WOOLSEY:  He's right.  I'll object.
19  It is his -- just his tabulations.  We'll reserve the
20  right to point out any errors if any exist.
21        DR. MITTLER:  Okay.
22    Q.  (By Dr. Mittler) My question to you:  Are
23  these numbers to you -- does this represent a high or
24  low dose of cisplatin per body surface area in
25  Mrs. Reynolds?

---

**65**

1    A.  Low.
2    Q.  So, at no time -- do you know what the --
3  what any cutoff point is for toxicity, neurotoxicity
4  for cisplatin per meters squared?
5    A.  It's different in different people.
6    Q.  Okay.  So, in treating Mrs. Reynolds, were
7  you -- were you aware or keeping a running total on the
8  amount of cisplatin you were giving -- giving to her in
9  terms of a -- avoiding a particular toxicity dose?
10    A.  So, it's not something that you just look at
11  on paper.  You have -- We talk to the patient.  You
12  know, it's a cli- -- so, for example, there's Taxol,
13  right?  There are some people who cannot take even
14  eight weeks of Taxol, but I have a patient, not one but
15  five, they have been on Taxol for five years.  So,
16  everybody is different.
17        That's why we talk to the patient and we
18  find out how they are doing before or after, you know,
19  to stop the medication, which we did once she said that
20  she was feeling weak.  We stopped it although she was
21  responding to the therapy.
22    Q.  You stopped the cisplatin; is that correct?
23    A.  We stopped whatever treatment, the Alimta,
24  whatever she was on, despite her scans looking stable
25  because then we started her on Opdivo --

---

17 (Pages 62 to 65)

66

1   Q.  Well, you --
2   **A.  -- based on somebody's -- like, her clinical**
3   **symptoms.**
4   Q.  Well, you agree that -- Do you agree that her
5   weakness was in part due to her neuropathy?
6   **A.  I don't agree.**
7   Q.  What was her weakness due to?
8   **A.  She had many things that contributed to her**
9   **weakness.  She was extremely anxious.  She was**
10  **debilitated.  She was not walking about.  She wasn't**
11  **pushing herself, you know, to be well.  We spent a lot**
12  **of time every week trying to motivate her to get**
13  **better.**
14  Q.  Did you read her deposition in this case?
15  **A.  No, I did not.**
16  Q.  Well, I'm going to represent to you that
17  Mrs. Reynolds has -- has said that she -- one of the
18  things she lost was her ability to use her hands well.
19      Do you agree that that inability to use
20  your hands well is a -- is a function of peripheral
21  neuropathy?
22  **A.  I don't know what exactly was said, but we**
23  **have all our documentation about her -- what she was in**
24  **December and later in the year.  And we also have**
25  **physical therapy, you know, that went out.  And we have**

67

1   **all of those documentation, as well.**
2   Q.  Now, you -- You staged Mrs. Reynolds as
3   Stage IV on the first day you saw her; correct?
4   **A.  Yes.**
5   Q.  And what was the basis -- tell -- Tell the
6   jury what Stage IV means.
7   **A.  Stage IV in lung cancer could be if tumors**
8   **were in two different parts of the lung, which was in**
9   **her case left upper lobe and the right upper lobe.**
10  Q.  And how did you know that Mrs. Reynolds had
11  tumor in her right upper lobe?
12  **A.  Given the historic information from April to**
13  **December.**
14  Q.  Well, in April of 2015, the biopsy was
15  negative of the up- --
16  **A.  It was negative of the left lung, too.**
17  Q.  Okay.  Let me finish my question.
18      In April of 2015, the biopsy of her
19  right upper lobe was negative for cancer; is that --
20  isn't that true?
21  **A.  That is true.**
22  Q.  All right.  Between April of 2015 and
23  November of 2015, when you first saw Mrs. Reynolds,
24  there was no evidence developed of any tumor in the
25  right upper lobe; was there?

68

1   **A.  So, she had persistent lesions in her scans.**
2   **And so, in Stage IV cancer, we don't go and -- we don't**
3   **need tissue diagnosis of every lesion in the body.  If**
4   **we have one lesion that shows cancer, we go with**
5   **corroborative evidence that -- you know, that all the**
6   **other lesions are cancerous, too.**
7   Q.  Well, the radiologist, in fact, did not read
8   the right upper lobe lesion as being indicative of
9   cancer, did the radiologist?
10  **A.  The radiologist read it as neoplastic**
11  **inflammatory on both sides.  He said it could be this**
12  **and it could be that.**
13  Q.  Okay.  Let's look at that.  Can you show me
14  that.
15  **A.  Sure.**
16      THE WITNESS:  Mr. Woolsey, we had that
17  scans, you know, as a pile.  Here, this one.
18  Q.  (By Dr. Mittler) Which imaging report are
19  you looking at?
20  **A.  So, there is a PET scan from 10/2/2015.**
21  Q.  Okay.
22  **A.  So, it says left upper lobe masslike**
23  **opacit- -- opacity.  Could be infectious, inflammatory,**
24  **and/or neoplastic.  Then it says right upper lobe**
25  **chronic consolidation.  Could be chronic infectious,**

69

1   **inflammatory, or neoplastic.**
2   Q.  So, neither of those reports say that it's
3   definitively neoplastic; correct?
4   **A.  A radiologist is not going to tell us that**
5   **something is definitely neoplastic.  It's common sense**
6   **and the clinical presentation.**
7   Q.  And the "neoplastic" refers to cancer;
8   correct?
9   **A.  Uh-huh.**
10  Q.  All right.  Because we want the jury to
11  understand.  We just don't want to talk "doctor talk".
12  All right?
13      So, "neoplastic" refers to cancer?
14  **A.  (Witness nods head up and down.)**
15  Q.  Now, would you agree that the -- that the
16  radiologist doesn't say there's definitive cancer with
17  either one of these lesions?  Correct?  Would you
18  agree?
19  **A.  I have to comment about what the radiologist**
20  **was thinking?**
21  Q.  The radiologist didn't say that either one,
22  either the right or the left lung, showed absolutely
23  cancer; correct?
24  **A.  No, he doesn't say that.**
25  Q.  All right.

18 (Pages 66 to 69)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

70

1          A.  He gives a broad differential.
2          Q.  So, a month later a biopsy was obtained of
3   the left upper lobe of the lung -- of the left lung;
4   correct?
5          A.  So, let's look at this pathology.  What's
6   that biopsy from?  The month after?
7          Q.  The biopsy was 11 -- was an 11/16/15.
8          A.  Uh-huh, yes.
9          Q.  And the decision --
10              MR. WOOLSEY:  It's been marked, hasn't
11   it?
12              DR. MITTLER:  Yes.
13              MR. WOOLSEY:  Yeah.
14          Q.  (By Dr. Mittler)  A decision was made to
15   biopsy the left upper lobe; correct?
16          A.  It looks like it.  I wasn't involved in that
17   decision.
18          Q.  Then Dr. Gomez didn't re-biopsy the right
19   upper lobe; correct?
20          A.  I don't see that.
21          Q.  Because the right upper lobe had been
22   biopsied seven months before; correct?
23          A.  And the left upper lobe.
24          Q.  And the right upper lobe was negative;
25   correct?

---

71

1          A.  It was negative for infection, as well.
2          Q.  So, by the way, are you in this -- At trial,
3   are you going to blame the pulmonary doctor, Dr. Hector
4   Gomez, for any of his care of Mrs. Reynolds?
5          A.  Blame?  I'm not blaming anybody.
6          Q.  So, you're not going to blame Dr. Gomez for
7   not getting you the ALK marker or the appropriate
8   biomarkers on Mrs. Reynolds; is that correct?
9          A.  No, I'm not going to blame him.
10          Q.  Are you going to blame the Baptist Health
11   System in any way for not getting you the appropriate
12   information about Mrs. Reynolds in your treatment
13   decisions?
14          A.  No.
15          Q.  Are you going to blame a pathologist at
16   Baptist Hospital, who was associated with doing the
17   evaluation of the ALK and EGFR markers, for not getting
18   you the appropriate information on Mrs. Reynolds?
19          A.  I'm not blaming anybody.
20          Q.  Now, if you look at the imaging studies of
21   the right upper lobe, do you see that there was a --
22   when was the next scan done on Mrs. Reynolds?
23          A.  4/2016.  There's a CT abdomen in between, but
24   that doesn't cover the lungs.
25          Q.  So, the next was one April 29, 2016; is that

---

72

1   correct?
2          A.  Yes.
3          Q.  And do you agree that both upper lobe lesions
4   were read as unchanged?
5          A.  It was smaller, a little bit.
6          Q.  Well, do you agree that there was something
7   called more hypermetabolic activity in the left upper
8   lobe lesion of the lung?
9          A.  You mean in the PET scan?
10          Q.  Yes.
11          A.  Hypermetabolic activity doesn't mean
12   anything.  It will be hypermetabolic in infection,
13   inflammation, any of that.
14          Q.  So, it's your -- What does the SUV value
15   refer to?
16          A.  It's the -- It's the brightness of the FDG
17   that's attached to the radioactive material.
18          Q.  So, is it your testimony that the
19   hypermetabolic activity and SUV values are not
20   important in diagnosing lung lesions in terms of there
21   being cancer, or not?
22          A.  They are not good tools to make a diagnosis,
23   no.
24          Q.  Well, then why -- Why do the radiologists
25   measure the SUV values in lung cancer?

---

73

1          A.  It's a part of the study.
2          Q.  And what is the meaning of -- well, what
3   is -- a part of the study -- Let me go back.
4              Why is that -- What does the part of the
5   study pertain to?
6          A.  So, when one reads a scan, they have to
7   indicate size of a lesion and then whatever comes with
8   it.
9          Q.  Is there any clinical information in the SUV
10   value for an oncologist?
11          A.  In some cases.
12          Q.  What would it be?
13          A.  In -- you know, in lymphomas we have had,
14   you know, good, like, corroborative evidence.  But just
15   because something was not -- SUV wasn't high doesn't
16   mean it wasn't cancerous.
17          Q.  Did you -- Did you notice, in the PET scan
18   reports that were generated on Mrs. Reynolds, that the
19   radiologist referred to something called ground glass
20   densities?
21          A.  Yes.
22          Q.  What is the significance of ground glass
23   densities in lung cancer?
24          A.  So, it could be tumor or it can be sometimes
25   nonspecific.

---

19 (Pages 70 to 73)

Thelma Louise Reynolds vs.                               Jayasree Rao, M.D.
Jayasree Rao, M.D., et al.                                December 18, 2019

---

74

1   Q. Can -- Ground glass densities in lung cancer,
2   can they be associated with a particular kind of tumor
3   called bronchoalveolar cancer?
4   **A. It's not pathognomonic of that.**
5   Q. But can it be?
6   **A. I don't know.**
7   Q. And are you aware of medical literature that
8   says that bronchoalveolar cancer with ground glass
9   appearance can be very curable with resection?
10   **A. In a patient with Stage IV cancer?**
11   Q. I'm asking the question. Are you aware of
12   medical literature that has said that patients with
13   ground glass appearance bronchoalveolar cancer can be
14   curable with resection?
15   **A. If somebody has early stage cancer, whether**
16   **it's bronchoalveolar, whether there is ground glass**
17   **opacity or not, whether it's squamous, if they had a**
18   **small lesion which was -- and they are eligible to have**
19   **a surgery, definitely somebody could try to have**
20   **curative dissection.**
21   Q. Do you agree that by December 2016 the PET
22   scan report on Mrs. Reynolds said that her right upper
23   lobe ground glass opacities were stable? Do you agree?
24   MR. WOOLSEY: What was the date you
25   said? I'm sorry.

---

75

1   DR. MITTLER: 12/12/2016.
2   **A. So, I see there's a CT scan in April of 2016,**
3   **and it says stable, multifocal bilateral upper lope**
4   **consolidation, suggesting stable multifocal**
5   **adenocarcinoma of the lung.**
6   Q. (By Dr. Mittler) Okay. And can you go to
7   the PET scan of 12/12/2016.
8   **A. And it says stable masslike consolidation**
9   **left upper lobe, comparably is significant decrease in**
10   **size, and left upper lobe satellite lesion is**
11   **unchanged, and the SUV is different in that. Then**
12   **right upper consolidative ground glass areas remain**
13   **unchanged.**
14   **And so, most of the lesions seem stable**
15   **and one of them has decreased in size. Even in the**
16   **left upper lobe, between the two lesions there was**
17   **changes in the hypermetabolic activity.**
18   Q. Was there more or less hypermetabolic
19   activity in the left size?
20   **A. So, no. The left tu- -- left side tumor had**
21   **two parts to it. There's a bigger lesion and a**
22   **satellite lesion. The SUV of the bigger lesion was**
23   **6.1, and the smaller lesion was 3.1.**
24   Q. And, in fact, did the right side change in
25   its SUV value?

---

76

1   **A. Compared to?**
2   Q. Compared with the previous values that we've
3   looked at.
4   **A. It was stable.**
5   Q. It was stable. So, the right side that you
6   said was tumor hadn't been changing; correct?
7   **A. It had gotten a little smaller.**
8   Q. And that's an area that there was no -- there
9   was absolutely no biopsy evidence of tumor in the right
10   upper lobe; correct?
11   **A. They had done one time biopsy. And they had**
12   **biopsied the left one which was negative, as well,**
13   **before.**
14   **(Exhibit 8 was marked.)**
15   Q. (By Dr. Mittler) I'm going to hand you
16   what's been marked Exhibit 8, which is a copy of an
17   article from the Journal of Clinical Oncology.
18   MR. WOOLSEY: Do you have a copy for me?
19   DR. MITTLER: Not for you, but (handed
20   document to Mr. Woolsey). I'm sorry. If you'll hand
21   it back to me.
22   MR. WOOLSEY: Yeah. Let me do this.
23   I'm going to take a picture.
24   Q. (By Dr. Mittler) First of all, are you
25   familiar with the Journal of Clinical Oncology?

---

77

1   **A. Yes.**
2   Q. Is that a journal that clinical oncologists
3   treating patients with non-small cell lung cancer rely
4   on for information about how to treat cancers like
5   Mrs. Reynolds had?
6   **A. It's one of the journals.**
7   Q. And this is -- This article is from the
8   Update Committee of the American Society of Clinical
9   Oncology; is that correct? Do you see that?
10   **A. Yeah.**
11   Q. And do you see under the methods -- Well,
12   first of all, the purpose, can you read the purpose of
13   this.
14   **A. To provide evidence-based recommendations to**
15   **update the American Society of Clinical Oncology**
16   **guideline on systemic therapy for Stage IV non-small**
17   **cell lung cancer.**
18   Q. And you said, at the very first visit with
19   Mrs. Reynolds, that she had Stage IV non-small cell
20   lung cancer; correct?
21   **A. Uh-huh.**
22   Q. And can you read the "Methods" section, what
23   it says there at the top under the abstract, please.
24   **A. An Update Committee of the American Society**
25   **of Clinical Oncology non-small cell lung cancer**

---

20 (Pages 74 to 77)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

78

1  **Expert Panel based recommendations on a systematic**
2  **review of randomized controlled trials from January**
3  **2007 to February 2014.**
4        DR. MITTLER:  Now can you turn over to
5  the page 3503, please.
6        MR. WOOLSEY:  Are you going to need this
7  back pretty quick?
8     Q.  (By Dr. Mittler)  Have you seen this article
9  before?
10    **A.  I don't remember.**
11    Q.  And do you see up at the top of the -- I'm
12  sorry -- the first page it says the -- the date of
13  publication was October 20, 2015?
14    **A.  Uh-huh.**
15    Q.  So, this, in fact, would have been relevant?
16  Would you agree this article would have been at least
17  in force so to speak or what oncologists were looking
18  at in December -- November and December of 2015, when
19  you were formulating decisions about how to treat
20  Mrs. Reynolds?  Do you agree?
21       MR. WOOLSEY:  Form.  Go ahead.  You can
22  answer unless I tell you not to.
23       THE WITNESS:  Okay.
24    **A.  So, it's one of things we -- we could follow.**
25    Q.  (By Dr. Mittler)  All right.  So, if you look

---

80

1  Mrs. Reynolds in November of 2015, when you first saw
2  her?
3     **A.  Mrs. Reynolds received standard of care**
4  **therapy from me.**
5     Q.  Did you keep, anywhere in your records, a
6  running total of the amount of cisplatin that you gave
7  Mrs. Reynolds?
8     **A.  No, I did not.**
9     Q.  Why not?
10    **A.  It's not standard of care.**
11    Q.  So, it's not standard of care to document the
12  total amount of milligrams per meter square that a
13  patient has gotten; is that correct?
14    **A.  Yes.**
15    Q.  And what happens if a patient like
16  Mrs. Reynolds is diagnosed with peripheral neuropathy?
17    **A.  We change the treatment.**
18    Q.  And you -- Did you discontinue cisplatin on
19  Mrs. Reynolds because of the development of peripheral
20  neuropathy?
21    **A.  We discontinued it because she was getting**
22  **weaker.**
23    Q.  Do you know how many doses of cisplatin
24  Mrs. Reynolds got after a diagnosis of peripheral
25  neuropathy?

---

79

1  at page 3503, do you see Clinical Question A5 on the
2  right-hand column?
3     **A.  Uh-huh.**
4     Q.  And it says, "What is the most effective
5  first-line therapy for patients with Stage IV NSCLC
6  with ALK gene rearrangement and PS 0 to 1 or possibly
7  PS 2?"  Do you see that?
8     **A.  Uh-huh.**
9     Q.  And do you see the recommendation is "If
10  patients have Stage IV NSCLC and ALK rearrangements,
11  first-line crizotinib is recommended..."?  Do you see
12  that?
13    **A.  Yeah.**
14    Q.  Did I read -- I wrote it -- I read it
15  correctly, right?
16    **A.  Yes.**
17    Q.  And you see the type in parentheses says:
18  Evidence-based, benefits outweigh harms; evidence
19  quality is high; strength of recommendation is strong.
20  Do you see that?
21    **A.  Uh-huh.  Yes, I do.**
22    Q.  Do you agree with that?
23    **A.  It's not for everybody.**
24    Q.  Well, do you agree that, in fact, that was
25  the standard of care for starting treatment on

---

81

1     **A.  So, Mrs. Reynolds refused to take any**
2  **gabapentin, saying that she didn't have peripheral**
3  **neuropathy, that she was -- so, we met with her every**
4  **week and asked her questions and documented it.**
5     Q.  So, it's your testimony that Mrs. Reynolds
6  refused to give -- I'm sorry -- refused to take a
7  medication for neuropathy; is that correct?
8     **A.  No.  What I meant was she said it was not**
9  **that bad and she didn't need it.**
10    Q.  Okay.  Now you used the term "gabapentin".
11  What is that?
12    **A.  It's something, when patients say they have**
13  **tingling or numbness, we offer.  It's also used for**
14  **patients with hot flashes or pain.**
15    Q.  So, if a patient is on cisplatin and has
16  developed peripheral neuropathy, is the standard of
17  care to stop the cisplatin or to put them on
18  gabapentin, or both?
19    **A.  Both.**
20    Q.  And where in the chart -- Where in your
21  records does it say that Mrs. Reynolds refused
22  treatment for peripheral neuropathy?
23    **A.  In many places.**
24    Q.  Okay.  Can you show me.
25    **A.  Sure.**

---

21 (Pages 78 to 81)

Case 5:20-cv-00548   Document 1-2   Filed 05/04/20   Page 114 of 163

Thelma Louise Reynolds vs.                                    Jayasree Rao, M.D.
Jayasree Rao, M.D., et al.                                   December 18, 2019

82

1    Q.  Can you show me the first time --
2    A.  Uh-huh.
3    Q.  -- it appears, please.
4        MR. WOOLSEY:  I looked at some things
5    going back in.  I looked over there at a half-full box
6    and didn't realize you were replacing things, and I
7    thought, oh, no, oh, no.
8    A.  So, the first time she complained of some
9    peripheral neuropathy was on 11/18/2016.  And on
10   11/25/2016, we graded it as 0 to 1.  It says patient
11   does not want medications at this time.
12   Q.  (By Dr. Mittler)  For peripheral neuropathy?
13   A.  Yeah.
14   Q.  Does it mention gabapentin?
15   A.  On 12/2 it says it's improving, but she has
16   fatigue and generalized weakness.  She said she didn't
17   want any therapy for that because it was getting
18   better.  So, on 12/16 she doesn't complain of
19   neuropathy, at all.  It has been taken out.  Lower
20   doses, Carbo, Procrit, neutropenia.  The dose was
21   reduced further on December 23rd.
22   Q.  Let me -- Can I just stop you for one second.
23   A.  Yes.
24   Q.  Can you go back to 12/9/16 --
25   A.  Uh-huh.

83

1    Q.  -- your visit.
2    A.  I'm on that visit.
3    Q.  Yeah.  Could you go to the review of
4    second -- I'm sorry.
5        Could you go to the "Review of Systems"
6    on Page 2 of 4 of that visit.
7    A.  "Peripheral neuropathy to bilateral hands."
8    Q.  Yes.  What's next?
9    A.  "Weakness to bilateral lower extremities.
10   Had a hard time getting up due to fatigue."
11   Q.  Okay.  So, is that some evidence of the
12   weakness associated with her peripheral neuropathy
13   that's documented in your records?
14   A.  Not necessarily because here in the "History
15   of Present Illness" it says complains of neuropathy, is
16   improving, but increased fatigue and generalized
17   weakness to her lower extremities.
18   Q.  And at that time you told the patient and her
19   family that she was incurable; correct?
20   A.  I've told the patient and her family she was
21   incurable even before that.
22   Q.  Now, isn't it true that once a patient
23   develops peripheral neuropathy, it doesn't go away?
24   Correct?
25   A.  That's not true.

84

1    Q.  And, in fact, in Mrs. Reynolds, her
2    cisplatin-induced neuropathy never went away; correct?
3        MR. WOOLSEY:  Form.
4    A.  I don't think she had peripheral neuropathy
5    from cisplatin.
6    Q.  (By Dr. Mittler)  Well, what do you think her
7    peripheral neuropathy was due to?
8    A.  She had generalized weakness.
9    Q.  Well, generalized weakness doesn't cause
10   peripheral neuropathy.  It's a -- It's a sign or
11   symptom; isn't it?
12   A.  It's a symptom.
13   Q.  Yes.  Peripheral neuropathy is an abnormality
14   of the peripheral nerves of the body; correct?
15   A.  Yes.
16   Q.  And peripheral neuropathy is caused by
17   something; correct?
18   A.  You know, if you have anxiety, it can cause
19   us to have tingling and numbness for hands or feet,
20   too.
21   Q.  So, is it your testimony that Mrs. Reynolds'
22   peripheral neuropathy was caused by anxiety?
23   A.  I'm not saying that it's the only cause.
24   Mrs. Reynolds week after week has told us that her
25   neuropathy is ze- -- you know, getting better and she

85

1    didn't want any treatment.
2    Q.  Well, in San Antonio a lot of people have
3    diabetes; correct?
4    A.  I think so.
5    Q.  And diabetes is a common cause of peripheral
6    neuropathy; isn't it?
7    A.  It is a common cause of peripheral
8    neuropathy, yes.
9    Q.  So, also in San Antonio a lot of people have
10   cancer; correct?
11   A.  I don't know about that.
12   Q.  Well, you do know that many cancer
13   chemotherapeutic agents do cause peripheral neuropathy?
14   You know that; correct?
15   A.  There are -- There are a few that cause
16   peripheral neuropathy, yes.
17   Q.  And drugs like carboplatin and cisplatin
18   cause peripheral neuropathy; correct?
19   A.  They can.
20   Q.  And the medical literature doesn't say
21   anxiety caused these cancer patients to have peripheral
22   neuropathy; correct?
23   A.  So, I'm saying that tingling and numbness of
24   the hands and feet could be also sometimes from
25   anxiety.

Thelma Louise Reynolds vs.                                    Jayasree Rao, M.D.
Jayasree Rao, M.D., et al.                                    December 18, 2019

---

86

1      Q.   But in your own records you diagnosed
2  peripheral neuropathy; didn't you?
3      A.   And it says it's improving, it's grade zero,
4  and she didn't want any therapy.
5      Q.   Well, you stopped the cisplatin; correct?
6      A.   Because she was getting weaker.
7      Q.   But, in fact, you gave how many more doses of
8  cisplatin after you initially diagnosed the peripheral
9  neuropathy?
10      A.   Three half doses.
11      Q.   Three half doses?
12           If you'll look at the log here -- again,
13  if our -- if our records are correct, based on your
14  billing records, you gave cisplatin on -- 40 milligrams
15  on 11/11/16.  Can you verify that?
16           Let me help.  Would the billing records
17  help you?
18      A.   It doesn't help because there could be
19  wastage.
20      Q.   Well, do the billing records -- If you've
21  billed for cisplatin, doesn't that indicate that you
22  gave the patient cisplatin?
23      A.   No.
24      Q.   Why not?
25      A.   Because sometimes the vials come in a higher

---

87

1  denomination than the patient receiving the drug.
2      Q.   So, you bill for the part that you don't use;
3  is that correct?
4      A.   Yes.  They write it as wastage, but we still
5  have to bill for it.
6      Q.   What do you do with the wastage of that drug?
7      A.   We throw it away.
8      Q.   So, there's a -- if a billing record of
9  11/11/2016, one of your billing records, says that you
10  billed for 40 milligrams of cisplatin, does -- that
11  doesn't mean that you gave the patient 40 milligrams of
12  cisplatin?
13      A.   It may not.  We just have to see the chemo
14  administration log.
15      Q.   Well, that record says that on 12/6/2016
16  Medicare paid you $6.49 for that cisplatin and
17  apparently another $7.85.  Does that -- Does that make
18  sense?
19      A.   I can look at the medication administration
20  and tell you what I see.
21      Q.   All right.  Can you look at the medication
22  administration from 11/11/2016, please.
23      A.   Yes.
24           DR. MITTLER:  Can I --
25           MR. WOOLSEY:  Yeah, that's fine.

---

88

1      Q.   (By Dr. Mittler)  In the interest of time,
2  can I just show you my copy.
3      A.   Sure.  Yeah, she got 40 milligrams.
4      Q.   And was there any waste?
5      A.   I don't see that charted.
6      Q.   Well, the waste says zero; doesn't it?
7      A.   Yeah.
8      Q.   So, is that an accurate number?
9      A.   I don't know.
10      Q.   Well --
11      A.   I don't -- Sir, I don't go and administer
12  chemotherapy.  I can definitely ask my nurses and let
13  you know.
14      Q.   Well, Dr. Rao, I understand your nurses
15  administer the chemotherapy.  Is that correct?
16      A.   Yes.
17      Q.   But isn't the --
18      A.   I just write the orders.
19      Q.   Okay.  Isn't the administration of the
20  chemotherapy under your control?
21      A.   Yes, sir, it is.
22      Q.   And it's under your --
23      A.   It's supposed to be.
24      Q.   And it's under your supervision --
25      A.   Yes.

---

89

1      Q.   -- correct?
2      A.   Yes.
3      Q.   And can we assume that what is present in
4  this nursing administration record, of the medications
5  given to Mrs. Reynolds on 11/11/2016, is accurate?
6      A.   If it says no waste -- Let me see one thing.
7  Okay?  Just give me one second.
8           So, according to this, 40 milligrams was
9  given.
10      Q.   And there was no waste; is that right?
11      A.   Yes.
12      Q.   Under the waste column it says zero --
13      A.   Yes.
14      Q.   -- correct?
15      A.   (Witness nods head up and down.)
16      Q.   All right.  Is there another part of your
17  record where there's a record of an audit of this
18  nursing record or a -- somehow some kind of a
19  documentation of waste that -- that, in other words, is
20  additional to these -- this section of
21  nursing notes that we're looking at?
22      A.   I don't think so or I'm not aware of it.
23      Q.   Well, how do you audit this nursing record?
24      A.   My billing staff do it.
25      Q.   So, you don't audit it?

---

23 (Pages 86 to 89)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

90

1       A.  Not on every patient.
2       Q.  Well, how do you know the nurses gave
3   40 milligrams of cisplatin?
4       A.  So, I write the orders, and we have three
5   people who verify -- somebody who pulls the drug, make
6   sure that it's the same patient, and then we have a --
7   you know, a pharmacy personnel who mix it, and then the
8   administrator.
9       Q.  Maybe I misheard you, but I -- but I thought
10  I heard you say that you couldn't tell by looking at
11  these records or this record that you have in front of
12  you, the nursing record, whether or not there was any
13  waste or not from the cisplatin that was given.
14      A.  I just don't know the process that is
15  involved in it.  That's all.  Like the billing and how
16  it is charted, I don't know that.
17      Q.  Well, who supervises the billing in your
18  practice?
19      A.  We have a supervisor for that.
20      Q.  All right.
21      A.  Actually, two of them.
22      Q.  How do you know the bill that goes in to
23  Medicare and BlueCross BlueShield in this case with
24  Mrs. Reynolds, how do you know those bills are
25  accurate?

---

91

1       A.  So, there is a link system that they pull the
2   drug from.  So, that would show how much was dispensed,
3   and then the nurses chart it.
4       Q.  So, how does the billing department know how
5   much to bill, say, Medicare for?
6       A.  Oh, they -- The yellow sheet, they write on
7   that.
8       Q.  Okay.  What -- What are the yellow sheets?
9       A.  Let me see.  You know, we transitioned to
10  this EMR system, and I'm not that savvy with it.  So,
11  we had a different one before and this.  So, I'm
12  just...
13      DR. MITTLER:  I'm going to resist from
14  making any sidebar about EMR systems which are the
15  cause of doctor burnout these days.
16      THE WITNESS:  I agree with you on that
17  100 period.
18      MR. WOOLSEY:  We've found some common
19  ground.
20      DR. MITTLER:  We have.  We agree.
21      MR. WOOLSEY:  We've found a place with
22  commonality.
23      DR. MITTLER:  We agree.
24      A.  Sir, all I see here is that says
25  10 milligram, four.  And I could definitely find out

---

92

1   and get back to you about how to see how they do that.
2       Q.  (By Dr. Mittler)  Do you have a yellow sheet
3   for that date --
4       A.  Yeah.
5       Q.  -- 11/11--
6       A.  It says --
7       Q.  Can you --
8       A.  That's all it says.
9       Q.  Can you show that to me.
10      A.  Uh-huh, yes.
11      Q.  I'd like to look at it just to...
12      MR. WOOLSEY:  Just hand him the whole
13  stack.
14      DR. MITTLER:  Was that -- Were these
15  also disclosed to us?
16      MR. WOOLSEY:  I believe they were.  If
17  they weren't --
18      THE WITNESS:  See here (pointing) it
19  says three.  That's cisplatin, 10 milligrams.  That's
20  how it's billed.
21      DR. MITTLER:  I see.  Okay.
22      MR. WOOLSEY:  If those haven't been
23  produced, that's --
24      MR. POWELL:  They are now because --
25      MR. WOOLSEY:  -- my oversight.

---

93

1       MR. POWELL:  -- that's Exhibit 1.
2       DR. MITTLER:  Yeah.  We have them now.
3       MR. WOOLSEY:  Yeah.  If they hadn't
4   been, that's my over-- I wasn't trying to hide them
5   from you.
6       DR. MITTLER:  I understand.  I just...
7       Q.  (By Dr. Mittler)  Okay.  So, this is a --
8   This is a system of where the -- at least at this point
9   in time, is this your -- your nursing staff makes notes
10  of the specific amounts of the various drugs and IV
11  materials and saline solution is given --
12      A.  Yes.
13      Q.  -- correct?
14      A.  Yes.
15      Q.  And then that's translated into this other
16  record, these nursing notes; is that correct?
17      A.  Yes.
18      Q.  And then that's also linked to a billing
19  system; is that correct?
20      A.  Yes.
21      Q.  So, the primary source of what's given at any
22  visit are these yellow sheets of paper; is that
23  correct?
24      A.  Yes.  And which is not filled by me.  I only
25  would fill the visit.  And then whoever, you know,

---

24  (Pages 90 to 93)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

94

1    administers that, they fill it.
2        Q.   During this period of time that you -- that
3    Mrs. Reynolds was under your care, did you ever have a
4    contract nurse, a nurse who was working under contract,
5    who wasn't a so-called regular employee, who was seeing
6    her?
7        A.   I don't think so.
8        Q.   Susan Reynolds, her daughter --
9        A.   Uh-huh.
10       Q.   -- when she's deposed, I'm going to represent
11   is going to testify that -- that there was a contract
12   nurse, someone who was a little bit older, with short
13   gray hair, who saw her mother for a period of time.  Do
14   you know who that might be?
15       A.   She may be thinking it's a nurse practitioner
16   or a nurse?
17       Q.   A nurse practitioner.
18       A.   No contract nurse practitioner.
19       Q.   You had no nur- --
20       A.   (Witness shakes head side to side.)
21       Q.   And did you have any nurse who was older and
22   have short, gray hair, nurse practitioner?
23       A.   I'm the one who's old.
24       Q.   I'm not going to ask you whether your hair is
25   dyed.

---

95

1        A.   Yes, it is.  Of course, it is.
2        Q.   You don't have to tell that.
3        A.   It's okay.
4            DR. MITTLER:  I'm going to object to my
5    own question.
6            MR. WOOLSEY:  Sustained.
7        A.   Sir, all I can tell you is Ms. Susan Reynolds
8    and Mrs. Reynolds, they were very nice people.  And we
9    spent a lot of time every week talking to them.  There
10   were issues, you know, like any other family.  Like, I
11   really think everybody was trying to look out for, you
12   know, each other, but, you know, just having cancer is
13   stressful enough.  They're older.  You know her husband
14   was also older.  So, I think there was a lot of -- me,
15   I can tell you it's hard enough taking care of myself.
16   You know?
17           So, every week we spent a lot of time.
18   We addressed everything to the best of our ability, and
19   we tried to keep one step ahead of it.  So,
20   we tried to give the best care we can and be responsive
21   to nutrition, social/family issues, and everything for
22   all our patients.
23       Q.   (By Dr. Mittler)  Was there any nurse
24   practitioner who left your practice during this period
25   of time, who was disgruntled, unhappy with the

---

96

1    practice?
2        A.   I could go back and look.  Nurse
3    practitioners -- I can go back and look.
4        Q.   And, again, I'm going to represent that
5    Susan -- Susan Reynolds is going to testify in her
6    deposition that there was this nurse practitioner who
7    worked for you for a relatively short period of time,
8    who saw her mother, who she had good rapport with, who
9    had advised her to get a second opinion about the
10   treatment she was getting.  Do you have any knowledge
11   of that?
12       A.   No, sir.
13       Q.   You had no -- There was not one of your nurse
14   practitioners who came to you and said I'm disagreeing
15   with the treatment of Mrs. Reynolds or any other
16   patient?
17       A.   (Witness shakes head side to side.)
18       Q.   Did that ever happen during this period of
19   time?
20       A.   No, sir.
21       Q.   Have you had any other patients who have
22   complained to you about the kinds of treatment they
23   were getting, in other words, they weren't getting the
24   right treatment or they wanted second opinions because
25   they had read on the Internet that they should have

---

97

1    been getting some other kind of treatment?
2            MR. WOOLSEY:  Form.  Go ahead.
3        A.   My -- in my practice -- this is my very first
4    law -- I mean this is the first law --
5            THE WITNESS:  What do you say?  Lawsuit,
6    right?
7        A.   So, we have long-term patients.  Even after
8    patients pass away, their families come and help us and
9    take -- you know, so the attrition rate is very, very
10   low.
11       Q.   (By Dr. Mittler)  So, you have -- You've had
12   not other medical malpractice lawsuits involving
13   questions of your standard of care; is that correct?
14       A.   Yes.
15       Q.   This is the very first?
16       A.   This is my first lawsuit.
17       Q.   Have there been any other inquires or
18   investigations as to your billing practices or the
19   kinds of drugs that you've been giving, by any
20   regulatory entity, say Texas Medical Board or Texas
21   Department of State Health Services, any entity like
22   that?
23       A.   State Health Services, what do they do?
24       Q.   Any Texas -- Well, they run hospitals for
25   example.  Have you had any kind of investigation like

---

25  (Pages 94 to 97)

Thelma Louise Reynolds vs.                          Jayasree Rao, M.D.
Jayasree Rao, M.D., et al.                          December 18, 2019

---

98

1  that?
2      A.  What was the first one?
3          MR. WOOLSEY:  Form.
4      Q.  (By Dr. Mittler)  The Texas Medical Board.
5      A.  About my billing practices?
6      Q.  Either billing or the kinds of medicines
7  you're giving or the amounts of medicines that you're
8  giving for cancer.
9      A.  No.
10     Q.  Have you ever been subject to any government
11 investigation about your cancer therapy practices?
12     A.  Not about my cancer therapy practices.
13     Q.  What have you been contacted about by the
14 government?
15         MR. WOOLSEY:  Form.
16     A.  So, I've -- on my notes there -- there was a
17 time where I had to, you know, make sure that there
18 were certain things like put the primary diagnosis --
19 like the format that we have now, that -- on my notes.
20     Q.  (By Dr. Mittler)  So, there was an
21 investigation as to the adequacy of your medical
22 records; is that correct?
23     A.  Not the medical records per se.  Just about
24 the formating of it.
25     Q.  What -- Did that investigation have to do

---

99

1  with whether there was enough support to justify your
2  billing?
3      A.  No.
4      Q.  So, what was the investi- -- I'm still not
5  understanding what the investigation was about.
6      A.  So, the investigation was about that it has
7  to have a primary diagnosis and -- What's the other
8  one?  About -- So, the way we have it now, that's how
9  they wanted us to do the notes.  That was because of
10 certain things that happened with my former partner.
11 It had nothing to do with billing practices or nothing
12 like that.
13     Q.  Who -- Who conducted that investigation?
14     A.  It was an agency for the -- What do you say?
15 I guess the CMS have somebody oversee.
16     Q.  So, "CMS" stands for Center for Medicare &
17 Medicaid Services?
18     A.  Uh-huh.
19     Q.  So, that's a -- That's a branch of Health and
20 Human Services; correct?
21     A.  I don't know.  You said Texas Health
22 Services.
23     Q.  No.  You -- I'm sorry.  You just said that
24 this investigation you were talking about was conducted
25 by some entity associated with CMS; correct?

---

100

1      A.  Right.  It's a private -- private person.
2  But I -- I passed it with 100 percent compliance.
3      Q.  Okay.  I'm just trying to -- instead of our
4  talking "doctor talk," I'm trying to take this -- you
5  know, these alphabet soup sort of things and explain
6  them to the jury because we have the jury listening.
7          So, "CMS" stands for Centers for
8  Medicare & Medicaid Services; is that correct?
9      A.  Yes.
10     Q.  And that's a branch of the federal
11 government; correct?
12     A.  Yes.
13     Q.  And that's the branch that oversees, for
14 example, Medicare benefits; correct?
15     A.  Yes.
16     Q.  All right.  So, did this investigation have
17 to do with Medicare benefits?
18     A.  No.
19     Q.  Did it --
20     A.  It's just about notes.
21     Q.  Okay.  Did it have to do with the -- your
22 progress notes and medical records for Medicare
23 patients?
24     A.  Just -- Just the formatting of my progress
25 notes.

---

101

1      Q.  All right.  And why -- What were they
2  critical of in your progress notes?
3      A.  So that it didn't -- so, if you look at my
4  notes from before --
5          DR. MITTLER:  I'll take that.  Thank
6  you.
7          MR. WOOLSEY:  Is that part of yours?  I
8  just want to make sure we don't lose any of our --
9          DR. MITTLER:  It's mine.
10         MR. WOOLSEY:  I don't want to lose any
11 of Exhibit 1.  I think we've muddied the question.  You
12 might have to re-ask it.  Sorry.
13         DR. MITTLER:  What was it?  Can you read
14 the question back, please.
15         THE REPORTER:  "What were they critical
16 of in your progress notes?"
17     A.  That we had to have a primary diagnosis, and
18 they were -- you know, there are certain notes where
19 there are two handwritings.  It's because I closely
20 supervise my nurse practitioners.  So, they do a note,
21 and I always -- you know, like Mrs. Reynolds, right,
22 I -- if there is a problem, I don't let my nurse
23 practitioners take care of it.  I will go in and I will
24 add, you know, to the notes.  So, that -- that was
25 another question as to why there was like two signa- --

---

26 (Pages 98 to 101)

**Thelma Louise Reynolds vs.**　　　　　　　　　　**Jayasree Rao, M.D.**
**Jayasree Rao, M.D., et al.**　　　　　　　　　　**December 18, 2019**

---

**102**

1　two different handwritings on a note.
2　　Q.  (By Dr. Mittler)  When did this investigation
3　occur?
4　　**A.  In 2016.**
5　　Q.  And was it resolved in 2016?
6　　**A.  Yes.**
7　　Q.  Were you represented by a lawyer then?
8　　**A.  No.**
9　　　　**Why is it that you-all have to -- I told**
10　**you I passed it with 100 percent compliance.**
11　　　　MR. WOOLSEY:  Hold on.  He didn't --
12　　　　DR. MITTLER:  Well, there's no question
13　on --
14　　　　THE WITNESS:  No, but, you know, they're
15　just trying to --
16　　　　MR. WOOLSEY:  Stop.
17　　　　THE WITNESS:  Right.
18　　　　MR. WOOLSEY:  Stop it.  Stop, stop,
19　stop.
20　　Q.  (By Dr. Mittler)  Has the -- You said that
21　you supervise your nurse practitioners.  When we look
22　at your progress notes or your records on
23　Mrs. Reynolds, how do we know whether the nurse
24　practitioner alone saw the patient and then later on
25　you came and looked at the progress note or you

---

**103**

1　actually yourself were there seeing Mrs. Reynolds at
2　the time?
3　　**A.  So, every case we discuss so nothing happens**
4　**there without, you know -- so, I guide and look at**
5　**everything.  Every case is discussed with me.  And any**
6　**difficult patient I would go and -- see, when -- when I**
7　**have a busy practice -- like Mrs. Reynolds, for**
8　**example, takes 45 to 50 minutes every visit.  You know?**
9　**I want the patients to feel like they have that kind of**
10　**support.  That's why we have med levels so that they**
11　**get that kind of time, you know, with the -- with the**
12　**provider, all their issues are addressed.**
13　　　　**And, you know, from -- see, you can see**
14　**from the 2015 notes to now notes.  You know, you can see**
15　**documentation, that has been the biggest issue of, you**
16　**know, if somebody was leaving.  This is the depth of a**
17　**practice.  You know, you have to document all of this.**
18　　Q.  But isn't it true that with the electronic
19　medical record, the EMR, that one of the reasons that
20　the records on Mrs. Reynolds, some of them have exactly
21　the same verbiage, is that you can cut and paste from
22　one visit to the next visit?
23　　**A.  We don't cut and paste.**
24　　Q.  But many of the words are exactly the same.
25　And --

---

**104**

1　　A.  So, the past medical surgical social history
2　we update them.  You know, if somebody went to the
3　hospital, we'll update it.  Some medi- -- every -- So,
4　I have an MA who goes in and gets a few, like,
5　information.  And then the nurse practitioner will also
6　sit down and make sure everything is accurate.
7　　　　And, you know, when you are spending 30,
8　40 minutes counseling about eating and drinking, and
9　looking at every problem, and addressing it, it you
10　know, sometimes I spend every Sunday charting.  I've
11　done that for 12 years.  I work six and a half days a
12　week.  This is my life.
13　　　　My point, though, is there's complex
14　issues.  You know, there could be low white count, high
15　white count, you know, anemia, magnesium, psychological
16　issues, fatigue, weight loss, low albumin.  It's not
17　one.  When you take care of cancer patients, there's at
18　least 14 different things we are looking at.
19　　Q.  Were there some visits where Mrs. Reynolds
20　was seen in your practice, where you did not see
21　Mrs. Reynolds during the time in which she was in your
22　office?
23　　**A.  There have been visits where I didn't see**
24　**Mrs. Reynolds.**
25　　Q.  So, how do we know the visits where you

---

**105**

1　personally saw Mrs. Reynolds and the visits where you
2　didn't see Mrs. Reynolds but reviewed the chart with a
3　nurse practitioner after the visit?
4　　**A.  Sometimes there will be, you know, my**
5　**handwriting on the note.**
6　　Q.  Well, look at -- Can you look at the record,
7　for example -- Do you have that in front of you?  Could
8　you look at the record of, say, 5/15/17.
9　　**A.  5/15/17 --**
10　　Q.  Yes.
11　　**A.  -- or 5/12/17?**
12　　Q.  I'm sorry.  5/5/17.  I'm sorry.  5/5/17.
13　May 5, 2017.
14　　**A.  This -- So, it looks like Reylin, my nurse**
15　**practitioner, saw her.  And it says discuss with**
16　**Dr. Rao; currently on gabapentin, 100 milligrams;**
17　**neuropathy has improved; will be evaluated in early**
18　**6/2017; has physical therapy coming to her house;**
19　**weakness and gait have improved.**
20　　Q.  Okay.  So, this is -- This is a five-page
21　progress note; is that correct?
22　　**A.  Yes.**
23　　Q.  All right.  And it does say that she was
24　taking gabapentin; correct?
25　　**A.  It does, uh-huh.**

**Koole Court Reporters of Texas**
(210) 558-3129  Fax　　　　myreportingfirm@gmail.com　　　　210-558-9484

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

106

1      Q.  So, at that point in time she hadn't refused
2  gabapentin; correct?
3      **A.  No.  She's only taking it once a day.  She**
4  **didn't want to take any more of that.**
5      Q.  Okay, all right.  Maybe I misheard you.  So,
6  I thought you had testified she had refused gabapentin.
7      **A.  In the beginning.  That was in**
8  **two-thousand- -- the previous year.**
9      Q.  But she --
10     **A.  We started off with -- in 11/2016.  This is**
11 **5/2017.**
12     Q.  So, if we go to Page 5 of 5 of this visit --
13     **A.  Uh-huh.**
14     Q.  -- do you see that it's signed by Reylin
15 Segura --
16     **A.  Right.**
17     Q.  -- NP?
18     **A.  (Witness nods head up and down.)**
19     Q.  Is that correct?
20     **A.  Yes.**
21     Q.  And that's your -- That's one of your nurse
22 practitioners --
23     **A.  Yes.**
24     Q.  -- correct?
25     **A.  (Witness nods head up and down.)**

---

107

1      Q.  And then below it you signed it?
2      **A.  Right.**
3      Q.  So, how do we know how much time you actually
4  saw Mrs. Reynolds or if you saw her at all?
5      **A.  All the notes have to be countersigned by me.**
6      Q.  Okay.  I understand what you're saying, but
7  my question is:  From looking at the record, how do we
8  know if you personally saw Mrs. Reynolds while she was
9  there or you merely conferred with your nurse
10 practitioner sometime after Mrs. Reynolds was there and
11 had left the office?
12     **A.  Or before.  Or before she saw her, too.**
13     Q.  Well, you couldn't sign off on the record --
14     **A.  Not the re- --**
15     Q.  -- until the visit was done; correct?
16     **A.  So, the signing off of the notes and the**
17 **visit doesn't have to be in real time.**
18     Q.  Well, it can't be before the visit, can it?
19     **A.  No.  I'm saying this -- I could -- Sometimes**
20 **they talk to me before they go see the patient, too.**
21     Q.  But you -- But in order for you to sign off
22 on this progress note, you have to review everything in
23 the progress note before signing off on it; correct?
24     **A.  I do.  We talk about patients, and then they**
25 **type up the notes, and we sign off on it.**

---

108

1      DR. MITTLER:  Let's go ahead and take a
2  break.  I know you want to take a break.
3      THE VIDEOGRAPHER:  We're going off the
4  record at 12:41.
5      (Recess.)
6      THE VIDEOGRAPHER:  We are back on the
7  record at 1:48.
8      Q.  (By Dr. Mittler)  Okay, Dr. Rao.  We're back
9  on the record and you're still under oath.  Do you
10 understand that?
11     **A.  Yes, sir.**
12     DR. MITTLER:  Okay.  Let me hand you
13 what we're going to mark as Exhibit 9.
14     (Exhibit 9 was marked.)
15     THE WITNESS:  Thank you.
16     Q.  (By Dr. Mittler)  And this is a --
17     MR. WOOLSEY:  Can I see it real fast.
18     DR. MITTLER:  Yeah, that's yours.
19     MR. WOOLSEY:  Oh, you've got one for me?
20     DR. MITTLER:  Yes, I do.
21     MR. WOOLSEY:  Okay.
22     DR. MITTLER:  Yeah, that's yours.
23     MR. WOOLSEY:  Thank you.
24     Q.  (By Dr. Mittler)  This is a medical article
25 from the -- a journal called Frontiers in Molecular

---

109

1  Neuroscience, a review article published on 31 May 2017
2  called "Pathophysiology of Chemotherapy-Induced
3  Peripheral Neuropathy".  Do you see that article?
4      **A.  Uh-huh.**
5      Q.  Could you turn over to page four, please.
6      **A.  (Witness complies.)**
7      Q.  And do you see in the right-hand column at
8  the bottom it says "Cisplatin"?
9      **A.  Yes, I do.**
10     Q.  Okay.  So, at the bottom of this page and on
11 to the top of the left-hand column of page five, the
12 next page, there's some information that's published
13 about cisplatin with some references.  Do you see that?
14     **A.  Yes.**
15     Q.  All right.  Now, the first part of that says,
16 "Cisplatin causes a wide range of side effects
17 including ototoxicity (hearing loss and tinnitus),
18 nephrotoxicity, myelotoxicity and neuropathy..."
19     Did I read that right?  My question is
20 did I read that sentence correctly?
21     **A.  Yeah, I'm just trying to find it and follow**
22 **it.**
23     Q.  (Dr. Mittler pointed to the bottom,
24 right-hand corner.)
25     **A.  On the first page?**

---

**Koole Court Reporters of Texas**

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Jayasree Rao, M.D.
December 18, 2019

---

**110**

1      MR. WOOLSEY:  On page four.
2      THE WITNESS:  Oh, I'm on the next page.
3  Thank you.
4      MR. WOOLSEY:  Bottom right corner.
5  Q.  (By Dr. Mittler)  Okay.  Do you see --
6      MR. WOOLSEY:  She was on page five.
7  Q.  (By Dr. Mittler)  Okay.  Do you see the -- do
8  you see the --
9  **A.  Yes, I do.**
10  Q.  All right.  So, did I read that first
11  sentence correctly?
12  **A.  Yes, you did.**
13  Q.  And then it says, "One of the most
14  dose-limiting of these is peripheral neuropathy, which
15  occurs in a dose- and time-dependent manner," and it
16  cites an article from 1985.  Do you see that?
17  **A.  Yes.**
18  Q.  Do you agree with that?
19  **A.  I don't have any opinion right now because I**
20  **have to read it.**
21  Q.  All right.  And then it says, "The onset of
22  cisplatin-induced neuropathy is variable, with some
23  patients reporting the first appearance of symptoms
24  after the first dose, and others after 12 cycles of
25  therapy," and it cites two references from 1989 and

---

**111**

1  1990.  Did I read that correctly?
2  **A.  You read that correctly.**
3  Q.  Do you agree with that -- that statement in
4  general?
5  **A.  It could be variable.  I agree that it could**
6  **be variable.**
7  Q.  Okay.  Next sentence says:  Generally,
8  cisplatin-induced neuropathy develops after cumulative
9  doses above 350 milligrams per meters squared, with
10  approximately 92 percent of patients developing
11  neurotoxic symptoms -- characterized by tingling,
12  numbness and mechanical and thermal hyperalgesia --
13  at cumulative doses of 500 to 600 milligrams per meter
14  square cisplatin, and it gives several references.  Did
15  I read that correctly?
16  **A.  You read that correctly.**
17  Q.  All right.  Do you agree with those -- those
18  numbers, that 350 milligrams per meters square and 500
19  to 600 milligrams per meters square?
20  **A.  I have to read the article, so I don't have**
21  **an opinion right now.**
22  Q.  If we look back at that exhibit you have in
23  front of you, about the cumulative dose of cisplatin,
24  which is Exhibit 7, do you know when Mrs. Reynolds
25  reached that -- a dose of 350 milligrams per meters

---

**112**

1  square or -- and 500 to 600 milligrams per meters
2  square?
3      THE WITNESS:  Can I have a pen?  I can
4  write on this, or not?
5      MR. POWELL:  Go ahead.
6      DR. MITTLER:  Yeah, you can write on it.
7  Is that okay with you?
8      THE WITNESS:  No?
9      DR. MITTLER:  Well, here, let me do
10  this.
11      THE WITNESS:  Just give me a piece of
12  paper.
13      DR. MITTLER:  Let's give another --
14      MR. WOOLSEY:  I can give her a piece of
15  paper.
16      DR. MITTLER:  Here, let me do this.
17      MR. WOOLSEY:  You just need something to
18  do some math on?
19      THE WITNESS:  Yes.
20      MR. WOOLSEY:  Okay.
21      DR. MITTLER:  Just use a piece of paper,
22  and we'll mark it as an exhibit.
23      (The witness is writing on a yellow
24      piece of paper.)
25  **A.  So, it looks like she may have been close to**

---

**113**

1  **500 milligrams per meters square, total.**
2  Q.  (By Dr. Mittler)  You mean at 12/30/2016?
3  **A.  Uh-huh.**
4  Q.  Well, she had -- She had gotten
5  1234 milligrams; correct -- is that correct, by
6  12/30/16 --
7  **A.  So, she had --**
8  Q.  -- of cumulative dose?
9  **A.  -- received 384 plus 800 plus 50, yeah.  So,**
10  **that's about 600 milligrams per meters square.**
11  Q.  Well, if you -- at the very end of her -- if
12  these numbers are correct, and I know you and your
13  counsel are going to check them, but if the number
14  1234 total milligrams of cisplatin that she had
15  achieved by 12/30/16 is correct, then if you divided
16  1234 by, what, 1.7 meters --
17  **A.  Uh-huh.**
18  Q.  -- that comes out to 725.88; doesn't it?
19  **A.  If that's the amount, yeah.**
20      MR. WOOLSEY:  It's 34.  34, Brant.  You
21  put 8.
22      DR. MITTLER:  Oh, sorry.  12- --
23      MR. WOOLSEY:  1, 2, 3, 4.
24      DR. MITTLER:  Okay.
25  **A.  725.**

---

29 (Pages 110 to 113)

**Koole Court Reporters of Texas**

(210) 558-3129  Fax          myreportingfirm@gmail.com          210-558-9484

114

1    Q.  (By Dr. Mittler)  .88; is that right?
2    **A.  (Witness nods head up and down.)**
3    Q.  Okay.
4    **A.  From your numbers, yeah.**
5    Q.  And, in fact, by the time she got to
6  12/30/2016, her body surface area was smaller because
7  she had lost weight; isn't that true?
8    **A.  I can check.  She had lost weight from**
9  **before.**
10    Q.  Well, what was her weight on 12/30/16?
11    **A.  114 pounds.**
12    Q.  114 pounds; correct?
13    **A.  Something like that.**
14    Q.  And she had started at 138 pounds, right?
15    **A.  134.**
16    Q.  Or 135 pounds?
17    **A.  Uh-huh.**
18    Q.  So, what was her body surface area on
19  12/30/16?  Well, let me -- Let me just ask you this
20  question.  I'm going to withdraw that question.
21          Is it fair to say that her body
22  surface -- is it fair to say that her meters -- that
23  her square meters were lower on 12/30/16 than they were
24  when we started --
25    **A.  Yes.**

115

1    Q.  -- your treatments; is that correct?
2    **A.  Yes.**
3    Q.  Let me say it again.
4          Is it fair to say that Mrs. Reynolds'
5  square meters body surface area were lower on
6  12/30/16 than when you first started treating her in
7  November of 2015?
8    **A.  Yes.**
9    Q.  So, that would mean that the dose of
10  cisplatin per meters square was actually higher than
11  725, which was the number based on the body surface --
12  the meters square body surface area than when she had
13  started; correct?
14    **A.  I'll have to do the calculation, but it seems**
15  **logical.**
16    Q.  Seems logical, yes.  Okay.
17          So, do you -- Do you agree that the
18  cisplatin caused the neuropathy in Mrs. Reynolds?
19    **A.  I don't know if she had neuropathy to the**
20  **extent that you are talking about.**
21    Q.  Okay.  If would you go back to the article
22  that's in front of you, Exhibit 9, on page -- now we're
23  on page five, the top of that left-hand column.
24          It says -- The next sentence says,
25  "Cisplatin-induced CIPN," which I believe is

116

1  cisplatin-induced peripheral neuropathy, "affects
2  mostly the lower and upper limbs and includes mixed
3  sensory and motor effects, including loss of vibration
4  sense and taste, paresthesia, weakness, and tremor..."
5  Did I read that correctly?
6    **A.  Yes.**
7    Q.  And then it cites, in parentheses, two
8  references from 1992 and 2011.  Do you see that?  Did I
9  read that correctly?
10    **A.  Yes.**
11    Q.  So, I believe you had some earlier testimony
12  that it was your opinion that cisplatin caused motor
13  neuropathy but not motor neuropathy.  Did I -- Am I
14  characterizing that correctly?
15    **A.  From all the notes that I have seen, I did**
16  **not think that Mrs. Reynolds had neuropathy.**
17    Q.  Well, your notes clearly say that she had
18  peripheral neuropathy, don't they, on Mrs. Reynolds?
19    **A.  It says Grade 0 to 1.**
20    Q.  But you have -- The term peripheral
21  neuropathy is in your progress notes on Mrs. Reynolds,
22  isn't it, in multiple occasions?
23    **A.  So, what I'm trying to explain to you is the**
24  **weakness -- generalized weakness that she had -- she**
25  **didn't say, oh, my hands are tingling or they are numb.**

117

1  **So, we have the home health people, we have all the**
2  **notes from them about all the physical exam, and we**
3  **also have physical exam documented.  So, I really don't**
4  **think she had worsening peripheral neuropathy.**
5    Q.  Well, did she have peripheral neuropathy?
6    **A.  It seems like for a couple of weeks she had**
7  **said, but it -- but it also says that it was improving,**
8  **and she doesn't have any complaints from all the notes**
9  **we just reviewed before lunch break.  It -- It says**
10  **that she was getting better.**
11    Q.  If you would look at your last follow-up
12  visit on 6/2/17.  Do you have that in front of you,
13  Dr. Rao?
14    **A.  6/2/17?**
15    Q.  Yes, ma'am.
16    **A.  Uh-huh.**
17    Q.  Okay.  If you look on the second page, again
18  under "Review of Symptoms" --
19    **A.  Uh-huh.**
20    Q.  -- under neurologic --
21    **A.  Uh-huh.**
22    Q.  -- it says -- and I believe it's in -- It's
23  in bold; correct?
24    **A.  Uh-huh.**
25    Q.  In bold print it says, "Unsteady gait.

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

118

1   Peripheral neuropathy: to bilateral hands.  Tremors,"
2   That's all in bold; is that correct?
3       A.  Yes.
4       Q.  And that's on Mrs. Reynolds on 6/2/17;
5   correct?
6       A.  Yes.
7       Q.  And then if you go to the last page, 4 of 4,
8   correct, under your "Impression & Plan" No. 5, do you
9   see that?
10      A.  Uh-huh.
11      Q.  Again, in bold it says "Peripheral
12  Neuropathy".
13      A.  Uh-huh.
14      Q.  So, do you agree that according to your own
15  documentation, that the last time you saw Mrs. Reynolds
16  she had peripheral neuropathy?
17      **A.  It doesn't say, you know, what is the degree**
18  **of it.  And I'm trying to corroborate all this with the**
19  **physical therapy, you know, where they have tested**
20  **every muscle in her body.  So, my thing is, when we**
21  **have a problem list, we keep that problem list to make**
22  **sure we don't forget something.**
23      Q.  So, is it your testimony that this -- the
24  medical record of 6/2/17, which is a contemporaneous
25  medical record on Mrs. Reynolds' visit --

---

119

1       **A.  What's a contemporaneous mean, please.  I'm**
2   **sorry.**
3       Q.  Let me start again.  So, do you agree that
4   the medical record, these four pages on Mrs. Reynolds,
5   dated 6/2/17, which is a real-time medical record, it
6   was produced real time the time she was there, is not
7   accurate in terms of the diagnosis of peripheral
8   neuropathy?
9       **A.  I -- it doesn't say that -- It doesn't**
10  **quantify anything.**
11      Q.  Are you saying today now that -- that what
12  this record really means is she had peripheral
13  neuropathy in the past, but she doesn't have it today?
14      **A.  Well, the problem list is not showing, you**
15  **know, is it debilitating, is it serious.  We don't know**
16  **that.**
17      Q.  Well, the problem list is peripheral
18  neuropathy?
19      **A.  Yeah.**
20      Q.  And she's currently being treated for it.  It
21  says, "Currently on Gabapentin 100mg PO BID".  Correct?
22      **A.  And physical therapy.**
23      Q.  And the gabapentin was prescribed for
24  peripheral neuropathy; correct?
25      **A.  Right.**

---

120

1       Q.  Well, if she didn't have peripheral
2   neuropathy, why are you prescribing gabapentin to her?
3       **A.  What I'm trying to tell you, sir, with all**
4   **due respect, is that -- so, she started experiencing**
5   **some symptoms in November.  Right?  Then as we go**
6   **along, we have charted that it was getting better and**
7   **she was refusing to take any medications because it**
8   **wasn't that serious or severe.**
9           **And we sent physical therapy to her**
10  **home.  She was doing well on physical therapy.  And**
11  **they actually discharged her in June with -- saying she**
12  **exceeded all the goals of -- it's very elaborate.**
13          **So, we have -- we have here, you know,**
14  **as a problem list saying she has, you know, history of**
15  **peripheral neuropathy, but it doesn't say it's worse.**
16  **It doesn't say, you know, none of that.  So, you -- I'm**
17  **just trying to corroborate the whole thing across the**
18  **board.**
19          **And she went to see Dr. Conde.**
20  **Dr. Conde doesn't talk about any neurological deficit.**
21  **She saw Dr. Srinivasan, and on that time there is no**
22  **complaints of neuropathy.  There is no physical exam**
23  **that shows she has motor sensory deficits.**
24      Q.  Did you -- Do you know how she got to
25  Dr. Conde's office?  Did she get there in a walker, by

---

121

1   wheelchair?  Do you know?  Do you know one way or
2   another?
3       **A.  I don't know.**
4       Q.  Okay.  Could you look at your -- You have
5   your records in front of you.  Could you look at your
6   progress note of 5/5/2017, which we've reviewed earlier
7   in this deposition.
8       **A.  Uh-huh.**
9       Q.  All right?
10      **A.  Uh-huh.**
11      Q.  Do you have that in front of you?
12      **A.  Yes.**
13      Q.  Okay.  Now, this is a five-page note;
14  correct?
15      **A.  Uh-huh.**
16      Q.  And do you see on page four Problem No. 11?
17  Do you see that?
18      **A.  Uh-huh.**
19      Q.  It says "Peripheral neuropathy".  Correct?
20      **A.  Yes.**
21      Q.  And then it says, "Currently on Gabapentin
22  100 mg po QD," which means every day; correct?
23      **A.  Uh-huh.**
24      Q.  And then it says, "Neuropathy to bilateral
25  hands has improved..."  Correct?

---

**Koole Court Reporters of Texas**

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

122

1    A.  Yep.
2    Q.  And then at the bottom it says, "Ok to
3  increase to 100 mg po BID".  That means twice a day;
4  correct?
5    A.  Uh-huh.
6    Q.  So, you increased the dose of the gabapentin;
7  correct?
8    A.  Yes.
9    Q.  So -- And then there's a note, "She has PT
10  coming to her house 3x/week, and her weakness and gait
11  has improved".  Correct?
12    A.  Yes.
13    Q.  So, she has peripheral neuropathy.  You say
14  she's getting better, but you've increased the dose of
15  the medicine for the neuropathy; correct?
16    A.  Yes.
17    Q.  Why did you do that?
18    A.  Because to start with, she should have taken
19  a higher dose.  It took her a long time even to accept
20  that much.  So, we told her, if you took a little more,
21  you'll even get better faster because here in your HPI
22  it says she comes today complaining of stable
23  peripheral neuropathy.  It doesn't say it's worse.
24    Q.  Okay.  Now, if you'd go to page two, do you
25  see the "Review of Systems"?

---

123

1    A.  Yes.
2    Q.  Okay.  It says under "Musculoskeletal" -- do
3  you see that?
4    A.  Uh-huh.
5    Q.  In bold it says "unsteady gait".
6    A.  Yeah.  She's had unsteady gait because she
7  was, you know, not eating, she wasn't -- she was just
8  generalized weakness.
9    Q.  And then it says, "Uses walker to ambulate."
10  Right.
11    A.  She's been using a walker for a year now.
12    Q.  And then it says, "...is walking better this
13  week".  Correct?
14    A.  Uh-huh.
15    Q.  And then the -- but the reason she was using
16  the walker was because she had peripheral neuropathy
17  involving both sensory and motor nerves; correct?
18    A.  No.
19    Q.  And then --
20    A.  She was using a walker even from earlier in
21  2016.
22    Q.  And the neuropathy, in fact, was due to the
23  cisplatin which you gave her and you continued to give
24  her even in cumulative doses that were in the toxic
25  range, with a 92 percent chance of causing nerve

---

124

1  damage; isn't that true?
2    MR. WOOLSEY:  Form.
3    A.  No, it is not.
4    Q.  (By Dr. Mittler)  If you go back to the --
5  well, let's -- have you seen Dr. Conde's records about
6  her assessment of -- Have you looked at Dr. Conde's
7  records from 2019?
8    A.  2019?
9    Q.  Uh-huh.
10    A.  Well, let's start with 2016 first.
11    MR. WOOLSEY:  Hold --
12    A.  Oh, no.  2017.
13    MR. WOOLSEY:  Hold on.
14    DR. MITTLER:  No, no.
15    MR. WOOLSEY:  I know you want to give
16  him information and you want to share with him, but
17  he -- he gets to conduct the examination.  So --
18    Q.  (By Dr. Mittler)  I want to just --
19    MR. WOOLSEY:  Just answer what he's
20  asking you.
21    Q.  (By Dr. Mittler)  I want to just show you
22  Dr. Conde's impression and plan from February 1, 2019,
23  this record.  Can you just -- I have a purple tab
24  there.  Can you read what says about the peripheral
25  neuropathy.

---

125

1    A.  "Debility of recent CVA."  So, Mrs. Reynolds
2  took her Xalkori and had a CVA.  And "...depression and
3  peripheral neuropathy for which she has mobility issues
4  due to foot drop from chemotherapy-induced neuropathy,
5  prior history of urinary tract infection,
6  hypothyroidism and anxiety."
7    Q.  So, the chemotherapy-induced neuropathy was
8  due to the chemotherapy you gave her; correct?
9    A.  That is her assessment.  It is not the truth.
10    Q.  Okay.  But --
11    A.  She is -- She is weak also from the CVA that
12  Dr. Conde gave her the Xalkori.  Maybe if I had given
13  it to her she would have had a CVA ahead of time and
14  not even lived a year and a half.
15    Q.  And Dr. -- so, when Dr. Conde writes on
16  March 8, 2019, "She also has significant peripheral
17  neuropathy from previous treatment as documented before
18  given at another facility," then you would say that's
19  not your chemotherapy that did it; is that right?
20    A.  So, Dr. Conde was asked to document all these
21  things so you can build a case, because Dr. Conde's
22  note from 2017 does not have any of this.
23    Q.  So, is it your testimony that Dr. Conde is
24  documenting her record in a way to support a lawsuit
25  against you?

---

**Koole Court Reporters of Texas**
(210) 558-3129  Fax          myreportingfirm@gmail.com          210-558-9484

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Jayasree Rao, M.D.
December 18, 2019

---

**126**

1    A.  Yes.
2    Q.  And what's the basis of that?
3    A.  That's -- That's what I think.
4    Q.  Do you have any other --
5    A.  Because --
6    Q.  Do you have any other basis for that?
7    A.  Because we have so many notes from so many
8  doctors, all through 2017, that has nothing mentioned
9  about neuropathy or foot drop.  Certainly in
10  two-thousand- -- you know -- -eighteen, after one year
11  she writes, oh, patient has neuropathy due to the
12  chemotherapy that was given.
13    Q.  Well, you saw that when Dr. Conde saw Mrs. --
14  Mrs. Reynolds for the very first time, the very first
15  thing she did was to have the Baptist laboratory fax
16  her the results of the ALK determination; correct?
17    A.  I don't know what she did first, but she
18  didn't -- her physical exam or review of systems do not
19  show that she has neuropathy.  Physical exam didn't
20  show that she had a foot drop, none of that.  So,
21  certainly in 2018, she has all these things documented
22  to corroborate yourselves.
23    Q.  And isn't it also true -- Let's continue this
24  in this article.  Isn't it also true that the
25  neuropathy of cisplatin progressively gets worse over

---

**127**

1  time?
2    A.  No.
3    Q.  Okay.  Let's look at this Exhibit 9 that we
4  have.
5    A.  So, the patient completed --
6        MR. WOOLSEY:  Hold on.  He doesn't have
7  a question to you.
8    Q.  (By Dr. Mittler)  I'd like you to look at
9  Exhibit 9, please, that column.  Okay.  So, do you see
10  about the middle of that paragraph that we've been
11  reading, after the -- after the term 2007, there's a
12  parenthesis closed and a period?  Do you see that?
13    A.  Yes.
14    Q.  All right.  Now I'm going to read the next
15  sentence.  "The symptoms of cisplatin-induced
16  neuropathy may persist for several months and can
17  progressively worsen over time, a phenomenon called
18  'coasting'..."  Do you see that?
19    A.  Yeah.
20    Q.  And then it -- And it gives a reference to a
21  1990 article.  And then it says, "With higher
22  cumulative doses and longer times of exposure to
23  cisplatin, the severity of CIPN," which is
24  cisplatin-induced peripheral neuropathy, "increases, as
25  does the likelihood of development of a chronic,

---

**128**

1  irreversible neuropathy..."  Did I read that correctly?
2    A.  Yes, you did read that correctly.
3    Q.  So, in fact, cisplatin-induced neuropathy was
4  documented in your medical records on Mrs. Reynolds?
5    A.  To be mild and improving.
6    Q.  And, in fact, it got worse after she left
7  your practice; correct?
8    A.  How do I know that?
9    Q.  Well, you have Dr. Conde --
10    A.  After one year.
11    Q.  You have Dr. Conde's documentation that
12  her -- her weakness and her -- her neuropathy became
13  worse; correct?
14    A.  That's one doctor who has documented
15  something against 20 people.
16    Q.  Are you and Dr. Conde colleagues or --
17    A.  I don't know who she is.
18    Q.  Have you ever met her?
19    A.  No.
20    Q.  Have you ever had any professional dealings
21  with her?
22    A.  No.
23    Q.  Is there any reason for her to not like you?
24    A.  I'm a competitor.
25    Q.  In what way?

---

**129**

1    A.  I'm another doctor in the community.
2    Q.  So, do you think that -- that every
3  oncologist is a competitor with every other oncologist?
4    A.  I am not saying that.
5    Q.  But you understand that when you put
6  diagnoses in the medical record, like peripheral
7  neuropathy, and you send a bill in to an entity, like
8  Medicare or BlueCross and BlueShield, you're
9  representing that that's an accurate diagnosis;
10  correct?
11    A.  So, let me say this.  The patient has a
12  history of diverticulosis/diverticulitis.  Right?  So,
13  we dealt with all that in 2016 or 2015.  So, if I
14  carried that as a problem list, it doesn't mean that it
15  got worse or, you know, that she currently has
16  diverticulitis.
17        So, all we can say is that the physical
18  exam, my review of system all the way through the end
19  shows that she was getting better.  And the physical
20  therapy people went home.  And you can look.  They have
21  tested every muscle group, and she exceeded all the --
22  all the goals, and she was discharged in 6/2017.
23        And there was a whole year before she
24  went to see Dr. Conde.  And so then Dr. Conde puts all
25  these buzzwords to help with the litigation and gives

---

**Koole Court Reporters of Texas**
(210) 558-3129  Fax     myreportingfirm@gmail.com     210-558-9484

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

130

1   her Xalkori.  She has a CVA and dies within three
2   months.
3           DR. MITTLER:  Object as nonresponsive.
4       Q.  (By Dr. Mittler)  In June -- early June of
5   2017, Mrs. Reynolds was doing so badly and she was
6   so -- so down that, in fact, she entered hospice with
7   an understanding that she had less than six months to
8   live; isn't that true?
9       A.  Her son, her daughter, both of them wanted
10  her to go on hospice, and that's the God's honest
11  truth.
12      Q.  Well, patients just can't go on hospice on
13  their own; isn't that true?
14      A.  Her daughter was trying to push hospice for
15  over a year.
16      Q.  But a doctor has to certify a Medicare
17  patient --
18      A.  I did not certify her.
19      Q.  But some doctor has to do it; correct?
20      A.  That is not -- that -- I mean you can't pin
21  that on me.  I just did what the family asked me to do.
22      Q.  Okay.  Doctor, I understand.  I've heard your
23  testimony that you didn't do the certification.  But
24  I'm just saying, if one of the doctors caring for her
25  certified her for hospice, then they had to represent

---

131

1   to Medicare, and that's a serious representation --
2       A.  You may want to talk to them, sir.
3       Q.  -- that she had six months or less to live;
4   correct?
5       A.  You may want to talk to them, sir.
6       Q.  And you don't put -- nobody -- if any -- does
7   Dr. -- In your knowledge, does Dr. Srinivasan or any of
8   the doctors caring for her, do they put people on
9   hospice if they're doing great?
10      A.  So, if the family has gotten so tired of
11  carrying for their loved one and they feel that she is
12  weak and they want her to go on hospice, I just help
13  them with that.
14      Q.  Do you understand that prior to your treating
15  Mrs. Reynolds, that she was living in her own home and
16  able to care for herself and her husband?  Do you
17  understand that?
18      A.  So -- Yeah.  I don't know how she was living.
19  I don't know all that.  I don't know how she was.
20      Q.  Well, she -- One thing you could do is to
21  look at her deposition testimony; isn't that correct?
22      A.  About what, sir?
23      Q.  About how she was doing.  Would that be a
24  good source of information about how she was doing
25  during the time before and during and after you treated

---

132

1   her?
2       A.  All I can tell you is I've seen all the
3   records from the hospital when she went into Southwest
4   General.  And so, there are other physicians who have
5   documented how she was.
6       Q.  Was Mrs. Reynolds -- was she a truthful
7   person when you dealt with her?
8       A.  I don't know.  I don't know, after all these
9   things that have happened, who is truthful and who is
10  not.
11      Q.  So, do you believe that she was not being
12  truthful when she told you and your nurse practitioners
13  about her symptoms during the time you cared for her?
14      A.  So, I -- We listened to her every week, and
15  we took care of everything that she told us.
16      Q.  Well, do you think that Mrs. Reynolds, during
17  the period of time from November of 2015 to early June
18  of 2017, do you think she was not giving you truthful
19  answers because she was plotting a lawsuit against you?
20      A.  So, from our notes it shows that
21  Mrs. Reynolds' neuropathy she said was improving.
22  That's all I can tell you, and even the last note says
23  that.
24      Q.  Do you have anything in your notes, in any of
25  your progress notes or your nurses' progress notes, is

---

133

1   there anything that you recorded or documented that
2   Mrs. Reynolds was not being truthful you -- with you
3   when she recounted her history to you?
4       A.  I'm not talk -- I mean I am just telling you
5   what we have written down and what the physical --
6   the --
7           THE WITNESS:  Who was the physical
8   therapy company?
9       A.  Premier Health, what they have written down.
10  I'm just talking about that.  I didn't say she wasn't
11  truthful.  So.  She has been very truthful.  She told
12  us her neuropathy was getting better.
13      Q.  (By Dr. Mittler)  Have you --
14      A.  So, why do you think she wasn't truthful?
15          MR. WOOLSEY:  Take a breath.  Listen to
16  the question he asked you.
17          DR. MITTLER:  Dr. Rao --
18          MR. WOOLSEY:  Y'all will have a better
19  conversation.
20          DR. MITTLER:  Yeah.  Again, I'm not
21  trying to be combative here, but the way the deposition
22  works, I get to ask the questions and you answer the
23  questions.  Okay?  And then your attorney objects when
24  appropriate.
25          MR. WOOLSEY:  Brant is giving me a

---

**Koole Court Reporters of Texas**
(210) 558-3129  Fax          myreportingfirm@gmail.com          210-558-9484

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

134

1  running objection to all of these questions. I'll
2  evaluate them later.
3      Q.  (By Dr. Mittler) All right. So -- But my
4  question is this, and this is a very serious question.
5  Because Mrs. Reynolds filed a lawsuit against you, do
6  you -- did that cause you to then go back over her --
7  her progress notes and records and question whether she
8  was being truthful with you at the time you saw her?
9      **A.  I have not had the time to do all that.**
10     Q.  So, the answer is no, you didn't -- you
11  didn't go back and evaluate in that regard?
12     **A.  You are -- We are just looking at all this**
13  **right now, isn't it?  That's what I've been doing.**
14  **You -- We started raising when her neuropathy symptoms**
15  **even started, so we had just been going over that.**
16             THE WITNESS:  I don't understand the
17  question.
18             MR. WOOLSEY:  He just wants to know if
19  you have retrospectively looked at the chart and
20  thought that she was being dishonest with her
21  statements to you.  It's real -- he's not --
22             THE WITNESS:  I'm not --
23             MR. WOOLSEY:  He's not trying to trick
24  you in his question.  It's just a simple -- He just
25  wants to know your thought process.

---

135

1             DR. MITTLER:  Thank you for being more
2  articulate in that question.
3      Q.  (By Dr. Mittler) Can you answer that
4  question?
5             MR. WOOLSEY:  So, I'll ask it for you.
6             DR. MITTLER:  Yes.
7             MR. WOOLSEY:  He just wants to know if
8  you have looked at your progress notes after the
9  lawsuit got filed and thought that what you were told
10  and documented was untruthful in retrospect.
11             THE WITNESS:  There have been a lot of
12  things that are untruthful in the lawsuit, which is,
13  you know, the family.
14             MR. WOOLSEY:  Hold --
15             THE WITNESS:  No.
16             MR. WOOLSEY:  Hold on.
17             THE WITNESS:  I mean I went back and I
18  looked about that.
19             DR. MITTLER:  Let's --
20             MR. WOOLSEY:  Can we take a break? Can
21  we take a break.
22             DR. MITTLER:  Can you --
23             MR. WOOLSEY:  Will you object
24  nonresponsive, and then --
25             DR. MITTLER:  I'll object nonresponsive,

---

136

1  and let's --
2             MR. POWELL:  To your question.
3             DR. MITTLER:  -- take a break.
4             MR. WOOLSEY:  Let's take a minute.
5             DR. MITTLER:  I'll object to your
6  question.
7             THE VIDEOGRAPHER:  Going off the record
8  at 2:24.
9             (Recess.)
10             THE VIDEOGRAPHER:  We are back on the
11  record at 2:32.
12     Q.  (By Dr. Mittler) Okay, Dr. Rao.  We're back
13  on the record, and you're still under oath.  Do you
14  understand that?
15     **A.  Yes.**
16     Q.  Okay.  Just as a matter of bookkeeping, you
17  wrote down some calculations or the beginning of
18  calculations on the milligrams -- total milligrams of
19  cisplatin per meters squared on Mrs. Reynolds.  And
20  we're marking that, whatever you wrote down in red ink
21  in your hand, as Exhibit 10.  Do you understand that?
22     **A.  Yes.**
23             **(Exhibit 10 was marked.)**
24     Q.  (By Dr. Mittler) And do you understand that
25  this is an exhibit that your attorney can object to and

---

137

1  it's not going to appear at trial, you know, until and
2  after he gets to object?  And so -- Do you understand
3  that?
4      **A.  Please, can you explain again.**
5      Q.  Well, you understand that your attorney gets
6  to object to this exhibit marked No. 10, and any other
7  exhibit, if we try to introduce this at trial?  Do you
8  understand that?
9             THE WITNESS:  What is that about, Bill?
10             MR. WOOLSEY:  He's just -- He's just
11  telling you that -- that -- He knows that you're
12  concerned that those are incomplete calculations, so
13  he's just telling you that before that would ever go to
14  a jury, I'm going to have a chance to complain about it
15  and we'll have a chance to explain it to the jury and
16  even potentially keep it out of the jury's hands at
17  trial. He's just --
18             THE WITNESS:  Will you remember to do
19  that?
20             MR. WOOLSEY:  I have a mind like a steel
21  trap.
22             THE WITNESS:  Thank you.
23     Q.  (By Dr. Mittler) All right.  Do you
24  understand that?
25     **A.  Yes.**

---

**Koole Court Reporters of Texas**

(210) 558-3129  Fax          myreportingfirm@gmail.com          210-558-9484

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Jayasree Rao, M.D.
December 18, 2019

---

**138**

1    Q.  Okay, good.  Because I want -- I know that
2  before we came on the record you were concerned that
3  these calculations were incomplete, and I wanted to
4  assure you that we were taking that into --
5    A.  I appreciate that.
6    Q.  You know, we're concerned about your concern.
7  So, you understand that?
8    A.  I appreciate that.
9    Q.  Okay.
10    A.  Thank you.
11    Q.  Now let's move on.  I want to ask you
12  again -- To go back just to some housekeeping, I want
13  to go back to the issue of the investigation that you
14  said was conducted by CMS, or somebody on behalf of
15  CMS, about your recordkeeping.
16    A.  Yes.
17    Q.  Correct?
18    A.  (Witness nods head up and down.)
19    Q.  All right.  Is that investigation complete?
20    A.  Yes.
21    Q.  Now, you mentioned a partner who was involved
22  in that.
23    A.  No.  There was a -- There was some issues
24  with a partner before that.
25    Q.  Okay.  Was there some issues with a partner

---

**139**

1  who was a doctor?
2    A.  She was a radiation oncologist, yes.
3    Q.  Okay.  And was that doc- -- Was there an
4  issue about her medical recordkeeping?
5    A.  No.
6    Q.  It was a different issue; is that correct?
7    A.  Yes.
8    Q.  So, was that issue with the other -- with the
9  former partner, the radiation oncologist, did that also
10  involve CMS?
11    A.  It involved a lot of agencies.
12    Q.  A lot of agencies?
13    A.  (Witness nods head up and down.)
14    Q.  Okay.  What was -- What was the name of that
15  partner?
16    A.  Dr. Dahiya.
17    Q.  Dr. Dahiya?
18    A.  Uh-huh.
19    Q.  Okay.  And where does she practice now?
20    A.  I don't know.
21       DR. MITTLER:  All right.  Let me --
22  let's mark this as --
23       (Exhibit No. 11 was marked.)
24    Q.  (By Dr. Mittler)  I'm going to hand you
25  what's been marked Exhibit 11, which was a copy of an

---

**140**

1  article from that San Antonio Express-News, dated
2  November 13, 2014, by Patrick Danner.  Do you see that?
3    A.  Yes.
4    Q.  Do you recall this article when it appeared?
5    A.  Yes.
6    Q.  Okay.  This is an article about a -- It says,
7  "A new lawsuit alleges Radiation Oncology (ROSA)
8  officials are causing the 'intentional destruction of
9  the medical practice' by, in part, failing to pay for
10  cancer medications, supplies and equipment for ongoing
11  patient treatment in two of its three divisions."  Is
12  that correct?
13    A.  The lawsuit --
14    Q.  Yes.
15    A.  -- you're reading -- What you were reading is
16  correct.
17    Q.  I was reading the second paragraph there.
18    A.  Yes.  What you were reading is what was in
19  the article.
20    Q.  Okay.  And it said that the lawsuit involved
21  Radiation Oncology of San Antonio; correct?
22    A.  Yes.
23    Q.  And was that a company you owned at that
24  time?
25    A.  No.  I was --

---

**141**

1    Q.  What was your relationship to that company?
2    A.  I was just working there.
3    Q.  Well, if you read down it says -- first of
4  all, it says, "Jason Davis, ROSA's lawyer, called the
5  allegations frivolous."  Do you see that?
6    A.  Uh-huh.
7    Q.  And then it says that -- There's a quote by
8  Mr. Davis, and then it says Davis represents ROSA and
9  its co-president, Dr. Jayasree Rao, in a lawsuit
10  against Dahiya's husband, Dr. Rajiv Dahiya, who was
11  removed as the practice's president and is part owner
12  in September -- and a part owner in September.  Did I
13  read that correctly?
14    A.  Yes.
15    Q.  So, were you co-president of Radiation
16  Oncology of San Antonio?
17    A.  After all that happened.
18    Q.  So -- well, at the time of the -- Were you
19  involved in this lawsuit, at all?
20    A.  So, I was just nobody.  And we found out --
21       THE WITNESS:  Am I supposed to answer
22  this?
23       MR. WOOLSEY:  You can answer.
24       THE WITNESS:  Okay.
25    A.  So, in 2014, earlier in the year, we found

---

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Jayasree Rao, M.D.
December 18, 2019

142

1  out that our chemotherapy drugs were not being paid.
2  So, I was supposed to be a partner, but they weren't
3  showing me any records, any bank statements, nothing.
4  So, I had to find somebody who will help me get to the
5  bottom of it. So, we found out that Dr. Dahiya had
6  swindled the company of over $20 million.
7      Q.  (By Dr. Mittler)  When you say our
8  chemotherapy was not being paid, who is "our"?
9      A.  The three medical oncologists.
10     Q.  And who were you working for at the time?
11     A.  ROSA.
12     Q.  So, you -- Were you an employee of ROSA?
13     A.  Yeah.  I was a nobody.  We didn't have a
14  contract, nothing.
15     Q.  Well, if you -- Were you working at ROSA?
16     A.  Yes.
17     Q.  What was your position there?
18     A.  I was just an on- -- oncologist.
19     Q.  So, were you a staff member?
20     A.  It's just difficult to explain.  It was just
21  a very nebulous relationship.  I didn't have a
22  contract, nothing.  I was working.  We all went to
23  school together, so I just start working with them.
24     Q.  You went to school in India?
25     A.  No.  Here at UT Health Science Center.

143

1      Q.  So, who -- Who was together at UT Health
2  Science Center?
3      A.  Rajiv Dahiya and his wife.
4      Q.  The three of you?
5      A.  (Witness nods head up and down.)
6      Q.  Anybody else?
7      A.  There are two other medical oncologists, and
8  there were all these other urologists they brought in.
9      Q.  Okay.  There was also -- Wasn't there also a
10  urology company that you were a part of?
11     A.  I was not a part of it.
12     Q.  Did you ever own it?
13     A.  No.
14     Q.  You had no ownership interest?
15     A.  (Witness shakes head side to side.)
16     Q.  I'm going to ask about that.
17         So, what I'm trying to understand is you
18  were working as a doctor in Radiation Oncology?
19     A.  That was just the name of the company.
20     Q.  So, you did not have your own company then?
21     A.  No.
22     Q.  When did you form your own company, Oncology
23  San Antonio?
24     A.  That is not my company, either.
25     Q.  What is your company?

144

1      A.  Jayasree Rao, MDPA.
2      Q.  What is Oncology San Antonio?
3      A.  It's just a -- It's just a network where we
4  have a professional association so we can have a
5  discounted drug price.
6      Q.  And who -- who are the -- this entity that
7  you -- What's the name of the entity?  I'm sorry.
8      A.  ROSA?
9      Q.  No.  The entity that --
10         MR. WOOLSEY:  Oncology San Antonio.
11     Q.  (By Dr. Mittler)  Oncology San Antonio,
12  what's the --
13     A.  It is just a -- It's just a name.  There's no
14  assets.  There is nothing through that company.  No
15  employees.
16     Q.  Oncology San Antonio has no employees?
17     A.  No employees, no assets, nothing.
18     Q.  Who writes your check now?  Where do you --
19     A.  I write it myself from my MDPA.
20     Q.  So, you get a check from your MDPA?
21     A.  I don't get check.  I get direct deposit.
22     Q.  Did you disclose your MDPA in part of your
23  disclosures to us in this lawsuit?
24         MR. WOOLSEY:  I don't know the answer to
25  that.

145

1      Q.  (By Dr. Mittler)  Did you disclose the
2  existence --
3      A.  I don't --
4      Q.  -- of your MDPA as your employer?
5      A.  Why is that an employer?  I just work.  That
6  is my company.
7      Q.  Well, you get a check from your -- from MDPA,
8  don't you?  Don't you get a salary check?
9      A.  It's my earnings.
10     Q.  Well, do you file a tax -- Does the MDPA file
11  a tax return?
12     A.  Yeah.
13     Q.  All right.  Do you file a tax return?
14     A.  Yes.  When I make money I file a tax return.
15     Q.  And you get a salary check that says your
16  name MDPA; is that right?
17     A.  (Witness nods head up and down.)
18     Q.  And the patients -- does Medicare -- when you
19  bill Medicare -- we've looked at your billing
20  statements.  When you bill Medicare, is your MDPA
21  billing Medicare, or is Oncology San Antonio billing
22  Medicare?
23     A.  The Oncology San Antonio because it was -- it
24  is to get drug discounts.
25     Q.  I'm going to ask you about that in a minute.

37 (Pages 142 to 145)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

146

1          So, Medicare pays Oncology San Antonio;
2    correct?
3          **A.   It's a flow -- what do you say --**
4    **pass-through entity.**
5          Q.   It's a pass-through entity?
6          **A.   (Witness nods head up and down.)**
7          Q.   And so then the money comes where, to your
8    PA?
9          **A.   Sometimes.**
10         Q.   Well, what about -- You have other doctors
11   who practice with you, don't you?
12         **A.   No.**
13         Q.   Well, what about your website?  There's other
14   doctors listed on your website.  What's their
15   relationship to you?
16         **A.   They work there.  They all have their own**
17   **companies.**
18              DR. MITTLER:  Okay.  Mark this.  I'm
19   going to mark Exhibit No. 12.
20              (Exhibit 12 was marked.)
21         Q.   (By Dr. Mittler)  Dr. Rao, this is something
22   I printed from your -- the website of Oncology
23   San Antonio yesterday.
24         **A.   Okay.**
25         Q.   All right.  Does this look familiar to you?

147

1          **A.   This doctor is no longer in practice.**
2          Q.   Well -- well, first of all, I mean is this
3    your -- is this a website of Oncology San Antonio?
4          **A.   I don't know.**
5          Q.   Well, I mean they're -- what I'm asking you,
6    is there such a thing as Oncology San Antonio website?
7    Is that something that exists?
8          **A.   Yes, it looks like it.**
9          Q.   Okay.  And if you look at page two of this,
10   is that you?
11         **A.   Yes.**
12         Q.   Okay.  And it's a very glamorous picture.
13         **A.   But that was before the lawsuit was filed.**
14              MR. WOOLSEY:  Low-hanging fruit.
15         Q.   (By Dr. Mittler)  All right.  But that is --
16   That is you; correct?
17         **A.   Yes.**
18         Q.   Now, the next doctor is listed as Dr. Zulfi
19   Jaffar.  Am I pronouncing that correctly?
20         **A.   Yes.**
21         Q.   And is he -- it says he is a board-certified
22   medical oncologist and hematologist; is that correct?
23         **A.   I don't know.**
24         Q.   Does he practice with you?
25         **A.   No.**

148

1          Q.   Is he part of Oncology San Antonio?
2          **A.   He retired.**
3          Q.   When did he retire?
4          **A.   Before the lawsuit was filed.**
5          Q.   Well, when?
6          **A.   I'm just teasing?**
7          Q.   When did --
8          **A.   No.  He -- He retired in November 2018.**
9          Q.   Okay.  How old was he?  Do you know how old
10   he was, more or less?
11         **A.   (Witness shakes head side to side.)**
12         Q.   He looks very young.  Did he retire from
13   practice or just left this practice?
14         **A.   He retired from practice.**
15         Q.   Doesn't practice anymore anytime?
16         **A.   (Witness shakes head side to side.)**
17         Q.   Did he have to retire, do you know?
18         **A.   I don't know anything about it.**
19         Q.   Illness?
20         **A.   (Witness shakes head side to side.)**
21         Q.   Was he fired?
22         **A.   No.**
23         Q.   Is someone -- How is Oncology San Antonio
24   run?  Is there like a board?  Is there a president, a
25   vice president, a board of directors?

149

1          **A.   We all just do our own work.  We just have**
2    **billing.  Our -- It's a pass-through entity.**
3          Q.   Who super- --
4          **A.   That's it.**
5          Q.   Who supervises quality?
6          **A.   We all supervise quality for our own**
7    **practices.**
8          Q.   And who supervises the billing of Oncology
9    San Antonio?
10         **A.   I have my own billing team.**
11         Q.   Well, Oncology San Antonio bills Medicare and
12   BlueCross BlueShield, for example; correct?
13         **A.   (Witness nods head up and down.)**
14         Q.   And those were the two insurance entities
15   involved in Mrs. Reynolds' care; correct?
16         **A.   I don't know.  I know she has Medicare.**
17         Q.   Well, I'm going to represent to you that the
18   other insurance entity was BlueCross BlueShield.  All
19   right.
20              So, let's talk about Medicare.  Oncology
21   San Antonio bills Medicare; correct?
22         **A.   So, we have an NPI number.  Is it an NPI**
23   **number?  Something to bill under.**
24         Q.   Yes.
25         **A.   Yes.**

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Jayasree Rao, M.D.
December 18, 2019

---

150

1    Q.  Okay.  I understand what you're saying.  All
2    right.
3           But who does the physical billing?  Is
4    it each office?
5    A.  Yeah.
6    Q.  So, your of- --
7    A.  My practice has its own biller.
8    Q.  So, your practice bills Medicare using the
9    name Oncology San Antonio; is that correct?
10   A.  Yes.
11   Q.  And that's to get -- because you can get a
12   drug discount?
13   A.  Yes.
14   Q.  And why could Oncolo- -- Why couldn't you get
15   a drug discount just as Dr. Rao MDPA?
16   A.  There's some collective benefit.
17   Q.  What does it mean to get a drug discount?
18   Can you explain that.
19   A.  So, if you buy 100 vials of let's say
20   cisplatin, right, we'll get instead of $6.00, maybe
21   $6.50.
22   Q.  And what causes -- What gets you the
23   discount?
24   A.  The volume.
25   Q.  Oh.  So, in other words, you're saying if

---

151

1    you -- if you take three or four oncologists and put
2    their needs -- their drug needs together, you can reach
3    the volume level to get a discount; is that right?
4    A.  Yes.
5    Q.  And is that -- Does that also cause Medicare
6    to pay you more money?
7    A.  No.
8    Q.  It doesn't matter?
9    A.  (Witness shakes head side to side.)
10   Q.  How do --
11   A.  Medicare is the bottom of the barrel.  It
12   pays 80 cents on the dollar.
13   Q.  So, Medicare you say pays the least of
14   anybody?
15   A.  That's my understanding.  I'm sure Medicaid
16   is worse.
17   Q.  So, you bill under the name Oncology
18   San Antonio, but, in fact, it's each doctor's office
19   doing the billing; is that right?
20   A.  (Witness nods head up and down.)
21   Q.  So, you're responsible for your own billing;
22   is that correct?
23   A.  (Witness nods head up and down.)
24   Q.  Now, the next doctor listed is Dr. -- is it
25   Syed Raza?

---

152

1    A.  Yeah.
2    Q.  And does he practice with you?
3    A.  He does not practice with me.  He has his on
4    practice in the south side of the town.
5    Q.  All right.  So, you say you have two offices,
6    right?
7    A.  (Witness nods head up and down.)
8    Q.  Is there any other doctor with you at the
9    office?
10   A.  (Witness shakes head side to side.)
11   Q.  You're the only person.
12   A.  (Witness nods head up and down.)
13   Q.  Do you-all share call together?
14   A.  (Witness shakes head side to side.)
15         MR. WOOLSEY:  You've got to give a
16   verbal answer.
17         DR. MITTLER:  Yeah.
18         THE WITNESS:  Oh, I'm so sorry.
19   Q.  (By Dr. Mittler)  Do you-all -- how many
20   doctor -- hematologists/oncologists share emergency
21   call with you?
22   A.  Nobody.
23   Q.  You take your own call?
24   A.  I don't have anybody in the hospital.
25   Q.  Well, but patients -- patients like

---

153

1    Mrs. Reynolds can have complications or adverse
2    reactions to --
3    A.  I see my own patients.
4    Q.  -- drugs; correct?  Is that correct?
5    A.  If they have some -- something, we try to
6    take care of it as outpatient.
7    Q.  So, you're on call 24 hours a day, seven days
8    a week; is that right?
9    A.  And all my patients have my cell number, yes.
10   Q.  So, do you ever take a vacation?
11   A.  I have not in five years.
12   Q.  And before that -- Well, how long have you
13   been part of Oncology San Antonio?
14   A.  Eleven years.
15   Q.  It's eleven years?
16   A.  Not Oncology San Antonio.  It was Radiation
17   Oncology of San Antonio.
18   Q.  When was Oncology San Antonio formed?
19   A.  2016.
20   Q.  How many offices does it have?
21   A.  None.
22   Q.  The website -- Okay.
23   A.  But it is not Oncology San Antonio's offices.
24   They are my offices.
25   Q.  Well, do you have your own website?

---

Koole Court Reporters of Texas

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

154

1     A.  I've been very lazy.  I haven't done it.
2     Q.  Does Oncology San Antonio purchase liability
3  insurance?
4     A.  No.
5     Q.  You purchase your own liability insurance?
6     A.  I believe so.
7     Q.  As I recall, when I looked at the website
8  yesterday, there were four office locations listed for
9  Oncology San Antonio.  Is that accurate?
10    A.  So, I have an office in Stone Oak and
11  downtown.  Dr. Raza has an office in Mission Trails.
12  And Dr. Jaffar sold his practice to the other doctor in
13  there, and he says all his patients in Live Oak.
14    Q.  So, there are four locations?
15    A.  Yeah.  But we --
16    Q.  Two --
17    A.  But we --
18    Q.  Two belong to you; is that correct?
19    A.  They are mine, yes.
20    Q.  And your offices, are they owned?  Are they
21  buildings you own, or do you lease or rent?
22    A.  Lease and rent.
23    Q.  And so, you -- do you lease them under your
24  name, under your MDPA name or --
25    A.  Uh-huh.

---

155

1     Q.  -- under Oncology San Antonio?
2     A.  MDPA.
3     Q.  So, you personally lease those -- that office
4  space?
5     A.  (Witness nods head up and down.)
6     Q.  Is that correct?
7     A.  Yes.
8     Q.  What ever happened to Dr. Dahiya, who you
9  said stole millions from the -- what, from the
10  practice?
11    A.  (Witness nods head up and down.)
12    Q.  What happened to him?
13    A.  I don't know.
14    Q.  Was he prosecuted by anybody?
15    A.  No.
16    Q.  Did any --
17    A.  He just filed --
18    Q.  -- government entity --
19    A.  He filed --
20    Q.  Did any government --
21    A.  -- for bankruptcy.
22    Q.  Okay.  Did any government entity sue him?
23    A.  I don't know.
24    Q.  Did -- Did you recover money from him?
25    A.  No.

---

156

1     Q.  Do you know if the Department of Justice
2  investigated him, Dr. Dahiya?
3     A.  We went to the FBI.  We went everywhere.
4     Q.  Do you know if he was investigated?
5     A.  I don't know.
6     Q.  Did Medicare investigate him?
7     A.  I don't know.
8     Q.  Was your problem -- Was your problem with the
9  medical record documentation, which you've told us
10  about earlier, was that related to the problem of
11  Dr. -- that Dr. Dahiya?
12    A.  So, Dr. Dahiya, the only thing he can do to
13  make me miserable is make all these allegations and
14  have me go through audits.  That's it.
15    Q.  Okay.  Well --
16    A.  He can't do nothing else.
17    Q.  Who did he make the allegations to?
18    A.  I don't know.
19    Q.  But you were audited by CMS; is that right?
20    A.  No.  By another -- It was just an internal
21  reporting thing I had to do.
22    Q.  Are you under investigation now by any entity
23  of the federal government?
24    A.  No.  What am I being investigated for?
25    Q.  I'm just asking the question.

---

157

1          MR. WOOLSEY:  Just an inquiry.
2     Q.  (By Dr. Mittler)  What did you go to the FBI
3  and tell them about Dr. Dahiya?
4          MR. WOOLSEY:  Hold on, hold on.  I don't
5  think that a report to the FBI is something that she
6  can disclose, so I'm going to instruct her not to
7  answer that.
8          DR. MITTLER:  Okay.
9          MR. WOOLSEY:  I think that that sort of
10  thing is subject to privilege.
11         DR. MITTLER:  I don't know, but we
12  won't --
13         MR. WOOLSEY:  It's also fairly far
14  afield from what we're here today about.
15         THE WITNESS:  But if you can recover
16  money from Dr. Dahiya, that would be great.  You can
17  have it all.
18    Q.  (By Dr. Mittler)  The answer -- the question
19  is -- the lawsuit involving ROSA and Dr. Dahiya, what
20  happened to that lawsuit?
21    A.  So, Dr. Dahiya just filed that lawsuit to
22  deflect all the attention on him.  That's it.
23    Q.  Was it settled?
24    A.  He went and filed for bankruptcy, and that's
25  it.  Who had the money to run after all these things?

---

**Koole Court Reporters of Texas**
myreportingfirm@gmail.com

(210) 558-3129  Fax

210-558-9484

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Jayasree Rao, M.D.
December 18, 2019

---

158

```
1        Q.  Was the lawsuit ever -- Is it finished?  Is
2   it still pending?  What happened to it?
3        A.  No.  I bought all the lawsuits back.
4        Q.  You bought the lawsuits back?
5        A.  That's something -- You have to ask Jason
6   Davis about it.  I don't -- I don't know about all
7   these legal things.  All I know is I was screwed.
8        Q.  Is it your testimony that that lawsuit is
9   completed, it's no longer ongoing?
10       A.  Yes.
11       Q.  Is that correct?
12       A.  That is correct.
13               DR. MITTLER:  Let's mark --
14               (Exhibit 13 was marked.)
15               MR. WOOLSEY:  What are we up to on
16   numbers now?  13?
17               THE REPORTER:  13.
18               DR. MITTLER:  13.
19       Q.  (By Dr. Mittler)  I'm going to -- before we
20   deal with this next exhibit, the Express-News article
21   said the Dahiyas were "suing Scott Rickenbach, ROSA's
22   former CFO and their financial manager."  Is that an
23   accurate description of Mr. Rickenbach?
24       A.  They were all thieves and lowlifes.
25       Q.  Is Mr. Rickenbach still working in
```

---

159

```
1   San Antonio?
2        A.  I do not have any contact with him.  I hope
3   they all are having a party somewhere in hell together.
4        Q.  All right.  Let me -- let's mark -- I've
5   marked Exhibit 13, which is another something I took
6   off the Oncology San Antonio website yesterday.  Could
7   you take a look at that.
8               Did you have any control of what was
9   posted on this website?
10       A.  I don't.
11       Q.  Who put this up there?
12       A.  I don't know.
13       Q.  Was it one of the other doctors?
14       A.  I don't know.  I don't know.  This is the
15   first time I'm looking at these things.
16       Q.  Okay.  Well, I want you to look back at --
17   these are -- This is what's been posted on lung cancer
18   on this website.  Do you see that?  On the first page,
19   do you see down at the bottom it says "Personalized
20   therapy" at the bottom?
21       A.  Yep.
22       Q.  It says, "Personalized therapy:  Studies of
23   specific features of lung tumors that can determine
24   whether a certain type of chemotherapy or targeted
25   therapy may be effective."  Did I read that correctly?
```

---

160

```
1        A.  Where is that?
2        Q.  On the -- Dr. Rao, on the first page, down at
3   the bottom.  It says "Personalized therapy".
4        A.  Oh, yes.
5        Q.  Okay.  Is that referring to the genetic
6   markers, like EGFR and ALK?
7        A.  Or PD-L1 or ROS or BRAF.
8        Q.  And if you go over to the next-to-the-last
9   page, do you see at the top it says "Targeted drug
10   therapy"?
11       A.  Yep.
12       Q.  It says, "These newer cancer treatments
13   target specific abnormalities in cancer cells and work
14   by disrupting growth of new blood vessels that feed the
15   tumor or blocking the chemical signals that make the
16   tumor grow."
17       A.  Yes.
18       Q.  Did I read that correctly?
19       A.  You read that correctly.
20       Q.  And that -- And some of those chemical
21   signals, are those ALK and EGFR?
22       A.  They could be.
23               THE WITNESS:  Where is the NCCN
24   guideline?
25               DR. MITTLER:  Mark this.
```

---

161

```
1               (Exhibit 14 was marked.)
2               MR. WOOLSEY:  Thank you.
3               DR. MITTLER:  Are we at Exhibit 14?
4               THE REPORTER:  Yes.
5               THE WITNESS:  My forehead.
6        Q.  (By Dr. Mittler)  Well, Exhibit 14 is --
7               MR. WOOLSEY:  The rest of you is on the
8   second page.
9        Q.  (By Dr. Mittler)  -- something else --
10              THE WITNESS:  Oh, dear.
11       Q.  (By Dr. Mittler)  -- I took off the website,
12   the San Antonio Oncology website yesterday, and this is
13   what's listed under your name.  Have you seen this?
14       A.  I'm seeing it now.
15       Q.  All right.  And if you go over to the third
16   page, do you see that under expertise, your expertise,
17   it says -- bullet four is "Anti-EFGR Therapy".
18   Correct?
19       A.  (Witness nods head up and down.)
20       Q.  That should be EGFR; correct?
21       A.  Yep.
22       Q.  And -- and then the next-to-the-bottom --
23   The two bottom targets says "Targeted Immunotherapy"
24   and then the last one is "Targeted Molecular Therapy"
25   bullet.  Is that correct?
```

---

**Koole Court Reporters of Texas**
(210) 558-3129  Fax        myreportingfirm@gmail.com        210-558-9484

Thelma Louise Reynolds vs.                    Jayasree Rao, M.D.
Jayasree Rao, M.D., et al.                    December 18, 2019

---

162

1    A.  Yes.
2    Q.  And targeted molecular therapy would refer to
3  something like the ALK genetic marker; correct?
4    A.  In the appropriate patient, yes.
5    Q.  And then under associations at the bottom, it
6  says "American Society of Medical Oncology".  Do you
7  see that?
8    A.  Uh-huh.
9    Q.  Is that a -- is that a -- Well, what kind of
10  an organization is the American Society of Medical
11  Oncology?
12    A.  I think it's ASCO.
13    Q.  I couldn't find that organization.  When I
14  looked, I found the American Society of Clinical
15  Oncology.
16    A.  Clinical Oncology.
17    Q.  So, is that what it is?
18    A.  (Witness nods head up and down.)
19    Q.  So, the American Society -- And you're a
20  member of the American Society of Clinical Oncology?
21    A.  I was.  I am no longer a member.
22    Q.  Because earlier we looked at some guidelines
23  on treating lung cancer, from the American Society of
24  Clinical Oncology.  Do you recall that?
25    A.  That was Journal of Clinical Oncology.

---

163

1    Q.  But it was from the Society, correct?
2    A.  I don't know.  I thought it was Journal of
3  Clinical Oncology.
4    Q.  How long since -- When were you last a member
5  of the American Society of Clinical Oncology?
6    A.  I don't recall.
7        DR. MITTLER:  Well, let's put this last
8  exhibit --
9        MR. WOOLSEY:  Thank you.
10        (Exhibit 15 was marked.)
11    Q.  (By Dr. Mittler)  Exhibit 15 in front of you,
12  this is, again, part of the website of Oncology
13  San Antonio that was -- that I'd printed out yesterday.
14  You can see at the top 12/17/2019.
15        And this is under the section called
16  "WHAT TO EXPECT".  And later it says, "If You or a
17  Loved One is Facing Cancer, You're Searching for
18  Information."  Did I read that correctly on the first
19  page?
20    A.  Yes.
21    Q.  All right.  Do you see under
22  "Multidisciplinary Collaboration"?
23    A.  (Witness nods head up and down.)
24    Q.  Do you see that?
25    A.  Yes.

---

164

1    Q.  It says, "After confirming your diagnosis,
2  your oncologist will put together your team of
3  treatment specialists -- usually a surgeon, medical
4  oncologist, and radiation oncologist.  An integrative
5  oncologist is also available to help you with treatment
6  and quality of life issues.  Together, your team
7  develops a treatment plan tailored exactly to your
8  disease, lifestyle and treatment goals."  Did I read
9  that correctly?
10    A.  Yes.
11    Q.  In fact, does Oncology San Antonio have a
12  team of treatment specialists?
13    A.  We did.
14    Q.  Do you have it now?
15    A.  We work with others, yeah.
16    Q.  Well, who is your team of treatment
17  specialists?
18    A.  We work with START Center radiation
19  oncologists sometimes.
20    Q.  The START Center?
21    A.  No.  The radiation oncologists.  We have a
22  professional association.
23    Q.  Okay.  Who are those radiation oncologists?
24    A.  His name is Dr. Keith Eyre.
25    Q.  How do you --

---

165

1    A.  He's in Stone Oak.
2    Q.  How do you spell that?
3    A.  E-y-r-e.
4    Q.  Okay.  And do you have a surgeon who's part
5  of Oncology San Antonio?
6    A.  Sir, it doesn't say that.  It just says you
7  will -- we'll put together a team of treatment
8  specialists.  So, we work with surgeons.  There are
9  breast surgeons.  There are neurosurgeons.  There are
10  gastrointestinal surgeons.  There are all kinds of
11  surgeons in the community we work with.
12    Q.  So -- so, when you -- When this website talks
13  about the team of treatment specialists, this is a team
14  of specialists that you, Dr. Rao, would put together;
15  correct?
16    A.  Yeah.
17    Q.  It's not a team of specialists that exists at
18  Oncology San Antonio; right?
19    A.  I don't think it says that.
20    Q.  Well, would you agree that this might give
21  the impression, of somebody looking at Oncology
22  San Antonio, that, in fact, there was a team of
23  specialists there?
24    A.  I don't know.
25    Q.  Do you think this is truthful advertising?

---

Koole Court Reporters of Texas
(210) 558-3129  Fax          myreportingfirm@gmail.com          210-558-9484

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

166

1    A.   Sir, I didn't put this together.
2    Q.   Well, who put it together?
3    A.   I don't know.
4    Q.   But your name is there, and your picture is
5  there; correct?
6    A.   And I am sorry.  I will go and remove
7  everything today.
8         (Exhibit 16 was marked.)
9    Q.   (By Dr. Mittler)  I've handed you what's been
10 marked Exhibit 16, which is a copy of an article from
11 The Texas Tribune, by Becca Aaronson, A-a-r-o-n-s-o-n,
12 and Alexa Ura, U-r-a, dated April 14, 2014.  Are you
13 familiar with this article?
14   A.   No.
15   Q.   The article says "Medicare Data Shines Light
16 on Billions Paid to Texas Doctors".  Do you -- Do you
17 recall this issue coming up in 2014?
18   A.   I don't recall.
19   Q.   All right.  If you turn to page -- If you
20 turn to the second page of the article, do you see
21 that?
22   A.   (Witness turned to the second page.)
23   Q.   This article is a list of the -- This table
24 that you're looking at, at the top, is a list of the 20
25 doctors in Texas who were paid the most by Medicare.

---

167

1  Do you recall that issue that came up?
2    A.   Vaguely.
3    Q.   Vaguely.  And I believe you're listed as
4  No. 15 on that list, having been paid $3.33 million in
5  2012 by Medicare.
6    A.   Okay.
7    Q.   Is that accurate, that number?
8    A.   I don't know.
9    Q.   Do you recall newspaper articles about that?
10   A.   Yes.  Did you read that?
11   Q.   My question is do you recall that there were
12 newspaper articles about that, The Texas Tribune and
13 others; correct?
14   A.   I don't know about Texas Tribune.
15   Q.   All right.  What about the
16 San Antonio Express-News?
17   A.   Yes, I did give them an interview.
18        (Exhibit 17 was marked.)
19   Q.   (By Dr. Mittler)  I marked as Exhibit 17 a
20 San Antonio Express-News article, dated April 10, 2014,
21 that's -- the headline is "Two S.A. doctors are on list
22 of top Medicare payments," and then it says "Correction
23 Appended".  Do you see that?
24   A.   Yes.
25   Q.   Okay.  Do you recall this article?

---

168

1    A.   Yes.
2    Q.   All right.  And this, again, said that you
3  were paid more than $3 million by Medicare in 2012.  Is
4  that accurate?
5    A.   That's what it says.
6    Q.   And this article appeared in 2014; correct?
7    A.   I don't know.  When did it -- When was it
8  published?
9    Q.   It says at the top April 10, 2014, State
10 Edition.  Do you see that?
11   A.   Yes.
12   Q.   Was there any investigation of your billing
13 or medical record practices based on these articles?
14   A.   No.
15   Q.   Have you ever been investigated about your
16 staging of cancer patients --
17   A.   No.
18   Q.   -- whether they were staged at higher stages
19 versus lower stages?
20   A.   No.
21   Q.   The -- Have you ever been an expert witness
22 in any lawsuit?
23   A.   No.
24   Q.   Have you ever been a fact witness in any
25 lawsuit.

---

169

1    A.   What does that mean?
2    Q.   Well, have you -- Have you ever been a
3  witness in any lawsuit?
4         THE WITNESS:  What does that mean?
5    Q.   (By Dr. Mittler)  Has any -- earlier you
6  testified --
7         MR. WOOLSEY:  Have you ever testified?
8    Q.   (By Dr. Mittler)  Have you ever testified as
9  a witness in any lawsuit?
10   A.   No.
11   Q.   In the litigation involving Dr. Dahiya, you
12 were never questioned by an attorney, under oath?
13   A.   (Witness shakes head side to side.)
14   Q.   You've never --
15        MR. WOOLSEY:  You've got to say it out
16 loud --
17   Q.   (By Dr. Mittler)  What is the --
18        MR. WOOLSEY:  -- for the record.
19   Q.   (By Dr. Mittler)  Is the answer to that no?
20   A.   No.
21   Q.   No.  Okay.
22        MR. WOOLSEY:  Just so Debbie can get it
23 written down.  It will help out.
24   Q.   (By Dr. Mittler)  Now, do you own -- Again,
25 do you own any other medical businesses right now?

---

43 (Pages 166 to 169)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

170

1    A.  So, there was a company called Physomnia that
2  was formed, but it's no longer a functioning entity.
3          THE REPORTER:  How do you --
4  Q.  (By Dr. Mittler)  And what --
5          THE REPORTER:  How do you spell that?
6          THE WITNESS:  P-h-y-s-o-m-n-i-a.
7  Q.  (By Dr. Mittler)  And what did that business
8  do?
9    A.  So, we wanted all our common -- like billing
10  and all that -- to go through that kind of entity.  But
11  it didn't work out, so we have it all ourselves.
12  Q.  And when did that business end?
13    A.  It's -- it's an open -- There is still a
14  business, but there's nothing happening in there.
15  Q.  Well, when did that business stop billing for
16  your practice?
17    A.  It didn't.  It didn't ever bill.  It just had
18  all the common employees when we -- when we had all the
19  previous, you know, entities.
20  Q.  Does that business exist now?
21    A.  No.
22  Q.  It has no employees?
23    A.  (Witness shakes head side to side.)
24  Q.  When was the last time it had employees?
25    A.  I'll have to check.

---

171

1  Q.  Was it a year ago?
2    A.  (Witness shakes head side to side.)
3  Q.  Two --
4    A.  Maybe earlier than that.
5  Q.  Two years ago?
6    A.  When Dr. Jaffar left we no longer had any of
7  those kind of employees.
8  Q.  But you had other employees -- I mean you had
9  other doctors still practicing; correct?
10    A.  But we all have our own people billing and
11  all -- collections and all that.  We have it in our
12  office.
13  Q.  How many employees do you have working for
14  you?
15    A.  About 21 --
16  Q.  And these --
17    A.  -- 22.
18  Q.  These are all employees of your MDPA?
19    A.  Uh-huh.
20  Q.  And they get a check from the MDPA?
21    A.  Yes.
22  Q.  Four Seasons Hospice, are you familiar with
23  that?
24    A.  I saw some paperwork from them, yeah.
25  Q.  Do you have a neighbor who owns that?

---

172

1    A.  Who owns it?
2  Q.  Do you know who owns it?
3    A.  No.
4  Q.  Do you have any financial interest in
5  Four Seasons Hospice?
6    A.  Financial interest?
7  Q.  Yes.
8    A.  I don't have any financial interests in any
9  other except my MDPA.
10  Q.  Did you ever have a financial interest in any
11  hospice?
12    A.  Never.
13  Q.  You have been divorced how many times?
14    A.  How is that relevant to this?
15  Q.  My question is, you have been divorced how
16  many times?
17    A.  Two times.
18  Q.  Were you ever deposed in a lawsuit -- in the
19  divorce lawsuit, as a part of those -- either of those
20  divorces?
21    A.  No.
22          DR. MITTLER:  I'll just mark one more.
23          MR. WOOLSEY:  I'm going to hold you to
24  that one more.
25          DR. MITTLER:  No, I -- one more in this

---

173

1  group.  I'm sorry.
2          MR. WOOLSEY:  I -- I assumed as much.
3          DR. MITTLER:  Okay.  I'm going to mark
4  Exhibit 18.  All right.
5          (Exhibit 18 was marked.)
6  Q.  (By Dr. Mittler)  And this is, again, another
7  San Antonio Express-News article from November 17,
8  2015.  Do you see that up at the top?
9    A.  Yeah.
10  Q.  And it says "Oncologists allege loan
11  paperwork was forged".  Do you see that?
12    A.  Where does it say that?
13  Q.  In blue.  I'm sorry.  Do you see that at the
14  top of the -- at the top of the article?
15    A.  (Witness nods head up and down.)
16  Q.  Okay.  I'm sorry.  Do you see that at the top
17  of the exhibit?
18    A.  Yes.
19  Q.  Okay.  That's the headline.
20          And it says that -- It starts saying:
21  Two doctors with Radiation Oncology San Antonio say in
22  recent court filings their signatures were forged on
23  documents used to obtain a $1 million loan for the
24  practice.  The disclosures by Drs. Jaffar and Raza have
25  sparked an investigation by Frost Bank, which made the

---

**Koole Court Reporters of Texas**
(210) 558-3129  Fax          myreportingfirm@gmail.com          210-558-9484

Case 5:20-cv-00548   Document 1-2   Filed 05/04/20   Page 137 of 163

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Jayasree Rao, M.D.
December 18, 2019

**174**

1  loan last year, another court document shows. Do you
2  see that?
3      **A.  Uh-huh.**
4      Q.  Now, here's the next paragraph I want to
5  read, and I want to ask you about it.  It says, "The
6  revelations mark the latest outgrowth in a bitter feud
7  involving current and former officials of Radiation
8  Oncology San Antonio, which does business as Oncology
9  San Antonio.  It has been one of the largest oncology
10  practices in San Antonio, generating $50 million in
11  revenue in 2012, according to a court filing.  However,
12  earlier this year it shrank its operations, shuttering
13  the Urology & Prostate Institute, reportedly in an
14  attempt to stabilize the practice following financial
15  troubles."  Did I read that correctly?
16      **A.  Yes.**
17      Q.  My question is, wasn't Radiology Oncology --
18  this says Radiation Oncology San Antonio did business
19  as Oncology San Antonio.
20      **A.  It was a "doing business as".**
21      Q.  Well, you're still under the umbrella of
22  Oncology San Antonio, or not?
23      **A.  But that name wasn't taken, so we had just**
24  **formed that company later.  It was doing business as.**
25  **ROSA was doing business as Oncology San Antonio.**

**175**

1      Q.  So, the current Oncology San Antonio is a
2  different Oncology San Antonio?
3      **A.  Yes.  That name was not taken, so we were**
4  **able to get that name.**
5      Q.  And who were you practicing with at that time
6  under one umbrella?
7      **A.  ROSA.**
8      Q.  And you were, you say, just a person, just a
9  doctor who practiced there?
10      **A.  (Witness nods head up and down.)**
11      Q.  You weren't an employee?
12      **A.  I was not an officer.**
13      Q.  You didn't -- You didn't get a check from
14  ROSA; correct?
15      **A.  No.  I -- it was very -- The setup was very**
16  **different.  You know, I -- It was an S Corp or C Corp,**
17  **something like that.**
18      Q.  When was the last time that you were -- that
19  you were divorced?
20      **A.  2015.**
21      Q.  And you asked why I'm asking these questions.
22  Here's my point.  You have a very, very busy medical
23  practice; correct?
24      **A.  Yes.**
25      Q.  Is it fair to say -- Do you have hundreds of

**176**

1  patients, thousands of patients?
2      **A.  It depends.**
3      Q.  Okay.
4      **A.  But at the time you saw Mrs. Reynolds and it**
5  **was important for you to assess her stage of cancer and**
6  **whether she had any of these genetic markers, there was**
7  **all sorts of litigation swirling around you; isn't**
8  **that -- is that a fair statement?**
9          MR. WOOLSEY:  Form.
10          THE WITNESS:  What is that?
11          MR. WOOLSEY:  I made an objection to the
12  form of the question.
13          DR. MITTLER:  You can answer.
14          MR. WOOLSEY:  You can still answer.
15          DR. MITTLER:  After he objects, you can
16  answer the question.
17      **A.  I got divorced because my husband said I was**
18  **married to my job.  I worked all the time and was**
19  **away.  He was lonely, so he ran away with somebody in**
20  **his office.  Does that make you happy?**
21      Q.  (By Dr. Mittler)  Dr. Rao, what I'm saying --
22  what I'm saying is that when you're making these
23  critical decisions on Mrs. Reynolds, you have the
24  trauma of divorce, of practice partners and allegations
25  of fraud and misappropriation of funds and bankruptcy

**177**

1  and all sorts of litigations swirling around you; is
2  that not true?
3          MR. WOOLSEY:  Objection; form.
4      **A.  So, a good doctor will rise above all that.**
5      Q.  (By Dr. Mittler)  But would you not agree
6  that this puts a lot -- this put a lot of pressure on
7  you at that point in time to concentrate on your work
8  when all of this litigation --
9      **A.  I --**
10      Q.  -- was swirling around you?
11      **A.  Sir, we took very good care of Mrs. Reynolds.**
12  **She got really good care, and I stand by it.**
13      Q.  As you've looked back on your care of
14  Mrs. Reynolds and those decisions that you made in late
15  November, early December of 2015, and you've read
16  Dr. Cohen's report and you've reviewed the records and
17  some of the literature, is there anything you'd do
18  different about treating her now?
19          MR. WOOLSEY:  Form.
20      **A.  I wouldn't do anything different.**
21      Q.  (By Dr. Mittler)  You wouldn't do one thing
22  different?
23      **A.  (Witness shakes head side to side.)**
24      Q.  Do you wish you had tried harder to get
25  the --

Thelma Louise Reynolds vs.                                    Jayasree Rao, M.D.
Jayasree Rao, M.D., et al.                                    December 18, 2019

---

178

1     A. I --
2     Q. -- results of the ALK marker?
3     A. I did. I did everything appropriate to help
4  Mrs. Reynolds.
5         DR. MITTLER: I need to find where my
6  report is. I'm looking for Dr. Cohen's report. Well,
7  let's get this into evidence first.
8         (Exhibit 19 was marked.)
9     Q. (By Dr. Mittler) I'm going to hand you
10 what's been marked Exhibit 19, which is a copy of an
11 article from The New England Journal of Medicine, from
12 the December 4, 2014 issue. Do you see that?
13    A. Uh-huh.
14    Q. Have you -- Dr. Rao, have you seen this
15 article before?
16    A. Yes.
17    Q. Did you see that Dr. Cohen cited this in his
18 expert report in this lawsuit?
19    A. Yeah.
20    Q. Have you reviewed this -- this study?
21    A. Yes.
22    Q. And this study is titled "First-Line
23 Crizotinib versus Chemotherapy in ALK-Positive Lung
24 Cancer". Is that correct, the title?
25    A. Yes.

---

179

1     Q. And the conclusion of the abstract is that
2  "Crizotinib was superior to standard first-line
3  pemetrexed-plus-platinum chemotherapy in patients with
4  previously untreated advanced ALK-positive NSCLC,"
5  which stands for non-small cell lung cancer. Did I
6  read that correctly?
7     A. You read that correctly.
8     Q. Do you agree with the findings of this study?
9     A. So, the findings of the study is about
10 shortness of breathe associated with cancer. So, it
11 was just on a few of the symptoms that -- so, it
12 doesn't say you don't do chemotherapy.
13        So, the study also had an update in
14 2018. So, if you look at all the side effects --
15 Crizotinib is not Tylenol. It has lots of side effects
16 as well.
17    Q. Okay. If you'll go to the page of the
18 article 2176.
19    A. You want to review 2173 first?
20    Q. No, ma'am. I want to review 2176. Let me
21 just hand you the highlighted --
22    A. It's highlighted here.
23    Q. Do you see it?
24    A. Uh-huh.
25    Q. Do you see the lines where it says

---

180

1  "Initiating crizotinib as first-line therapy in
2  patients whose tumors test positive for ALK
3  rearrangements maximizes the probability that these
4  patients will benefit from ALK-directed therapy"? Did
5  I read that correctly.
6     A. Yeah.
7     Q. Do you agree with that statement.
8     A. I don't.
9     Q. Why not?
10    A. So, the -- There was an update on this study
11 in 2018. And if you look at it, it says that -- first
12 of all, the study design was flawed, as well. Patients
13 who were on the chemotherapy arm were allowed to
14 transfer to the crizotinib arm. But the -- At four
15 years the expected survival was 56 percent for
16 crizotinib arm versus chemotherapy was 49.6 percent.
17        So, it didn't really make any big
18 difference in overall survival. This is free survival.
19 All it was was from certain symptoms associated with
20 lung cancer.
21    Q. And do you agree that this was part of the
22 evidence used by the American Society of Clinical
23 Oncology in their expert panel recommendations that
24 were made on October 20, 2015, that we looked at in
25 Exhibit 8?

---

181

1     A. I haven't read that article. I have to -- I
2  have to read it and understand it first before I answer
3  that question.
4     Q. Has this article been retracted by the
5  authors or The New England Journal of Medicine?
6     A. It has been updated with more information.
7     Q. And is it your testimony that the updated
8  information shows that crizotinib is not the first-line
9  treatment for non-small cell lung cancer?
10    A. No. It is my testimony that there are
11 various ways to treat lung cancer, and we have to pick
12 what is appropriate for each patient at that given
13 point of time.
14    Q. And the point is that, at the point of time
15 in which you initiated treatment in Mrs. Reynolds, the
16 ALK genetic factor was known; correct?
17    A. Not to me.
18    Q. But it was known; correct?
19    A. Looking back, yes, it was known.
20    Q. And so, that was a critical factor to take
21 into account in choosing the correct therapy for
22 Mrs. Reynolds in November and December of 2015;
23 correct?
24    A. I disagree.
25    Q. (By Dr. Mittler) And it was the correct

---

46 (Pages 178 to 181)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

182

1  factor in January of 2016, in March of 2016, in June of
2  2016, all the way up until June of 2017, when she was
3  under your care; correct?
4      A.  I --
5          MR. WOOLSEY:  Form.
6      A.  -- disagree.
7      Q.  (By Dr. Mittler)  And during that whole
8  period of time, you could have obtained the results of
9  the ALK genetic factor and you didn't; did you?
10     A.  I disagree.
11     Q.  Well, the term ALK, the three letters in
12  capital, A-L-K, don't appear in your records, in other
13  words, the records you and your nurse practitioner
14  generated, anywhere; do they?
15     A.  No, because we didn't know about it.
16     Q.  Well, you didn't -- You didn't even ask about
17  it later; correct?
18     A.  We asked about it.  We don't ask every two
19  weeks when somebody says there was nothing -- there was
20  no tissue to do that.
21     Q.  But it was a critical factor when you first
22  saw Mrs. Reynolds in terms of decision-making; do you
23  agree with that?
24     A.  No, I do not.  Mrs. Reynolds got the best
25  care.

---

183

1      Q.  Well, the standard of care would have been
2  for you to write in your record ALK and EGFR are
3  important factors, EGFR is insufficient, and I can't
4  get the ALK.  You didn't even make a note of that; did
5  you?
6      A.  So, Mrs. Reynolds got the best care she
7  possibly -- possibly could have.  She got first-line,
8  second-line.  She got good treatment.  She lived a long
9  time, and we gave her excellent care.
10     Q.  And one of the reasons that Mrs. Reynolds
11  lived a long time is that you didn't have the stage
12  correct; isn't that true?
13     A.  No, that is not true.
14     Q.  In fact, Dr. Cohen said she was Stage IIB.
15     A.  Dr. Cohen is not right.
16         (Exhibit 20 was marked.)
17     Q.  (By Dr. Mittler)  I'm going to hand you
18  what's been marked Exhibit 20, and this is Dr. Cohen's
19  expert report which was appended to the lawsuit, I
20  believe, and was filled.  And you sa-- -- I think you've
21  testified multiple times that you have seen this.
22  Correct?
23     A.  (Witness turning pages of Exhibit 20.)
24     Q.  Can you turn to page four.  Well, you have
25  seen this report; is that correct?

---

184

1      A.  Yes, I have.
2      Q.  All right.  Can you turn to page four and
3  look at the bottom of the page.
4      A.  (Witness complies.)
5      Q.  Do you see there's one sentence near the
6  bottom paragraph that says, "Dr. Rao's initial note in
7  her office suggested stage IV disease"?  Do you see
8  that?
9      A.  Yes.
10     Q.  And then Dr. Cohen says, "It was known that
11  her N and M clinical staging were 0 based on a number
12  of negative PET/CT thorax and body scans.  There are no
13  extra thoracic or nodal metastases identified on her
14  scans.  I believe her initial T Stage was T3.  She
15  should have been Staged IIB.  Dr. Rao's suggestion that
16  Mrs. Reynolds had stage IV disease was not demonstrated
17  by any imaging testing, and she made no notation of
18  these test results to corroborate her conclusion about
19  disease stage."
20         Do you agree with Dr. Cohen's
21  assessment?
22     A.  I do not.
23     Q.  Why?
24     A.  Because scan after scan it has shown she had
25  bilateral upper lobe tumors, and the right-sided tumor,

---

185

1  the lesion never went away.  In fact, it got bigger
2  when we stopped the treatment.  Dr. Conde wrote in her
3  note that she has bilateral upper lobe breast -- I mean
4  lung cancer.  So, this is erroneous.  It's -- I do not
5  agree with that.
6      Q.  Well, Dr. Conde wrote her note based on your
7  notes; correct?
8      A.  Well, Dr. Conde is her own oncologist.  Why
9  would she base her findings on my note.
10     Q.  Well, Dr. Conde initially -- her initial
11  notes were based on the records that she got from you;
12  correct?
13     A.  She -- I'm sure she looked at all the scans,
14  and she has to come up with her own staging, sir.  Why
15  she -- I mean she -- you said that she was -- she did
16  her own thing.  She should have done her own thing all
17  the way.
18     Q.  Did you see that Dr. Conde termed
19  Mrs. Reynolds' cancer "bronchoalvoelar"?
20     A.  It doesn't make any difference as to what
21  treatments you give people.
22     Q.  Does bronchoalveolar cancer have a different
23  prognosis than non-small -- as a type of non-small
24  cell?
25     A.  It depends, again, on how old the patient is,

---

**Koole Court Reporters of Texas**
**myreportingfirm@gmail.com**

(210) 558-3129  Fax                                    210-558-9484

Thelma Louise Reynolds vs.                                    Jayasree Rao, M.D.
Jayasree Rao, M.D., et al.                                    December 18, 2019

---

186

1   what the -- what the stage was, and what treatments
2   they got.
3       Q.  Well, Dr. Cohen makes a point, independent of
4   Dr. Conde, that Mrs. Reynolds had bronchoalveolar
5   carcinoma.
6       A.  It doesn't change anything as far as the
7   management goes.
8       Q.  Well, if you go over to page nine, do you
9   see -- do you see there where the sentence -- the
10  paragraph that starts "Finally"?  Do you see that?
11      A.  Yep.
12      Q.  It says:  Finally, I believe Mrs. Reynolds
13  had bronchoalveolar adenocarcinoma.  This type of
14  cancer is TTF1 and CK7 positive, as was Mrs. Reynolds'
15  tumor.  Furthermore, this type of lesion is
16  slow-growing, susceptible to lepidic growth and limited
17  aggressivity.  This tumor would explain the local tumor
18  involvement, absence of extrathoracic metastases, lack
19  of significant measurable response to chemotherapy, and
20  minimal, if any, progression of tumor.  Dr. Rao failed
21  the standard of care by not seeking the pathological
22  results of a positive ALK, TTF1, and CK7 marker.
23          Do you agree with that?
24      A.  No, I do not.
25      Q.  So, Dr. Cohen is wrong when he says that a

---

187

1   bronchoalveolar adenocarcinoma with lepidic growth and
2   limited aggressivity would give Mrs. Reynolds a better
3   prognosis; correct?
4       A.  It doesn't say that.  TTF1 needs to be
5   positive to say that a cancer is lung cancer.
6       Q.  Did you --
7       A.  So, that's basic for any lung cancer.
8       Q.  Isn't it true that if Dr. Cohen is correct,
9   that Mrs. Reynolds had Stage IIB adenocarcinoma, that
10  the treatment at the time you initially saw her would
11  have been surgery, resection of the tumor in the left
12  upper lobe?  Correct?
13      A.  So -- No, this is not correct.  There would
14  be nobody in this town who would want to operate on a
15  woman with bilateral upper lobe lesions that have been
16  there for eight months.  That's a joke if somebody says
17  somebody would operate on Mrs. Reynolds at age 81 with
18  bilateral upper lobe lesions.
19      Q.  Well, the right -- The right upper lobe
20  lesion was biopsied as negative for cancer; correct?
21      A.  And so was the left upper lobe lesion
22  biopsied at one time it was negative for cancer.  That
23  doesn't mean anything, does it?
24      Q.  And what wasn't a joke was the fact that she
25  did not get crizotinib as the very first treatment for

---

188

1   an ALK-positive treatment; isn't that true -- cancer;
2   isn't that true?
3       A.  She may, you know --
4           MR. WOOLSEY:  Form.  Go ahead.  I'm just
5   objecting.
6           THE WITNESS:  Okay.
7       A.  So, she got therapy that was appropriate for
8   her cancer, she lived over one and a half years on the
9   treatments, and --
10          THE WITNESS:  I'm trying not to say it.
11  I won't say it.
12      Q.  (By Dr. Mittler)  What did you want to say?
13      A.  I'm not saying it.
14      Q.  Dr. Cohen attributed Mrs. Reynolds'
15  neuropathy to your treatment with cisplatin; correct?
16      A.  I don't know.
17      Q.  And you -- Well, did you see it in his
18  report?
19      A.  I don't -- I haven't memorized his report,
20  sir.
21          How much does Dr. Cohen get paid for
22  this kind of thing?
23          MR. WOOLSEY:  He's not going to answer
24  your questions.
25      Q.  (By Dr. Mittler)  Do you know how long

---

189

1   Dr. Cohen has practiced oncology/hematology in
2   San Antonio?
3       A.  I don't know, and I don't really care.
4           MR. WOOLSEY:  Objection; nonresponsive.
5           DR. MITTLER:  Let me just -- I want to
6   go back to -- what was that first -- Exhibit 2.  I want
7   to go back to Exhibit 4, and this is the Surgical
8   Pathology Report with your handwritten notes on it.
9   Let me see -- is there a -- We might have to do this
10  again.  Let's look at this.  Okay.  Let me -- I want
11  you to compare this with this next exhibit I'm going to
12  mark.
13          THE WITNESS:  Mr. Woolsey, can I please
14  have a copy of this?
15          (Exhibit 21 was marked.)
16      Q.  (By Dr. Mittler)  This is Exhibit 21, which
17  is the Surgical Pathology Report with the addendum at
18  the bottom, which you say is not part of your records.
19  All right.
20          But can you -- Can you direct your
21  attention down just to the second page and see when
22  this was -- do you see the addendum report there at the
23  bottom, that says "ALK analysis (FISH)?
24      A.  Yes.
25      Q.  Do you see that?

---

Koole Court Reporters of Texas
(210) 558-3129 Fax          myreportingfirm@gmail.com          210-558-9484

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

190

1    A.  Yes.
2    Q.  And FISH is the methodology they use to check
3  the ALK genetic muta- -- mutation; correct?
4    **A.  It stands for fluorescence in situ**
5  **hybridization technique.**
6    Q.  And that's a -- And that's a good technique
7  to measure ALK; correct?
8    **A.  I don't have an opinion about whether it's a**
9  **good technique or a bad technique.**
10    Q.  Well, isn't it considered in the literature
11  the gold standard to measure ALK?
12        MR. WOOLSEY:  Form.
13    **A.  There may be a different gold standard**
14  **tomorrow, and there are better drugs than crizotinib.**
15    Q.  (By Dr. Mittler)  Okay.  And then -- So, at
16  the bottom it says ALK gene arrangement detected by
17  FISH; correct?
18    **A.  Yes.**
19    Q.  And it's electronically signed by Nancy B.
20  Banks on 11/25/15, at 1:13 p.m.; correct?
21    **A.  That's what it says.**
22    Q.  All right.  And your handwritten note says
23  that you called -- or did an assistant call -- somebody
24  called from your office on December 15th; correct?
25    **A.  Uh-huh.**

191

1    Q.  And we don't know what year.  There's not a
2  year after that; correct?
3    **A.  I don't know.**
4    Q.  So, on some December 15th, there was a call
5  from your office you say to the pathologist; is that
6  right?
7    **A.  Yep.**
8    Q.  And so, all I -- all I want you to
9  acknowledge is is that whatever 12/15 it was when --
10  Let me start again.
11        I'd like you to acknowledge that
12  whatever December 15th it was when the call was made
13  from your office to the pathology lab, the ALK result
14  was, in fact, known.  Do you agree to that?
15    **A.  I don't know.  I can tell you many times**
16  **where I have to call the pathology supervisor.  You can**
17  **call Dr. Rushton and talk to her.  We call.  And this**
18  **person did something, and the other person doesn't know**
19  **what it is.  These are "send outs".  So, I can only**
20  **tell you what I know.**
21    Q.  Well, December 15th was after November 25th;
22  correct?
23    **A.  I don't know, sir.  December 15th is after**
24  **November 20th.  Yes, you are right.**
25    Q.  Okay.  So, I'm saying that the pathology lab

192

1  itself knew the results of the ALK determination prior
2  to December -- to some December 15th; correct?
3    **A.  So, there's -- There is not always a**
4  **congruency about when these tests come in and they put**
5  **it in the system.  There were doctors coming and going.**
6  **I really don't know.**
7    Q.  And is it your testimony that you don't
8  believe the standard of care required you to make a
9  notation in Mrs. Reynolds' medical chart about the
10  status of the ALK biomarker?
11    **A.  What I told you was I did call and tried to**
12  **get all the information, and I was told there was not**
13  **enough tissue to run the test.  I did everything that I**
14  **usually do for my patients before I start treatment.**
15  **And I put my -- I promised that I would take care of**
16  **her, and I took good care of her.  That's all I can**
17  **tell you.**
18    Q.  But you never -- You've never made a note in
19  the chart about the ALK marker.
20    **A.  But if I didn't know what am I going to make**
21  **a note about it.  All I can tell you is I called.**
22    Q.  Wasn't it important to make a note about
23  that --
24    **A.  That is important --**
25    Q.  -- prognostic marker --

193

1    **A.  There are many --**
2    Q.  -- so that you can --
3    **A.  -- prognostic --**
4    Q.  -- choose treatment?
5    **A.  -- markers, sir.  I've been trying to tell**
6  **you.  There are many prognostic markers.  Why didn't**
7  **she do PD-L1?  Why didn't she do ROS?  Why didn't she**
8  **do BRAF?**
9    Q.  Why --
10    **A.  Why don't you ask her?**
11    Q.  Why didn't you do PD-L1?
12    **A.  All I can tell you is at that time things**
13  **were evolving.  You cannot go back five years and**
14  **expect everything to be how it is now.  I can only work**
15  **within the confines of what pathologists and**
16  **radiologists and other doctors give me to support my**
17  **patients.**
18        DR. MITTLER:  I think this will be my
19  last --
20        MR. WOOLSEY:  Don't say it again.
21        DR. MITTLER:  I think it will be.  It
22  depends on --
23        THE WITNESS:  My baby has the flu, and
24  I've been here all day.
25        DR. MITTLER:  Okay.  I understand.  How

49 (Pages 190 to 193)

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

**194**

1  old is your baby?
2        THE WITNESS:  She's 12.
3        DR. MITTLER:  Let me give you -- this is
4  going to be the last mark -- thing I'm going to mark.
5  I want you to look at this, Bill.
6        MR. WOOLSEY:  Okay.
7        DR. MITTLER:  This is the whole -- I
8  want to mark this as Exhibit 22.
9        (Exhibit 22 was marked.)
10       THE WITNESS:  I really think it's so
11  mean to keep seeing things.
12       DR. MITTLER:  Okay.  In the interest of
13  not adding thousands of pages, I'm giving you this part
14  from it.
15       MR. WOOLSEY:  What is it?
16       DR. MITTLER:  It's the package insert on
17  Opdivo.
18       MR. WOOLSEY:  Okay.
19       DR. MITTLER:  Okay?
20       MR. WOOLSEY:  All right.
21       DR. MITTLER:  All right.
22       MR. WOOLSEY:  And so, this is just one
23  little --
24       DR. MITTLER:  Yeah.  Here, I'm giving
25  you that.

---

**195**

1       MR. WOOLSEY:  -- selected section?
2       DR. MITTLER:  Exactly.
3    Q.  (By Dr. Mittler)  Okay.  So, I'm going to
4  give you a part I'm marking as Exhibit --
5       MR. WOOLSEY:  Can you e-mail me the
6  whole thing, produce it at some point?
7       DR. MITTLER:  Yeah.
8       MR. WOOLSEY:  I'll ask for it.
9       DR. MITTLER:  Yeah.
10    Q.  (By Dr. Mittler)  So, I'm going to hand you
11  what's been marked Exhibit 22, which are selected pages
12  from the prescribing information for doctors on Opdivo.
13  And the selected pages are 1, 2, 3, and 4.  And the
14  entire document, which we will scan and produce to your
15  attorney, is a 56-page document.  And on page one it
16  says "Revised: 11/2016".  Do you see that?
17       MR. WOOLSEY:  Right here (pointing).
18    A.  I see it.
19    Q.  (By Dr. Mittler)  And you prescribed Opdivo
20  to Mrs. Reynolds; correct?
21    A.  Yes.
22    Q.  And this -- and the chemical name is what,
23  nivo- -- nivolumab?  Is that the correct name?
24    A.  Nivolumab.
25    Q.  So, it's n-i-v-o-l-u-m-a-b; correct?

---

**196**

1    A.  (Witness nods head up and down.)
2    Q.  Otherwise known as Opdivo, O-p-d-i-v-o;
3  correct?
4    A.  Yes.
5    Q.  Now, will you look -- It says "INDICATIONS
6  AND USAGE".  "OPDIVO is a programmed death receptor-1
7  (PD-1) blocking antibody indicated for the treatment of
8  patients with..."  Did I read that correctly?
9    A.  Yes.
10    Q.  And if you go down to the one, two, three --
11  fourth bullet, it says, "Metastatic non-small cell lung
12  cancer and progression on or after platinum-based
13  chemotherapy.  Patients with EGFR or ALK genomic tumor
14  aberrations should have disease progression on
15  FDA-approved therapy for these aberrations prior to
16  receiving OPDIVO."  Did I read that correctly?
17    A.  Yes, you did.
18    Q.  Now, Mrs. Reynolds did, in fact, have the ALK
19  genomic tumor aberration; didn't she?
20    A.  I didn't know it.
21    Q.  And she got Opdivo prior to having the
22  correct therapy; isn't that true?
23    A.  I didn't know it.
24    Q.  But you should have known it?
25       MR. WOOLSEY:  Form.

---

**197**

1    A.  I tried my best.
2    Q.  (By Dr. Mittler)  Why didn't you insist on
3  getting the actual printout of the addendum or lab
4  tests from -- the final lab tests from the Baptist
5  Health System laboratory on the ALK and EGFR testing?
6    A.  Dr. Miller [sic], I really loved
7  Mrs. Reynolds.  I wanted to take good care of her.  I
8  didn't do anything to harm her.  I didn't -- What can I
9  say?  I -- It was something that didn't happen, and I
10  am sorry.  I did not do anything but love her and take
11  good care of her.  I hope you believe me.
12       DR. MITTLER:  I'm going to object as
13  nonresponsive.
14    Q.  (By Dr. Mittler)  My question is why didn't
15  you get the final laboratory report on the ALK and EGFR
16  testing that was available on 11/25/15, and make it
17  part of Mrs. Reynolds' record?
18    A.  Sir, like we've been talking all day, it just
19  happened that I didn't get it.
20    Q.  Well, do you --
21    A.  I tried.
22    Q.  Do you agree if you had gotten that record
23  and seen that she was ALK genetic rearrangement
24  positive, that you would have changed your therapy?
25    A.  I wouldn't have changed my therapy.  I would

---

**50 (Pages 194 to 197)**

Thelma Louise Reynolds vs.
Jayasree Rao, M.D., et al.

Jayasree Rao, M.D.
December 18, 2019

---

**198**

1   **have still done what I did.**
2   Q.   And that was below the standard of care;
3   wasn't it?
4   **A.   It was not.  It is standard of care.**
5   DR. MITTLER:  I have no further
6   questions.  I'll pass the witness.
7   THE WITNESS:  Thank you.
8   MR. WOOLSEY:  I'll reserve.
9   THE VIDEOGRAPHER:  This concludes the
10  deposition.  We're going off the record at 3:46.
11
12  (The deposition was concluded at
13  3:46 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

---

**199**

1   CHANGES AND SIGNATURE
2   PAGE/LINE          CHANGE          REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
20  I, JAYASREE RAO, M.D., have read the foregoing
21  deposition and hereby affix my signature that same is
22  true and correct, except as noted above.
23
24          _____
25          JAYASREE RAO, M.D.

---

**200**

1   STATE OF TEXAS          )
2   COUNTY OF _____   )
3
4   Before me,_____, on this day
5   personally appeared JAYASREE RAO, M.D., known to me or
6   proved to me on the oath of _____ or
7   through _____
8   (description of identity card or other document) to be
9   the person whose name is subscribed to the foregoing
10  instrument and acknowledged to me that he/she executed
11  the same for the purpose and consideration therein
12  expressed.
13
14  Given under my hand and seal of office on
15  this _____ day of_____, 2020.
16
17
18          _____
19          NOTARY PUBLIC IN AND FOR
19          THE STATE OF TEXAS
20
21
22  My Commission Expires:
22
23
24
25

---

**201**

1   CAUSE NO. 2018-CI-13942
2
2   THELMA LOUISE REYNOLDS,   §   IN THE DISTRICT COURT
3                             §
3   Plaintiff,    §
4                             §
4   vs.                       §
5                             §   BEXAR COUNTY, TEXAS
5                             §
6   JAYASREE RAO, M.D. and     §
6   ONCOLOGY SAN ANTONIO      §
7   CANCER CENTER NETWORK,    §
7                             §
8   Defendants.    §   45TH JUDICIAL DISTRICT
9
9   ***********************************************
10
10  REPORTER'S CERTIFICATE
11
11  ORAL AND VIDEOTAPED DEPOSITION
12               OF
12       JAYASREE RAO, M.D.
13
13  DECEMBER 18, 2019
14
14  ***********************************************
15
15  I, Deborah A. Koole, Certified Shorthand Reporter
16  in and for the State of Texas, hereby certify to the
17  following:
18
18  That the witness, JAYASREE RAO, M.D., was duly
19  sworn and that the transcript of the deposition is a
20  true record of the testimony given by the witness;
21
21  That the deposition transcript was duly submitted
22  on _____ to the witness or to the
22  attorney for the witness for examination, signature,
23  and return to me by _____;
24  That a copy of this certificate was served on all
25  parties shown herein on_____.

---

**Koole Court Reporters of Texas**
myreportingfirm@gmail.com

(210) 558-3129  Fax

210-558-9484

**Thelma Louise Reynolds vs.**
**Jayasree Rao, M.D., et al.**

**Jayasree Rao, M.D.**
**December 18, 2019**

---

202

1    That pursuant to information given to the
deposition officer at the time said testimony was
2    taken, the following includes all parties of record and
the amount of time used by each party at the time of
3    the deposition:
4    Brant Mittler, Counsel for Plaintiff      (4:20)
5    Jon Powell, Counsel for Plaintiff       (0:00)
6    William C. Woolsey, Counsel for Defendants  (0:00)
7
8    I further certify that I am neither counsel for,
related to, nor employed by any of the parties in the
9    action in which this proceeding was taken, and further
that I am not financially or otherwise interested in
10   the outcome of this action.
11
     Further certification requirements pursuant to
12   Rule 203 of the Texas Code of Civil Procedure will be
complied with after they have occurred.
13
14   Certified to by me on this 6th day of January,
2020.
15
16
17   Deborah A. Koole, CSR
Texas CSR #6699, Expires 1/31/2021
18
19   Koole Court Reporters of Texas
Firm Registration No. 413
20   8000 I-10 West, Suite 600
San Antonio, TX 78230
21   (210) 558-9484
(210) 558-9484  Fax
22   myreportingfirm@gmail.com
23
24
25

---

203

1    FURTHER CERTIFICATION UNDER TRCP RULE 203
2
3    The original deposition was/was not returned to
the deposition officer on _____.
4
5    If returned, the attached Changes and Signature
page(s) contain(s) any changes and the reasons
6    therefor.
7
     If returned, the original deposition was delivered
8    to Jon Powell and Brant Mittler, Custodial Attorneys.
9
     $ _____ is the deposition officer's
10   charges to Plaintiff for preparing the original
deposition and any copies of exhibits;
11
12   The deposition was delivered in accordance with
Rule 203.3, and a copy of this certificate, served on
13   all parties shown herein, was filed with the Clerk.
14
     Certified to by me on this _____ day of
15   _____, 2020.
16
17
18   Deborah A. Koole, CSR
Texas CSR #6699
19   Expiration:  1/31/2021
20   Koole Court Reporters of Texas
Firm Registration No. 413
21   8000 I-10 West, Suite 600
San Antonio, TX 78230
22   (210) 558-9484
(210) 558-9484  Fax
23   myreportingfirm@gmail.com
24
25

---

52 (Pages 202 to 203)

# Exhibit F.

# Texas Tribune article titled "Medicare Data Shines Light on Billions Paid to Texas Doctors."



# Medicare Data Shines Light on Billions Paid to Texas Doctors

Texas doctors who treat **Medicare** patients earned a combined $4.6 billion from the federal insurer of the elderly in 2012, with the state's ophthalmologists and oncologists raking in the most.

BY **BECCA AARONSON** AND **ALEXA URA**    APRIL 14, 2014    6 AM



Graphic by Todd Wiseman / Carlos Paes / Becca Aaronson



EXHIBIT
Rao - 16
12-18-19    DK

Texas doctors who treat Medicare patients earned a combined $4.6 billion from the federal insurer of the elderly in 2012, with the state's ophthalmologists and oncologists raking in the most, according to detailed data from the federal Centers for Medicare and Medicaid Services (CMS).

The massive data set, which was released last week, casts light for the first time on the money Texas doctors make for treating the state's more than 3 million Medicare beneficiaries. It lists names of physicians, the cities in which they practice, the type and number of health care services they provided and the average charges for particular services, among other details.

The data show that 342 Texas doctors were each paid more than $1 million by Medicare in 2012. The 20 doctors paid the most by Medicare that year — from a Tyler ophthalmologist who received $6.8 million to a rheumatologist from the same city who was paid $3.1 million — earned a combined $79.5 million from the federal program that year.

| Physician | Specialty | City | Medicare Payments |
|---|---|---|---|
| Thomas Bochow | Ophthalmology | Tyler | $6.82 million |
| Reuben Elovitz | Internal Medicine | Dallas | $5.07 million |
| Harshivinderjit Bains | Ophthalmology | Tyler | $4.52 million |
| Russell Lam | Vascular Surgery | Dallas | $4.46 million |
| Sanjay Mehta | Radiation Oncology | Houston | $4.29 million |
| William Decker | Ophthalmology | Houston | $4.28 million |
| Alex Ehsan | Medical Oncology | Sherman | $4.22 million |
| Darren Kocs | Hematology/Oncology | Round Rock | $4.04 million |
| Matthew Benz | Ophthalmology | Houston | $4.03 million |
| Constantine Saadeh | Allergy/Immunology | Amarillo | $3.93 million |
| Tien Wong | Ophthalmology | Houston | $3.77 million |
| Thanh Van | Diagnostic Radiology | Houston | $3.61 million |
| Peter Lanasa | Radiation Oncology | Arlington | $3.52 million |
| Ricardo Cigarroa | Internal Medicine | Laredo | $3.48 million |
| Jayasree Rao | Hematology/Oncology | San Antonio | $3.33 million |
| James Petrikas | Radiation Oncology | Paris | $3.26 million |
| Jason Ysasaga | Ophthalmology | Amarillo | $3.25 million |
| Basel Dabas | Medical Oncology | Live Oak | $3.24 million |
| Antonio Aragon | Ophthalmology | Amarillo | $3.23 million |
| William Brelsford | Rheumatology | Tyler | $3.16 million |

Created with Datawrapper    Source: Centers for Medicare and Medicaid Services, Get the data

The Texas Tribune thanks its sponsors. **Become one.**

Federal officials touted the release of the data as a step toward increased transparency in Medicare. But it was met with anxiety by health care professionals and medical associations that had fought the disclosure in court for decades until a federal court ruled last year that the information should be public.

Opponents have argued that the data could be misleading because the total payments to doctors could be interpreted as physicians' take-home pay. They argue it doesn't reveal what physicians and medical practices apply to their overhead costs, including drug treatments with hefty price tags and staff salaries.

The Texas Medical Association opposed the release of the data, President Stephen Brotherton said, arguing that it does not help patients assess their doctors and instead might leave them with questions.

The data release comes with some big caveats. For example, doctors and health care providers are differentiated in the data by their "national provider identifier" — a unique code number. But Medicare payments assigned to these identifiers may include claims for services provided by other health care professionals physicians oversee, like medical residents or assistants.

That was the case with the second-highest recipient of Medicare dollars in Texas in 2012. Dr. Reuben Elovitz, an internal medicine specialist in Dallas, was paid $5.1 million by Medicare. A spokeswoman for the doctor said that included reimbursements for services provided by several health care professionals that were filed under Elovitz's identifier while he was medical director of a Baylor University Medical Center laboratory.

The Texas Tribune thanks its sponsors. **Become one.**

Other doctors attributed their high reimbursements to costs associated with the drugs they provided to patients to treat costly medical conditions. June Cheatham, the practice administrator for Dr. Thomas Bochow, a retinal specialist in Tyler who was paid more by Medicare than any other Texas doctor in 2012, said the $6.8 million the physician received was mostly used to cover costs associated with expensive drugs he uses to treat age-related macular degeneration.

"He's not out there trying to gather Medicare dollars," she said. "He's trying to help patients retain their vision."

Indeed, more than a third of the 20 Texas doctors paid the most by Medicare in 2012 specialized in ophthalmology.

(Use this sortable table to see how much Medicare paid Texas providers by specialty in 2012. Providers who reported more than one specialty were classified by CMS by the specialty they most commonly billed under. Additionally, medical services that were provided fewer than 11 times were removed from the data altogether to protect patient confidentiality.)

| Specialty | Number of Providers | Total Medicare Payments (millions) ▲ | Average Paid per Provider | Maximum Paid to a Provider |
|---|---|---|---|---|
| Internal Medicine | 4,995 | $602.14 M | $120,549 | $5,070,967 |
| Cardiology | 1,435 | $418.00 M | $291,288 | $2,171,679 |
| Ophthalmology | 1,059 | $372.27 M | $351,529 | $6,823,316 |
| Family Practice | 5,565 | $352.06 M | $63,263 | $1,554,999 |
| Diagnostic Radiology | 1,923 | $214.82 M | $111,709 | $3,614,957 |
| Nephrology | 643 | $187.11 M | $290,996 | $2,930,625 |
| Hematology/Oncology | 434 | $183.97 M | $423,898 | $4,040,761 |
| Emergency Medicine | 2,402 | $151.20 M | $62,946 | $1,837,077 |
| Orthopedic Surgery | 1,365 | $146.92 M | $107,631 | $960,381 |
| Dermatology | 680 | $141.96 M | $208,766 | $2,833,000 |
| Radiation Oncology | 281 | $138.18 M | $491,740 | $4,287,451 |
| Pulmonary Disease | 517 | $108.05 M | $208,988 | $1,622,639 |

A spokeswoman for Dr. William Brelsford, a rheumatologist from Tyler who received $3.2 million from Medicare in 2012, said his practice accrues about $1 million in debt purchasing drugs to treat Medicare patients with arthritis before receiving reimbursements from the federal program.

Seven oncologists — doctors who treat cancer patients — were also among the 20 Texas doctors paid the most by Medicare in 2012. Oncology was a top field for doctors reporting hefty Medicare payments.

Several of the top-grossing doctors — including Drs. Alex Ehsan and Darren Kocs, who both received more than $4 million from Medicare in 2012 — both work for Texas Oncology, one of the largest cancer treatment providers in Texas with offices statewide.

The Texas Tribune thanks its sponsors. **Become one.**

"Because many cancer patients are seniors, it's no surprise that payments for cancer treatment are significant for Medicare," said Ed Bryson, a Texas Oncology spokesman. "We support greater transparency, but the Medicare data released yesterday, without context, does not provide meaningful insight into costs per physician."

Bryson added that the data did not account for the number of patients physicians treat and the type and stage of their cancer, among other costly aspects of treating such patients.

The CMS data released also includes payments made to other service providers in Texas like hospitals, ambulance providers and nursing homes, which received hundreds of millions of dollars in Medicare payments combined in 2012 for services like hospitalization, emergency room visits and nursing care.

Texas physicians received a combined $785 million in Medicare payments in 2012 for a basic service: "office visit with an established patient."



| | |
|---|---|
| Office visit (established patient) | $789 million |
| Subsequent hospital care | $418 million |
| Initial hospital care | $181 million |
| Office visit (new patient) | $152 million |
| Cataract surgery (IOL insertion) | $137 million |
| Emergency department visit | $130 million |
| Ambulance and medical transfer | $113 million |
| Tissue exam by pathologist | $92 million |
| Subsequent nursing facility care | $75 million |
| Eye exam & treatment | $66 million |
| Critical care first hour | $62 million |

Created with Datawrapper          Source: Centers for Medicare and Medicaid Services, Get the data

The data release could lead to increased scrutiny of physicians who are already under the microscope by federal and state watchdogs of waste and fraud in government-subsidized health services.

In a press call last week, CMS Principal Deputy Administrator Jonathan Blum said federal officials were seeking help from the public, health care researchers and reporters to identify spending "that doesn't make sense" or appears to be fraudulent.

In December, the U.S. Office of Inspector General, which investigates possible fraud and abuse for the U.S. Department of Health and Human Services, recommended that physicians who file the highest reimbursement claims to Medicare be scrutinized.

In Texas, where some providers are already on edge about what could trigger an investigation, the data could be used by the state's Office of Inspector General, which recently increased efforts to investigate possible fraud among physicians who treat poor children and disabled patients covered by Medicaid.

Stephanie Goodman, a spokeswoman for the Texas Health and Human Services Commission, said her office is still considering ways in which the data may be used, particularly when it comes to Texans who are eligible for both Medicaid and Medicare.

"It will help our researchers with an analysis of care coordination for our dual-eligible population," Goodman said in a statement. "And it gives OIG a more complete picture of a provider's operations."

*This story was produced in partnership with Kaiser Health News, an editorially independent program of the Henry J. Kaiser Family Foundation, a nonprofit, nonpartisan health policy research and communication organization not affiliated with Kaiser Permanente.*

*Disclosure: The Texas Medical Association and the Baylor Health Care System are corporate sponsors of The Texas Tribune. Texas Oncology was a corporate sponsor of The Texas Tribune in 2012. A complete list of Texas Tribune donors and sponsors can be viewed here.*

## Quality journalism doesn't come free

At a time when newsroom resources and revenue across the country are declining, The Texas Tribune remains committed to sustaining our mission: creating a more engaged and informed Texas with every story we cover, every event we convene and every newsletter we send. As a nonprofit newsroom, we rely on members to help keep our stories free and our events open to the public. Do you value our journalism? Show us with your support.

**YES, I'LL DONATE TODAY**



**Donate**
Contact Us
Advertise
© 2019 The Texas Tribune

**TOPICS**
Congress
Courts
Criminal justice
Demographics
Economy
Energy
Environment
Health care
Higher education
Immigration
Politics
Public education
State government

**INFO**
About Us
Our Staff
Who Funds Us?
Strategic Plan
Republishing Guidelines
Code of Ethics
Terms of Service
Privacy Policy
Send us a confidential tip
Corrections
Feeds
Newsletters
Podcasts
Video

**SOCIAL MEDIA**
Facebook
Twitter
YouTube
Instagram
LinkedIn
Reddit

Join our Facebook Group, This Is Your Texas.

# Exhibit G.

# San Antonio Express-News article titled "Two S.A. doctors are on list of top Medicare payments – Correction Appended."

## Two S.A. doctors are on list of top Medicare payments - Correction Appended

San Antonio Express-News

April 10, 2014 Thursday, STATE EDITION

⚑ **Correction Appended**

Copyright 2014 San Antonio Express-News All Rights Reserved

**Section:** A SECTION; A; Pg. 1

**Length:** 788 words

**Byline:** Peggy O'Hare

## Body

For the first time, the federal government has released the names of physicians who received the biggest payments from Medicare in a single year - and two local cancer doctors are on the list.

Dr. *Jayasree Rao* at Oncology San Antonio and Dr. Basel Dabas at Dabas Cancer Institute each were paid more than $3 million by Medicare in 2012, according to data released Wednesday by the Centers for Medicare and Medicaid Services.

Rao attributed her billing and reimbursement figures to the high cost of new drugs for late-stage cancer treatments and to the number of geriatric patients she sees.

Rao and Dabas - who do not practice together - were among just 23 physicians in Texas and 344 nationwide to collect at least $3 million from Medicare that year, according to an Associated Press analysis of the physician data. But they hardly were the top earners.

A Florida ophthalmologist, Dr. Salomon Melgen, was paid nearly $21 million by Medicare in 2012, reaping more money from the government program that year than any other physician in the nation, the AP's analysis found. And the Texas physician who raked in more Medicare dollars than any other doctor in the state was Dr. Reuben J. Elovitz, who practices internal medicine in Dallas. He collected more than $5 million, federal data showed. *** SEE CORRECTION ***

Federal officials heralded the unprecedented release of Medicare data as a step toward transparency. The information, containing billing and payment data for 825,000 physicians nationwide, will give consumers, researchers and policymakers more insight into health care spending and physician practices, said U.S. Health and Human Services Secretary Kathleen Sebelius.

Susan Stanley



EXHIBIT

Rao - 17

12-18-19    DK

The data allow consumers to compare prices and reimbursements among physicians, medical specialties, local markets and specific types of medical procedures.

Rao, a hematologist and oncologist with offices in the Stone Oak area and in downtown San Antonio, was paid $3.3 million by the government program for services provided to 536 Medicare beneficiaries, the data showed.

While she billed Medicare more than $8.4 million for care she provided to her patients in 2012, her payment covered only about 40 percent of those costs.

Because she's also a geriatric oncologist, Rao noted she takes on a heavier caseload of older patients than do some doctors. She said many physicians do not accept Medicare patients, which might increase the number of older patients in her care.

Although Rao was paid more than $3 million by Medicare that year, she said, "it doesn't mean that's my income. It means that's what we collected. We have such huge overhead. ... Our overheads have gone up every year."

Prices of some cancer drugs have skyrocketed, and newer drugs approved to treat the most advanced cancers, such as Stage 4 illnesses, cost far more than generic medications, Rao said.

Medicare typically doesn't adjust reimbursement rates for such price increases for about six months, she said.

"For Stage 4 cancers, all the new drugs on the market are very expensive. ... So those are the ones that increase our billing," Rao said. "Billing doesn't always equate to profit.

"People are living longer (with) Stage 4 cancer with all these new drugs. ... We do what's right for the patient."

Dabas - an oncologist with offices in Live Oak, New Braunfels and Seguin - received $3.2 million from Medicare in 2012 for services he provided to 751 Medicare beneficiaries, the federal data showed. He had billed Medicare more than $14.3 million, meaning he recouped about 23 percent of those costs.

Dabas had no comment on the Medicare report Wednesday, an employee at his Live Oak office said. He did not respond to a message left by the San Antonio Express-News.

Rao has practiced in San Antonio for nine years and is one of a dozen physicians at Oncology San Antonio, the practice's website states. She specializes in treating breast cancer, genitourinary cancers and gastrointestinal cancers.

She notes that her patients have good survival rates. She also said their hospitalization rates are less than 1 percent, since her practice provides advanced hands-on care.

Rao said her office also has staff dedicated to finding financial assistance for patients unable to pay their out-of-pocket costs since Medicare covers only 80 percent of the medical bills. Rao's office raised almost $800,000 one year from foundations to help patients pay their share of bills not covered by Medicare, she said.

Susan Stanley

Dabas has practiced in San Antonio since 1997 and opened the cancer institute bearing his name in 2002, his website states.

*The Associated Press contributed to this report.*

To see a map showing top doctors by state receiving the most in Medicare reimbursements, go to ExpressNews.com.

## Correction

SETTING IT STRAIGHT: Dr. Thomas Bochow, an ophthalmologist in Tyler, received the biggest Medicare reimbursement, more than $6.8 million, among all physicians in the state in 2012. This story had incorrect information. 20140411

**Correction-Date:** April 10, 2014 Thursday

**Load-Date:** April 11, 2014

End of Document

Susan Stanley

 **LexisNexis**°

**User Name:** Susan Stanley
**Date and Time:** Friday, November 15, 2019 9:11:00 AM CST
**Job Number:** 102986564

## Document (1)

1. _Two S.A. doctors are on list of top Medicare payments - Correction Appended_
   **Client/Matter:** -None-
   **Search Terms:** Jayasree w/3 Rao
   **Search Type:** Terms and Connectors
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | News | -None- |

# Exhibit H.

# San Antonio Express-News article titled "More Troubles at S.A. Oncology Practice."

BUSINESS // LOCAL BUSINESS

# More troubles at S.A. oncology practice

**Patrick Danner** | Nov. 13, 2014

Radiation Oncology San Antonio's troubles are widening.

A new lawsuit alleges Radiation Oncology (ROSA) officials are causing the "intentional destruction of the medical practice" by, in part, failing to pay for cancer medications, supplies and equipment for ongoing patient treatment in two of its three divisions.

"Patient care is in jeopardy," alleges the suit, which was brought on behalf of the company as a shareholder derivative action by Dr. Marta Dahiya, a radiation oncologist at ROSA. The suit was filed Thursday in Bexar County District Court.

Jason Davis, ROSA's lawyer, called the allegations frivolous.

"My client will show that those reckless allegations are untrue," Davis said. "At the appropriate time, the defendants are going to seek dismissal of this suit and appropriate remedies for filing a frivolous" action.

Davis represents ROSA and its co-president, Dr. Jayasree Rao, in a lawsuit against Dahiya's husband, Dr. Rajiv Dahiya, who was removed as the practice's president and a part-owner in September. Rajiv Dahiya is alleged to have "misappropriated hundreds of thousands of dollars, if not millions" from ROSA to support his various "investment schemes and extravagant lifestyle." He remains at ROSA treating patients.

Rajiv Dahiya joined his wife as a plaintiff in the latest lawsuit, alleging Rao has made defamatory statements about his character and reputation in the medical field.

Together, the Dahiyas also are suing Scott Rickenbach, ROSA's former CFO and their financial manager. He's accused of abusing both positions "to divert and steal hundreds of thousands of dollars, if not millions, leaving the Dahiyas in financial distress." Neither Rickenbach nor his lawyer responded to a request for comment.



The lawsuit seeks unspecified financial and punitive damages against the various defendants.



SUBSCRIBE     Sign In

Marta Dahiya alleges Rao, Jaffar and Raza have "engaged in a systematic campaign" to tank two ROSA divisions — Radiation Oncology and the Urology & Prostate Institute. The three doctors work for ROSA's other division, Medical Oncology, the suit adds.

The suit alleges the trio are "financially starving" the two divisions "through the misallocation of expenses and the creation of artificial losses." The actions have resulted in a "mass exodus of physicians and other medial providers who mostly worked" in the two divisions, it adds.

Davis, who said he hadn't read the lawsuit in detail, disputed the charges.

"Far from destroying the company, the current management has done everything they can to address the problems that were caused by the former management — including putting in their own funds," Davis said. He is a partner with Davis & Santos.

Meanwhile, the Dahiyas say they and ROSA were the victims of Rickenbach's "elaborate and sometimes desperate schemes to support his lifestyle, cover ups of misdeeds, and substantial gambling debts."

Rickenbach appears on various online betting sites as a tout — someone who charges for his betting selections on sporting events. He calls himself "The Bulldog."

In their lawsuit against Rajiv Dahiya, ROSA and Rao allege that he made unauthorized transfers totaling more than $1 million from ROSA to four companies owned or controlled by him and Rickenbach.

Rickenbach, in a sworn affidavit attached with the lawsuit, outlined various alleged misdeeds by Rajiv Dahiya. Among them: That the doctor used a ROSA-issued black American Express card for non-company expenses, which sometimes exceeded $100,000 a month. ROSA and Rao's lawsuit was filed in September.

But the Dahiyas, in their suit, claim that Rickenbach was using their money and ROSA's funds "to hide and cover up losses and shortfalls in bank accounts controlled by Rickenbach but in the name of the Dahiyas as well as ROSA."

"As the facts unfold, it will be clear that the allegations raised against Dr. (Rajiv) Dahiya were actually instigated and implemented by Rickenbach," said Gay Gueringer, the Dahiyas' lawyer. She is a partner in the firm Richie & Gueringer.

# Exhibit I.

# San Antonio Express-News Article titled "Oncologists allege paperwork was forged."

## Oncologists allege loan paperwork was forged

San Antonio Express-News

November 17, 2015 Tuesday, STATE EDITION

Copyright 2015 San Antonio Express-News All Rights Reserved

**Section:** A SECTION; A; Pg. 1

**Length:** 849 words

**Byline:** Patrick Danner

## Body

Two doctors with Radiation Oncology San Antonio say in recent court filings their signatures were forged on documents used to obtain a $1 million loan for the practice.

The disclosures by Dr. Zulfaqqar Jaffar and Dr. Syed Raza have sparked an investigation by Frost Bank, which made the loan last year, another court document shows.

The revelations mark the latest outgrowth in a bitter feud involving current and former officials of Radiation Oncology San Antonio, which does business as Oncology San Antonio. It has been one of the largest oncology practices in San Antonio, generating $50 million in revenue in 2012, according to a court filing. However, earlier this year it shrank its operations, shuttering the Urology & Prostate Institute, reportedly in an attempt to stabilize the practice following financial troubles.

Litigation erupted in state District Court last year but landed in U.S. Bankruptcy Court in San Antonio two months ago following the Chapter 7 liquidation filing of Scott Rickenbach, who was Radiation Oncology's chief financial officer at the time Frost Bank made its loan. He was terminated in September 2014.

Rickenbach was a "key figure" in negotiating the loan and was "responsible for obtaining certain signatures on some of the loan documents," including personal guarantee agreements to be signed by Jaffar and Raza, Frost Bank states in an Oct. 12 court filing.

Radiation Oncology defaulted on the note in May - owing all but about $10,500 of the $1 million, Frost Bank alleges in an Aug. 21 lawsuit seeking to get the loan paid. Jaffar and Raza each responded in separate court filings that Frost Bank's claims were "barred" because of the forgeries.

William Kingman, an attorney or Jaffar and Raza, said his clients don't know who signed their names on the loan documents.

"They were unaware of the guarantees until well after the fact," Kingman said.

Susan Stanley



EXHIBIT

Rao-18

12-18-19    DK

In its court filing in the Rickenbach case, Frost Bank asked the court for more time to investigate the forgery contentions to determine if it may have have a potential claim in the bankruptcy. The court gave the bank until Dec. 21.

Rickenbach and his bankruptcy lawyer, Michael O'Connor, didn't respond to a request for comment. Rickenbach and wife listed assets of $500,000 and liabilities of about $769,000 in the bankruptcy.

Robert Barrows, Frost Bank's attorney, also didn't return a phone call.

Frost Bank also named in its lawsuit former Radiation Oncology President Dr. Rajiv Dahiya and his wife, Dr. Marta Dahiya, who was a shareholder. Their names were on the loan documents, as well. The couple, however, were dropped from the suit on Thursday - two days after they filed for Chapter 7 bankruptcy. The pair has yet to file a list of their assets and liabilities.

The Dahiyas' bankruptcy lawyer, Eric Taube, didn't respond to a request for comment.

In September 2014, Radiation Oncology and its co-president, Dr. ***Jayasree Rao***, sued Dr. Rajiv Dahiya alleging he "misappropriated hundreds of thousands of dollars, if not millions" from the practice to support his "investment schemes and extravagant lifestyle." Dahiya is accused of having made unauthorized transfers - unrelated to the practice - totaling more than $1 million to four companies owned or controlled by him and Rickenbach. The plaintiffs also allege that Dahiya is responsible for the practice's losses. Dahiya has disputed the allegations.

Less than two months later, Marta Dahiya filed a shareholder derivative action against Rao , Jaffar, Raza and Rickenbach alleging the "intentional destruction" of Radiation Oncology. In an amended compliant, Marta Dahiya alleged Rao was successful in "sinking" the practice's Urology division. A lawyer for Radiation Oncology previously called the allegations "reckless."

Marta Dahiya also alleged Rickenbach, whom she described as her and her husband's "trusted financial manager," abused his position to "divert and steal hundreds of thousands of dollars, if not millions, leaving the Dahiyas in financial distress." Rickenbach, for his part, accused Rajiv Dahiya of various wrongdoing.

The disputes have "gotten uglier and more acrimonious everyday," Ronald Johnson, a lawyer for Radiation Oncology, told U.S. Bankruptcy Judge Craig Gargotta during a court hearing Friday. "The parties in this litigation have spent in excess of $300,000 (in litigation costs), and there's nothing but blood and tears to show for it to date. I think whatever happens will be a very Pyrrhic victory."

With the Dahiyas' bankruptcy filing, any litigation claims they have are now owned by the Chapter 7 trustee. It will be up to the trustee to decide whether he wants to pursue those claims.

Meanwhile, Amegy Bank last month entered into an agreed judgment of $520,000 with Radiation Oncology and the Dahiyas related to four business loans the practice defaulted on. The Dahiyas had guaranteed the loans, Amegy said in lawsuit filed in July.

Separately, Amegy in August entered into an agreed judgment for about $250,000 with Rajiv Dahiya after it alleged he failed to pay back two loans.

Susan Stanley

 **LexisNexis**

**User Name:** Susan Stanley
**Date and Time:** Friday, November 15, 2019 9:13:00 AM CST
**Job Number:** 102986822

## Document (1)

1. _Oncologists ellege loan paperwork was forged_

   **Client/Matter:** -None-

   **Search Terms:** Jayasree w/3 Rao

   **Search Type:** Terms and Connectors

   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | News | -None- |

**LexisNexis** | About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © 2019 LexisNexis

Susan Stanley